**THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF NURSE PRACTITIONERS, *et al.*, | |
| *Plaintiffs*, | No. 1:26-cv-1780 (BAH) |
| v. | |
| LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education, et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
STAY UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

The Working Families Tax Cuts Act .................................................................................. 2

Reimagining and Improving Student Education ................................................................. 5

This Litigation.................................................................................................................... 10

LEGAL STANDARD......................................................................................................... 12

ARGUMENT...................................................................................................................... 12

I.      Plaintiff Have Not Established a Likelihood of Success on the Merits........................... 13

        A.      The Rule's Effective Date Is Not Contrary To Law. ........................................... 13

        B.      The Rule's Definition of Professional Degree Is Not Contrary To Law. ............. 16

II.     Plaintiffs Have Failed To Establish Article III Standing, Much Less Irreparable Harm.. 24

        A.      Plaintiffs Fail To Identify Irreparable Harm To Any Individual Member............ 25

        B.      Plaintiffs Fail To Identify Irreparable Harm To Their Organizations Or Institutional
                Members. ...................................................................................................... 28

III.    The Balance Of Equities And The Public Interest Weigh Against A Stay....................... 31

IV.     Any Relief Should Be Appropriately Limited. ................................................................ 32

        A.      Any Stay Should Be Limited To The Relevant Portions Of The Rule................. 32

        B.      The Court Should Not Enjoin Defendants From Enforcing The Unchallenged
                Statute. ......................................................................................................... 33

        C.      Any Relief Should Be Limited To Plaintiffs And Their Members Who Have
                Demonstrated Standing................................................................................. 37

V.      If The Court Enjoins Defendants From Enforcing The Statute, The Court Should Issue a
        Stay Pending Appeal And Require Plaintiffs To Post Security ....................................... 38

CONCLUSION................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ................................................................................................................ 31

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020)................................................................................................ 25

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006)................................................................................................ 26

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
3 F.4th 373 (D.C. Cir. 2021) .................................................................................................. 32

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005)................................................................................................ 25

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015).................................................................................................. 29

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ................................................................................................................ 34

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018)..................................................................................... 15, 33

*Bowen v. Kendrick*,
483 U.S. 1304 (1987) .............................................................................................................. 33

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ................................................................................................................ 20

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*,
344 F. Supp. 3d 158 (D.D.C. 2018)........................................................................................ 29

*Carney v. Adams*,
592 U.S. 53 (2020) .................................................................................................................. 24

*Chamber of Com. of U.S. v. E.P.A.*,
642 F.3d 192 (D.C. Cir. 2011)........................................................................................... 26, 29

*Chestnut Hill Benevolent Ass'n v. Burwell*,
142 F. Supp. 3d 91 (D.D.C. 2015).......................................................................................... 17

*Circuit City Stores v. Adams*,
532 U.S. 105 (2021) ................................................................................................................ 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................ 24, 25

*Cobell v. Norton*,
    391 F. 3d 251 (D.C. Cir. 2004)...................................................... 12

*C.S. Lawn & Landscape, Inc. v. Dep't of Labor*,
    No. 12-cv-1533 (TSC), 2026 WL 820976 (D.D.C. Mar. 25, 2026)........................................ 22

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009)...................................................... 31

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025) ................................................................ 39

*Dickinson v. Trump*,
    17 F.4th 634 (9th Cir. 2026)........................................................ 38

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999)...................................................... 38, 39

* *FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................. 25, 31

* *Fischer v. United States*,
    603 U.S. 480 (2024) .............................................................. 17, 23

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561 (1995) ................................................................ 16

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ................................................................ 38

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008)...................................................... 25

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013)...................................................... 12

*Lindsey v. District of Columbia*,
    879 F. Supp. 2d 87 (D.D.C. 2012)...................................................... 36

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................ 22

*Los Angeles Press Club v. Noem*,
    171 F.4th 1179 (9th Cir. 2026)...................................................... 38

iv

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 27

*Mack Trucks, Inc. v. EPA*,
  682 F.3d 87 (D.C. Cir. 2012) ........................................................................ 15

*Make the Road N.Y. v. Noem*,
  No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ......................... 32

\* *Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1998) .............................................................. 13, 14, 15

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
  571 U.S. 161 (2014) ...................................................................................... 16

\* *Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................ 24, 25, 26, 28

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ........................................................................... 30

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018) .................................................................................. 17, 18

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  606 U.S. —, 145 S. Ct. 2658 (2025) ............................................................. 39

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ....................................................................... 30

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ................................................................ 25, 30

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................... 12

*North Carolina v. FERC*,
  730 F.2d 790 (D.C. Cir. 1984) ....................................................................... 32

*Sekhar v. United States*,
  570 U.S. 729 (2013) ...................................................................................... 19

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................................... 26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .................................................................................. 37, 38

*Trinity Servs., Inc. v. Marshall*,
  593 F.2d 1250 (D.C. Cir. 1978) .................................................................................... 17

\* *Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ..................................................................................................... 37

*Turner Broad. Sys., Inc. v. FCC*,
  507 U.S. 1301 (1993) ................................................................................................... 34

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ..................................................................................... 29

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ..................................................................................................... 27

*Warth v. Seldin*,
  422 U.S. 490 (1975) ..................................................................................................... 24

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825) ....................................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................... 12, 24, 30, 34

\* *Yates v. United States*,
  574 U.S. 528 (2015) ................................................................................................ 16, 21

## **Statutes**

5 U.S.C. § 553 ................................................................................................................ 13, 15

5 U.S.C. § 705 ................................................................................................................ 11, 39

20 U.S.C. § 1082 .................................................................................................................... 1

20 U.S.C. § 1087e ........................................................................................................ *passim*

20 U.S.C. § 1089 .......................................................................................................... *passim*

20 U.S.C. § 1098a .............................................................................................................. 7, 14

20 U.S.C. § 1221e-3 ............................................................................................................ 1, 22

20 U.S.C. § 3441 .................................................................................................................... 1

20 U.S.C. § 3471 .................................................................................................................... 1

20 U.S.C. § 3474 ................................................................................................................ 1, 22

Higher Education Act of 1965,
  Pub. L. No. 89-329 ...................................................................................................... 1

Working Families Tax Cuts Act ("WFTCA"),
  Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................................... *passim*

**Rules**

Fed. R. Civ. P. 65 ....................................................................................................... 39

**Legislative Materials**

H.R. Rep. No. 119-206 (2025) (Book 1) ................................................................... 31

S. Rep. No. 99-296 (1986) ......................................................................................... 33

**Administrative & Executive Materials**

34 C.F.R. § 668.2 ............................................................................................... *passim*

34 C.F.R. § 685.102 ................................................................................................ 5, 32

34 C.F.R. § 685.203 (2025) ......................................................................................... 2

Federal Student Aid Programs,
  72 Fed. Reg. 44620 (Aug. 8, 2007) ..................................................................... 18

Federal Student Aid Programs,
  72 Fed. Reg. 62014 (Nov. 1, 2007) ..................................................................... 18

Public Hearing; Negotiated Rulemaking Committees,
  90 Fed. Reg. 35261 (July 25, 2025) ...................................................................... 5

Reimagining and Improving Student Education,
  91 Fed. Reg. 4254 (Jan. 30, 2026) .............................................................. *passim*

Reimagining and Improving Student Education—Federal Student Loan Program Final
  Requirements,
  91 Fed. Reg. 23768 (May 1, 2026) .............................................................. *passim*

**Other Authorities**

Dear Colleague Letter GEN-08-04 (April 14, 2008),
  https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf. ....... 3

NCES, *About IPEDS*,
  https://nces.ed.gov/ipeds/about-ipeds (last visited June 3, 2026)..................................... 18, 19

NCES, U.S. Dep't of Educ., NCES 2008-159, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007* (Oct. 2008),
https://nces.ed.gov/pubs2008/2008159rev.pdf .......................................................................... 19

NCES, U.S. Dep't of Educ., *IPEDS 2025-26 Data Collection System*,
https://surveys.nces.ed.gov/ipeds/public/glossary (last visited June 3, 2026) .......................... 19

NCES, U.S. Dep't of Educ., *The Classification of Instructional Programs*,
https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited June 3, 2026) .................... 21

## **INTRODUCTION**

The cost of higher education has risen dramatically over the past several decades, leaving millions of Americans burdened by substantial student debt.  Concerned with the unsustainable strain on students, taxpayers, and the federal lending system, Congress enacted, and President Trump signed into law, the Working Families Tax Cuts Act ("WFTCA") to reform federal student lending and promote affordability in higher education.  Among other changes, WFTCA sought to encourage institutions to align educational costs with economic outcomes, curb excessive borrowing, and place federal student aid on a more fiscally sustainable footing.  WFTCA amended portions of the Higher Education Act of 1965, Pub. L. No. 89-329 ("HEA"), and made significant changes to the federal student aid framework, including by establishing new borrowing limits and restructuring available federal student loan programs.  One such change was to establish new borrowing limits for graduate and professional students.

