**THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| PA EDUCATION ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | No. 1:26-cv-1941 (BAH) |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION*, et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

The Working Families Tax Cuts Act ................................................................................... 2

Reimagining and Improving Student Education .................................................................. 4

This Litigation ...................................................................................................................... 9

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 11

I.      Plaintiffs Have Failed To Show Likely Success On The Merits. ................................. 12

II.     Plaintiffs Have Failed To Establish Article III Standing, Much Less Irreparable Harm.. 25

        A.      Plaintiffs Fail To Identify Irreparable Harm To Any Individual Member Of The Plaintiff Organizations. ................................................................. 26

        B.      Plaintiffs Fail To Identify Irreparable Harm To Any Institutional Member Of The Plaintiff Organizations. ...................................................... 30

        C.      Plaintiffs' Alleged Reputational Injuries Do Not Establish Standing Or Irreparable Harm. ................................................................................... 31

III.    The Balance Of Equities And The Public Interest Weigh Against A Stay ...................... 35

IV.     Any Relief Should Be Appropriately Limited. ............................................................. 36

        A.      Any Injunction Should Be Limited To The Relevant Portions Of The Rule ........ 36

        B.      Any Relief Should Be Limited To Plaintiffs And Their Members Who Have Demonstrated Standing. ............................................................ 39

V.      If The Court Issues Injunctive Relief, The Court Should Issue a Stay Pending Appeal And Require Plaintiffs To Post Security ................................................................. 40

CONCLUSION .................................................................................................................. 41

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ................................................................................................ 36

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) .............................................................................. 34

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006) ............................................................................... 27

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
3 F.4th 373 (D.C. Cir. 2021) ................................................................................. 36

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) ................................................................... 26, 27, 31

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ................................................................................ 31

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) .............................................................................................. 38

*Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. Env't Prot. Agency*,
72 F.4th 284 (D.C. Cir. 2023) ............................................................................... 37

*Bragdon v. Abbott*,
524 U.S. 624 (1998) .............................................................................................. 15

*Bristol–Myers Squibb Co. v. Shalala*,
923 F.Supp. 212 (D.D.C. 1996) ............................................................................ 32

*C.S. Lawn & Landscape, Inc. v. Dep't of Labor*,
No. 12-cv-1533 (TSC), 2026 WL 820976 .......................................................... 20

*Carney v. Adams*,
592 U.S. 53 (2020) ................................................................................................ 25

*Chamber of Com. of U.S. v. E.P.A.*,
642 F.3d 192 (D.C. Cir. 2011) ................................................................... 27, 30, 34

*Chestnut Hill Benevolent Ass'n v. Burwell*,
142 F. Supp. 3d 91 (D.D.C. 2015) ........................................................................ 12

*Circuit City Stores v. Adams*,
532 U.S. 105 (2021) ................................................................................. 13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................... 25, 26

*Cobell v. Norton*,
391 F. 3d 251 (D.C. Cir. 2004)................................................................. 11

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........................................................................... 36, 40

*Dickinson v. Trump*,
17 F.4th 634 (9th Cir. 2026) .................................................................... 39

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999)................................................................... 40

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................................... 26, 34

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................................................... 13, 21

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015).................................................................. 34

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) ................................................................................. 12

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ................................................................................. 40

*Hi-Tech Pharmacal Co. v. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008)............................................................. 26

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
933 F. Supp. 2d 58 (D.D.C. 2013)........................................................... 11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................. 20

*Los Angeles Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026)................................................................. 39

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................... 28, 29, 31

*Make the Road N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)................................. 36, 37

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
571 U.S. 161 (2014) ............................................................................................. 12

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................... 25, 29, 30

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ............................................................................................. 13

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
606 U.S. —, 145 S. Ct. 2658 (2025) .................................................................... 41

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995)............................................................................. 34

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996)................................................................ 25, 29, 34

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................. 11

*North Carolina v. FERC*,
730 F.2d 790 (D.C. Cir. 1984).............................................................................. 36

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995)................................................................................ 37

*Sekhar v. United States*,
570 U.S. 729 (2013) ............................................................................................. 15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................. 29

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................................. 27

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) ............................................................................................. 28

*Toxco Inc. v. Chu*,
724 F. Supp. 2d 16 (D.D.C. 2010)........................................................................ 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............................................................................................. 39

iv

*Trinity Servs., Inc. v. Marshall,*
  593 F.2d 1250 (D.C. Cir. 1978) ........................................................................... 13

*Trudeau v. Fed. Trade Comm'n,*
  384 F. Supp. 2d 281 (D.D.C. 2005) ...................................................................... 32

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ............................................................................................. 39

*United Transp. Union v. ICC,*
  891 F.2d 908 (D.C. Cir. 1989) ............................................................................. 31

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ............................................................................................. 28

*Warth v. Seldin,*
  422 U.S. 490 (1975) ........................................................................................ 25, 34

*Wayman v. Southard,*
  23 U.S. (10 Wheat.) 1 (1825) ............................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................... 11, 25, 26, 31

*Yates v. United States,*
  574 U.S. 528 (2015) ........................................................................................ 12, 19

## Statutes

20 U.S.C. § 1082 .................................................................................................... 1

20 U.S.C. § 1087e ............................................................ 2, 3, 4, 10, 23, 24, 27

20 U.S.C. § 1221e-3 ........................................................................................ 1, 19

20 U.S.C. § 3441 .................................................................................................... 1

20 U.S.C. § 3474 ............................................................................................... 1, 19

20 U.S.C. § 3471 .................................................................................................... 1

Alaska Admin. Code tit. 12 § 40.410 (2026) ...................................................... 21

La. Rev. Stat. § 37:1310.11 .................................................................................. 22

Mo. Rev. Stat. § 334.036 ...................................................................................... 22

Higher Education Act of 1965,
  Pub. L. No. 89-329, 79 Stat. 1219 ......................................................................... 1

Vt. Stat. Ann. Tit. 26 § 1735a (2026) ............................................................................ 21

Working Families Tax Cuts Act,
  Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................................ 2, 3, 38

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................................ 40

Federal Rule of Civil Procedure 65(d) ........................................................................... 39

**Legislative Materials**

H.R. Rep. No. 119-206 (2025) ....................................................................................... 35

**Administrative & Executive Materials**

12 Alaska Admin Code 40.410 ....................................................................................... 21

34 C.F.R. § 668.2 ................................................................................................... *passim*

34 C.F.R. § 685.200 ....................................................................................................... 38

34 C.F.R. § 685.203 ................................................................................................... 2, 38

Federal Student Aid Programs,
  72 Fed. Reg. 44620 (Aug. 8, 2007) ..................................................................... 14

Federal Student Aid Programs,
  72 Fed. Reg. 62014 (Nov. 1, 2007) ...................................................................... 14

Public Hearing; Negotiated Rulemaking Committees,
  90 Fed. Reg. 35261 (July 25, 2025) ....................................................................... 5

Reimagining and Improving Student Education,
  91 Fed. Reg. 4254 (Jan. 30, 2026) ................................................................. *passim*

Reimagining and Improving Student Education, Federal Student Loan Program
  Final Requirements,
  91 Fed. Reg. 23768 (May 1, 2026) ................................................................. *passim*

**Other Authorities**

Ctrs. for Disease Control & Prevention, *Collaborative Practice Agreements and Pharmacists'*
*Patient Care Services* (2013),
https://perma.cc/L3NW-Q8NK ..................................................................................... 23

Dear Colleague Letter GEN-08-04 (April 14, 2008),
https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf ........ 2

Nat'l Conf. of State Legislatures, *Physician Assistant Practice and Prescriptive Authority*,
https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-assistants/physician-
assistant-practice-and-prescriptive-authority (last updated Oct. 2025) ............................... 21, 24

Nat'l Conf. of State Legislatures, *Practitioner: Physician Assistants*,
https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-
assistants/%E2%80%8Cphysician-assistant-practice-and-prescriptive-authority .................... 24

Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *About IPEDS*,
https://nces.ed.gov/ipeds/about-ipeds ..................................................................................... 14

Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *Detail for CIP Code 39.0605*,
https://perma.cc/Y5GS-ZKMQ ................................................................................................ 18

Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *IPEDS 2025-26 Data Collection System*,
https://surveys.nces.ed.gov/ipeds/public/glossary ................................................................... 14

Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *Postsecondary Institutions in the United*
*States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month*
*Enrollment: 2006-2007*,
https://nces.ed.gov/pubs2008/2008159rev.pdf ......................................................................... 15

Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *The Classification of Instructional*
*Programs*,
https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 ............................................................... 18

Porter, Stanley E., *Weighing the Past, Present, and Future of Graduate Theological*
*Education*, 2024 Christian Higher Educ. 90 (2025) ........................................................... 17, 18

Smith, Timothy M., *What's the difference between pharmacists and physicians?*, Am. Med.
Ass'n (Feb. 5, 2024), https://perma.cc/4TGR-VRVG ............................................................... 23

Thomson, Henry B., *The Choice of a Profession, 1857,*
https://perma.cc/5S33-S65X ..................................................................................................... 17

U.S. Dep't of Educ., *Dear Colleague Letter GEN-08-04* (Apr. 14, 2008),
https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf. ....... 2

Wright, Peter, *What is a "Profession?"*,
  29 Canadian B. Rev. 748 (1951) ........................................................................................ 17

**INTRODUCTION**

The cost of higher education has risen dramatically over the past several decades, leaving millions of Americans burdened by substantial student loan debt. Concerned with the unsustainable strain on students, taxpayers, and the Federal lending system, Congress enacted, and President Trump signed into law, the Working Families Tax Cuts Act ("WFTCA") to reform Federal student lending and promote affordability in higher education. Among other changes, WFTCA sought to encourage institutions to align educational costs with economic outcomes, curb excessive borrowing, and place Federal student aid on a more fiscally sustainable footing. WFTCA amended portions of the Higher Education Act of 1965, Pub. L. No. 89-329 ("HEA"), and made significant changes to the Federal student aid framework, including by establishing new borrowing limits and restructuring available Federal student loan programs. One such change was to establish new borrowing limits for students seeking graduate and professional degrees.

