**UNITED STATES DISTRICT COURT**
**THE DISTRICT OF COLUMBIA**

AMERICAN ASSOCIATION OF NURSE
PRACTITIONERS, *et al.*,

        Plaintiffs,

v.

LINDA MCMAHON, *et al.*,

        Defendants.

Case No. 1:26-cv-01780-BAH

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR STAY UNDER 5 U.S.C. § 705**
**AND FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………….. 1

ARGUMENT......................................................................................................................................2

I.   The Rule is contrary to law. ....................................................................................................2

   A.   The Rule is contrary to law because its effective date violates the Higher Education
        Act's master-calendar requirement.................................................................................2

   B.   The Rule is contrary to law because its definition of professional degrees is
        inconsistent with the regulation that Congress adopted into statute...............................6

II.  Plaintiffs establish concrete injury and irreparable harm. ....................................................9

III. The balance of the equities and the public interest favor a stay.........................................16

IV.  The Court should enter sufficient preliminary relief to protect educational institutions
     and matriculating students from irreparable injury in the coming school year..................17

   A.   The Court should stay the Rule's definition of "professional degree" under
        Section 705 of the APA. ...............................................................................................17

   B.   The Court should order the Department to apply the higher loan limits
        uniformly until it devises a lawful way to distinguish between professional and
        graduate degrees. ..........................................................................................................18

   C.   At a minimum, the Court should order the Department to treat the relevant degree
        programs as professional degrees. .................................................................................22

   D.   The requested relief should not be limited to Plaintiffs or their members. ...................23

   E.   The Court should neither enter a stay pending appeal nor require an
        injunction bond...............................................................................................................24

CONCLUSION .................................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810 (D.C. Cir. 2006) ...............................12

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022)..................................................................................................................10, 11

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58 (D.D.C. 2000) ..................................................................................................................15

*Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30 (D. Me. 2025)....................................................24

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998)..................................................................3

*California Ass'n of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018) ..................................................................................................................10

*Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ................................12

*Career Coll. Ass'n v. Riley*, 74 F.3d 1265 (D.C. Cir. 1996).............................................................3

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) ..............................9

*Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90 (D.D.C. 2025)................................24

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249 (1992) .................................................................7

*CREW v. U.S. Dep't of Just.,* No. CV 25-4426, 2026 WL 472589, (D.D.C. Feb. 19, 2026).....................................................................................................25

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009).......................................15

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ....................................................................14

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025) ....................................................................................24

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................................................................15

*Geston v. Anderson*, 729 F.3d 1077 (8th Cir. 2013).........................................................................8

*Grundmann v. Trump*, 786 F. Supp. 3d 188 (D.D.C. 2025).............................................................24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)...................................................................15

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944)........................................................................................19

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ........................................................9

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001) ...................................5

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...............................14, 15

*M.M.V. v. Barr*, 459 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................24

*Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313
   (D.C. Cir. Nov. 22, 2025) ........................................................................................................18, 23

*Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1998) ...................................3

*N.Y. Republican State Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019) ...........................................5

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) .........................................14, 15

*Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63
   (D.D.C. 2025) ...............................................................................................................................24

*Neguse v. USCIS*, No. 25-cv-2463, 2026 WL 575509 (D.D.C. Mar. 2, 2026) .............................19

*Rosario–Urdaz v. Rivera–Hernandez*, 350 F.3d 219 (1st Cir. 2003) ...........................................15

*Ross v. Blake*, 578 U. S. 632 (2016) ................................................................................................9

*Rubin v. United States*, 449 U.S. 124 (1981) ...................................................................................7

*Sekhar v. United States*, 570 U.S. 729 (2013) ..................................................................................9

*Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) ..............................................................................3

*Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351 (7th Cir. 2006) ...........................................7

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ...............................................................................18, 23

*United Fac. of Fla. v. Lamb*, No. 1:24-cv-136, 2026 WL 1630428
   (N.D. Fla. Mar. 20, 2026) ............................................................................................................24

*United States v. Turkette*, 452 U.S. 576 (1981) ...............................................................................7

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014) ...................................................................7, 8

*Van Buren v. United States*, 593 U.S. 374 (2021) ............................................................................9

*WildEarth Guardians v. Haaland*, No. 20-cv-1035-CKK, 2021 WL 4502054
   (D.D.C. Sept. 30, 2021) ...............................................................................................................19

**Statutes**

5 U.S.C. § 553(c) ...............................................................................................................................2

5 U.S.C. § 559 ...............................................................................................................3

5 U.S.C. § 705 ..............................................................................................1, 17, 19, 23

20 U.S.C. § 1089 ...................................................................................................2, 3, 20

20 U.S.C. § 1089(c)(1) ..................................................................................................2

20 U.S.C. § 1089(c)(2)(A) .............................................................................................4

20 U.S.C. § 1098a(b) .................................................................................................3, 5

**Regulations**
34 C.F.R. § 668.2..........................................................................................5, 6, 7, 8, 13

**Other Authorities**
91 Fed. Reg. 23768 (May 1, 2026)........................................................................*passim*

**INTRODUCTION**

Absent this Court's intervention, the Department of Education will, on July 1, impose unlawful loan caps on students pursuing advanced degrees in critical professions, including nursing, education, public health, therapy, and countless others. The challenged Rule is contrary to law in two independent respects. First, the Department violated a statutory requirement that regulatory changes affecting student financial assistance be finalized by November 1 to go into effect by July 1 of the following year. Second, the Rule's narrow definition of a "professional degree" directly contravenes the statute's unambiguous adoption of three and only three criteria for a program to meet to qualify as a professional degree: that the degree signifies "completion of the academic requirements for beginning practice in a given profession," the degree signifies "a level of professional skill beyond that normally required for a bachelor's degree," and licensure is "generally required." The Department was not free to add new criteria to that statutory list.