"When Congress passes legislation amending statutory provisions regarding programs administered by an agency, that agency is tasked with implementing those changes in its regulations."  Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4256 (Jan. 30, 2026).  Federal student loan Programs are administered by the Department of Education ("Department"), and Congress has granted the Secretary of Education broad authority to implement those programs.  *See* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3474, 3471.  The Secretary exercised this delegated authority by promulgating a Rule to implement WFTCA's statutory reforms.  *See* Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements, 91 Fed. Reg. 23768 (May 1, 2026) ("Rule").

A group of associations challenge the Rule's definition of "professional degree" and the Department's conclusion that the Master Calendar requirement, applicable to certain Department rulemakings, was irreconcilable with Congress's effective date of the WFTCA.  Plaintiffs seek a

preliminary injunction.   That challenge should fail, however, because the Rule is consistent with law and Plaintiffs have not identified any irreparable harm from the Rule.  The balance of equities and the public interest also weigh heavily against the extraordinary remedy of a preliminary injunction, which would disrupt the implementation of Congress's chosen reforms and undermine the Department's efforts to administer the federal student aid system in accordance with statutory mandates.  Because Plaintiffs cannot satisfy the requirements for preliminary relief, their Motion should be denied.

At the very least, any relief the Court enters should be narrow.  Plaintiffs seek the extraordinary remedy of a stay or injunction against not just a portion of the Rule, but also any enforcement of the loan caps that Congress itself established in WFTCA.  Such an injunction would block congressionally enacted loan caps, and not just for Plaintiffs but for everyone in the nation.  Plaintiffs cannot get such broad relief that extends beyond their own asserted injury; and they cannot get relief against a *statute* that they don't challenge in any way.  If the Court does decide to issue some preliminary relief, at most, they are entitled to a stay or injunction of the portions of the *Rule* that they actually challenge, and that relief should be appropriately tailored and limited to those Plaintiffs that have established standing.

## BACKGROUND

**The Working Families Tax Cuts Act**

On July 4, 2025, Congress enacted, and President Trump signed into law H.R. 1, colloquially known as the Working Families Tax Cuts Act, or WFTCA.  *See* Pub. L. No. 119-21, 139 Stat. 72 (2025).  Among other things, WFTCA amended the Department's Direct Loan program to establish loan caps for graduate and professional students and to terminate graduate

2

and professional federal Direct PLUS loans altogether.[1]  *See* 20 U.S.C. § 1087e.  WFTCA added multiple subparagraphs to the HEA, and codified the caps on student loans at 20 U.S.C. § 1087e(a)(4).  *See* Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35.  That provision caps borrowing by "a graduate student, who is not a professional student" to $20,500 for "any academic year or its equivalent." 20 U.S.C. § 1087e(a)(4)(A)(i).  By contrast, the maximum annual amount that "a professional student may borrow in any academic year or its equivalent [is] $50,000." *Id.* § 1087e(a)(4)(A)(ii).

Congress also established new aggregate limits for both graduate and professional students, with professional students qualifying for a higher cap.  The aggregate limit for a graduate student "who is not (and has not been) a professional student," is $100,000.  *Id.* § 1087e(a)(4)(B)(i)(I). And if a graduate student "is (or has been) a professional student," the maximum is $200,000 minus the amount borrowed for the student's professional program.  *Id.* § 1087e(a)(4)(B)(i)(II). For a professional student "who is not (and has not been) a graduate student," WFTCA establishes a $200,000 aggregate cap.  *Id.* § 1087e(a)(4)(B)(ii)(I).  And the aggregate cap for a professional student "who is (or has been) a graduate student," is $200,000 minus the amount borrowed for the student's graduate program.  *Id.* § 1087e(a)(4)(B)(ii)(II).  All loan limits "begin[] on July 1, 2026," *id.* § 1087e(a)(4)(A), (B), but these new limits do not apply during the expected time to credential[2]

---

[1] Prior to July 4, 2025, graduate and professional students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate).  *See* 34 C.F.R. § 685.203 (2025); *see also* NPRM at 4273 (comparison chart). Additionally, graduate and professional students enrolled in certain approved health profession programs could obtain Direct Unsubsidized Loans of up to $224,000 in aggregate. *See* NPRM at 4277; Dear Colleague Letter GEN-08-04 (April 14, 2008), https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf.
Graduate and professional students in need of additional federal financial assistance could then obtain Direct PLUS loans (also known as Grad PLUS loans), available at a higher interest rate than Direct Unsubsidized Loans, to cover up to the full cost of attendance.
[2] For the purpose of the exception to the loan limits, "expected time to credential" means the lesser of 1) three academic years, or 2) the period determined by calculating the difference between the

3

of students currently enrolled in a program of study at a university or college and who have received a loan (or on whose behalf a loan was made) for that program of study "as of June 30, 2026," *id.* § 1087e(a)(8).

WFTCA effectuated the distinct loan caps for graduate students and professional students by defining those terms. A "graduate student" is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i). And "in this paragraph,"—*i.e.*, for purposes of the annual and lifetime loan caps—a "professional student" "means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on [the date of enactment of this paragraph]), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii). In short, Congress's definition of professional student depends on the degree that student is seeking. And for the requisite degrees, Congress relied on a defined term in the Code of Federal Regulations at 34 C.F.R. § 668.2.

As of the date of WFTCA's enactment, July 4, 2025, 34 C.F.R. § 668.2 defined a professional degree as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pd.D..), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b).

---

program length for the program of study in which the individual is enrolled and the period of the program of study the student has completed as of June 30, 2026. 20 U.S.C. § 1087e(a)(8)(B).

4

**Reimagining and Improving Student Education**

To make WFTCA's changes administrable and to provide clarity on which degrees are considered professional degrees, the Department published a Notice of Proposed Rulemaking titled Reimagining and Improving Student Education. 91 Fed. Reg. 4254, 4254 (Jan. 30, 2026) ("NPRM"). The NPRM explained that the Department had convened a negotiated rulemaking committee in the fall of 2025[3] and that the committee had "reached consensus" on proposed new regulatory text to be codified at 34 C.F.R. § 685.102(b), including a definition of "professional student" for purposes of WFTCA's loan limits. NPRM at 4256. The Department noted in the NPRM that WFTCA's definition of professional student "incorporated a variety of words and phrases that may, without context, appear ambiguous or vague on their face or as applied to specific degree programs." *Id.* at 4262. The Department's proposed definition set forth "the best reading of [WFTCA] using the tools of statutory construction." *Id.*

The Department acknowledged that the WFTCA definition "establishes a three-part test" for a professional degree: (1) "the degree must signify completion of the academic requirements for beginning practice in a given profession"; (2) "the profession the graduate enters must require a level of professional skill beyond what is normally required for a bachelor's degree"; and (3) "the profession that a degree holder would enter after graduating generally requires professional licensure." *Id.* Those three requirements were included in the new proposed regulation as separate criteria. *See id.* at 4332. As for the specific degrees enumerated in § 668.2, because they "were codified by Congress into the definition as examples," the Department needed no "additional interpretive work to know that these specific degree programs qualify as professional degrees."

---

[3] The Department announced its intent to establish the rulemaking committee and hear public comments on July 25, 2022. *See* Public Hearing; Negotiated Rulemaking Committees, 90 Fed. Reg. 35261 (July 25, 2025).

*Id.* at 4262. Accordingly, the Department listed those degrees in a separate subsection, following the proposed criteria, as fields where "[a] professional degree may be awarded." *Id.* at 4332. And the Department proposed adding the Doctorate of Clinical Psychology to that list because that degree "meet[s] all of the criteria in the definition of *professional degree* in 34 C.F.R. [§] 668.2." *Id.* at 4263 (emphasis added).

The rest of the Department's proposed criteria stemmed from the list of degrees in 34 C.F.R. § 668.2 that Congress had incorporated. The Department determined that the § 668.2 list "provides additional contextual clues" that assist in "discerning the facial or as applied meaning of the operative test." *Id.* at 4262. Specifically, the Department explained that although neither WFTCA nor § 668.2 "explicitly state that a degree must *generally* be at the doctoral-level . . . the illustrative list of degrees suggests that this must be the case, as it contains only three non-doctoral degrees." *Id.* The Department further explained that, when originally promulgated, § 668.2's definition of "professional student" was based on a previous definition of "first professional student" in a glossary of terms that the Department published to schools for data reporting. *See id.* at 4262. Two criteria of that glossary definition were that a degree required "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *Id.* The Department also noted that this glossary had listed as "first professional degrees" the same ten degrees enumerated in § 668.2. Accordingly, the Department proposed that a professional degree must "generally be at the doctoral-level" and must require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4332.