"When Congress passes legislation amending statutory provisions regarding programs administered by an agency, that agency is tasked with implementing those changes in its regulations." Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4256 (Jan. 30, 2026). Federal student loan programs are administered by the Department of Education ("Department"), and Congress has granted the Secretary of Education broad authority to implement those programs. *See* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3474, 3471. The Secretary exercised her delegated authority by promulgating a Rule to implement WFTCA's statutory reforms. *See* Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements, 91 Fed. Reg. 23768 (May 1, 2026) ("Rule").

Two associations challenge the Rule's definition of "professional degree" and the Department's conclusion that Physician Associate/Assistant ("PA") degrees do not qualify as a "professional degree" under the Rule. Plaintiffs seek a preliminary injunction.

1

That challenge should fail, however, because the Rule is consistent with law, the Department's decision to exclude PAs was not arbitrary and capricious, and Plaintiffs have not identified any irreparable harm to any of their members. The balance of equities and the public interest also weigh heavily against the extraordinary remedy of a preliminary injunction, which would disrupt the Department's efforts to administer the Federal student aid system in accordance with Congress's mandate. Because Plaintiffs cannot satisfy any of the requirements for preliminary relief, their Motion should be denied. At the very most, any relief the Court enters should be narrow. Any injunction should be limited to the portions of the Rule that the Court determines are likely unlawful, and that relief should be appropriately tailored and limited to those Plaintiffs that have established standing.

## BACKGROUND

**The Working Families Tax Cuts Act**

On July 4, 2025, Congress enacted, and President Trump signed into law H.R. 1, colloquially known as the Working Families Tax Cuts Act, or WFTCA. *See* Pub. L. No. 119-21, 139 Stat. 72 (2025). Among other things, WFTCA amended the Department's Direct Loan program to establish loan caps for graduate and professional students and to terminate graduate and professional Federal Direct PLUS loans altogether.[1] *See* 20 U.S.C. § 1087e. WFTCA added multiple subparagraphs to the HEA and codified the caps on Federal student loans at 20 U.S.C.

---

[1] Prior to the July 4, 2025 changes, graduate and professional students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate). *See* 34 C.F.R. § 685.203 (2025); *see also* NPRM at 4273 (comparison chart). Additionally, graduate and professional students enrolled in certain approved health profession programs could obtain Direct Unsubsidized Loans of up to $224,000 in aggregate. *See* NPRM at 4277; Dear Colleague Letter GEN-08-04 (April 14, 2008), *available at* https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf. Graduate and professional students in need of additional federal financial assistance could then obtain Direct PLUS loans (also known as Grad PLUS loans), available at a higher interest rate than Direct Unsubsidized Loans, to cover up to the full cost of attendance.

2

§ 1087e(a)(4).  *See* Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35.  That provision caps borrowing by "a graduate student, who is not a professional student" to $20,500 for "any academic year or its equivalent."  20 U.S.C. § 1087e(a)(4)(A)(i).  By contrast, the maximum annual amount that "a professional student may borrow in any academic year or its equivalent [is] $50,000."  *Id.* § 1087e(a)(4)(A)(ii).

Congress also established new aggregate limits for both graduate and professional students, with professional students qualifying for a higher cap.  The aggregate limit for a graduate student "who is not (and has not been) a professional student," is $100,000.  *Id.* § 1087e(a)(4)(B)(i)(I). And if a graduate student "is (or has been) a professional student," the maximum is $200,000 minus the amount borrowed for the student's professional program.  *Id.* § 1087e(a)(4)(B)(i)(II). For a professional student "who is not (and has not been) a graduate student," WFTCA establishes a $200,000 aggregate cap.  *Id.* § 1087e(a)(4)(B)(ii)(I).  And the aggregate cap for a professional student "who is (or has been) a graduate student," is $200,000 minus the amount borrowed for the student's graduate program.  *Id.* § 1087e(a)(4)(B)(ii)(II).  All new loan limits "begin[] on July 1, 2026," *id.* § 1087e(a)(4)(A), (B), but these new limits do not apply during the expected time to credential[2] of students currently enrolled in a program of study at an institution and who have received a loan (or on whose behalf a loan was made) for that program of study "as of June 30, 2026," *id.* § 1087e(a)(8).

WFTCA effectuated the distinct loan caps for graduate students and professional students by defining those terms.  A "graduate student" is "a student enrolled in a program of study that

---

[2] For the purpose of the exception to the loan limits, "expected time to credential" means the lesser of 1) three academic years, or 2) the period determined by calculating the difference between the program length for the program of study in which the individual is enrolled and the period of the program of study the student has completed as of June 30, 2026.  20 U.S.C. § 1087e(a)(8)(B).

awards a graduate credential (other than a professional degree) upon completion of the program."

*Id.* § 1087e(a)(4)(C)(i).  And "in this paragraph,"—*i.e.*, for purposes of the annual and lifetime

loan caps—a "professional student" means "a student enrolled in a program of study that awards

a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as

in effect on [the date of enactment of this paragraph]), upon completion of the program."  *Id.*

§ 1087e(a)(4)(C)(ii).  In short, Congress's definition of professional student depends on the degree

that student is seeking.  And for the requisite degrees, Congress relied on a defined term in the

Code of Federal Regulations at 34 C.F.R. § 668.2.

As of the date of WFTCA's enactment, July 4, 2025, 34 C.F.R. § 668.2 defined a

professional degree as:

> A degree that signifies both completion of the academic requirements for
> beginning practice in a given profession and a level of professional skill
> beyond that normally required for a bachelor's degree.  Professional
> licensure is also generally required. Examples of a professional degree
> include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or
> D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.),
> Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic
> Medicine (D.O.), Podiatry (D.P.M., D.P., or Pd.D..), and Theology (M.Div.,
> or M.H.L.).

34 C.F.R. § 668.2(b).

**Reimagining and Improving Student Education**

To make WFTCA's changes administrable and to provide clarity on which degrees are

considered professional degrees, the Department published a Notice of Proposed Rulemaking

titled Reimagining and Improving Student Education.  91 Fed. Reg. 4254, 4254 (Jan. 30, 2026)

("NPRM").  The NPRM explained that the Department had convened a negotiated rulemaking

4

committee in the fall of 2025[3] and that the committee had "reached consensus" on proposed new regulatory text to be codified at 34 C.F.R. § 685.102(b), including a definition of "professional student" for purposes of WFTCA's loan limits. NPRM at 4256. The Department noted in the NPRM that WFTCA's definition of professional student "incorporated a variety of words and phrases that may, without context, appear ambiguous or vague on their face or as applied to specific degree programs." *Id.* at 4262. The Department's proposed definition set forth "the best reading of [WFTCA] using the tools of statutory construction." *Id.*

The Department acknowledged that the WFTCA definition of a professional degree "establishes a three-part test": (1) "the degree must signify completion of the academic requirements for beginning practice in a given profession"; (2) "the profession the graduate enters must require a level of professional skill beyond what is normally required for a bachelor's degree"; and (3) "the profession that a degree holder would enter after graduating generally requires professional licensure." *Id.* Those three requirements were included in the new proposed regulation as separate criteria. *See id.* at 4332. As for the specific degrees enumerated in § 668.2, because they "were codified by Congress into the definition as examples," the Department needed no "additional interpretive work to know that these specific degree programs qualify as professional degrees." *Id.* at 4262. Accordingly, the Department listed those degrees in a separate subsection, following the proposed criteria, as fields where "[a] professional degree may be awarded." *Id.* at 4332. And the Department proposed adding the Clinical Psychology (Psy. D, Ph.D.) to that list because that degree "meet[s] all of the criteria in the definition of *professional degree* in 34 C.F.R. [§] 668.2." *Id.* at 4263 (emphasis added).

---

[3] The Department announced its intent to establish the rulemaking committee and hear public comments on July 25, 2025. *See* Public Hearing; Negotiated Rulemaking Committees, 90 Fed. Reg. 35261 (July 25, 2025).

The rest of the Department's proposed criteria stemmed from the list of degrees in 34 C.F.R. § 668.2 that Congress had incorporated. The Department determined that the § 668.2 list "provides additional contextual clues" that assist in "discerning the facial or as applied meaning of the operative test." *Id.* at 4262. Specifically, the Department explained that although neither WFTCA nor § 668.2 "explicitly state that a degree must *generally* be at the doctoral-level . . . the illustrative list of degrees suggests that this must be the case, as it contains only three non-doctoral degrees." *Id.* The Department further explained that, when originally promulgated, § 668.2's definition of "professional student" was based on a previous definition of "first professional student" in a glossary of terms that the Department published to schools for data reporting. *See id.* at 4262. Two criteria of that glossary definition were that a degree required "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *Id.* The Department also noted that this glossary had listed as "first professional degrees" the same ten degrees enumerated in § 668.2. Accordingly, the Department proposed that a professional degree must "generally [be] at the doctoral level" and must require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4332.