Defendants' opposition does not undermine Plaintiffs' showing of standing and irreparable harm. Plaintiffs have submitted declarations demonstrating that they and their organizational and individual members will suffer irreparable injury in the coming school year if the Rule is permitted to take effect—harms that the Department itself has acknowledged are likely to occur and cannot dismiss as speculative for the purposes of standing. This is more than sufficient to carry Plaintiffs' evidentiary burden with respect to harm at the preliminary injunction stage.

In order to provide complete relief to Plaintiffs, the Court should both enter a stay of the challenged Rule under 5 U.S.C. § 705 and preliminarily enjoin the Department from denying that any program qualifies as a "professional degree" program until such time that the Department completes a valid rulemaking that draws a lawful distinction between graduate degrees and professional degrees. This relief is needed to protect schools that train the next generation of

1

professionals in a variety of vital fields and students planning their professional futures during the interim until such time as the Department corrects its errors.

## ARGUMENT

**I.   The Rule is contrary to law.**

    **A.  The Rule is contrary to law because its effective date violates the Higher Education Act's master-calendar requirement.**

The master calendar provision of the Higher Education Act provides that any regulations governing federal student loan programs must be finalized by November 1 in order to go into effect for the following school year. *See* 20 U.S.C. § 1089. The Department missed this deadline by a full six months: Although the Rule purports to go into effect for the coming school year, it was not finalized until May 2026. As a result, educational institutions had no meaningful notice of how the Department intended to implement the new student loan limits for the 2026 school year and prospective students were forced to decide whether and where to enroll without full visibility of the financial consequences of their decisions. This scenario is precisely what the master calendar provision was enacted to prevent. Under the plain language of those provisions, the Rule cannot take effect until the 2027 school year. 20 U.S.C. § 1089(c)(1); *see also* Mot. at 16–20.

In its opposition, the government simply rehashes the Rule's explanation for disregarding the master calendar provisions. Namely, the government complains that the new student loan provisions are "particularly complicated" and that it therefore "would have been impossible" to implement those provisions prior to November 1 and cites precedent suggesting that an agency's need to implement a complicated statute provides good cause to bypass notice and comment under 5 U.S.C. § 553(c). Opp. at 13–14 (citing *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225,

1237 (D.C. Cir. 1998)).[1] But this only proves Plaintiffs' point. Congress wrote the Higher Education Act to permit the Department to invoke good cause to bypass that statute's negotiated rulemaking and notice-and-comment provisions. *See* 20 U.S.C. § 1098a(b)(2); *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996). But Congress pointedly withheld any similar authority from the Department to waive the master calendar provision, *see* 20 U.S.C. § 1089(c), and its choice to permit the Department to waive one set of procedural requirements but not the other must be understood to be a meaningful one, *see Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). That is particularly so because Congress has at times temporarily altered the master calendar deadlines in enacting other student loan legislation but did not do so in the statute at issue here. *See* Mot. at 18-19. If the Department believed that it had good cause to depart from the usual requirements for making rules governing student loan provisions, the course that Congress set out for it would have been to forgo notice and comment, not to ignore the master calendar provision.

At the same time that it invokes the good cause standard, Opp. at 13, the Department also asserts that it "determined" that it did not have good cause to waive the statutory negotiated rulemaking and notice-and-comment procedures, *id.* at 15 (citing 91 Fed. Reg. at 23770). But this is simply not true. The Rule does not even acknowledge that the Department had the option of waiving negotiated rulemaking, much less determine that there was not good cause to do so. Moreover, the suggestion that good cause was lacking because a rulemaking could have been completed by July 1 begs the question. The Department's actual deadline to finalize a rule to become effective July 1 was—under the master calendar provisions—November. 1. Thus, to the extent that the Department was unable to complete a rulemaking prior to November 1, it should

---

[1] *But cf. Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (clarifying that *Methodist Hospital* turned on whether Congress had mandated different procedures under 5 U.S.C. § 559, not whether the agency had invoked good cause to waive notice and comment).

have at least considered whether to assert good cause to waive the negotiated rulemaking requirement. In any event, it ultimately does not matter whether the Department had good cause to waive negotiated rulemaking. To the extent that the Department lacked good cause to waive negotiated rulemaking, then surely it had no basis to disregard the master calendar provisions. That is particularly true given that the master calendar provisions, unlike the negotiated rulemaking provisions, do not contain any language indicating that they can be waived for good cause.

And the Department had an additional tool at its disposal that would have permitted it to issue a rule implementing the new student loan limits while observing the master calendar deadline. The master calendar provision itself specifies what should happen when the Department is unable to meet the November 1 deadline. The Department could have issued the rule but designated it as one that would only take effect in the coming year for educational institutions that accepted its terms. *See* 20 U.S.C. § 1089(c)(2)(A) ("The Secretary may designate any regulatory provision that affects the programs under this subchapter and is published in final form after November 1 as one that an entity subject to the provision may, in the entity's discretion, choose to implement prior to the effective date."). Although the government insists that it had no choice but to disregard the master calendar deadline, in fact, the statute expressly contemplates a scenario where the Department is unable to meet the deadline and explains how the agency should handle that situation. A designation under section 1089(c)(2)(A) would have allowed the Department to implement the new student loan provisions while at the same time allowing for an orderly transition to the new regulatory regime. In its opposition, the government altogether ignores this point, and it has therefore waived any argument it may have as to why designation under 20 U.S.C. § 1089(c)(2)(A) was not a viable way for it to reconcile its obligation to timely implement the new statutory loan limits with the master calendar deadline.