Lastly, the Department proposed as a criterion that a degree must have "a four-digit program CIP code . . . in the same intermediate group as" the § 668.2 degrees and clinical

6

psychology. *Id.* CIP refers to the Classification of Instructional Programs ("CIP"), a system designed "for tracking and reporting fields of study and program completion activity." *Id.* at 4264. The Department determined that requiring the same four-digit codes as the § 668.2 degrees and clinical psychology would encompass any degrees "closely related" to the ones enumerated in the new regulation. *Id.* The Department also said that using CIP codes would "ha[vee] administrative benefits for the Department and institutions given [their] wide use." *Id.* at 4264. The NPRM's discussion of the definition of professional degree ended with discussion of specific degrees and why the Department concluded that those degrees did not "meet the professional degree definition." *Id.* at 4265–67. For example, the Department explained that a Masters in Public Health ("MPH") would not satisfy the definition because "it is not required for entrance into a specific profession and does not lead to licensure." *Id.* at 4266.

Separate from its proposed definition and criteria for a professional degree, the Department determined that the Master Calendar provision was irreconcilable with Congress's effective date of the WFTCA. The Master Calendar provision, codified at 20 U.S.C. § 1089, is a statutory schedule in the HEA that sets timing requirements for certain HEA rules. As background, the Department must follow a negotiated rulemaking process for any HEA rules, which requires the Secretary to, among other things, obtain advice and recommendations from interested parties in the public and provide for a "comprehensive discussion and exchange of information." 20 U.S.C. § 1098a(a). The Secretary considers those views, writes proposed regulatory text, and then submits proposed text to a negotiated rulemaking committee, which includes representatives from the higher education industry. *See id.* § 1098a(b). The Secretary must conduct the whole negotiation process "in a timely manner" not to exceed 360 days. *Id.* § 1098a(b)(1). Meanwhile, under the Master Calendar provision, any regulatory change to higher education programs not published in

7

final form by November 1 "prior to the start of the award year" is not effective until "the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). In other words, under the Master Calendar provision, the Department needed to have all WFTCA rules in final form by November 1, 2025, for those rules to go into effect on WFTCA's effective date of July 1, 2026. *See* NPRM at 4257.

As the Department explained in the NPRM, "[i]t would not have been possible for the Department to undertake every step of the negotiated rulemaking process by November 1, 2025," to implement the provisions in WFTCA that become effective on July 1, 2026. *Id.* Notably, "[t]he fastest possible timeframe in which the negotiated rulemaking process . . . could have occurred is 149 days" but there were only 120 days from July 4, 2025, (the day Congress enacted the WFTCA) to November 1, 2025, (the final publication date required by the Master Calendar provision). Rule at 23770. "Congress was aware of this temporal impossibility" and yet decided that the caps on student loans "would still go into effect on July 1, 2026." NPRM at 4257. Thus, the Department determined that WFTCA's effective date is irreconcilable with the Master Calendar provision. *See id.*

The Department requested comments by March 2, 2026, on its proposal. *See id.* at 4254. On May 1, the Department published a final rule. *See* Rule. The preamble to the Rule reiterated that it would not have been possible to initiate rulemaking in accordance with the Master Calendar requirement given the effective date that Congress established in WFTCA. *See id.* at 23770. The preamble also responded to numerous comments about the proposed definition of "professional student." As in the NPRM, the Department stated that the list of degrees in § 668.2 "provides context and limiting principles" about whether other degrees qualify as professional degrees. *Id.* at 23783. The Department relied on that list "to identify common characteristics of those degrees"

8

and included those common characteristics as criteria in the Rule. *Id.* at 23785. As proposed, the Department determined that clinical psychology is a professional degree. *See id.* at 23782. The preamble further responded to comments about specific degrees, including some at issue in this litigation, and explained why each degree did not qualify as a professional degree. *See id.* at 23790–808.

Ultimately, the Rule promulgates the following regulatory text related to the definition of a professional degree:

> (i) A professional degree is a degree that:
>
>> (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
>>
>> (B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
>>
>> (C) Generally requires professional licensure to begin practice; and
>>
>> (D) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.
>
> (ii) A professional degree may be awarded in the following fields:
>
>> (A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* at 23882.

The Department also noted in the preamble that all portions of the Rule are severable and established the Department's "inten[t] that [the portion of the Rule regarding classification of

9

degrees as professional degrees] is entirely severable" from the rest of the Rule. *Id.* at 23771. The Rule is effective on July 1, 2026. *See id.* at 23768.

**This Litigation**

Plaintiffs filed suit on May 21, 2026, against Defendants, Linda McMahon in her official capacity as the Secretary of the United States Department of Education and the United States Department of Education, raising three causes of action. *See* Compl., ECF No. 1. In Count I, Plaintiffs allege that Defendants acted contrary to law in violation of the Administrative Procedure Act ("APA") by adopting a definition of "professional degree" that differs from the regulatory definition referenced in 20 U.S.C. § 1087e(a)(4)(C)(ii). *Id.* ¶¶ 62–64. Plaintiffs allege in Count II that Defendants violated the APA when promulgating the Rule by failing to meet the November 1 deadline in the Master Calendar provision of 20 U.S.C. § 1089, for the Rule to become effective in 2026. *Id.* ¶¶ 67–71. In Count III, Plaintiffs allege that Defendants' "decision to limit the scope of a 'professional degree'" is arbitrary and capricious. *Id.* ¶¶ 74–77.

Plaintiffs are various organizations that can be grouped into three categories: organizations with individual members, organizations with institutional members, and organizations with both individual and institutional members. *See, e.g.*, *id.* at 3–6.

Three organizations consist of individual members. The National Association of Pediatric Nurse Practitioners ("NAPNAP") "has more than 7,000 individual members who hold or are seeking degrees in pediatric advanced practice nursing," taking courses to obtain or renew certifications and licenses, or are faculty members teaching "at the master's or doctoral level." *Id.* ¶ 7. The National Education Association's ("NEA") members "include aspiring educators; K–12 classroom teachers; education support professionals; school counselors, school psychologists, and other specialized instructional support personnel; as well as higher education faculty and staff."

10

*Id.* ¶ 12. And the American Association for Marriage and Family Therapy's ("AAMFT") members "include licensed marriage and family therapists" ("LMFTs"). *Id.* ¶ 13.

Two organizations consist of institutional members. The American Association of Colleges of Nursing's ("AACN") members "include more than 890 colleges and universities." *Id.* ¶ 9; *see also* Decl. of Deborah Trautman, ¶ 8, ECF No. 4-7 ("Membership in AACN is institutional . . . ."). AACN's member schools consist of nearly 200,000 non-member students pursuing post-baccalaureate nursing degrees. Compl. ¶ 9. The Association of Schools and Programs of Public Health's ("ASPPH") members include "more than 150 accredited schools and programs of public health." Compl. ¶ 11; *see also* Decl. of Laura Magaña, ¶ 1, ECF No. 4-5; (describing ASPPH as "a membership organization representing accredited schools and programs of public health"). ASPPH's member schools include communities of non-member "deans, faculty, staff, and students." Compl. ¶ 11.

As to the third category, the American Association of Nurse Practitioners ("AANP") consists of "approximately 119,000 individual members" who are either nurse practitioners ("NPs") or student NPs. Decl. of Jon Fanning, ¶ 5, ECF No. 4-3; *see also* Compl. ¶ 5. AANP's membership also comprises approximately 169 nationwide organizational members, which variously include state and local NP professional associations and organizations; "universities and colleges offering NP educational programs"; and "hospitals and clinics employing NPs." Compl. ¶ 6; ECF No. 4-3 ¶ 6.

Plaintiffs filed a Motion, ECF No. 4, and supporting memorandum, ECF No. 4-1 ("Motion" or "Mot.")[4] on May 21, 2026, seeking a stay under 5 U.S.C. § 705 and a preliminary injunction.

---

[4] Any pincites to ECF filings in this case are to the ECF pagination.

ECF No. 4 at 1.[5]  Specifically, Plaintiffs seek an order both staying the Rule's definition of "professional degree" and enjoining Defendants "from enforcing the statutory caps on the availability of federal student loans that apply to students pursuing 'graduate' and 'professional degrees,' 20 U.S.C. § 1087e(a)(4), until the Department promulgates a new rule defining 'professional degree' consistent with its statutory obligations."  Pls.' Proposed Order at 1, ECF No. 4-9; ECF No. 4.  Plaintiffs request resolution of the Motion in advance of the statute and Rule's July 1, 2026, effective date.  ECF No. 4 at 2.

## **LEGAL STANDARD**

"The standard for issuance of the extraordinary and drastic remedy of . . . a preliminary injunction is very high."  *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). A preliminary injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F. 3d 251, 258 (D.C. Cir. 2004).