Lastly, the Department proposed as a criterion that a degree must have "a four-digit program CIP code . . . in the same intermediate group as" the § 668.2 degrees and clinical psychology. *Id.* CIP refers to the Classification of Instructional Programs ("CIP"), a system designed "for tracking and reporting fields of study and program completion activity." *Id.* at 4264. The Department determined that requiring the same four-digit codes as the § 668.2 degrees and clinical psychology would encompass any degrees "closely related" to the ones enumerated in the

6

new regulation. *Id.* The Department also said that using CIP codes would "ha[ve] administrative benefits for the Department and institutions given [their] wide use." *Id.* at 4264.

The NPRM's discussion of the definition of professional degree ended with discussion of specific degrees and why the Department concluded that those degrees did not "meet the professional degree definition." *Id.* at 4265–67. But before those explanations, the Department noted its hesitance "to classify degrees that lead to employment that must be supervised by a licensed professional, and cannot be performed independently, as professional degrees." *Id.* at 4265. The Department explained that this decision was "informed by the characteristics of [the] programs in 34 C.F.R. [§] 668.2." *Id.*

The Department concluded that due to "the unsettled regulatory landscape regarding licensure and scope of practice of physician assistants," the Master of Science in Physician Assistant Studies ("MSPAS") is not a professional degree. *Id.* at 4266. The majority of States require a PA to be supervised by a "physician or other health care provider in order to practice and prescribe medication." *Id.* And although the Department recognized that five States permit PAs to practice independently, "several only allow independent practice after the [PA] has completed a requisite number of hours of postgraduate clinical experience in collaboration with a physician." *Id.* "[B]ecause the overwhelming majority of states substantially restrict the practice of [PAs] and require them to collaborate with, or be supervised by, physicians," the Department determined that "it would be inaccurate to treat an MSPAS as a professional degree." *Id.*

The Department requested comments on its NPRM by March 2, 2026, *see id.* at 4254, and on May 1, 2026, the Department published a final rule, *see* Rule. The preamble to the Rule responded to numerous comments about the proposed definition of "professional student." As in the NPRM, the Department stated that the list of degrees in § 668.2 "provides context and limiting

7

principles" about whether other degrees qualify as professional degrees. Rule at 23783. The Department relied on that list "to identify common characteristics of those degrees" and included those common characteristics as criteria in the Rule. *Id.* at 23785. As proposed, the Department determined that Clinical Psychology is a professional degree. *See id.* at 23782.

As in the NPRM, the Department also discussed another common characteristic based on "the contextual significance of the illustrative list" in § 668.2, *i.e.*, supervision. "[P]eople who practice [the professions listed in § 668.2] may obtain a license and practice without supervision of another licensed professional, and, to the extent they are supervised at the beginning of their careers, it is by someone who holds the same degree and practices the same profession." *Id.* at 23787. The Department did not deny that certain degrees in § 668.2 often involve a period of "supervised practice," but that period is "temporary" and, once complete, "is no longer required." *Id.* The Department concluded that degrees that lead to employment ordinarily supervised "by a licensed professional in a different occupation" are not substantially similar to the degrees listed in § 668.2. *Id.*

The preamble further responded to comments about specific degrees and explained why each degree did not qualify as a professional degree. *See id.* at 23790–808. Consistent with the NPRM, the Department explained that PA degrees are not professional degrees because States largely "do not provide for independent practice authority for licensed [PAs]." *Id.* at 23800. The Department also noted that an MSPAS is "a master's level credential" rather than a doctoral-level credential like all the example medical degrees enumerated in § 668.2. *Id.*

Ultimately, the Rule promulgates the following regulatory text related to the definition of a professional degree:

(i) A professional degree is a degree that:

8

(A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;

(B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

(C) Generally requires professional licensure to begin practice; and

(D) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.

(ii) A professional degree may be awarded in the following fields:

(A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* at 23882.

In both the NPRM and Rule, the Department emphasized that its "classification of particular professions and degree pathways into either 'graduate' or 'professional' does not represent a normative judgment regarding whether we think the underlying career is worthy." *See, e.g.*, *id.* at 23782. Rather, the Department's classifications identify borrower categories only for the purpose of Direct Loan limits. *Id.* at 23781.

The Department also noted in the preamble that all portions of the Rule are severable and established the Department's "inten[t] that [the portion of the Rule regarding classification of degrees as professional degrees] is entirely severable" from the rest of the Rule. *Id.* at 23771. The Rule is effective on July 1, 2026. *See id.* at 23768.

**This Litigation**

Plaintiffs filed suit on June 3, 2026, against Defendants, the United States Department of Education and Linda McMahon in her official capacity as the Secretary of the United States

Department of Education, raising three causes of action. *See* Compl., ECF No. 1. In Count I, Plaintiffs allege that Defendants acted contrary to law and in excess of statutory authority in violation of the Administrative Procedure Act ("APA") by "rewrit[ing] the definitions of professional student and professional degree that Congress established [in 20 U.S.C. § 1087e(a)(4)(C)(ii)]," and excluding PA degrees from those definitions. *See id.* at 15–16. Plaintiffs allege in Count II that Defendants' decision not to classify PA degrees as professional degrees was arbitrary and capricious in violation of the APA. *Id.* at 16–17. In Count III, Plaintiffs allege that the Rule and Defendants' "specific finding[] and conclusions that PA degrees are not professional degrees, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with [the APA]." *Id.* at 17–18.

Plaintiffs are two national organizations that allege standing to sue in their representative capacities on behalf of their members. *Id.* at 5, 6; *id.* at ¶¶ 20, 27. Plaintiff PA Education Association ("PAEA") sues on behalf of "330 PA educational programs," *id.* at ¶ 18, and Plaintiff American Academy of Physician Associates ("AAPA") on behalf of its "74,271 members, who are PAs, PA students, and those preparing to enter PA schools." Decl. of Lisa Gables, ECF No. 7-2 at ¶ 6.

Plaintiffs filed a Motion, ECF No. 7 ("Motion" or "Mot.")[4] on June 3, 2026, seeking a preliminary injunction. Mot. at 1. Specifically, Plaintiffs ask the Court to enter an order enjoining the Department from implementing the Rule and requiring the Department "to treat existing and entering Physician Associate/Physician Assistant students, including those returning after a deferral or a break in their education, as 'professional students' for the purpose of access to the higher student loan limits" under the WFTCA. Pls.' Proposed Order, ECF No. 7-11 at 1–2.

---

[4] Any pincites to ECF filings are to the ECF pagination of filings in No. 26-cv-1941.

**LEGAL STANDARD**

"The standard for issuance of the extraordinary and drastic remedy of . . . a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). A preliminary injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F. 3d 251, 258 (D.C. Cir. 2004).

To warrant preliminary injunctive relief, the moving party must satisfy four requirements: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. Where, as here, the government is the party opposing injunctive relief, the last two requirements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

Plaintiffs fail to meet any of the requirements for a preliminary injunction and are not entitled to the relief they seek. They have not demonstrated success on the merits because the Rule's definition of professional degree is consistent with Congress's decision in WFTCA to incorporate the definition in 34 C.F.R. § 668.2 and is not arbitrary or capricious under the APA. Plaintiffs also have failed to demonstrate Article III standing, but even if they had met that minimum standard, they have not shown irreparable harm. Moreover, the balance of the equities tips in the Department's favor. If the Court disagrees and decides to grant injunctive relief, that remedy must be limited to the portions of the Rule the Court determines are likely unlawful and the Plaintiffs that have demonstrated standing.

11

## I.       Plaintiffs Have Failed To Show Likely Success On The Merits.

Each component of the Department's definition of professional degree accords with the language in 34 C.F.R. § 668.2 that Congress cross-referenced in WFTCA.  Start with the well-worn premise that the Department must execute the wishes of Congress as expressed in the text of WFTCA.  *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 168 (2014) ("Our analysis begins with the statutory text.").  Section 668.2's definition is part of that text, and the Department must respect that Congress chose to define professional degree based on the illustrative list in § 668.2.

The Department's interpretation of professional degree flows naturally from the statutory principle of *nosictur a sociis*, which holds that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995).  The Supreme Court has relied on this canon to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation omitted).  That canon requires the Department to interpret "professional degree" based on the words surrounding it—namely, the list of degrees already in § 668.2.  The Department therefore correctly relied on the list to "provide context for the types of degrees that Congress considered to have met its definition of professional degree for the purposes of higher loan limits."  NPRM at 4263.  True enough, that list provides "[e]xamples" which "include but are not limited to" the enumerated degrees.  34 C.F.R. § 668.2.  But "it is widely accepted that general expressions such as 'including but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples."  *Chestnut Hill Benevolent Ass'n v. Burwell*, 142 F. Supp. 3d 91, 103 (D.D.C. 2015) (citing authorities).  The Department therefore did not exceed the bounds of statutory interpretation

12

by interpreting "professional degree" to include degrees with characteristics common to those degrees in the list. *See* Rule at 23785.