Each of these options—either designating the rule as optional for the first academic year under 20 U.S.C. § 1089(c)(2)(A) or showing good cause to waive negotiated rulemaking under 20 U.S.C. § 1098a(b)(2)—provides the Department a tool to use when a full negotiated rulemaking is not feasible prior to the master calendar deadline. Moreover, each of these tools is expressly contemplated in the text of the Higher Education Act. These options demonstrate that the Department was not in the impossible situation it claims. It was entirely possible for the Department to satisfy both its obligation to implement the new statutory loan limits while also meeting the master calendar deadline. Given that the Department's statutory obligations are fully reconcilable, there is no basis for the Court to conclude that Congress intended to implicitly repeal the master calendar provisions. *See N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 506 (D.C. Cir. 2019) ("[Th]e Supreme Court has instructed that when 'statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" (quoting *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001))).

### B. The Rule is contrary to law because its definition of professional degrees is inconsistent with the regulation that Congress adopted into statute.

There can be no question that the definition of "professional degree" in the Final Rule is contrary to law—Congress enacted a specific definition of "professional degree" for purposes of imposition of new limits on federal loans and the Department made substantive changes to Congress's directive. Congress did not direct or authorize the Department to create a definition. Rather, Congress made unequivocally clear that its chosen definition was fixed—even if the Department were to amend the definition of "professional degree" in 34 C.F.R. § 668.2 at some point, the applicable definition for purposes of graduate and professional degree loan limits would remain the version of the regulation "in effect on July 4, 2025." Mot. at 22.

5

Congress required that a professional degree must meet three criteria—(1) "signif[ying] completion of the academic requirements for beginning practice in a given profession"; (2) signifying "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) "generally" enabling "professional licensure"—that were in the regulation Congress expressly incorporated into the statute. 34 C.F.R. § 668.2(b). That regulation also included a set of explicitly non-exclusive examples of degrees that meet this three-part test. *Id.* The Rule unlawfully added several criteria—that the degree is generally at the doctoral level; that it requires at least six years of coursework; that it is listed in a particular four-digit CIP code; and that it lead to work free from supervision by other professionals—to that clear statutory definition, contrary to the statute's plain terms.

A prime example of the unlawfulness of the Department's approach is the Rule's treatment of Advanced Practice Registered Nurses. The Department acknowledged that such nurses "hold a fundamentally distinct profession" that "are specialized in nature and . . . require training at the graduate level." 91 Fed. Reg. at 23788. The Department did not dispute commenters' analysis that those nurses "meet[] the operative definition's three-part test," *id.*, but it still excluded them from the definition of professional degrees because "they do not satisfy the contextual requirements provided by the illustrative list of advanced degrees included within the definition of *professional student*." *Id.* at 23789. Similarly, the Department stated that the Doctor of Nursing Practice degree "appears to satisfy the three parts of the operative test but fails to satisfy the contextual requirements." *Id.* at 23797. It was legal error for the Department to add so-called "contextual requirements" beyond the three-part test in the prior regulation that Congress codified.

Defendants argue that two canons of statutory interpretation—*noscitur a sociis* and *ejusdem generis*—"require[] the Department to interpret 'professional degree' based on the words

6

surrounding it—namely, the list of degrees already in § 668.2." Opp. at 16. But canons of construction can be applied permissibly only to ambiguous language—they are of no use where, as here, the statutory language itself is clear. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (quoting *Rubin v. United States*, 449 U.S. 124 (1981)). Agencies "must give effect" to unambiguously expressed Congressional intent. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 325 (2014). Here, the static definition that Congress adopted provided the Department with no authority to supplement the definition with new eligibility criteria.

Even if Congress's three-part test were ambiguous, canons of construction could be used only to understand the language Congress adopted. That is not what the Department did here. Rather, the Department looked at the illustrative list—on its own and divorced from the text of the statutory test itself—to create new substantive requirements above and beyond the statutory language. Indeed, the Final Rule acknowledges that it is possible for a degree program "to satisfy the three parts of the operative test" from the 2007 definition, but to still not be treated as a "professional degree" under the final rule's new definition. *Id.* at 23795. But no canon of statutory construction permits, much less requires, the Department to supplant Congress's clear text. *See United States v. Turkette*, 452 U.S. 576, 581 (1981); *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 354 (7th Cir. 2006).

Defendants' contrary arguments are unavailing. The Department cannot justify its added requirements by claiming that CIP code restrictions are necessary to "fill in the details" of the statute or "avoid confusion." Opp. at 22. The Department might believe that it would have been more convenient if Congress had chosen to define professional degrees by reference to CIP codes, but "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should

7

operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Nor can it plausibly contend that its imposition of a general doctoral-level requirement "flows from the list of degrees in § 668.2." Opp. at 20. That list also includes three non-doctoral programs, and under the principle of *noscitur a sociis* (the very principle Defendants purport to be applying*)*, that list could shed light on the rest of the statute only to the extent the Department identifies features common to every item on the list. *See Geston v. Anderson*, 729 F.3d 1077, 1083 (8th Cir. 2013). Likewise, nothing in the statute permits the Department to add a supervision requirement found nowhere in the three-part test for a professional degree specified in the text. Opp. at 23. Each of these extratextual requirements changes Congress's mandatory definition of "professional degree" and is contrary to law.