To warrant preliminary injunctive relief, the moving party must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  Where, as here, the government is the party opposing injunctive relief, the last two factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## **ARGUMENT**

Plaintiffs are not entitled to the relief they seek.  They have not demonstrated success on the merits because the Master Calendar requirement is irreconcilable with the WFTCA's effective

---

[5] Plaintiffs only move for a preliminary injunction based on Counts I and II; they do not raise their arbitrary and capricious claim from Count III.  *See* Mot. at 22 n.2.

date and the Rule's definition of professional degree is consistent with Congress's decision in WFTCA to incorporate the definition in 34 C.F.R. § 668.2. Plaintiffs also have failed to demonstrate standing based on their various theories of injury, but even if they have met that minimum standard, they have not shown irreparable harm. Moreover, the balance of the equities tips in the Department's favor.

If the Court disagrees and decides to stay or enjoin the Rule, that remedy must be limited to the challenged portions of the Rule and the Plaintiffs who have demonstrated standing. Above all, the Court should deny Plaintiffs' request to enjoin the loan caps in WFTCA because Plaintiffs have not challenged Congress's caps or any portion of WFTCA.

## I.    Plaintiff Have Not Established a Likelihood of Success on the Merits.

### A.  The Rule's Effective Date Is Not Contrary To Law.

The Master Calendar provision of the HEA states that "any regulatory changes initiated by the Secretary affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). But courts have held that when Congress has given an agency statutory direction that is irreconcilable with procedural requirements, then the procedural requirements "need not be followed." *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding "good cause" to bypass notice-and comment procedures under 5 U.S.C. § 553(b) when Congress's direction was irreconcilable with those procedural requirements). Indeed, "deviation from [procedural] requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated." *Id.* at 1236.

WFTCA is particularly complicated, and Congress's directive to implement WFTCA beginning July 1, 2026, is irreconcilable with the requirements of the Master Calendar provision.

13

Congress enacted WFTCA on July 4, 2025, and it sets statutory caps on student loans beginning July 1, 2026. *See, e.g.*, WFTCA, § 81001, 139 Stat. at 334 (noting "annual limits beginning July 1, 2026"). The Department, thus, promulgated the Rule to provide guidance and support to borrowers and institutions to facilitate implementation of WFTCA's statutory changes. *See, e.g.*, Rule at 23788 (noting how some commenters asked for even more guidance).

The Master Calendar provision of the HEA, however, requires rules to be published in final form by November 1 "prior to the start of the award year" to go into effect for that award year. 20 U.S.C. § 1089(c)(1). And Section 492 of the HEA requires the Department to undergo negotiated rulemaking for any regulation under Title IV of the HEA. *See id.* § 1098a. Negotiated rulemaking requires the Department to, among other things, provide notice to the public; solicit nominations from the public to serve on the committee; select negotiators; hold negotiations; develop a notice of proposed rulemaking based on the negotiations and submit it for review by the Office of Information and Regulatory Affairs; publish the proposed rule with at least a thirty day public-comment period; and publish a final rule that responds to substantive comments. *See id.*

The negotiated rulemaking process takes significant time, but there were only 120 days between WFTCA's enactment on July 4, 2025, and the Master Calendar's final-rule requirement of November 1, 2025. It would have been impossible for the Department to undergo the entire process of negotiated rulemaking—which covered not just the definition of professional degree but a host of other details involving loan repayment plans, loan caps, etc.—by November 1, 2025. Rule at 23770 (noting the fastest possible timeframe the negotiated rulemaking process could have occurred was 149 days); *cf. Methodist Hosp. of Sacramento*, 38 F.3d at 1237 (analyzing the "daunting task of preparing regulations" to implement a massive statutory amendment that resulted in the agency publishing a 133-page interim rule, compared to the Department's 94-page NPRM

14

and 134-page final Rule here).  Yet Congress still decided that WFTCA would go into effect on July 1, 2026.  Since WFTCA's effective date is irreconcilable with the Master Calendar provision, the Department was not required to abide by the requirement, *see Methodist Hospital of Sacramento*, 38 F.3d at 1237, and the Rule's effective date is not contrary to law.

Plaintiffs do not challenge the Department's assertion that it could not have completed the negotiated rulemaking process before November 1, 2025.  *See* Mot. at 22–26.  Instead, Plaintiffs argue that the Department could have met the Master Calendar deadline "by issuing an interim final rule before November 1 that could become effective in the coming school year."  *Id.* at 25.  But an agency can waive notice and comment under the APA —and thereby publish an interim final rule—only "for good cause . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  That exception "is to be narrowly construed and only reluctantly countenanced."  *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).  Tellingly, Plaintiffs do not concede that the Department could have met the good cause standard as to this Rule.  *See* Mot. at 25 n.19 (saying the Department could "seek to issue an interim final rule").  The Department agreed, determining it was possible to undergo the required negotiated rulemaking process and publish a final rule at least 30 days before July 1, 2026, as required by the APA.  *See* 5 U.S.C. § 553(d); Rule at 23770; NPRM at 4257.  The Department determined that notice and comment was therefore not "impracticable."  5 U.S.C. § 553(b)(4)(B); *see Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018) (holding that waiver of negotiated rulemaking occurs under "the same legal standard that applies to waiving the notice and comment requirements under the APA").

Even if the Court determined that the Rule was contrary to the Master Calendar requirement, failure to comply with that requirement would not entitle Plaintiffs to the relief they

seek. *See* Pls' Proposed Order, ECF No. 4-9 at 1. A violation of the Master Calendar requirement would merely delay the Rule's effective date to July 1, 2027, not overturn it entirely. Moreover, such delay would have no impact on Section 81001 of WFTCA itself, which would still impose statutory caps on loans for graduate and professional students beginning July 1, 2026. *See* WFTCA, § 81001, 139 Stat. at 334–35.

### B. The Rule's Definition of Professional Degree Is Not Contrary To Law.

Each component of the Department's definition of professional degree accords with the language in 34 C.F.R. § 668.2 that Congress cross-referenced in WFTCA. Start with the well-worn premise that the Department must execute the wishes of Congress as expressed in the text of WFTCA. *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 168 (2014) ("Our analysis begins with the statutory text."). Section 668.2's definition is part of that text, and the Department must respect that Congress chose to define professional degree based on the illustrative list in § 668.2.

The Department's interpretation of professional degree flows naturally from the statutory principle of *nosictur a sociis*, which holds that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). The Supreme Court has relied on this canon to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation omitted). That canon requires the Department to interpret "professional degree" based on the words surrounding it—namely, the list of degrees already in § 668.2. The Department therefore correctly relied on the list to "provide context for the types of degrees that Congress considered to have met its definition of professional degree for the purposes of higher loan limits." NPRM at 4263. True enough, that list provides "[e]xamples" which "include but are not limited to" the enumerated degrees. 34 C.F.R. § 668.2. But "it is

16

widely accepted that general expressions such as 'including but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." *Chestnut Hill Benevolent Ass'n v. Burwell*, 142 F. Supp. 3d 91, 103 (D.D.C. 2015) (citing authorities). The Department therefore did not exceed the bounds of statutory interpretation by interpreting "professional degree" to include degrees with characteristics common to those degrees in the list. *See* Rule at 23785.

The Department's interpretation is also consistent with the related canon of *ejusdem generis*, which teaches that "where specific words precede or follow general words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978). As applied here, the general term "professional degree" should be interpreted by reference to and in light of common attributes shared by the specific degrees listed in § 668.2. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114 (2021) (applying *ejusdem generis* to "give independent effect to the statute's enumeration of . . . specific categories," which would otherwise be superfluous).

Thus, the Department did not err by interpreting "professional degree" in relation to the degrees enumerated in examples provided in § 668.2. Any other approach does not account for Congress's choice to incorporate the entire list of degrees in § 668.2—"Congress would not normally introduce a general term that renders meaningless the specific text that accompanies it," so the Department must rely on the § 668.2 list to interpret "professional degree." *Fischer v. United States*, 603 U.S. 480, 487 (2024). Put another way, Congress's incorporation of that list must "have some legal consequence." Rule at 23789; *accord Nat'l Ass'n of Mfrs. v. Dep't of Def.*,

17

583 U.S. 109, 128–29 (2018) (The Supreme Court "is 'obliged to give effect, if possible, to every word Congress used'" (citation omitted)).    The Department therefore could not ignore the incorporated list from § 668.2.  That interpretive decision was correct and, as discussed below, validates the requirements the Department included in the Rule.

*Requirements in Subsection (i)(B).*  Proposed subsection (i)(B) contains two requirements derived from the list of degrees in § 668.2 that Congress incorporated.