The Department's interpretation is also consistent with the related canon of *ejusdem generis*, which teaches that "where specific words precede or follow general words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978). As applied here, the general term "professional degree" should be interpreted by reference to and in light of common attributes shared by the specific degrees listed in § 668.2. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114 (2021) (applying *ejusdem generis* to "give independent effect to the statute's enumeration of . . . specific categories," which would otherwise be superfluous).

Thus, the Department did not err nor act in an arbitrary or capricious manner by interpreting "professional degree" in relation to the degrees enumerated in examples provided in § 668.2. Any other approach does not account for Congress's choice to incorporate the entire list of degrees in § 668.2—"Congress would not normally introduce a general term that renders meaningless the specific text that accompanies it," so the Department must rely on the § 668.2 list to interpret "professional degree." *Fischer v. United States*, 603 U.S. 480, 487 (2024). Put another way, Congress's incorporation of that list must "have some legal consequence." Rule at 23789; *accord Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) (The Supreme Court "is 'obliged to give effect, if possible, to every word Congress used'" (citation omitted)). The Department therefore could not ignore the incorporated list from § 668.2. That interpretive decision was correct and, as discussed below, validates the requirements the Department included in the Rule.

***Requirements in Subsection (i)(B).*** Proposed subsection (i)(B) contains two requirements derived from the list of degrees in § 668.2 that Congress incorporated.

First, the Department specified that a professional degree "requires at least six academic years of post secondary education coursework for completion, including at least two years of post-baccalaureate level coursework." Rule at 23882. That requirement is a characteristic common to all the degrees listed in § 668.2. The Department did not fabricate this similarity; section 668.2 acknowledged it. In 2007, the Department promulgated § 668.2's definition of a professional degree as one in a series of definitions to apply to all programs under Title IV of the HEA. *See* Federal Student Aid Programs, 72 Fed. Reg. 62014 (Nov. 1, 2007). Although the eventual defined term was "professional degree," it was originally "first professional degree." *See id.* at 62015. That is important because, as the Department explained when it proposed § 668.2, the definition was "based on the definition currently used by the National Center for Educational Statistics (NCES)." Federal Student Aid Programs, 72 Fed. Reg. 44620, 44621 (Aug. 8, 2007); *see also* NPRM at 4262–63 (discussing this history).

NCES defined first-professional degree for purposes of the Integrated Postsecondary Education Data System ("IPEDS"), which is "a system of interrelated surveys" that "gathers information from every college, university, and technical and vocational institution that participates in the Federal student financial aid programs." NCES, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds (last visited June 9, 2026). IPEDS has always provided a glossary of terms to guide institutions in their data collection efforts.[5] And in 2007, the IPEDS glossary defined "first-professional degree" as:

---

[5] To access the current glossary, *see* NCES, U.S. Dep't of Educ., *IPEDS 2025-26 Data Collection System*, https://surveys.nces.ed.gov/ipeds/public/glossary (last visited June 9, 2026).

14

> An award that requires completion of a program that meets all of the following criteria: (1) completion of the academic requirements to begin practice in the profession; *(2) at least 2 years of college work prior to entering the program; and (3) a total of at least 6 academic years of college work to complete the degree program*, including prior required college work plus the length of the professional program itself. First-professional degrees may be awarded in the following 10 fields:

| | |
|---|---|
| Chiropractic (D.C. or D.C.M.) | Osteopathic medicine (D.O.) |
| Dentistry (D.D.S. or D.M.D.) | Pharmacy (Pharm.D.) |
| Law (L.L.B. or J.D.) | Podiatry (D.P.M., D.P., or Pod.D.) |
| Medicine (M.D.) | Theology (M.Div., M.H.L., B.D., |
| Optometry (O.D.) | or Ordination) |
| | Veterinary medicine (D.V.M.) |

NCES, U.S. Dep't of Educ., NCES 2008-159, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007* at B-2 (Oct. 2008) (emphasis added).[6]  As the italicized language above makes clear, the IPEDS term included the same requirements for program length that the Department included in the Rule.

The presence of these requirements in § 668.2's precursor means they are properly part of the Rule now.  A fundamental canon of interpretation is that when words are "obviously transplanted from another legal source, whether the common law or other legislation," those words "bring[] the old soil with [them]."  *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted).  As a result, when the Department carried over the same ten degrees from the IPEDS definition to § 668.2, it also transplanted the length-of-program requirements from IPEDS.  And when Congress cross-referenced § 668.2 in WFTCA, it intended to incorporate that same administrative interpretation.  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory

---

[6] This report is available at https://nces.ed.gov/pubs2008/2008159rev.pdf.  And although the report postdates the Department's promulgation of § 668.2, the data collection occurred in "fall 2007." *Id.* at iii.

provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").

The requirement in subsection (1)(B) that a professional degree be "generally at the doctoral level" likewise flows from the list of degrees in § 668.2.  Rule at 23882.  "[O]nly one" grouping of those degrees—the ones for Theology—includes only degrees "not at the doctoral level." *Id.* at 23784.  That is a major clue for the meaning of "professional degree"; if 90% of the degrees listed and incorporated by Congress are at the doctoral level, "professional degree" encompasses degrees which are "*generally* at the doctoral level." *Id.* at 23882 (emphasis added).

Plaintiffs' main attack against the "generally at the doctoral level" criterion is that "not all the degrees included in [§ 668.2] are doctoral degrees." Mot. at 14.  That is true, as the Department acknowledged.  "The list [in § 668.2] shows that the incorporated framework is not categorically limited to doctoral degrees."  Rule at 23784.  But the list also shows that "the category is narrow and specific rather than open-ended," and the Department could not overlook that, "among the professional degrees listed in § 668.2, only one is not at the doctoral level."[7]    *Id.*  "Paragraph (1)(ii) [of the regulatory text] reflects that contextual reading of the incorporated definitions" by requiring that a degree be "generally" at the doctoral level.  *Id.*  Although the Department does not read § 668.2 to "require a doctoral-only rule"—hence the inclusion of the term "generally" in the regulatory text, *id.*—the identification of almost entirely doctoral degrees indicates that Congress incorporated a definition of "professional degree" that generally includes degrees at the doctoral level.

---

[7] By "only one," the Department meant that the grouping of degrees under the subject of Theology uniquely includes only master's degrees and no doctoral degrees.

Regardless, it was not "arbitrary and capricious" for the Department to exclude the MSPAS degree from the definition of professional degree. *But see* Mot. at 16. All the healthcare-related degrees in § 668.2 are at the doctoral level. The MSPAS degree is not a doctoral degree, but rather a "master's level credential." Rule at 23800; *see also* ECF No. 7-1 at 15 ("PA programs award only graduate-level master's degrees."). Had Congress wished to incorporate healthcare degrees at the master's level, it could have done so.[8] Including a master's degree in healthcare as Plaintiffs request would flout Congress's choice to recognize only doctoral degrees in healthcare-related fields.

In any event, the three non-doctoral degrees listed in § 668.2 are inapposite comparators for the MSPAS degree on their own terms. The LL.B. degree is "no longer conferred by American institutions of higher education" and thus has no bearing on what degrees should be considered professional today. *See* Rule at 23796. As for the theological degrees listed in § 668.2, they reflect a centuries-long recognition of theology as one of the traditional "learned professions" along with law and medicine. Henry Byerley Thomson, *The Choice of a Profession, 1857,* https://perma.cc/5S33-S65X; *see also* Peter Wright, *What is a "Profession?"*, 29 Canadian B. Rev. 748, 750–51 (1951) (detailing the rise of "Law, Divinity, and Medicine" as the learned professions). To the extent the Rule's definition appears "internally inconsistent," Mot. at 16, that is because the Department must account for the historical recognition of theology as a profession. Section 668.2 does so by including a Master of Divinity (M. Div.) and a Master of Hebrew Learning (M.H.L.), both of which are typically required for ordination into holy orders. *See* Stanley E. Porter, *Weighing the Past, Present, and Future of Graduate Theological Education,*

---

[8] The Department also could have done so in 2008 when it promulgated § 668.2—by Plaintiffs' own admission, PA programs predate that regulatory definition by decades. *See* ECF No. 7-1 at 6, ¶ 23 (first PA class was established in 1965).

17

2024 Christian Higher Educ. 90, 96–97 (2025) ("The MDiv, however, continues to be touted in most circles as *the* degree for ministry preparation."); NCES, *Detail for CIP Code 39.0605*, https://perma.cc/Y5GS-ZKMQ (defining an MHL as "[a] program that prepares individuals for ordination as Rabbis"). MSPAS degrees do not have this history and are not analogous to master's degrees in theology, which are the initiating credentials for a field that has been recognized as "professional" for centuries. And as mentioned, the other "learned profession" of medicine is accounted for in § 668.2 by doctoral-level degrees. In short, given the unique history related to master's level theology degrees, the Department reasonably concluded that their explicit inclusion in § 668.2 does not support including master's level degrees in other fields.[9]

***Requirements in Subsection (i)(D).*** The Department's requirement that a degree must "[i]nclude[] a four-digit program CIP code . . . in the same intermediate group as the fields listed in paragraph (ii)(A)" is also consistent with law. Rule at 23882. For background, higher education includes "over 4,000 institutions and tens of thousands of programs that grant numerous . . . degrees." *Id.* at 23784. "[E]very postsecondary school that receives Federal student aid funds must use CIP codes to report their program data to the government." *Id.* at 4264. CIP codes are arranged in two-digit, four-digit, and six-digit groupings. There are 48 two-digit CIP codes that group a large number of related programs into a particular area, such as Engineering (Code 14) or Visual and Performing Arts (Code 50).[10] Within each two-digit series is a four-digit code that groups programs "that have comparable content and objectives" within the particular area, such as Civil Engineering (14.08) and Dance (50.03). NPRM at 2464. And "specific instructional

---

[9] The Rule also explained that theology degrees should be treated differently than other listed degrees because of First Amendment Free Exercise concerns. *See* Rule at 23791.