Defendants' separate arguments with respect to the added length-of-time requirements fare no better. Defendants argue that because a precursor to § 668.2—a nonregulatory "glossary of terms" by the Integrated Postsecondary Education Data System (IPEDS)—contained length-of-time requirements, the Department must have imported those requirements into § 668.2, which also means that Congress must have intended to codify those requirements into the statute. Opp. at 19. The opposite is true. When the Department promulgated § 668.2 in 2007, the Department did not simply adopt, without amendment, the IPEDS definition of "first-professional degree." Rather, the Department substantively changed the language, *removing* the requirement on program length that was in the IPEDS glossary when it promulgated § 668.2. The Department now tries to read that requirement back into the § 668.2 definition and thus read that requirement into the statute. But rather than use the IPEDS definition that required "at least 2 years of college work prior to entering the program; and . . . a total of at least 6 academic years of college work to complete the degree Program," § 668.2 required only "a level of professional skill beyond that normally required for a bachelor's degree." The 2- and 6-year requirements therefore were not

8

"obviously transplanted from another legal source" Opp. at 19 (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)), but were instead specifically *eliminated* from the baseline definition. If anything, that the durational requirement was in the IPEDS definition of "First-Professional Degree" and removed from § 668.2 counsels against reading it into the statutory definition here. *See, e.g.*, *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) (noting that when courts are "engaged in the business of interpreting statutes [they] presume differences in language . . . convey differences in meaning."); *Van Buren v. United State*s, 593 U.S. 374, 393 (2021) ("When Congress amends legislation, courts must presume it intends the change to have real and substantial effect.") (quoting *Ross v. Blake*, 578 U. S. 632, 641–642 (2016)).

## II.    <u>Plaintiffs establish concrete injury and irreparable harm.</u>

Defendants' challenge to Plaintiffs' standing and irreparable-harm showing misconstrues the evidentiary burden at the preliminary injunction stage and ignores both the record before the Court and the Department's own record findings.

First, Defendants' arguments fall short because Plaintiffs need not identify specific harmed members at the preliminary injunction stage, but must instead "show that [they are] 'likely to be able to demonstrate standing at the summary judgment stage.'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1229 (D.C. Cir. 2026). For instance, in *Centro de Trabajadores Unidos*, the court rejected "[t]he government's primary objection to standing [] that [the plaintiff] had not identified any specific members," because "this is not the merits stage," and "the question on a motion for preliminary injunction is whether [the plaintiff] was likely to establish standing later in the case." *Id.* Likewise here, Plaintiffs have provided "detailed information about multiple members who would have standing to sue, which is enough at this early juncture." *Id. See* Declaration of Brittany Fair (Fair Decl.) ¶ 14 (NEA member who would be subject to the caps may "leav[e] the field of education completely"); Declaration of Ronny Lau (Lau Decl.) ¶ 23 (additional

9

NEA members will be forced to make similar choices); Declaration of Jon Fanning (Fanning Decl.) ¶ 35 (AANP members will experience immediate impacts to enrollment, tuition revenue, workforce planning, and educational programming from the rule); Declaration of Laura Magaña (Magaña Decl.) ¶ 20 (ASPPH member programs and institutions will experience "substantial financial strain due to declining enrollment, inflationary pressures, reduced state support, and increasing operational costs."); Declaration of Deborah Trautman (Trautman Decl.) ¶ 21 (AACN's member programs will experience immediate negative impacts from a reduction in enrollment, including impairment of their ability to meet operating expenses and carry out their educational missions); Declaration of James Wendorf (Wendorf Decl.) ¶ 12 (NAPNAP members, many of whom are likely to be seeking advanced degrees in nursing, will be adversely affected by the rule's restriction in access to affordable student loans). Defendants' citation to *California Association of Private Postsecondary Schools v. DeVos* is misplaced, Opp. at 29, because that district court case precedes *Centro de Trabajadores Unidos* and is superseded by it. 344 F. Supp. 3d 158, 175 (D.D.C. 2018).

The Department's own record findings, which acknowledge that the Rule will harm students and academic institutions, render it doubly unnecessary to further identify members at this early stage. A plaintiff need not identify a specific member when standing is "'apparent from the administrative record'" such that the court need not "speculate whether one individual will meet all of the[] [standing] criteria[.]" *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 593-94 (D.C. Cir. 2022). The central question, therefore, is not whether plaintiffs have identified a specific member, but whether the record permits the court to conclude that members subject to the challenged rule will suffer a concrete injury.

Here, the Final Rule acknowledges the harms to both individual borrowers and institutions. The Rule admits that borrowers "may have to reduce their enrollment due to the inability to afford the cost of their program;" may seek other forms of financing like private loans with less favorable terms; and may be unable to secure other financing, resulting in students "reconsider[ing] their enrollment." 91 Fed Reg. at 23856. With respect to institutions, the Department admits that the Final Rule will "create indirect costs for institutions," explaining that "[i]nstitutions of higher education will receive less loan revenue from the Federal government," and straightforwardly acknowledging that "[t]his will cause a loss of revenue for institutions." *Id.* The Department is therefore "ill-positioned" to assert a change when "defending [the Rule] on the merits and yet assume that nothing will change" for Plaintiffs when contesting standing. *Advocs. for Highway & Auto Safety*, 41 F.4th at 595.[2]

The remaining cases Defendants cite to contest Plaintiffs' associational standing showing are not at the preliminary injunction stage and are not to the contrary. In *Chamber of Commerce of the United States v. EPA*, there was "no evidence—nor even any assertion" that challenged emissions standards would have an effect on the ability of identified Ford dealers to meet customer