First, the Department specified that a professional degree "requires at least six academic years of post secondary education coursework for completion, including at least two years of post-baccalaureate level coursework."  Rule at 23882.  That requirement is not a "material change[]" to the list of degrees in § 668.2, Mot. at 27, but is instead a common characteristic shared among them.  The Department did not fabricate this similarity, § 668.2 acknowledged it.  In 2007, the Department promulgated § 668.2's definition of a professional degree as one in a series of definitions to apply to all programs under Title IV of the HEA. *See* Federal Student Aid Programs, 72 Fed. Reg. 62014 (Nov. 1, 2007).  Although the eventual defined term was "professional degree," it was originally termed "first professional degree." *See id.* at 62015.  That is important because, as the Department explained when it proposed § 668.2, the definition was "based on the definition currently used by the National Center for Educational Statistics (NCES)."  Federal Student Aid Programs, 72 Fed. Reg. 44620, 44621 (Aug. 8, 2007); *see also* NPRM at 4262–63 (discussing this history).

NCES defined first-professional degree for purposes of the Integrated Postsecondary Education Data System ("IPEDS"), which is "a system of interrelated surveys" that "gathers information from every college, university, and technical and vocational institution that participates in the federal student financial aid programs."    NCES, *About IPEDS*,

18

https://nces.ed.gov/ipeds/about-ipeds (last visited June 3, 2026).  IPEDS has always provided a glossary of terms to guide institutions in their data collection efforts.[6]  And in 2007, the IPEDS glossary defined "first-professional degree" as:

> An award that requires completion of a program that meets all of the following criteria: *(1)* completion of the academic requirements to begin practice in the profession; *(2) at least 2 years of college work prior to entering the program; and (3) a total of at least 6 academic years of college work to complete the degree program*, including prior required college work plus the length of the professional program itself. First-professional degrees may be awarded in the following 10 fields:
>
> | | |
> |---|---|
> | Chiropractic (D.C. or D.C.M.) | Osteopathic medicine (D.O.) |
> | Dentistry (D.D.S. or D.M.D.) | Pharmacy (Pharm.D.) |
> | Law (L.L.B. or J.D.) | Podiatry (D.P.M., D.P., or Pod.D.) |
> | Medicine (M.D.) | Theology (M.Div., M.H.L., B.D., |
> | Optometry (O.D.) | or Ordination) |
> | | Veterinary medicine (D.V.M.) |

NCES, U.S. Dep't of Educ., NCES 2008-159, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007* at B-2 (Oct. 2008) (emphasis added).[7]  As the italicized language above makes clear, the IPEDS term included the same requirements for program length that the Department included in the Rule.

The presence of these requirements in § 668.2's precursor means they are properly part of the Rule now.  A fundamental canon of interpretation is that when words are "obviously transplanted from another legal source, whether the common law or other legislation," those words "brings the old soil with [them]."  *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted).  So when the Department carried over the same ten degrees from the IPEDS definition

---

[6] To access the current glossary, *see* NCES, U.S. Dep't of Educ., *IPEDS 2025-26 Data Collection System*, https://surveys.nces.ed.gov/ipeds/public/glossary (last visited June 3, 2026).

[7] This report is available at https://nces.ed.gov/pubs2008/2008159rev.pdf.  And although the report postdates the Department's promulgation of § 668.2, the data collection occurred in "fall 2007." *Id.* at iii.

19

to § 668.2, it also transplanted the length-of-program requirements from IPEDS. And when Congress cross-referenced § 668.2 in WFTCA, it intended to incorporate that same administrative interpretation. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").

The requirement in subsection (1)(B) that a professional degree be "generally at the doctoral level" likewise flows from the list of degrees in § 668.2. Rule at 23882. "[O]nly one" of those degrees—the Theology degree—"is not at the doctoral level." *Id.* at 23784. That is a major clue for the meaning of "professional degree"; if 90% of the degrees listed and incorporated by Congress are at the doctoral level—and indeed, 100% of the healthcare-related degrees are at the doctoral level—"professional degree" encompasses degrees which are "*generally* at the doctoral level." *Id.* at 23882 (emphasis added). To be clear, the Department does not read § 668.2 to "require a doctoral-only rule"—hence the inclusion of the term "generally" in the regulatory text, *id.* at 23784—but the identification of almost entirely doctoral degrees indicates that Congress incorporated into WFTCA a definition of "professional degree" that generally included degrees at the doctoral level.

***Requirements in Subsection (i)(D).*** The Department's requirement that a degree must "[i]nclude[] a four-digit program CIP code . . . in the same intermediate group as the fields listed in paragraph (ii)(A)" is also consistent with law. Rule at 23882. For background, higher education includes "over 4,000 institutions and tens of thousands of programs that grant numerous . . . degrees." *Id.* at 23784. "[E]very postsecondary school that receives Federal student aid funds must use CIP codes to report their program data to the government." *Id.* at 4264. CIP codes are

20

arranged in two-digit, four-digit, and six-digit groupings.  There are 48 two-digit CIP codes that group a large number of related programs into a particular area, such as Engineering (Code 14) or Visual and Performing Arts (Code 50).[8]  Within each two-digit series is a four-digit code that groups programs "that have comparable content and objectives" within the particular area, such as Civil Engineering (14.08) and Dance (50.03).  NPRM at 2464.  And "specific instructional programs" receive their own six-digit code.  *Id.*  For example, Transportation and Highway Engineering is 14.0804, and Ballet is 50.0302.  *See id.*

Consistent with its general interpretive approach, the Department's use of four-digit CIP codes ensures that professional degrees remain similar to the degrees listed in the definition Congress incorporated.  Because those four-digit codes group programs by "comparable content and objectives," any program that falls into the same four-digit code as a subsection (ii) degree should be considered a professional degree, assuming it meets all other requirements.  The Department explained this well in the NPRM regarding Veterinary Medicine, which is listed in subsection (ii) of the regulation (as well as § 668.2) and has a four-digit code of 01.80.  *See id.*  It would be "illogical to include all programs sharing the same 2-digit CIP family"—such as, in the case of Veterinary Medicine, programs in Brewing Science and Dairy Science—because that would encompass programs that have only a minimal relationship to the degrees that Congress incorporated through WFTCA.  *Id.*  The Department cannot establish procedures that would "giv[e] unintended breadth to the Acts of Congress" in this way.  *Yates*, 574 U.S. at 543 (citation omitted).  Similarly, using the six-digit code would limit the professional degrees to specific

---

[8] The Court can peruse the CIP codes by visiting NCES, U.S. Dep't Educ., *The Classification of Instructional Programs*, https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited June 3, 2026) and clicking on the dropdown titled "2-digit series."

21

programs at specific institutions, which would be too narrow to operationalize Congress's decision to identify certain degrees—not specific programs—as professional degrees.

Plaintiffs' argument that the Department could not clarify the professional degree definition Congress incorporated in this way is unpersuasive. Congress has granted the Secretary of Education the authority to promulgate "rules and regulations governing the manner of operation of, and governing the applicable programs by, the Department." 20 U.S.C. § 1221e-3; *see id.* § 3474 (authorizing Secretary to prescribe "rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department"). And the Supreme Court has long recognized that agencies are empowered to "fill up the details of a statutory scheme." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). Here, that authority allows the Department "to establish procedures to administer" what will be a professional degree and what will not. *C.S. Lawn & Landscape, Inc. v. Dep't of Labor*, No. 12-cv-1533 (TSC), 2026 WL 820976, slip op. at 16 (D.D.C. Mar. 25, 2026) (citation omitted).

Using CIP codes to define "professional degree" fills up the details of the Department's procedures for loan limits. The Department needs to avoid "confusion among institutions or even [within] the Department regarding what specific programs are eligible for higher loan limits." Rule at 23784. Multiple commenters made the same point, requesting that the Department "provide greater transparency and clearer criteria regarding which programs qualify" as professional degrees. *Id.* at 23788. CIP codes provide that clarity because institutions are already familiar with them and, in a landscape with so many institutions and degrees, CIP codes provide an easy and accessible way for the Department to apply WFTCA's loan limits and for institutions to know the programs to which those loan limits apply. *See id.* at 23784 (CIP codes are "critical to ensuring

22

that the rule is operationally feasible"); *id.* at 23788 ("[U]se of the CIP code taxonomy will also help to make it clearer to institutions and students the way each program is classified.").