[10] The Court can peruse the CIP codes by visiting NCES, U.S. Dep't Educ., *The Classification of Instructional Programs*, https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited June 9, 2026) and clicking on the dropdown titled "2-digit series."

programs" receive their own six-digit code. *Id.* For example, Transportation and Highway Engineering is 14.0804, and Ballet is 50.0302. *See id.*

Consistent with its general interpretive approach, the Department's use of four-digit CIP codes ensures that professional degrees remain similar to the degrees listed in the definition Congress incorporated. Because those four-digit CIP codes group programs by "comparable content and objectives," any program that falls into the same four-digit code as a subsection (ii) degree should be considered a professional degree, assuming it meets all other requirements. The Department explained this well in the NPRM regarding Veterinary Medicine, which is listed in subsection (ii) of the regulation (as well as § 668.2) and has a four-digit code of 01.80. *See id.* It would be "illogical to include all programs sharing the same 2-digit CIP family"—such as, in the case of Veterinary Medicine, programs in Brewing Science and Dairy Science—because that would encompass programs that have only a minimal relationship to the degrees that Congress incorporated through WFTCA. *Id.*; *see also* Rule at 23786. The Department cannot establish procedures that would "giv[e] unintended breadth to the Acts of Congress" in this way. *Yates*, 574 U.S. at 543 (citation omitted). Similarly, using the six-digit code would limit the professional degrees to specific programs at specific institutions, which would be too narrow to operationalize Congress's decision to identify certain degrees—not specific programs—as professional degrees.

Plaintiffs' argument that the Department could not clarify the professional degree definition Congress incorporated in this way is unpersuasive. Congress has granted the Secretary of Education the authority to promulgate "rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see id.* § 3474 (authorizing Secretary to prescribe "rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or

19

the Department"). And the Supreme Court has long recognized that agencies are empowered to "fill up the details of a statutory scheme." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). Here, that authority allows the Department "to establish procedures to administer" what will be a professional degree and what will not. *C.S. Lawn & Landscape, Inc. v. Dep't of Labor*, No. 12-cv-1533 (TSC), 2026 WL 820976, slip op. at 16 (D.D.C. Mar. 25, 2026) (citation omitted).

Using CIP codes to define "professional degree" fills up the details of the Department's procedures for loan limits. The Department needs to avoid "confusion among institutions or even [within] the Department regarding what specific programs are eligible for higher loan limits." Rule at 23784. Multiple commenters made the same point, requesting that the Department "provide greater transparency and clearer criteria regarding which programs qualify" as professional degrees. *Id.* at 23788. CIP codes provide that clarity because institutions are already familiar with them and, in a landscape with so many institutions and degrees, CIP codes provide an easy and accessible way for the Department to apply WFTCA's loan limits and for institutions to know the programs to which those loan limits apply. *See id.* at 23784 (CIP codes are "critical to ensuring that the rule is operationally feasible"); *id.* at 23788 ("[U]se of the CIP code taxonomy will also help to make it clearer to institutions and students the way each program is classified.").

***Supervision "Requirement."*** Plaintiffs take aim at the "free-from-supervision qualification," which they say "is not in the statutory definition of professional degree, nor in the regulatory language in the Final Rule." Mot. at 15. The latter part is correct; the Department did not adopt anything related to supervision as "freestanding, disqualifying criteria" in the regulatory text. Rule at 23787. Nevertheless, any reliance by the Department on considerations surrounding supervision to identify a professional degree is consistent with Congress's incorporation of

20

§ 668.2.  A common feature of the degrees listed in that regulation (and of clinical psychology) is that people in those professions "may obtain a license and practice without supervision of another licensed professional."  *Id.*  And although some of the degrees do involve supervision, that supervision is "temporary" and "by someone who holds the same degree and practices the same profession."  *Id.*  Those characteristics are gleaned directly from the "statutory definition of 'professional degree.'"  Mot. at 15.  The "common sense" canons of *noscitur a sociis* and *ejusdem generis* clarify the meaning of "professional degree" that Congress incorporated to exclude degrees the holders of which must be supervised either on a continuing basis or by other professions because the degrees listed in § 668.2 do not have that characteristic.  *Fischer*, 603 U.S. at 487.

PAs cannot fulfill that contextual requirement incorporated by Congress.  Twenty-five States require physician supervision to permit a PA to practice and have prescriptive authority.  *See* Nat'l Conf. of State Legislatures, *Physician Assistant Practice and Prescriptive Authority* (last updated Oct. 2025).[11]  And twenty-one States (plus the District of Columbia) require a PA to "collaborat[e]" with a physician for practicing and prescribing authority.  *See id.*  Plaintiffs downplay this requirement, saying that only "half of the states require PAs to practice and prescribe medicine under the supervision of another professional."  Mot. at 17.  But a sampling of state laws makes clear that collaboration still presents a barrier to a PA's ability to practice and prescribe akin to the barriers imposed by supervision.  In Alaska, for example, a PA's relationship with a physician must be established by a "collaborative plan," almost all changes to which will "automatically suspend[]" the PA's authority to practice under that plan.  *See* Alaska Admin Code tit. 12 § 40.410 (2026); *see also* Vt. Stat. Ann. tit. 26 § 1735a (2026) (requiring a PA to practice

---

[11]    Available    at    https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-assistants/physician-assistant-practice-and-prescriptive-authority.

21

only under "a written practice agreement" with a physician).  There are no similar requirements for the professions that result from the degrees listed in § 668.2.

Special classifications of medical graduates and authorized collaboration agreements for pharmacists do not undermine the Department's conclusions on supervision or render those conclusions arbitrary and capricious.  *Contra* Mot. at 17.  Some states allow practice by medical-school graduates that have not entered a residency program—in other words, they have an M.D. or a D.O., both listed in § 668.2—who are then supervised by a licensed physician.  *See, e.g.*, Mo. Rev. Stat. § 334.036(1), (2) (2026); La. Rev. Stat. § 37:1310.11(F).  These graduates are referred to by multiple names, including assistant physicians, associate physicians, graduate registered physicians, bridge year graduate physicians, and special permit holders.  *See* ECF No. 7-1 at 18–19 nn.14, 16–19.  As an initial matter, this  option for holders of an M.D. or D.O. is another indication that "supervised practice may exist within [the] recognized professional pathways" to becoming a licensed physician.  Rule at 23787.  That "some supervision exists somewhere after degree completion" does not mean a degree is not a professional degree.  *Id.*  In the case of these graduates, they can still obtain full licensure for unsupervised practice if they take a further step, namely "match[] with a residency" program.  Mot. at 17.

PAs are different—in all but a handful of States, they do not have an option for unsupervised practice as a result of their degree.  Moreover, unlike a PA, the specially classified physicians are still supervised by "someone who holds the same degree and practices the same profession," like a medical or clinical psychology resident.  Rule at 23787.  Plaintiffs are therefore incorrect to say that these graduates' M.D. degrees "would not qualify as professional degrees under the standard the Department applied to PA degrees."  Mot. at 17.  And to the extent Plaintiffs suggest that a degree holder must obtain a license for the degree to qualify as professional, § 668.2

does not define a degree's professional status based on whether the recipient becomes licensed but on whether the *profession* for which the degree is required generally also requires licensure. *See* 34 C.F.R. § 668.2 ("Professional licensure is also *generally* required." (emphasis added)).  Some students may forego licensure or choose different career paths, but that does not change the profession's requirements.  For example, a J.D. is still a professional degree even if a recipient never takes or passes the bar, and a student "enrolled in" a J.D. program is therefore a professional student because practicing law generally requires a license and, in the vast majority of cases, a J.D. is required for that licensure. *See* 20 U.S.C. § 1087e(4)(C)(ii).

As for collaboration agreements for pharmacists, Plaintiffs rely on a publication that says pharmacists "*can* work with other health care providers" through collaborative agreements, not that they *must* do so as part of their profession.  CDC, *Collaborative Practice Agreements and Pharmacists' Patient Care Services* 1 (Oct. 2013), https://perma.cc/L3NW-Q8NK (emphasis added) (cited at Mot. at 17 n.17).  There is no evidence that these kinds of collaborative agreements "exist within recognized professional pathways" for pharmacists. *See* Rule at 23787.  Put more simply, a pharmacist need not enter into these kinds of supervisory or collaborative agreements to obtain their license as a pharmacist, unlike licensed PAs in almost every State.  Moreover, although the licenses of pharmacists and physicians may allow them to perform some overlapping functions (for example, administration of certain vaccines), each license definitively allows each profession to perform functions that the other legally may not.  For example, pharmacists generally cannot write prescriptions. *See* Timothy M. Smith, *What's the difference between pharmacists and physicians?*, Am. Med. Ass'n (Feb. 5, 2024), https://perma.cc/4TGR-VRVG.  Agreements between physicians and pharmacists are therefore truly collaborative across two professions.  Not so for PAs, who are legally empowered to perform only functions that a physician can also

23

perform. *See, e.g.*, Nat'l Conf. of State Legislatures, *Practitioner: Physician Assistants* (last visited Jun. 9, 2026) (explaining at a high level the duties of a physician assistant).[12]  Their collaboration agreements with physicians are therefore fundamentally different than a collaboration agreement between a pharmacist and a physician.