---

[2] Moreover, like in *Advocates*, the Administrative Record contains references to information obtained from anonymous surveys of regulated individuals and entities that support a finding of actual injury. In their comments on the Proposed Rule, Plaintiffs AACN and AAMFT discuss the results of surveys they conducted of deans, students, and therapists about the impacts of the loan caps in the Proposed Rule. In AACN's surveys, 78% of nursing school deans reported that the $20,500 annual loan limit would negatively affect enrollment, and 82% of students reported that the same limit would negatively impact their ability to finance their education. *See* Declaration of Joel McElvain (McElvain Decl.) Ex. 1*,* AACN Comment on Proposed Rule at 7-8. *See also* ECF 4-7, Trautman Decl. ¶¶ 20-21 (mentioning survey results). Plaintiff AAMFT's surveys showed that the great majority of marriage and family therapists rely on federal loans to complete their education, and more than half relied or will rely on loans between $20,500 and $50,000 per year. McElvain Decl., Ex. 2, AAMFT Comment on Proposed Rule at 6-7. AAMFT's comments also included anonymous feedback from survey respondents about the impacts of the Proposed Rule on students, mental health providers, and communities. *See id.*

demands, and contemporaneous evidence showed that Ford was already implementing fuel-efficiency improvements and was unlikely to need to alter its sales practices to comply. 642 F.3d 192, 203 (D.C. Cir. 2011). In *American Chemistry Council v. Department of Transportation,* the record did not, as here, include an acknowledgment from the Defendant agency itself of harm to the plaintiff's members, and the plaintiffs failed to submit affidavits supplementing that record. 468 F.3d 810, 819 (D.C. Cir. 2006). By contrast, Plaintiffs here have submitted declarations describing harms to their members and assert that the Rule will harm them, and the Department acknowledges that the Rule will harm academic institutions in the way that Plaintiffs allege. This is more than sufficient to demonstrate that Plaintiffs are likely to be able to demonstrate standing when the case reaches summary judgment.

Defendants incorrectly assert that Plaintiffs' and their members' harms stem from the statutory establishment of annual caps or the elimination of Grad PLUS loans. But Plaintiffs' harms are caused by the Department's unlawful decision to classify degree programs that satisfy Congress's definition of "professional degree" as ordinary graduate programs subject to lower borrowing limits. As explained above, Congress adopted a specific definition of "professional degree," and the Department unlawfully ignored Congress's instruction.[3] For instance, the Rule causes direct harm to NEA member Brittany Fair by departing from the statutorily required "professional degree" definition criteria to classify her school psychometry and intended Education Specialist degree in School Psychology as non-professional, thereby subjecting those degrees to the graduate degree caps. Fair Decl. ¶ 11. Absent that incorrect classification, Fair would

---

[3] In any event, Defendants' redressability argument assumes that the only possible remedy would require immediate application of statutory limits that are no longer effective. That assumption is incorrect, *see infra* Section IV.

12

be able to take out loans up to the $200,000 lifetime cap. *Id.* ¶ 12. This concrete injury to Fair is traceable to the Rule and establishes associational standing for NEA.[4]

Plaintiff NEA has also shown that the harms individual members face are irreparable. In her declaration, Ms. Fair stated that she intends to pursue programs in school psychometry and psychology, but that the new loan caps "will make it extremely difficult or even impossible for [her] to complete the education required for this career path." Fair Decl. ¶ 12. As a result, Fair is "considering leaving the field of education completely." *Id*. ¶ 14. And another NEA member was recently accepted into a program in Speech Language Pathology to pursue her bachelor's degree, but her state now requires a master's degree for professional licensure. Lau Decl. ¶ 26. This member will need loans to complete both degrees, and the caps "will directly impact [her] ability to complete both degrees and pursue her career." *Id*. As explained in Plaintiffs' opening brief, the inability to obtain the education needed to practice one's chosen profession is irreparable harm. Mot. at 24.

Finally, each Plaintiff establishes organizational standing. Defendants' arguments that Plaintiffs' injuries "depend on the independent actions of third parties" fails because students' decisions not to enroll in degree programs due to reduced access to federal loans are a "predictable

---

[4] Defendants also incorrectly contend that NEA does not assert harms arising from the Rule's treatment of specialized instructional support personnel degree programs, arguing that NEA should have identified the degree program instead of the corresponding professional role. Opp. at 35. But each of the specialized instructional support personnel positions highlighted in NEA's declaration requires completion of a corresponding professional degree program. Lau Decl. ¶ 21. Defendants further argue that Plaintiffs do not challenge the Department's determination that these programs purportedly are not "required to enter [a] profession," Op. at 36, ignoring both Plaintiffs' express argument that these degrees meet the original professional degree definition, Mot. at 11, and the fact that these degrees are required for entry into the specialized professions they serve in various states. *See* Fair Decl. ¶ 8 (explaining that an Ed.S in school psychology is required for Brittany Fair to become a school psychologist). In any event, the unlawful classification of professional degrees cannot be severed across applications to different professions, Mot. at 29.

effect of Government action on the decisions of third parties" that this Court can permissibly recognize. *Dep't of Commerce v. New York*, 588 U.S. 752, 768–70 (2019). As the Department itself acknowledged, the Rule will lead some students to reduce or reconsider enrollment, and as a result, institutions will receive less loan revenue from the Federal government, causing "a loss of revenue for institutions," *see supra* at 11. Having expressly predicted these impacts, the Department cannot now disclaim them as too speculative to support Plaintiffs' standing.

Defendants fail to respond to Plaintiffs' assertions that the Rule also causes significant irreparable harm by fundamentally "mak[ing] it more difficult" for Plaintiffs and their institutional members to accomplish their primary missions. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Plaintiffs have shown concrete harm from reduction in membership and dues that will impede their ability to accomplish their primary missions by requiring them to cut educational programing, conferences, research, student engagement initiatives, and workforce development initiatives, as well as harming Plaintiffs' relationships with the students, educational institutions, organizational members, and underserved communities that rely on the professional degree field workforces; and reputational harm arising from reduced educational access and workforce instability affecting the professions that they represent. Fanning Decl. ¶ 22; Lau Decl. ¶ 27; Magaña Decl. ¶ 17; Michaels Decl. ¶ 17; Trautman Decl. ¶ 19; Wendorf Decl. ¶ 14.