***Supervision "Requirement."***    Plaintiffs take aim at the supposedly "extra-textual requirement that professionals perform their duties free from supervision of other professionals." Mot. at 27.    The Department did not adopt anything related to supervision, however, as "freestanding, disqualifying criteria" in the regulatory text.    Rule at 23787.    Nevertheless, any reliance by the Department on considerations surrounding supervision to identify a professional degree is consistent with Congress's incorporation of § 668.2.    A common feature of the degrees listed in that regulation (and of clinical psychology) is that people in those professions "may obtain a license and practice without supervision of another licensed professional" and, to the extent some supervision is required, "it is by someone who holds the same degree and practices the same profession." *Id.*    Moreover, to the extent supervision is required for some of the degrees listed in § 668.2, that supervision is "temporary." *Id.*

As described above, the Department permissibly followed the "common sense" canons of *noscitur a sociis* and *ejusdem generis* to clarify the meaning of "professional degree" that Congress incorporated. *Fischer*, 603 U.S. at 487.    That canon requires the Department to exclude degrees the holders of which must be supervised either on a continuing basis or by other professions because the degrees and professions listed in § 668.2 do not have that characteristic.    Again, the Department does not rely on supervision as a freestanding requirement for a professional degree, and the regulatory text does not include it.    But the Department's analysis of supervision pertaining to the definition of professional degree nonetheless is consistent with Congress's choice to incorporate § 668.2.

23

In sum, none of the requirements set forth in the Rule and challenged by Plaintiffs are contrary to law. The Department's interpretation of § 668.2, as incorporated by Congress in WFTCA, is consistent with the tools of statutory interpretation and is valid. Moreover, the Department has not created "a closed, exclusive list." Mot. at 27. The Department made clear in the preamble that "[t]he statute is not fixed" because "new degree programs could, at some point in the future, be professional degrees." Rule at 23783. The Department thus allows that other degrees could be added in the future "[a]s the economy evolves and new degrees and careers are created." *Id.* But those degrees would still need to meet the definition of professional degree in WFTCA. The Department has correctly interpreted that definition in the Rule.

## II.   Plaintiffs Have Failed To Establish Article III Standing, Much Less Irreparable Harm.

Plaintiffs' "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), nor does it demonstrate an irreparable injury that "is likely in the absence of an injunction," *Winter*, 555 U.S. at 22. Given the overlap between Article III standing and irreparable harm here, Defendants address the jurisdictional inquiry through the irreparable-harm framework applicable at the preliminary injunction stage.

Standing is an essential aspect of the Article III case-or-controversy requirement that requires a plaintiff to have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). A "plaintiff 'bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified) (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)). "At the preliminary injunction stage," that means "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each

24

element of standing": "that [it] has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy*, 603 U.S. at 57–58 (citations omitted).

An organization can assert standing either on its own behalf (organizational standing) or on behalf of its members (associational, sometimes called representational, standing). *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). For organizational standing, an organization must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citation omitted). Under a theory of associational standing, a plaintiff must establish that at least one of their members would have "standing to sue in her or his own right." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). To do so, a plaintiff must establish injury-in-fact as to those members, which requires "that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation modified).

Independent of standing, to obtain a preliminary injunction, a plaintiff must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm is a high standard—Plaintiffs must show that they face injuries that are "certain, great, actual, and imminent." *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).

### A. Plaintiffs Fail To Identify Irreparable Harm To Any Individual Member.

Plaintiffs allege that their matriculating student members "will be forced to either forgo their educational and professional goals or accept economically burdensome private loans." Mot.

25

at 29.    But Plaintiffs fail to identify any member of the Plaintiff organizations who is a matriculating student subject to the Rule.

Plaintiffs cite a Declaration from NEA's Associate Director of Government Relations to support the assertions that "NEA student members will face increased educational costs," and "exacerbating debt burdens" "making it difficult to obtain degrees in specialized educational fields." *Id.* (citing Decl. of Ronny Lau, ECF No 4-4).    Yet Plaintiffs do not identify any NEA members who are prospective or matriculating students subject to the Rule.    At most, Plaintiffs rely on statements from unidentified NEA members in Alabama and Connecticut who each point to "caps on federal graduate loans" as the basis for any alleged injuries.    Mot. at 29–30; ECF No. 4-4 ¶¶ 24–25; *see also id.* ¶ 26 (same but from Nevada); *see also, e.g.*, Mot. at 18–19 (vaguely discussing impacts on unidentified "prospective students"); ECF No. 4-4 ¶ 3 (discussing unidentified students and professionals who "wish to pursue professional degrees").

But when claiming "associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011).    "Rather, the petitioner must specifically 'identify members who have suffered the requisite harm,'" *id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)), which at the very least requires that "the identity of the party suffering an injury in fact . . . be firmly established." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006).    Plaintiffs here fail to identify any matriculating students at all, let alone one who will suffer irreparable harm in the absence of an injunction.

Even if Plaintiffs had sufficiently identified members subject to the Rule, their alleged harms do not stem from the Rule itself.    *See Murthy*, 603 U.S. at 57 (requiring traceability).    Since WFTCA, not the Rule, establishes "the loan-caps being introduced," Mot. at 30 (quoting ECF No.

26

4-4 ¶ 25), Plaintiffs' individual members' alleged harms stem from the caps imposed by Congress in WFTCA, not the Rule. For example, the only identified NEA member, Ms. Brittany Fair, classifies her "existing debt from her prior master's degree," Mot. at 19, combined with "the new $100,000 lifetime federal loan cap for graduate degrees" as the source of her alleged injury. *See* Decl. of Brittany Fair ¶ 12, ECF No. 4-2; *see also* Pls.' Proposed Order at 1, ECF No. 4-9 (seeking relief from the WFTCA). But just as the Rule did not establish the annual caps for graduate degrees, it also did not establish the aggregate lifetime caps. *See* 20 U.S.C. § 1087e(a)(4). Plaintiffs fail to identify an injury that is traceable to the Rule rather than Congress's annual and aggregate caps on student loans.

Ms. Fair's injuries also do not establish irreparable harm. Even if Plaintiffs had properly identified an injury attributable to the Rule, Ms. Fair is not a matriculating student who will be irreparably harmed in the absence of a preliminary injunction before the Rule's July 1 effective date. Rather, her "desired [educational] path" is to someday enroll in a post-master's certification program and eventually enroll in an Education Specialist degree program. ECF No. 4-2 ¶¶ 9–10. But she has neither enrolled in either program nor provided any timeline for when she intends to enroll. She thus faces no irreparable harm that warrants remedy before the Rule's effective date. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (citation omitted)).

27

Plaintiffs' theory of injury also assumes that setting aside the challenged Rule and enjoining the Department from enforcing the new statutory caps in the WFTCA would restore a favorable status quo.  But that necessary assumption, *see Murthy*, 603 U.S. at 57 (requiring redressability), overlooks at least one major intervening statutory change enacted by Congress.  In WFTCA, Congress eliminated Grad PLUS loans, which did not impose borrowing caps and instead permitted borrowers to borrow up to the cost of attendance.  *See* WFTCA, § 81001, 139 Stat at 334.  Plaintiffs do not challenge Congress's elimination of that program here, *see, e.g.*, Mot. at 35 n.4, and they fail to show what loan limits would apply if the Court granted their requested relief, or how those limits would redress their alleged harm.  In the absence of Grad PLUS loans, and assuming the Court enjoins the WFTCA's caps, Plaintiffs would, at the very least, be subject to the current $20,500 unsubsidized loan limits for both graduate and professional students.  *See, e.g.*, NRPM at 4272 (comparing current annual borrowing limits of $20,500 for both graduate and professional students with annual borrowing limits under the WFTCA).  Plaintiffs fail to allege how those current borrowing limits, without the Grad PLUS program, would remedy their alleged harm.

Because Plaintiffs fail to identify an injury to any individual member caused by the Rule that could be redressed by their requested relief, Plaintiffs fail to establish standing, let alone irreparable harm that warrants preliminary injunctive relief.[9]

---

[9] Plaintiffs also allege harm to students, advanced practice nurses, educators, therapists, and public health professionals. *See* Mot. at 32.  However, current student borrowers are not subject to the WFTCA's new borrowing caps. *See* 20 U.S.C. § 1087e(a)(8).  Nor are practitioners or educators simply by virtue of their profession.  Rather, many of these professionals have likely already obtained their degrees. *See, e.g.*, ECF No. 4-3, ¶ 3 (noting all NPs must complete a master's or doctoral degree); Decl. of Christine Michaels, ¶ 4, ECF No. 4-6 (noting LMFTs "must have graduated with a master's or doctoral degree"); ECF No. 4-7, ¶ 3 (noting advanced practice registered nurses complete post-baccalaureate education at the master's or doctoral level).