Plaintiffs might respond that because some States allow a PA to practice without supervision, the absence-of-supervision requirement is satisfied.  *See* Nat'l Conf. of State Legislatures, *Physician Assistant Practice and Prescriptive Authority*, *supra* (showing five States that permit PAs to practice and prescribe without supervision or collaboration by a physician). That argument gets the analysis backwards.  The key is that for the degrees listed in § 668.2, *no* State requires supervision of people who get those degrees and, if they do, that supervision is temporary and/or by a licensed professional in the same occupation.  *See* Rule at 23787.  And in any event, the Department cannot achieve "a clear, nationally uniform framework for administering [WFTCA's] loan-limit provisions" if that framework depends on the idiosyncrasies of a few State laws.  *Id.* at 23782.

In sum, none of the requirements set forth in the Rule are contrary to law or arbitrary and capricious, including the doctoral-level requirement and the supervision "requirement" that the Department relied on to conclude in the Rule's preamble that the MSPAS degree is not a "professional degree."  Moreover, the Department has made clear that "[t]he statute is not fixed" because "new degree programs could, at some point in the future, be professional degrees."  Rule at 23783.  The Department thus allows that other degrees could be added in the future "[a]s the

---

[12]    Available    at    https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-assistants/%E2%80%8Cphysician-assistant-practice-and-prescriptive-authority.

economy evolves and new degrees and careers are created." *Id.* But those degrees would still need to meet the definition of professional degree in WFTCA. The MSPAS degree does not.

## II. Plaintiffs Have Failed To Establish Article III Standing, Much Less Irreparable Harm.

Plaintiffs' "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), nor does it demonstrate an irreparable injury that "is likely in the absence of an injunction," *Winter*, 555 U.S. at 22. Given the overlap between Article III standing and irreparable harm here, Defendants address the jurisdictional inquiry through the irreparable-harm framework applicable at the preliminary injunction stage.

Standing is an essential aspect of the Article III case-or-controversy requirement that requires a plaintiff to have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). A "plaintiff 'bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified) (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)). "At the preliminary injunction stage," that means "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing": "that [it] has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy*, 603 U.S. at 57–58 (citations omitted).

Associational standing (sometimes called representational standing) allows an organization to assert standing on behalf of its members. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). Under a theory of associational standing, a plaintiff must establish that at least one of their members would have "standing to sue in her or his own right."

25

*Am. Lib. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). To do so, a plaintiff must establish injury-in-fact as to those members, which requires "that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation modified).

Independent of standing, to obtain a preliminary injunction, a plaintiff must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm is a high standard—Plaintiffs must show that they face injuries that are "certain, great, actual, and imminent." *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).

Plaintiffs allege that prospective PA students, institutions that educate PA students, and the PA profession at large will be harmed absent an injunction.[13] Mot. at 18–24. But Plaintiffs fail to establish standing as to any identified member of the Plaintiff organizations, much less irreparable harm.

### A. Plaintiffs Fail To Identify Irreparable Harm To Any Individual Member Of The Plaintiff Organizations.

Plaintiffs' Motion generally alleges that "[p]rospective PA students who are applying, or have been accepted to attend a PA degree program as soon as this summer and this fall, and were relying on the availability of the federal loans to help finance their education" will face irreparable harm if the Court does not enjoin the Rule before July 1, 2026. Mot. at 19. But Plaintiffs fail to identify any member of the Plaintiff organizations who is a prospective PA student matriculating this summer or fall and who is subject to the Rule. When claiming associational standing, "it is

---

[13] Plaintiffs do not allege a theory of organizational standing in the Complaint or the Motion, and they do not base their alleged irreparable harm on purported harm to the Plaintiff organizations. *See, e.g.*, Compl. ¶¶ 20, 27 (alleging standing in their representative capacities).

not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011). "Rather, the petitioner must specifically 'identify members who have suffered the requisite harm,'" *id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)), which at the very least requires that "the identity of the party suffering an injury in fact . . . be firmly established." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006).

In support of their Motion, Plaintiffs filed five declarations from individuals, four declarations from the Plaintiff organizations, and one declaration from an institutional member, *see* ECF Nos. 7-1–7-10, but none establishes Plaintiffs' associational standing based on a member's "standing to sue in her or his own right." *Am. Lib. Ass'n*, 401 F.3d at 492. Since Plaintiffs fail to identify any members who will suffer an injury, much less irreparable harm in the absence of an injunction, the Court should deny the Motion.

Three of Plaintiffs' individual declarants fail to allege membership in either Plaintiff association to support Plaintiffs' theory of associational standing. First, Ms. Juliana Sloan is a current student who "will soon finish [her] PA degree." Decl. of Julianna Sloan ¶ 2, ECF No. 7-6. Ms. Sloan alleges that she "could not complete PA school under the proposed new loan limitations," but she does not have to. Not only does Ms. Sloan not allege membership in either Plaintiff association, but as a current student, Ms. Sloan is grandfathered into the current federal loan system, and thus not subject to the new loan caps established by Congress in WFTCA. *See* 20 U.S.C. § 1087e(a)(8); *see also* Mot. at 22 ("[M]ost PA programs do not accept transfer students."). Similarly, Ms. Olivia Trull does not allege to be a member of either Plaintiff association. *See* Decl. of Olivia Trull, ECF No. 7-7. Even if she had, she does not allege to have applied to, or been accepted into, any educational program so as to subject her to the Rule, and her

27

"intention of eventually earning a doctoral degree in the PA field," ECF No. 7-7 ¶ 6, is not sufficient to establish an injury, much less irreparable harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (citation omitted)). Likewise, Ms. Jasmine Vasquez does not allege membership in either Plaintiff association, *see* Decl. of Jasmine Vasquez, ECF No. 7-9, and her alleged deferral of enrollment into a PA program, with no indication of when (or if) she will eventually enroll or begin her studies to fulfil her "intention of attending PA school," ECF No. 7-9 ¶ 6, is insufficient to establish standing, much less irreparable harm that warrants remedy before the Rule's effective date. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").[14] Plaintiffs fail to allege an injury that satisfies Article III for any of these individuals, let alone irreparable harm to entitle them to a preliminary injunction.

While the other two individual declarants allege membership status in the Plaintiff organizations, Plaintiffs do not establish standing to sue on their behalf, nor do they show irreparable harm. First, Ms. Laura Cunningham is allegedly a member of AAPA, Decl. of Laura

---

[14] Ms. Vasquez's declaration also advances counterfactual assertions about the statute's grandfathering provision, where her theory depends on a series of hypotheticals that did not happen: had she enrolled in the PA program she was admitted to in 2024, and had that program not been delayed in its accreditation process, the grandfathering provision allegedly "would not have applied to [her] or other students who need or choose to defer [enrollment]." ECF No. 7-9 ¶ 12–16. Because this asserted theory of injury turns on events that did not occur and because Plaintiffs do not mount a legal attack on the grandfathering provision, these allegations cannot establish an Article III injury. *Lujan*, 504 U.S. at 560 (requiring injury to be "actual or imminent, not conjectural or hypothetical" (citation modified)); *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation modified)).

L. Cunningham ¶ 2, ECF No. 7-5, but as a practitioner who has already obtained her PA degree using federal student loans, *see id.* ¶ 9, she is not subject to the Rule.  And her generalized grievance with "any policy or program that limits rather than increases the ability of students to access loans," *id.* ¶ 46, is insufficient to confer standing.  *See Lujan*, 504 U.S. at 573; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" (quoting *Lujan*, 504 U.S. at 560 n.1)).  Second, Mr. Benjamin Pinckney alleges membership with AAPA, but he does not allege to have applied to, or been accepted into, any PA program to fulfill his intention of "eventually want[ing] to be a health care provider."  Decl. of Benjamin Pinckney ¶¶ 13, 17, ECF No. 7-8; *but see Lujan*, 504 U.S. at 564.  Moreover, although he alleges that he would be unable to afford a PA program if the Rule were to take effect and subject him to the lower loan cap, ECF No. 7-8 ¶ 23, he does not allege he would be able to afford a PA program if the higher loan limits apply nor does he explain how his alternative plan to pursue a master's degree in medical science, *id.* ¶ 25—a degree not classified as a professional degree under the Rule or statute—would result in more favorable loan treatment such that he could afford the master's program but not his preferred PA program.  Absent such explanation, Plaintiffs have not plausibly alleged that the Rule is the cause of Mr. Pinckney's asserted inability to attend a PA program, let alone how he faces irreparable harm absent an injunction.  *See Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (emphasizing defendant's conduct must cause the harm); *Murthy*, 603 U.S. at 57 (requiring traceability); *see also* ECF No. 7-1 ¶ 38 (admitting "the total cost of attendance [for PA programs] often surpasses $200,000,"

29

even the higher aggregate cap).[15]  These alleged potential future harms do not warrant relief at all, and they certainly do not warrant extraordinary emergency relief now.