Defendants respond only that Plaintiffs have not shown that their operational expenditures would be for "'operational costs beyond those normally expended' to carry out its advocacy mission," Opp. 30 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011)). This misses the point: Plaintiffs' injury is not merely that they must expend additional resources;

14

it is that the Rule impairs their ability to accomplish their organizational missions. *Newby*, 838 F.3d at 9.[5]

Finally, Defendants incorrectly suggest that economic loss can never constitute irreparable harm. *See* Opp. 31 (citing *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009)). The relevant test is not whether a loss is economic, but whether it is compensable by a later money damages award. Where an economic injury "cannot adequately be compensated by an end-of-case award of money damages," it is irreparable. *Rosario–Urdaz v. Rivera–Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003); *see Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding irreparable harm based on lost backpay where plaintiffs "might be precluded from suing the federal government to recoup pay and benefits they lost before the court so ruled"). Here, Plaintiffs' members cannot recover the opportunity to pursue their chosen professions and Plaintiffs cannot recover from the federal government the membership dues, conference revenue, programming, institutional relationships, and workforce-development opportunities lost as a result of reduced enrollment during the pendency of this litigation. Once those members, revenues, and opportunities are lost, they cannot be fully restored.

---

[5] Regardless, Plaintiffs' organizational injuries are unlike the "litigation[] expenses" and other advocacy expenses at issue in *National Association of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (rejecting as sufficient for injury plaintiffs' allegations that it expended resources submitting comments to the EPA, testifying before the Senate, and participating in "numerous court cases"). For instance, the resources that NEA will need to expend counseling borrowers on the Rule is exactly the type of "perciptibl[e] impair[ment]" to a "non-abstract interest" in the organization's core activities contemplated by *Havens Realty Corp. v. Coleman. See* 455 U.S. 363, 378–79 (1982) (holding that where a petitioner's steering practices "perceptibly impaired" the plaintiff's "ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

### III.    The balance of the equities and the public interest favor a stay.

The balance of the equities and public interest favor a stay and the Defendants' arguments to the contrary are unpersuasive. First, it is pure speculation to suggest that limiting the amount of money students can borrow to fund their degrees *lowers* the cost of education for students and their families. *See* Opp. at 31. Defendants' argument is premised on an assumption that setting loan limits *may* eventually cause institutions to limit tuition increases. *See id.* This assumption is based on speculation that higher loan limits have led to higher tuition costs, which has never been proven. *See* McElvain Decl., Ex. 3, NEA Comment on NPRM at 4-5 & nn.14-19. In fact, the Department admits in the Final Rule that any correlation between federal loan availability and tuition growth reflected in the studies they rely on "does not establish causation." 91 Fed. Reg. at 23857-58. And even if increases in financial aid were to cause rises in tuition, it does not mean that the opposite is true and that capping aid will lead to decreases in tuition. NEA Comment at 4. Moreover, even if Defendants are right, any effects on tuition would take time, and therefore would not help the students who want to enroll in these degree programs this fall (or the American communities who will benefit from the services their education enables them to provide).

Plaintiffs' requested injunction also does not infringe on Congress's discretion, *see* Opp. at 31, because Plaintiffs are not asking that the Court enjoin the statutory loan caps. Rather, the most equitable solution is to apply the higher loan limits set by Congress to all graduate students while this case is pending, given that the Department has failed to timely and lawfully implement Congress's definition of professional student and therefore has rendered it impossible to distinguish between graduate degrees and professional degrees until a lawful rule is published. *See infra* § IV.B. While this may result in Defendants disbursing loans in excess of the $20,500 annual cap for some students who a lawful rule would later define not to be professional students, this is a problem of Defendants' own making and is more equitable than permitting Defendants to impose

16

unlawful caps on some professional students, which will result in immediate negative impacts on Plaintiffs and their members.

IV.    **The Court should enter sufficient preliminary relief to protect educational institutions and matriculating students from irreparable injury in the coming school year.**

The Court should enter two forms of preliminary relief to prevent irreparable injury in the coming school year and for the pendency of this litigation: First, the Court should stay the Rule's definition of "professional degree," 91 Fed. Reg. at 4332, under Section 705 of the Administrative Procedure Act (APA), 5 U.S.C. § 705. Second, the Court should enjoin the Department from enforcing the lower loan limits applicable to graduate degrees. Instead, the Court should require the Department to apply the higher loan limits to all professional and graduate degrees until the Department has devised a lawful process for distinguishing between the two types of degree programs. This relief is well within the Court's remedial authority under the APA and is necessary to ensure that aspiring nurses, educators, counselors and other professionals are not penalized because the Department failed to timely and lawfully implement the new statutory distinction between professional and graduate degrees.

A.  **The Court should stay the Rule's definition of "professional degree" under Section 705 of the APA.**

First, the Court can—and should—stay the Rule's definition of "professional degree" under Section 705 of the APA. *See* 5 U.S.C. § 705 (authorizing a court "to postpone the effective date of an agency action" pending judicial review). The government never contests that a stay of the relevant portion of the Rule would be an appropriate remedy in the event Plaintiffs prevail on the merits. While the government generally argues that any relief granted should be limited to Plaintiffs, *see* Opp. at 37–38, it never cites any authority for the proposition that a Section 705 stay must be limited to the Plaintiffs. Nor could it. It is well settled that a Section 705 stay is not a

party-specific remedy but instead operates on the agency action itself. *See Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34–36 (D.C. Cir. Nov. 22, 2025). The government invokes *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). Opp. at 37. But, put simply, "*CASA* does not control the scope of relief available under Section 705." *Make the Rd.*, 2025 WL 3563313, at *34. Thus, if the Court agrees with Plaintiffs and concludes (as it should) that the Rule's definition of a "professional degree" is contrary to the law, then at minimum the Court should enter a Section 705 stay of the relevant portion of the Rule, which is the entire regulatory definition of "professional student."