### B. Plaintiffs Fail To Identify Irreparable Harm To Their Organizations Or Institutional Members.

Plaintiffs also allege irreparable harm based on injury to Plaintiffs' institutional members and Plaintiffs' own organizations. Mot. at 30. Plaintiffs allege their organizations and their member colleges and universities will face reduced membership and enrollment, which will result in a decrease in revenue from membership dues and tuition. *See* Mot. at 30–32. Like Plaintiffs' alleged individual members, Plaintiffs fail to identify any college or university member at all. *See Chamber of Com.*, 642 F.3d at 199; *cf. Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 175 (D.D.C. 2018) (holding affidavits from identified schools did not sufficiently allege injury to support associational standing and organizational declarations asserting member schools were subject to rule without referencing a single member school were insufficient to establish associational standing); *id.* ("Absent the identification of a member likely to suffer an injury, these declarations fail to satisfy an essential requirement for establishing associational standing."). Plaintiffs have failed to establish associational standing to sue on behalf of their institutional members for this reason alone.

Even if Plaintiffs had identified a member, Plaintiffs' alleged injuries depend on the independent actions of third parties. Courts "treat 'allegations that are really predictions' differently." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989)). "When considering any chain of allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Id.* (quoting *United Transp. Union*, 891 F.2d at 913). Plaintiffs' alleged membership- and enrollment-related injuries depend entirely on the independent decisions of third-party students not before the Court. Whether any future student chooses not to enroll in an educational program (and in turn not to join a professional

29

organization) depends on a host of speculative contingencies that cannot establish a certainly impending injury, much less irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").[10]

Plaintiffs' alleged revenue and tuition shortfalls are also not traceable to the Rule. *See Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (emphasizing defendant's conduct must cause the harm). Neither are Plaintiffs' alleged harms to AANP and NEA, *see* Mot. at 31. Any alleged losses based on lower student admissions, or changes to organizational training needs, would be attributable to WFTCA's statutory caps and elimination of Grad PLUS loans, both of which would limit available federal funds to students regardless of the Rule. As for Plaintiffs' other alleged operational expenditures, Plaintiffs have not shown how they would be for "'operational costs beyond those normally expended' to carry out its advocacy mission" as to justify an injury, much less an irreparable one. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); *see id.* (organization's expenditures must be for "'operational costs beyond those normally expended' to carry out its advocacy mission" (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)); *see also Nat'l Taxpayers Union*, 68 F.3d at 1434 (association's "self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision]

---

[10] Plaintiffs' theory also assumes that third parties will not offer alternative sources of funding if the Rule takes effect. But, as the Department noted in the Rule, "[w]hile students will no longer be able to borrow up to cost of attendance using the Grad PLUS program, borrowers may have access to different funding options, that may include institutional loans, scholarships, non-Federal funding sources, or additional institutional aid drawn down from endowments." Rule at 23817. And in fact, schools are already lowering tuition and offering additional student aid. *See id.* at 23849 n.47 (citing examples).

does not present an injury in fact"); *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (rejecting diversion of resources organizational standing theory based on plaintiffs' self-directed expenditures for research, member education, public outreach, petitions, and advocacy in response to agency action); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) ("[T]he general rule [is] that economic harm does not constitute irreparable injury.").

The Court should deny Plaintiffs' Motion because they lack Article III standing and fail to satisfy the irreparable-harm requirement for injunctive relief.

### III.    The Balance Of Equities And The Public Interest Weigh Against A Stay.

Not only is the Rule consistent with the law, *see supra* § I–II, the Rule is consistent with the motivation behind the relevant sections of WFTCA, which is "to lower the cost of post-secondary education for taxpayers, students, and families." H.R. Rep. No. 119-206, at 203 (2025) (Book 1). As the House Report accompanying an early version of WFTCA explains, "published tuition and fees" for postsecondary education rose by "164 percent, nearly three times faster than the rate of inflation," in the two decades before 2020. *Id.* at 207. As a result, the share of Americans' expenditures towards higher education "nearly doubl[ed]" in those 20 years. *Id.* Easing this burden on American families and students is in the public interest, and setting loan limits is one step that could not only reduce borrowers' overall expenditures but also "provide an incentive to institutions to limit tuition increases." NPRM at 4299; *see also* H.R. Rep. No. 119-206 (Book 1) at 207 ("[A] 2017 study by the New York Federal Reserve found that colleges raise tuition by 60 cents for each $1 increase in federal loan subsidies.").

At the very least, Plaintiffs' requested injunction against the statutory caps set by Congress would infringe on Congress's "broad discretion" under Article I of the Constitution to determine how federal taxpayer dollars—and these loans constitute federal taxpayer dollars—are spent. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such an intrusion

into the workings of a coordinate branch of the Government inflicts irreparable harm on the Government. Moreover, an injunction is especially inequitable here where it could force the Government to make specific payments that may not be fully recoverable.

## IV. Any Relief Should Be Appropriately Limited.

### A. Any Stay Should Be Limited To The Relevant Portions Of The Rule.

For the reasons explained above, no relief is warranted here. But if the Court were to award any relief, it should be limited to staying the effective date of the portions of the Rule's definition of "professional student" that the Court determines are likely unlawful. Plaintiffs claim only subsections (i)(B) (coursework and doctoral level) and (i)(D) (CIP code) in the definition of professional degree in 34 C.F.R. § 685.102 exceed the statute. *See* Mot. at 27. Any stay should accordingly be limited to only those portions of the regulation. The Department indicated in the preamble that it intended all provisions of the Rule to be severable from each other. *See* Rule at 23771 ("no part herein will be affected if another part is found to be unlawful"); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021) ("Severability 'depends on the issuing agency's intent.'" (quoting *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984)); *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025) (noting a stay under 5 U.S.C. § 705 "should stay the effective date only of those portions of the agency action that are inflicting injury"). Moreover, if those portions of the professional degree definition are stayed, what remains in the definition merely parrots the statute (and the regulation the statute expressly incorporates, 34 C.F.R. § 668.2). And Plaintiffs concede that "Congress expressly directed the Department to apply the preexisting Section 668.2 definition as the relevant test." Mot. at 27.

This relief also would redress any finding that the Department likely violated the Master Calendar requirement. The Master Calendar provision addresses only "regulatory changes

initiated by the Secretary," 20 U.S.C. § 1089(c)(1). If the Court stays the portions of the regulatory definition of "professional student" that it believes likely exceed the statute, what's left is a regulation that parrots the statute. The remaining regulation thus is neither a regulatory "change[]" nor one "initiated by the Secretary," *id*., but rather a statutory requirement imposed by Congress and directed by Congress to take effect beginning July 1, 2026.[11]

### B. The Court Should Not Enjoin Defendants From Enforcing The Unchallenged Statute.

If the Court nonetheless stays the entire regulatory definition of "professional degree," it should not grant Plaintiffs' additional request to enjoin the Department from "enforcing the statutory caps on the availability of federal student loans that apply to students pursuing 'graduate' and 'professional' degrees, 20 U.S.C. § 1087e(a)(4), until the Department promulgates a new rule defining 'professional degree' consistent with its statutory obligations." Pls' Proposed Order, ECF No. 4-9. Although it is not entirely clear, Plaintiffs appear to request that the Court enjoin the Department from enforcing the statutory caps on graduate direct unsubsidized loans imposed by the WFTCA. But Plaintiffs have not challenged the validity of the statute, which Congress specified takes effect "beginning July 1, 2026." WFTCA, § 81001, 139 Stat at 334–35. Nor is there any basis for the Court to find the statute unlawful. Indeed, there is a strong "presumption of constitutionality which attaches to every Act of Congress." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers) (citation omitted). Furthermore, the Supreme Court has traditionally presumed that "all Acts of Congress . . . 'should remain in effect pending a final

---

[11] The Master Calendar requirement functions as a notice statute; its objective is to ensure a specific level of communication to the public of "any regulatory changes" to programs under the HEA. *See* 20 U.S.C. § 1089(c)(1); *see also Bauer*, 325 F. Supp. 3d at 95 (noting the purpose of the Master Calendar requirement is "to assure adequate notification and timely delivery of student aid funds" (quoting S. Rep. No. 99-296, at 11 (1986))); *see also* 20 U.S.C. § 1089(a). Plaintiffs, and the public, have been on notice of Congress's changes to federal student loans for nearly a year.

decision on the merits by [the Supreme] Court.'" *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (citation omitted). Given Plaintiffs' failure to challenge the statute, there is no basis for this Court to enjoin the Department from enforcing the statutory caps (even in the absence of an implementing rule). *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("[A] court cannot 'use its remedial powers to circumvent the intent of the legislature.'" (citation omitted)).