### B. Plaintiffs Fail To Identify Irreparable Harm To Any Institutional Member Of The Plaintiff Organizations.

As to PA educational programs, Plaintiffs only identify one institutional member of the Plaintiff associations through a declaration from Dr. Reamer Bushardt, the Provost of MGH Institute of Health Professions ("IHP").  *See* Decl. of Reamer Bushardt ¶ 3, ECF No. 7-4.  Dr. Bushardt's declaration alleges that IHP is a "degree granting entity," ECF No. 7-4 ¶ 3, and a member of PAEA, *id.* ¶ 17.  As it relates to member IHP, Dr. Bushardt's declaration appears to variously advance theories of harm related to IHP's PA program and IHP's mission, *see, e.g.*, ECF No. 7-4 ¶¶ 23–24, as well as IHP's diversion of resources, ECF No. 7-4.  *See also* Mot. at 21–22.  Plaintiffs contend that "uncertainty at educational institutions about the number of PA students who will ultimately enroll" has "disrupt[ed] admissions planning and student counseling."  Mot. at 22.  Yet the speculative possibility that enrollment numbers may change does not amount to a concrete injury, much less one that is traceable to the Department's Rule rather than Congress's overhaul of the Federal student loan programs in the WFTCA.  *But see Murthy*, 603 U.S. at 57 (requiring traceability).  Nor does Plaintiffs' asserted need to plan around uncertain future enrollment constitute irreparable harm warranting the extraordinary remedy of a preliminary injunction.

---

[15] Plaintiffs also offer declarations from four representatives of the Plaintiff associations: Todd Pickard, AAPA's current President and Chair of the Board, ECF No. 7-1; Mr. Pickard's successor, David J. Bunnell, ECF No. 7-3; Lisa Gables, AAPA's Chief Executive Officer, ECF No. 7-2; and Sara Fletcher, PAEA's Chief Executive Officer, ECF No. 7-10.  However, none of these declarations identify any individual or institutional member of the Plaintiff associations, let alone one who is subject to the Rule and facing injury or irreparable harm.  *See Chamber of Com.*, 642 F.3d at 199.

Instead, Plaintiffs' alleged institutional injuries depend entirely on the independent decisions of third-party students not before the Court. *But see Lujan*, 504 U.S. at 560. Courts "treat 'allegations that are really predictions' differently." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989)). "When considering any chain of allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Id.* (quoting *United Transp. Union*, 891 F.2d at 913). Whether any future student chooses not to enroll, or to pursue a different program, *see* ECF No. 7-4 ¶ 20, depends on a host of contingencies that are too speculative and attenuated to establish a concrete injury, much less irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").[16] Because Plaintiffs fail to allege at least one of their members who would have "standing to sue in her or his own right," *Am. Lib. Ass'n*, 401 F.3d at 492, Plaintiffs fail to establish standing and cannot establish irreparable harm attributable to the Rule.

### C. Plaintiffs' Alleged Reputational Injuries Do Not Establish Standing Or Irreparable Harm.

Plaintiffs also assert an overarching theory of reputational harm based on the Rule's exclusion of PA degrees from "professional degree" status. For example, Plaintiffs allege that the

---

[16] Plaintiffs' theory also assumes that third parties will not offer alternative sources of funding if the Rule takes effect. But, as the Department noted in the Rule, "[w]hile students will no longer be able to borrow up to cost of attendance using the Grad PLUS program, borrowers may have access to different funding options, that may include institutional loans, scholarships, non-Federal funding sources, or additional institutional aid drawn down from endowments." Rule at 23817. And in fact, schools are already lowering tuition and offering additional student aid. *See id.* at 23849 n.47 (citing examples); *cf.* ECF No. 7-5 ¶ 10 (noting how even AAPA member Ms. Cunningham obtained $10,000 in financial assistance from an institutional loan in 2013).

purported misclassification of PA students "as something less than 'professional students' for federal loan purposes" "will likely cause applicants, families, advisors, clinical partners, and employers to misunderstand the PA program as less professional, less rigorous, or less important than listed professional degree programs" and that purported misclassification will "undermine the confidence, morale, and professional identity of existing PAs, PA students, and future PA students." ECF No. 7-4 ¶¶ 19–20; *see also* Mot. at 22–23. Plaintiffs also assert that this alleged misclassification will harm "[t]he PA profession at large," Mot. at 23–24, and faculty recruitment and retention, ECF No. 7-4 ¶¶ 28–29; *see also* Mot. at 23. But Plaintiffs' theory of reputational injury rests on a speculative chain of events that does not establish injury or irreparable harm. *See Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006) ("[A]s with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative."); *see also Bristol–Myers Squibb Co. v. Shalala*, 923 F.Supp. 212, 220 (D.D.C. 1996) (rejecting irreparable harm claim due to reputational harm that was "based solely upon conjecture"); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30 (D.D.C. 2010) (rejecting reputational harm claim based on "uncorroborated and speculative assertions").

Plaintiffs' theory is particularly tenuous because it conflicts with both the Rule and NPRM, which expressly disclaim judgment on the quality or importance of any program or profession. The Rule explicitly states that the Department's classifications of professions and degrees as "graduate" or "professional" identify borrower categories only for the purpose of Direct Loan limits, and that "[t]hey do not express a value judgment about the importance of any occupation or field." Rule at 23781. In the NPRM, the Department emphasized that:

> The designation, or lack thereof, of a program as "professional" does not reflect a value judgment by the Department regarding whether a borrower

32

> graduating from the program is considered a "professional." This NPRM only interprets the phrase "professional student" as used in the context of the loan limits established by the [WFTCA].

NPRM at 4254. And the Department specifically invited comments addressing terminology "to ensure it is clear that this provision was designed by Congress to reduce borrowing for certain types of students and is not a value judgement about the professional nature of programs or occupations themselves." NPRM at 4277.

In the Rule, the Department responded to related comments and repeatedly explained the purpose of the classifications. Specifically, the Department said:

> At the onset, the Department notes that our classification of particular professions and degree pathways into either "graduate" or "professional" does not represent a normative judgment regarding whether we think the underlying career is worthy. The term "professional student" is used in the new amendments to the Higher Education Act to classify degrees based upon particular characteristics *only* for the purposes of Direct Loan eligibility.
>
> . . .
>
> This [R]ule does not pass judgment regarding the relative worth of those careers, nor does it claim that the work that many Americans are engaged in is not professional.
>
> . . .
>
> In this [R]ule, we interpret the law as written and do not claim that degrees that do not meet the definition of "professional student" are of lesser worth.

Rule at 23782.

Even if Plaintiffs had standing to sue on behalf of the "PA profession at large," Mot. at 23, or otherwise based on their reputational-harm theory, Plaintiffs do not allege that anyone has adopted their speculative interpretation, much less altered enrollment decisions or professional perceptions as a result. Such conjecture is insufficient to establish a concrete injury or irreparable harm. *See Trudeau*, 384 F. Supp. 2d at 297.

33

Plaintiffs also assert that this purported misclassification will harm IHP's mission "to prepare a diverse health care workforce to serve an ever more increasingly diverse population." Mot. at 22–23.  But frustration to an organization's "objectives is the type of abstract concern that does not impart standing." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (requiring organization to "allege more than a frustration of its purpose").  And in any event, IHP's mission does not conflict with the Rule, which speaks neither to diversity in the health care workforce nor to the quality of any educational program.  Plaintiffs thus fail to establish standing based on a theory of harm to the only identified institutional member's mission.  *See Nat'l Treasury Emps. Union*, 101 F.3d at 1430 ("[I]f the government's conduct does not directly conflict with the organization's mission, the alleged injury to the organization likely will be one that is shared by a large class of citizens and thus insufficient to establish injury in fact." (citing *Warth*, 422 U.S. at 499)); *see also Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (requiring a traceable, redressable, injury-in-fact for an organization to have standing to sue).  And Plaintiffs' theory of harm based on directing resources to correct misconceptions, *see, e.g.*, Mot. at 23, is also insufficient to establish standing.  *See Nat'l Taxpayers Union*, 68 F.3d at 1434 (association's "self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact"); *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (rejecting diversion of resources organizational standing theory based on plaintiffs' self-directed expenditures for research, member education, public outreach, petitions, and advocacy in response to agency action).

The Court should deny Plaintiffs' Motion because they lack Article III standing and fail to satisfy the irreparable-harm requirement for injunctive relief.

34

### III.    The Balance Of Equities And The Public Interest Weigh Against A Stay.

Not only is the Rule consistent with the law, *see supra* § I, the Rule is consistent with the motivation behind the relevant sections of WFTCA, which is "to lower the cost of post-secondary education for taxpayers, students, and families."  H.R. Rep. No. 119-206, at 203 (2025) (Book 1). As the House Report accompanying an early version of WFTCA explains, "published tuition and fees" for postsecondary education rose by "164 percent, nearly three times faster than the rate of inflation," in the two decades before 2020.  *Id.* at 207.  As a result, the share of Americans' expenditures towards higher education "nearly doubl[ed]" in those 20 years.  *Id.*  Easing this burden on American families and students is in the public interest, and setting loan limits is one step that could not only reduce borrowers' overall expenditures but also "provide an incentive to institutions to limit tuition increases."  NPRM at 4299; *see also* H.R. Rep. No. 119-206 (Book 1) at 207 ("[A] 2017 study by the New York Federal Reserve found that colleges raise tuition by 60 cents for each $1 increase in federal loan subsidies.").