> **B. The Court should order the Department to apply the higher loan limits uniformly until it devises a lawful way to distinguish between professional and graduate degrees.**

The Court should also order the Department of Education to treat all graduate and professional degree programs as "professional degrees" and therefore apply the higher limits applicable to professional degrees under the statute. The new statutory regime distinguishes between graduate and professional degrees, but as explained above, the Department has failed to timely and lawfully implement this distinction, *see supra* § I. With the new school year fast approaching, and in the absence of any lawful manner for distinguishing between graduate and professional degrees, the only practicable and fair remedy is for the Court to require the Department to place all graduate and professional degree programs on equal footing for the pendency of this litigation.

The Court has broad and flexible authority to craft an appropriate and workable remedy. Under Section 705 of the APA, a court has the power to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings" and to do so "[o]n such conditions as may be required to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705; *see also Neguse v. USCIS*, No. 25-cv-2463, 2026 WL 575509, at *6 (D.D.C. Mar.

18

2, 2026). The court's authority to enter injunctive relief is equally flexible. *See WildEarth Guardians v. Haaland*, No. 20-cv-1035-CKK, 2021 WL 4502054, at \*6 (D.D.C. Sept. 30, 2021) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944)). Here, once the Court properly stays the Rule's unlawful definition of "professional degree," then schools and students will be left without any clear guidance on what types of degree programs qualify as "professional degrees" and are thus subject to the higher loan limits. There is not enough time for the Department to lawfully implement and operationalize the statutory definition of "professional degree." In these circumstances, the only workable and fair solution is for the Court to require the higher loan limits to be applied across the board, and that solution is entirely consistent with the Court's broad remedial authority.

Indeed, the Department has repeatedly conceded that a rulemaking is necessary to implement the new statute and that absent regulatory implementation, the loan limits cannot go into effect. *See* 91 Fed. Reg. at 23770 ("[T]hese provisions are not self-implementing and cannot go into effect unless the Department promulgates a final rule."); *see also id.* ("Many of these provisions are not self-executing and could not be implemented absent the Department promulgating regulations to provide details for institutions on how to comply."). Given the Department's insistence that the new loan limits "cannot go into effect" without a rulemaking, *id.*, it is appropriate for the Court to enjoin the enforcement of the lower loan limits until the Department completes a valid rulemaking to implement the new statute.

If there were any doubt, the Higher Education Act makes clear that when the Department violates its master calendar provisions, the effect cannot be to penalize institutions. *See* 20 U.S.C.

19

§ 1089(d) ("Nothing in this section shall be interpreted to penalize institutions . . . based on the failure of the Secretary to adhere to the dates specified in this section."). The only way to avoid penalizing educational institutions for the Department's failure to comply with the master calendar provisions is to forestall implementation of the lower loan limits until the Department has completed a valid rulemaking distinguishing between professional and graduate degrees.

The government resists this conclusion on a few fronts. For one, it argues that the Court should at most stay the contested portions of the Rule's definition of "professional degree," effectively reinstating the statutory definition. *See* Opp. at 32–33. But reinstating the statutory definition, which the Department itself recognizes is not self-executing, is not a workable solution. The statutory definition sets forth a multipart test to determine which degree programs qualify as "professional degrees" but offers no further clarification as to which specific degrees satisfy that test. To reinstate the statutory definition without further guidance and without sufficient time for the Department to implement the statute would result in significant confusion and effectively punish institutions and aspiring professionals for the Department's failure.

The government also asserts that according to "Plaintiffs' theory of the case" the "statute is self-executing" because it "does not give the Department discretion to do anything." Opp. at 34. That misreads Plaintiffs' position. As explained above, the statute provides a three-pronged definition of "professional degree." The Rule's definition of "professional degree" is contrary to law because it imposes new, atextual limitations on what qualifies as a "professional degree" that are nowhere to be found in the three-pronged statutory definition. *See supra* § I.B. But that does not mean that the statute is self-executing. The agency still needed to implement and operationalize the statute, but Congress had already supplied the governing definition. The Department's role was

20

to faithfully administer that definition by explaining which specific degree programs satisfy the definition articulated by Congress, not to narrow and rewrite it.

Moreover, the government also asserts that if Plaintiffs prevail on the merits the Court "will have necessarily rejected the Department's argument . . . that the statute is not self-executing." Opp. at 34. That's simply not true. As explained above, there are a variety of ways the Department could have completed a valid rulemaking consistent with the master calendar provisions, including making the requirements of the new rulemaking elective for the first operative academic year, showing good cause to waive negotiated rulemaking, or showing good cause to waive notice-and-comment. *See supra* § I.A. So, there is work for the Department to do in specifying which programs meet the test for professional degrees that Congress set forth in the statute (not a new test of the Department's own devising) and in specifying when these determinations would take effect in keeping with the master calendar provisions.

The government also emphasizes that Plaintiffs do not "challenge the statute." Opp. at 34. Indeed, Plaintiffs do not. But it does not follow that the Court should allow the Rule to go into effect in the coming school year. As explained above, it would be unworkable and unfair for the lower limits that apply to programs conferring graduate (but not professional) degrees to go into effect prior to the Department completing a valid rulemaking implementing the statute that draws a lawful distinction between graduate degrees and professional degrees. Plaintiffs are not asking the Court to strike down the statutory loan limits but simply to forestall the effective date of the cap for graduate (but not professional) degrees in order to give the Department time to properly implement the new statute.