Plaintiffs' request for an injunction against the statute is based on the Department's preamble statement addressing the Master Calendar requirement where the Department opined that the statute is "not self-implementing." *See* Mot. at 36. But for their part, Plaintiffs do not affirmatively argue that the caps in the statute are not self-executing. Indeed, they claim the opposite. Plaintiffs assert that "Congress expressly codified [the] regulatory definition of 'professional degree' [34 C.F.R. § 668.2] and specified that it was adopting the definition 'as in effect on July 4, 2025.'" Mot. at 26. Plaintiffs similarly say that "Congress expressly directed the Department to apply the preexisting Section 668.2 definition as the relevant test." *Id.* at 27. And they claim that "[t]he Department lacks any authority to change Congress's required definition through rulemaking." *Id.* at 27; *see also id.* at 28 ("Here, there was no statutory gap for the agency to fill."). Under Plaintiffs' theory of the case, then, the statute is self-executing as to the definition of professional degree because the statute does not give the Department discretion to do anything other than apply the existing definition incorporated into the statute.

In any event, if the Court determines that preliminary relief is warranted, it will have necessarily rejected the Department's argument on the merits that the statute is not self-executing. *See Winter*, 555 U.S. at 20 (requiring a likelihood of success on the merits for entry of a preliminary injunction). The Court cannot determine, on the one hand, that Congress did not waive the Master

34

Calendar requirement because the statute is self-executing and thus rulemaking is not required, while, on the other hand, enjoining the Department from enforcing the statute as written because the statute is not self-executing.

In the preamble to the Rule, the Department explained why certain degrees referenced by Plaintiffs are graduate degrees, and not professional degrees, based solely on the criteria Plaintiffs concede come from the statute. For example, the Department explained that "licensure is not required for epidemiology or other public health positions," meaning that the MPH and DPH degrees do not meet 34 C.F.R. § 668.2's explicit criterion that "[p]rofessional licensure" be "generally required." Rule at 23801. The MPH degree also "is not required for entrance into a specific profession." *Id.* at 23800. That "many public health positions require or strongly prefer accredited graduate-level professional training," ECF No. 4-5 ¶ 15.b, is "a matter of preference rather than licensure requirements for the profession," Rule at 23801. *See also* NPRM at 4266 (reaching same conclusion). Similarly, although some States "require an MFT from an accredited institution prior to licensure, . . . some States allow degrees in related counseling fields." Rule at 23804. Therefore, an MFT degree is not "specifically required for entry" into the field of marriage and family therapy. *Id.*

As for NEA, it does not focus on degrees so much as professions, asserting that the Rule should not exclude "specialized instructional support personnel" ("SISPs") from the higher loan limits. Mot. at 16–17. Nowhere, however, does NEA identify the specific *degrees* that these personnel plan to pursue and why those degrees are professional degrees. *See* ECF No. 4-4 ¶ 18 (asserting that none of the degrees "required to pursue these [SISP] roles are considered "professional degrees" without specifying what degrees are required). NEA thus avoids the proper framework altogether, which defines a professional student as someone "enrolled in a program of

35

study that awards a professional degree."  20 U.S.C. § 1087e(a)(4)(C)(ii).  The WFTCA therefore does not focus on the job a particular student obtains or receives after graduation; it focuses on the degree.

To the extent that NEA does challenge decisions on individual degrees, however, the Department has already concluded that degrees for a "social worker," ECF No. 4-4 ¶ 10, do not meet the test because some States license social workers based on obtaining a bachelor's degree, not a master's or doctoral degree.  *See* Rule at 23801; NPRM at 4266.  The MSW and DSW degrees therefore are not generally required for professional licensure.  And the Department similarly determined that the Ed.S. degree—which Brittany Fair says she intends to seek, *see* ECF No. 4-2 ¶ 10—is not a professional degree because, like other educations degrees raised by commenters, it is not "required to enter [a] profession."  Rule at 23793; *see also* NPRM at 4265.

In their Motion for preliminary injunction, Plaintiffs do not take issue with the Department's determinations regarding these degrees; nor do Plaintiffs argue that these degrees are professional degrees even under the requirements Plaintiffs concede are expressly codified in the statute—and Plaintiffs have forfeited any ability to do so at this stage, *Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) (stating an argument raised for the first time on reply is waived).  Thus, any preliminary relief awarded here would not prevent the Department from continuing to treat students pursuing these degrees as graduate students directly under the statute.

Finally, even if the Court somehow determines that it should enjoin the Department from enforcing the statutory caps on graduate unsubsidized loans set forth in WFTCA, Plaintiffs are wrong to the extent they suggest the result would be no caps on graduate unsubsidized loans. Before WFTCA's enactment, graduate unsubsidized loans were capped at $20,500 annually,

regardless of whether the borrower was a graduate or professional student. *See* NPRM at 4272 (annual loan limits comparison chart). Moreover, combined undergraduate and graduate loans are currently capped at $138,500. *Id.* at 4273 (aggregate loan limits comparison chart). If the Department were enjoined from enforcing the new caps in WFTCA, these current caps would remain in place.

### C. Any Relief Should Be Limited To Plaintiffs And Their Members Who Have Demonstrated Standing.

Separately, any relief should be limited to the Plaintiffs and their members who have demonstrated standing. As the Supreme Court explained in *CASA*, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). And once a party has received complete relief, providing relief to nonparties "would not render [the party's] relief any more complete." *Id.* at 853.

Under Plaintiffs' theory of associational standing, Plaintiffs are entitled to relief, if at all, only on behalf of those among their current members who establish their standing. *See CASA*, 606 U.S. at 861 (staying injunctions insofar as they are "broader than necessary to provide complete relief to each plaintiff with standing to sue"). And basic principles of equity require that an enjoined defendant must know against whom it must refrain from acting. *See* Fed. R. Civ. P. 65(d). The Plaintiff associations here cannot (1) forgo pleading or joining specific claims or available class-action procedures for litigating those claims; (2) assert that they have large or dispersed memberships; (3) claim only an unidentified fraction have standing; and (4) still demand injunctive relief for all members. That exceeds the traditional bounds of equity and the Court's authority to provide equitable relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross," and "Article III does not give federal courts the power to order relief to

any uninjured plaintiff, class action or not." (citation omitted)).  Any relief here should be appropriately limited to the Plaintiffs and their members who have demonstrated standing.  *See, e.g.*, *Dickinson v. Trump*, 17 F.4th 634, 645–46 (9th Cir. 2026) (vacating preliminary injunction because it was not limited to relief for the named plaintiffs); *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1191 (9th Cir. 2026) (similar).

**V.    If The Court Enjoins Defendants From Enforcing The Statute, The Court Should Issue a Stay Pending Appeal And Require Plaintiffs To Post Security**

For the reasons stated above, Defendants submit that the Court should deny Plaintiffs' Motion.  However, if the Court enters a preliminary injunction enjoining Defendants from "enforcing the statutory caps on the availability of federal student loans that apply to student pursuing 'graduate' and 'professional degrees,'" under 20 U.S.C. § 1087e(a)(4), *see* Pls.' Proposed Order at 1, ECF No. 4-9, the Court should issue a stay pending appeal and order Plaintiffs to post security.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay").  For the reasons explained above, Plaintiffs are not likely to succeed on the merits and Defendants will be irreparably injured absent a stay.  *See id.*  The public interest strongly favors giving effect to a provision enacted by the American people's democratically elected representatives, particularly here where Plaintiffs do not challenge the validity of the statute.  *See id.*  Those factors outweigh any injury Plaintiffs might suffer.  A stay pending appeal is warranted if the Court enjoins Defendants from enforcing the statute, 20 U.S.C. § 1087e(a)(4).

Alternatively, the Court should require Plaintiffs to post an appropriate bond commensurate with the amount of funding affected by Plaintiffs' requested relief—that is, the costs and damages that would be sustained by the Government, because an injunction may require the Government to make specific payments it is not legally obligated to make, and which may not be fully recoverable.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that

Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"); *cf. Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025) (staying district court injunction requiring payment of federal funds in part because the district court "declined to impose bond"); *see also* Rule at 23769 (estimating taxpayer savings of the professional student definition at $51–52 million).  Under Federal Rule of Civil Procedure 65(c), the Court may issue preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  Without such a protective measure here, there may be no way to recover the funds lost to United States taxpayers if this Court or appellate courts were later to find that the Department was "wrongfully enjoined."  *See id.*; *cf. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 145 S. Ct. 2658, 2660 (2025) (staying district court injunction because plaintiffs did not say they would "repay grant money if the Government ultimately prevail[ed]" during appellate process).

## CONCLUSION

For the forgoing reasons, the Court should deny Plaintiff's Motion for a Stay under 5 U.S.C. § 705 and for Preliminary Injunction.

Dated: June 3, 2026                    Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General
                                       Civil Division

                                       MICHELLE BENNETT
                                       Assistant Branch Director
                                       Civil Division, Federal Programs Branch

                                       */s/ Christian Dibblee*
                                       CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
                                       KATHRYN L. ALKIRE (FL Bar No. 1050146)
                                       Trial Attorneys
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, D.C. 20005
                                       Tel: (202) 353-5980
                                       Email: Christian.R.Dibblee@usdoj.gov

                                       *Counsel for Defendants*

40