Plaintiffs argue mainly that PAs are an important part of health care such that we, "as a society," should not "put impediments in the way of aspiring PAs."  Mot. at 25.  The Department reiterates that the definition of professional student "is not intended to provide, nor does it represent, a normative judgment regarding the value" of any degree or program.  Rule at 23784. The definition is instead used "solely for purposes of administering" the loan provisions that Congress passed.  *Id.*  To the extent the definition places impediments on PAs, Plaintiffs' gripe is with Congress.  And although PAs serve a valuable role, Congress determined the taxpayer-funded loans they receive for their studies should be limited to the graduate degree level, *i.e.*, $20,500 annually and $100,000 in the aggregate.

On that point, Plaintiffs' proposed remedy would force the Department to make payments for a degree that has not yet been conclusively determined to meet the statutory definition of

professional degree. That injunction would infringe on Congress's "broad discretion" under Article I of the Constitution to determine how and under what conditions federal taxpayer dollars—and these loans constitute federal taxpayer dollars—are spent. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such an intrusion into the workings of a coordinate branch of the Government inflicts irreparable harm on the Government. Moreover, Plaintiffs have not represented that they or their members would return any monies loaned above the WFTCA's cap if the Department's Rule is enjoined and later reinstated. *See Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025). So Plaintiffs' statement about an injunction posing "little or no downside" is incorrect—an injunction would force the Department to outlay funds for programs that do not meet the definition of professional degree. Mot. at 25.

## IV.  Any Relief Should Be Appropriately Limited.

### A.  Any Injunction Should Be Limited To The Relevant Portions Of The Rule.

For the reasons explained above, no relief is warranted here. But if the Court were to award any relief, it should be limited to enjoining the Department from enforcing the portions of the Rule's definition of "professional student" that the Court determines are likely unlawful. For example, although Plaintiffs seek to enjoin all parts of the Rule's definition, *see* Pls.' Proposed Order, ECF No. 7-11 at 1, they acknowledge that the MSPAS degree fails only the "generally at the doctoral level" requirement in subsection (i)(B) and the supervisory "requirement" discussed in the Rule's preamble. *See* Mot. at 14–17. Any injunction should accordingly be limited to only those portions of the regulation. The Department indicated in the preamble that it intended all provisions of the Rule to be severable from each other. *See* Rule at 23771 ("no part herein will be affected if another part is found to be unlawful"); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021) ("Severability 'depends on the issuing agency's intent.'" (quoting *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984)); *Make the Road N.Y. v. Noem*, No. 25-

36

5320, 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025) (noting a stay under 5 U.S.C. § 705 "should stay the effective date only of those portions of the agency action that are inflicting injury"). Moreover, if those portions of the professional degree definition are enjoined, what remains in the definition merely parrots the statute (and the regulation the statute expressly incorporates, 34 C.F.R. § 668.2).

Plaintiffs appear to seek an injunction against the entire Rule. *See* Pls.' Proposed Order, ECF No. 7-11 at 1. But they do not claim any portion of the regulations besides the definition of professional student are unlawful. Nor do Plaintiffs contend this aspect of the Rule is not severable. *See Bd. of Cnty. Comm's of Weld Cnty. v. Env't Prot. Agency*, 72 F.4th 284, 296 (D.C. Cir. 2023) ("[R]egulations—like statutes—are presumptively severable[.]"). Thus, any relief the Court enters should be limited to the portions of the Rule's definition of professional student that the Court determines are likely unlawful.

The Court, moreover, should decline Plaintiffs' request for an order directing "the Department to treat existing and entering Physician Associate/Physician Assistant students, including those returning after a deferral or break in their education, as 'professional students' for the purpose of access to the higher student loan limits available to students so designated in the statute[.]" Pls.' Proposed Order, ECF No. 7-11 at 1–2. If the Court enjoins the Rule's definition of professional degree and/or determines that the Department unlawfully relied on supervision in determining that PA degree programs are graduate degrees, it should allow the Department to determine in the first instance whether PA degree programs are graduate or professional degrees under the remaining provisions of the Rule and the statute. *Cf. PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at

37

an end: the case must be remanded to the agency for further action consistent with the corrected legal standards.").

At the very least, the Court should not direct any particular treatment for "existing" students, whether "returning after a deferral or break in their education" or otherwise. Pls.' Proposed Order, ECF No. 7-11 at 1–2. Section 81001(8) of the WFTCA contains an "Interim exception for certain students," stating that the new loan limits "shall not apply" during the expected time to credential of students currently enrolled in a program of study at an institution and who have received a loan (or on whose behalf a loan was made) for that program of study "as of June 30, 2026." Pub. L. No. 119-21, § 81001(8), 139 Stat. at 334–36; *see* 20 U.S.C. § 1087e(a)(8). Instead, such students will retain eligibility for loan limits established in Section 455 of the HEA prior to the implementation of the WFTCA as well as for Graduate PLUS loans. *Id*. The Department implemented this interim exception in the Rule at 34 C.F.R. §§ 685.200(b)(2)(ii), 685.203(b)(2)(iv)(B), 685.203(e)(6), 685.203(f)(2)(ii), 685.203(g)(3), and 685.203(j)(3). Although Plaintiffs refer to the scope of this interim exception as a "cruel defect in the Final Rule," Mot. at 21, they do not challenge Section 81001(8) of the WFTCA or the Department's implementation of that provision or make any argument that either is unlawful. The Court therefore cannot direct the Department on how to apply the interim exception in any particular circumstance. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("[A] court cannot 'use its remedial powers to circumvent the intent of the legislature.'" (citation omitted)); Rule at 23815 (explaining that "the interim exception to the new loan limits are mandatory" because Congress instructed what rules "shall apply" and "shall not apply" under specified circumstances).

**B.  Any Relief Should Be Limited To Plaintiffs And Their Members Who Have Demonstrated Standing.**

Separately, any relief should be limited to the Plaintiffs and their members who have demonstrated standing.  As the Supreme Court explained in *CASA*, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court."  *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).  And once a party has received complete relief, providing relief to nonparties "would not render [the party's] relief any more complete."  *Id*. at 853.

Under Plaintiffs' theory of associational standing, Plaintiffs are entitled to relief, if at all, only on behalf of those among their current members who establish their standing.  *See CASA*, 606 U.S. at 861 (staying injunctions insofar as they are "broader than necessary to provide complete relief to each plaintiff with standing to sue").  And basic principles of equity require that an enjoined defendant must know against whom it must refrain from acting.  *See* Fed. R. Civ. P. 65(d).  The Plaintiff associations here cannot (1) forgo pleading or joining specific claims or available class-action procedures for litigating those claims; (2) assert that they have large or dispersed memberships; (3) claim only an unidentified fraction have standing; and (4) still demand injunctive relief for all members.  That exceeds the traditional bounds of equity and the Court's authority to provide equitable relief.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross," and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (citation omitted)).  Any relief here should be appropriately limited to the Plaintiffs and their members who have demonstrated standing.  *See, e.g.*, *Dickinson v. Trump*, 17 F.4th 634, 645–46 (9th Cir. 2026) (vacating preliminary injunction because it was not limited to relief for the named plaintiffs); *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1191 (9th Cir. 2026) (similar).

39

## V.      If The Court Issues Injunctive Relief, The Court Should Issue a Stay Pending Appeal And Require Plaintiffs To Post Security

For the reasons stated above, Defendants submit that the Court should deny Plaintiffs'

Motion.  However, if the Court enters injunctive relief, the Court should issue a stay pending

appeal and order Plaintiffs to post security.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)

(setting forth the factors "regulating the issuance of a stay").  For the reasons explained above,

Plaintiffs are not likely to succeed on the merits and Defendants will be irreparably injured absent

a stay.  *See id.*  The public interest strongly favors giving effect to a provision enacted by the

American people's democratically elected representatives.  *See id.*  Those factors outweigh any

injury Plaintiffs might suffer.  A stay pending appeal is warranted if the Court issues injunctive

relief.

The Court should also require Plaintiffs to post an appropriate bond commensurate with

the amount of funding affected by Plaintiffs' requested relief—that is, the costs and damages that

would be sustained by the Government, because an injunction may require the Government to

make specific payments it is not legally obligated to make, and which may not be fully recoverable.

*See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places

"broad discretion in the district court to determine the appropriate amount of an injunction bond");

*cf. Dep't of Educ.*, 604 U.S. at 652 (staying district court injunction requiring payment of federal

funds in part because the district court "declined to impose bond"); *see also* Rule at 23769

(estimating taxpayer savings of the professional student definition at $51–52 million).  Under

Federal Rule of Civil Procedure 65(c), the Court may issue preliminary injunctive relief "only if

the movant gives security" for "costs and damages sustained" by Defendants if they are later found

to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  Without such a protective measure

here, there may be no way to recover the funds lost to United States taxpayers if this Court or

40

appellate courts were later to find that the Department was "wrongfully enjoined." *See id.*; *cf. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 145 S. Ct. 2658, 2660 (2025) (staying district court injunction because plaintiffs did not say they would "repay grant money if the Government ultimately prevail[ed]" during appellate process).

## CONCLUSION

For the forgoing reasons, the Court should deny Plaintiff's Motion for Preliminary Injunction.

Dated: June 9, 2026                Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Christian Dibblee*
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
KATHRYN L. ALKIRE (FL Bar No. 1050146)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*

41