The government also contends that if the Court enjoins the new statutory loan limits, then certain prior statutory loan limits will spring back into place. Opp. at 36–37. But, again, the statute

21

requires the Department to draw a distinction between graduate degrees and professional degrees, and the Department has failed to lawfully do so. The appropriate remedy for the Department's failure is an order applying the higher cap for professional degrees to each program until the Department fulfills the task that Congress set out for it. The government never explains why an order temporarily applying higher loan limits to all professional and graduate degrees would resuscitate a defunct, superseded statute. Nor does it cite any authority for that proposition. Plaintiffs are not asking the Court to invalidate the new statutory regime wholesale. Instead, Plaintiffs are simply asking the Court to apply the new statute's higher limits for professional degree limits uniformly until the Department completes a valid rulemaking.

**C. At a minimum, the Court should order the Department to treat the relevant degree programs as professional degrees.**

Even if the Court is not inclined to enter an injunction requiring the Department of Education to apply the higher loan limits to all graduate and professional degree programs, the Court should at minimum enjointer an injunction requiring the Department to apply the higher limits applicable to "professional degrees" to the degree programs relevant to Plaintiffs. As explained in Plaintiffs' motion, graduate degrees in nursing, education, counseling, and public health all demonstrably satisfy the three-prong definition of "professional degree" supplied by the statute. *See* Mot. at 11. So even if the Court concludes that the statutory definition of "professional degree" is self-executing and can be implemented prior to a valid rule-making, the Court should nonetheless order the Department—consistent with the statutory definition of "professional degree"—to apply the higher loan limits to these specific degree programs for the coming school year.

22

**D.  The requested relief should not be limited to Plaintiffs or their members.**

Finally, the government errs in arguing that "any relief should be limited to the Plaintiffs and their members who have demonstrated standing." Opp. at 37. The Court should not limit any relief to Plaintiffs much less a subset of their members.

First, *CASA* expressly does not limit remedies issued under the APA. 606 U.S. at 847 n.10; *see also Make the Rd.*, 2025 WL 3563313, at *34. As explained above, Section 705 of the APA gives the Court the authority not only to defer the effective date of an agency action but also to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Here, the requested relief—an order requiring the Department to apply the higher loan limits to all graduate and professional degrees—simply operates to ensure that educational institutions and aspiring professionals are not penalized for the Department's failure to complete a valid rulemaking implementing the statute. That relief is wholly authorized under Section 705 of the APA and need not be limited under *CASA*.

Moreover, *CASA* permits courts to enter relief as broad as is necessary to afford the parties "complete relief." 606 U.S. at 861. The only way for the Court to ensure Plaintiffs and their members are afforded "complete relief" is to enter an order that provides meaningful clarity as to which loan limits will apply in the coming school year. At minimum, the Court should thus order the Department to treat the degree programs relevant to Plaintiffs as professional degrees for the coming school year. Anything less would not provide Plaintiffs complete relief.

Finally, even if the Court is inclined to limit some of its relief to Plaintiffs, there is certainly no requirement that it go further and afford the protections of the injunction only to Plaintiffs' members who have submitted proof at this stage in the litigation. The government does not cite any authority for the proposition that injunctive relief should be limited to associational members found to have standing. And multiple courts have rejected that cramped reading of the scope of

23

Article III jurisdiction. *E.g.*, *Doe v. Trump*, 157 F.4th 36, 80 (1st Cir. 2025) (rejecting argument that injunction must be limited to the "members whom the organizations identified in seeking associational standing"); *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 47 (D. Me. 2025) (similar); *United Fac. of Fla. v. Lamb*, No. 1:24-cv-136, 2026 WL 1630428, at *10 (N.D. Fla. Mar. 20, 2026) (similar).

### E. The Court should neither enter a stay pending appeal nor require an injunction bond.

Finally, the government concludes its brief by requesting that the Court either stay any injunctive relief pending appeal or, in the alternative, require an injunction bond. Mot. at 38–39. Those requests should be denied.

First, "[a] stay pending appeal is an extraordinary remedy." *Grundmann v. Trump*, 786 F. Supp. 3d 188, 190 (D.D.C. 2025) (quoting *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020)). "A court is supposed to consider four factors in connection with a stay motion: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* (quoting *M.M.V.*, 459 F. Supp. at 4). The government cannot satisfy this standard because, for the reasons stated above, the Plaintiffs are likely to succeed on the merits, Plaintiffs will be irreparably injured in the absence of preliminary relief, and the public interest counsels in favor of preliminary relief.

Next, "Rule 65(c) gives this court broad discretion to determine the appropriate amount of an injunction bond . . . including the discretion to require no bond at all." *Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 73 (D.D.C. 2025) (citations omitted); *see also Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 121 (D.D.C. 2025) (requiring no bond);

24

*CREW v. U.S. Dep't of Just.,* No. CV 25-4426, 2026 WL 472589, at *14 (D.D.C. Feb. 19, 2026) (requiring nominal bond). Plaintiffs seek to prevent the financial harm they would suffer from the unlawful rule; the purpose of injunctive relief would be defeated if Plaintiffs were to suffer the same harm in a different form through the imposition of a bond. Particularly given the public interest at stake in this litigation, no bond should be required, or any bond should be nominal.

## CONCLUSION

The Court should grant Plaintiffs' motion.

Respectfully submitted,

/s/ *Joel McElvain*
Joel McElvain (DC Bar No. 448431)
Elena Goldstein (DC Bar No. 90034087)
Tsuki Hoshijima (DC Bar No. 90043312)
Ryan Cooper (DC Bar No. 1645301)
Jennie L. Kneedler (DC Bar No. 500261)
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
egoldstein@democracyforward.org
thoshijima@democracyforward.org
rcooper@democracyforward.org
jkneedler@democracyforward.org

/s/ Daniel F. Jacobson
Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

25