**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF NURSE PRACTITIONERS, et al.** | } } } } |
| | } } **Case No. 26-cv-01780-BAH** |
| **Plaintiffs,** | } } } **Consolidated with** |
| | } **Case No. 26-cv-01941-BAH** |
| **v.** | } } } |
| | } } **REPLY BRIEF OF PLAINTIFFS PA** |
| **LINDA MCMAHON, et al.,** | } **EDUCATION ASSOCIATION AND** } **AMERICAN ACADEMY OF** |
| | } **PHYSICIAN ASSOCIATES IN** |
| **Defendants.** | } **SUPPORT OF THEIR MOTION FOR** } **PRELIMINARY INJUNCTION** |
| | } } |
| | } |

**Paul D. Cullen, Jr. / Bar No. 463759**
**Kathleen Balthrop Havener / Bar No. 432638**
**The Cullen Law Firm, PLLC**
**1101 30th Street, Suite 500**
**Washington, DC 20007**
**202-298-4774**
**paul@cullenlaw.com**
**202-298-4775**
**kathleen@cullenlaw.com**

*Attorneys for Plaintiffs*
*PA Education Association and*
*American Academy of Physician Associates*

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.    Plaintiffs Have Demonstrated That They Have Standing to Sue Defendants in This
      Court. ....................................................................................................................... 3

   A.    Plaintiffs have constitutional standing to challenge the Final Rule in federal court. ..... 3

   B.    PAEA and AAPA submitted extensive evidence of the irreparable harm to their
   members. ..................................................................................................................... 5

   C.    The harm to both AAPA and PAEA members is fairly traceable to Defendants' action
   and redressable by this Court. .................................................................................... 10

   D.    The requested relief should apply to all PA students. .................................................... 10

II.   The Plaintiffs have Demonstrated a Clear Likelihood of Success on the Merits. ............. 11

   A.    The plain words of the statute are clear and unambiguous. ........................................... 11

   B.    The Defendants identify no ambiguity or vagueness, a precondition for
   interpretation. ............................................................................................................ 12

   C.    Plaintiffs' arguments against using the list of degrees to construct stricter terms in the
   definition do not render that part of the statute meaningless. .................................... 14

   D.    The Department's interpretations do not have a rational basis, are internally
   inconsistent, introduce vagueness, and are arbitrary and capricious. ...................... 15

III.  The Court Should Not Issue a Stay Pending Appeal or Require Plaintiffs to Post
      Security. .................................................................................................................. 20

   A.    The factors regulating the issuance of a stay are not met. ............................................ 20

   B.    A bond is not warranted. ............................................................................................... 21

   C.    If the Court requires a bond, the amount should be nominal. ....................................... 23

CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    41 F.4th 586 (D.C. Cir. 2022)............................................................................5, 10

*All. for Retired Ams. v. Bessent*,
    770 F. Supp. 3d 79 (D.D.C. 2025) ............................................................................10

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
    816 F. Supp. 3d 27 (D.D.C. 2026) ............................................................................23

*Am. Anti-Vivisection Soc'y. v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020)....................................................................................4

*Barrick Goldstrike Mines, Inc. v. Whitman*,
    260 F. Supp. 2d 28 (D.D.C. 2003)............................................................................18

*Burgess v. United States*,
    553 U.S. 124 (2008)..................................................................................................15

*Chamber of Comm. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011)....................................................................................4

*Chestnut Hill Benevolent Ass'n v. Burwell*,
    142 F. Supp. 3d 91 (D.D.C. 2015)............................................................................13

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
    901 F.2d 107 (D.C. Cir. 1990)....................................................................................5

*Connecticut Nat. Bank v. Germain*,
    503 U.S. 249 (1992)..................................................................................................12

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999)....................................................................................23

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
    811 F. Supp. 3d 1 (D.D.C. 2025)..............................................................................23

*Fischer v. United States*,
    603 U.S. 480 (2024)..................................................................................................14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000)....................................................................................................4

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)..................................................................................................20

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................................................12

*M.M.V. v. Barr*,
    459 F. Supp. 3d 1 (D.D.C. 2020)....................................................................................20

*Make the Road New York v. Noem*,
    Case No. 25-5320, 2025 WL 3563313 (D.C. Cir. 2025).................................................11

*Nat'l Endowment for Democracy v. United States*,
    795 F. Supp. 63 (D.D.C. Feb 25, 2025)..........................................................................22

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................................20

*Or. Env't Council v. IRS*,
    Case. No 25-4400, 2026 U.S. Dist. LEXIS 125356 (D.D.C. June 6, 2026)...........3, 4, 10

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015)........................................................................................3

*P.J.E.S. ex. rel. Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020)................................................................................21

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)........................................................................................................12

*Russell Motor Car Co. v. United States*,
    261 U.S. 514 (1923)........................................................................................................13

*Summers v. Earth Land Inst.*,
    555 U.S. 488 (2009)..........................................................................................................4

*Tex. Low Income Hous. Info. Serv. v. Carson*,
    427 F. Supp. 3d 43 (D.D.C 2019)....................................................................................3

*United States v. Monsanto*,
    491 U.S. 600 (1989)........................................................................................................14

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)........................................................................................................12

*United States v. Turkette*,
    452 U.S. 576 (1981)..................................................................................................13, 14

*Yates v. United States*,
    574 U.S. 528 (2015)........................................................................................................13

**Federal Statutes**

5 U.S.C. § 705................................................................................................................10, 11

20 U.S.C. § 1087e.......................................................................................................15, 16, 17

Administrative Procedure Act...................................................................................2, 5, 10, 11

One Big Beautiful Bill Act ..............................................................................................2, 10, 18

**Rules**

Federal Rule of Civil Procedure 65(c) ...................................................................................21

**Regulations**

34 C.F.R. § 668.2(b) ................................................................................................. *passim*

Federal Student Aid Programs,
72 Fed. Reg. 44,620, 44,662 (Aug. 8, 2007)..................................................................17

Federal Student Aid Programs,
72 Fed. Reg. 62,014, 62,024–25 (Nov. 1, 2007)..............................................................18

Reimagining and Improving Student Education,
91 Fed. Reg. 4,254, 4,262 (proposed Jan. 30, 2026) ....................................11, 15, 17, 18

Reimagining and Improving Student Education—Federal Student Loan Program Final
    Regulations,
91 Fed. Reg. 23,768 (May 1, 2026) ................................................................... *passim*

**Other Authorities**

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
104 Va. L. Rev. 933, 1012 (2018) ..................................................................................5, 11

Off. Mgmt. and Budget, *Federal Credit Supplement*,
 *Budget of the U.S. Government Fiscal Year 2018* (2018) ..........................................22

U.S. Gov't Accountability Off., GAO-22-105365*,
Student Loans: Education has Increased Federal Cost Estimates of Direct Loans by Billions Due
    to Programmatic and Other Changes*, (2022) .......................................................22

**Web Pages**

Master Promissory Note (MPN), Fed. Student Aid,
https://studentaid.gov/mpn/...........................................................................................21

## **INTRODUCTION**

Defendants do not dispute that PA students meet the plain terms of the statutory definition of professional student. Nor do the Defendants respond to Plaintiffs' assertion that the Defendants' have not identified any vague or ambiguous terms in the statutory definition. Nor do the Defendants identify any command by Congress to draft rules that would narrow the application of the statutory definition. Failing to identify any specific vague or ambiguous terms in the statute and without identifying the specific authorization of Congress, the Defendants fail to satisfy the prerequisites for applying the canons of statutory interpretation to amend the statutory definition of professional degree in ways that fundamentally frustrate congressional intent and excludes PAs. Defendants' attempts to apply the canons of statutory interpretation reveal that the Department added requirements to the statutory definition of professional student in the Final Rule[1] and their decision to specifically disqualify PA students from higher loan limitations during the rulemaking are unreasonable, arbitrary and capricious, and not in accordance with law.

Arguing that Plaintiffs lack standing to sue, Defendants ignore the extraordinarily comprehensive articulation of the injuries that Plaintiffs' members will suffer if the Final Rule is allowed to take effect. The individuals whose declarations accompanying Plaintiffs' Motion for Preliminary Injunction, have testified to the immediate and ongoing irreparable harm that they and others will suffer if the Final Rule is not enjoined. Indeed, Defendants recognized much of this harm during the rulemaking. *See Final Rule*, 91 Fed Reg. at 23856. Nothing Defendants argue contradicts the declarants' testimony that the Final Rule will cause immediate and

---

[1] *Reimagining and Improving Student Education – Federal Student Loan Program Final Regulations,* 91 Fed. Reg. 23768 (May 1, 2026) (to be codified at 34 C.F.R. pt 685) (hereinafter "Final Rule").

irreparable harm to students who seek to enroll in PA programs, PA programs throughout the country, and the healthcare system at large and in the communities they seek to serve. That harm will begin on July 1, 2026, unless the court intervenes.

Plaintiffs have standing to sue the Defendants under Article III because if the Final Rule is not enjoined, (1) Plaintiffs' members will suffer an injury in fact (be denied access to higher loan amounts); (2) the injury is causally linked to the Defendants' conduct (the definition of professional degree in the Final Rule), and (3) the injury is capable of redress by the court (setting aside the Final Rule as it applies to PA students). Finally, and to satisfy the standing requirement under the Administrative Procedure Act ("APA") (4) the Plaintiffs are within the "zone of interests" protected by federal law governing the agency's action. Because Plaintiffs meet all these requirements and are entitled to sue on their own behalf, but they invoke representational standing on behalf of their members.

The Final Rule will also harm the public in their efforts to obtain healthcare and choose appropriate providers. The Final Rule will interfere with access to care, and with clinicians' ability to provide high-quality, safe, and timely care to the communities the healthcare system serves at a time when patients are facing an extraordinary deficit of providers. *See* Plaintiffs' Motion for Preliminary Injunction at 2–7, ECF No. 7 in Case No. 1:26-cv-01941-BAH (*hereinafter* "Pls.' Mot.").

Finally, the Defendants' explanation that in implementing the loan limits in the One Big Beautiful Bill Act (the "Act"), Congress "sought to encourage institutions to align educational costs with economic outcomes, curb excessive borrowing, and place Federal student aid on a more fiscally sustainable footing." Defs.' Opp'n to Pls.' Mot. For Prelim. Inj. at 1 in Case No. 1:26-cv-1941 (BAH) (hereinafter "Defs.' Response") fails to account for their effort to exclude

2

PAs students from the definition of professional student in contravention of Congress's goals. Although PA education is inherently expensive to offer (therefore requiring higher professional loan limits), a PA degree produces an excellent return on investment for PA graduates because of their high employment rates, high starting salaries, and strong workforce demand. *See* Pls.' Mot., Ex. 1 at ¶ 22. This is further supported by the exceedingly low default rates for PA program graduates, indicating that PA students are consistently able to obtain employment and repay their loans. *See* Decl. of Sara Fletcher at ¶ 11, ECF No. in Case No. 1:26-cv-01941-BAH ("Fletcher Decl.") (default rates for PA graduates is often zero as reported by individual institutions). Plaintiffs ask the Court to issue a preliminary injunction narrowly tailored to protect PA students' access to funding for professional students under the statute, and, by extension, to preserve patients' access to high-quality care delivered by PAs at a time when the nation faces critical healthcare workforce shortages and growing demand for care.

## ARGUMENT

**I.      Plaintiffs Have Demonstrated That They Have Standing to Sue Defendants in This Court.**

    **A.      Plaintiffs have constitutional standing to challenge the Final Rule in federal court.**

An organization appropriately asserts standing "on its own behalf, on behalf of its members or both." *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 52 (D.D.C 2019) (*citing People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*")). An organization can show standing in the same way that an individual does, *i.e.*, by showing "an actual or threatened injury in fact" to its own interests *or* that of its members "that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *See Or. Env't Council v. IRS,* Case. No 25-4400, 2026 U.S. Dist. LEXIS 125356, \*\* 26-27 (D.D.C. June 6, 2026) (*citing Am. Anti-*

3

*Vivisection Soc'y*. v. *U.S. Dep't of Agric*., 946 F.3d 615, 618 (D.C. Cir. 2020)). When an organization is suing on behalf of its members, it must establish "representational" or "associational" standing. In this circumstance, it must satisfy the three-prong test by showing that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 181 (2000) (citations omitted).

To satisfy the first prong, it is "not enough to aver that unidentified members have been injured." *Chamber of Comm. v. EPA,* 642 F.3d 192, 199 (D.C. Cir. 2011). Rather, the organization must name at least one member who has suffered the requisite harm. *See Summers v. Earth Land Inst.,* 555 U.S. 488, 498-99 (2009). Each Plaintiff has submitted at least one declaration that establishes this factor. *See, e.g.*, Decl. of Reamer Bushardt, at ¶17, ECF No. 7-4 in Case No. 1:26-cv-01941-BAH ("Bushardt Decl.") (an officer of an educational institution that is a member of PAEA), Decl. of Benjamin Pinckney, ¶20, ECF No. 7-8 in Case No. 1:26-cv-01941-BAH ("Pinckney Decl.") (a member of AAPA). PAEA has hundreds of members who would have standing to challenge the Final Rule's effects on the quality and continuity of their programs. AAPA has thousands of members who have standing to challenge the Final Rule's negative impact on their ability to attend PA school.

Plaintiffs also satisfy the second and third prongs to qualify for associational standing. The interests that Plaintiffs seek to protect are "germane to the organizations' purposes" of advocating for PA educational programs (PAEA) and advocating for students who seek to attend them (AAPA). *See Or. Env't Council,* Case. 2026 U.S. Dist. LEXIS 125356, *40; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111 (D.C. Cir.

4

1990) (explaining that the "[g]ermaneness" requirement "is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose"). Finally, in neither PAEA's nor AAPA's case is a member's participation required to resolve this suit.

Here, while both PAEA and AAPA would have standing based on their own cognizable injuries, they assert associational standing based on the harm to their members that has begun to and will occur unless the Court enjoins the unlawful Final Rule. Further, only one plaintiff must establish standing. *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 592 (D.C. Cir. 2022) ( citation omitted) ("When multiple petitioners seek common relief, [the Court has] jurisdiction as long as one of the petitioners has standing.").

Although Defendants argue that any relief should apply only to Plaintiffs who have demonstrated standing*, see* Defs.' Response at 39, they cite no authority for their restrictive position. "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA and related statutory provisions go further by empowering the judiciary to act directly against the challenged agency action." *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018) (internal quotation marks omitted). The Plaintiffs nevertheless focus their request for relief on behalf of the members in the PA community.

### B.    PAEA and AAPA submitted extensive evidence of the irreparable harm to their members.

Included in the standing analysis is whether Plaintiffs have shown an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. *I Or. Env't Council v. IRS*, 2026 WL 1631612 at **26-27. The harm detailed in the Declarations submitted with Plaintiffs' motion both establishes sufficient injury to

5

support standing and demonstrates that harm will be irreparable, sufficient to support a preliminary injunction.

1. **<u>AAPA has shown actual or threatened harm to its members.</u>**

AAPA is a not-for-profit trade association that works to advance the PA profession and promote quality, accessibility, and cost-effectiveness in patient-centered healthcare. *See* Decl. of Todd Pickard at ¶ 4 in Support of Plaintiffs' Motion for Preliminary Injunction ("Pickard Dec."), ECF No. 7-1 in Case No. 1:26-cv-01941-BAH. Its advocacy includes initiatives related to the federal, state and grassroots levels in all fifty states, the District of Columbia, the U.S. territories, and the uniformed services. *Id.* at ¶ 3. Founded in 1968, AAPA represents a profession of more than 200,000 constituents, including PAs, student PAs, and pre-PA students. *See id.*

If the Court does not enjoin the implementation of the Final Rule, many prospective PA students will be unable to pursue their education. *See* Pinckney Decl. at ¶ 23; *see also id.* at ¶ 20 (confirms Mr. Pinckney is a member of AAPA)[2]; s*ee also* Decl. of Laura Cunningham ¶¶, 2, 22-29, ECF No. 7-5, in Case No. 1:26-cv-01941-BAH (describing being a PA and member of AAPA for eleven years, *see id.* at ¶ 2, engaged in a private psychiatric practice in an underserved community who could not have completed her PA degree under the new loan limitations, and who repaid all her federal loans within the assigned time); Decl. of Julianna Sloan, ¶¶ 2-10, ECF No. 7-6, in Case No. 1:26-cv-01941-BAH (stating she is a graduating PA and member of AAPA who joined the Army National Guard in 2022 in order to qualify for educational benefits but nevertheless required the existing loan limitations in order to complete PA school).

---

[2] Defendants attacked the Declaration of Mr. Pinckney because "he does not allege to have applied to, or been accepted into, any PA program." When Mr. Pinckney executed his Declaration, he had not yet received his bachelor's degree and therefore he was ineligible to apply via CASPA prior to the date of his Declaration. However, Mr. Pinckney's membership in AAPA as a pre-PA reinforces his intent to apply to PA school.

6

Plaintiffs pointed out in their Motion the cruelty of the timing of the Final Rule's issuance. Pls.' Mot. at 16. The application process for PA schools (CASPA) opened on April 30, 2026, the same day the Final Rule's issuance became public. *Id.* Thus, even though the Final Rule is meant to apply to the rapidly approaching 2026-27 school year, it was only finalized on May 1, 2026. Given the Department's planned implementation of the new loan limits for July 1, aspiring PA students and PA institutions have been required to reevaluate their ability to attend or plans to administer a school year that begins as soon as July. *See* Pinckney Decl. at ¶¶ 21-22; *see also* Bushardt Decl. at ¶ 21,

Prospective students must decide whether and where to enroll without understanding the financial consequences of their decisions. This absence of transparency alone gives rise to significant harm for prospective PA students who intended to enroll in the 2026-27 academic year.

### 2.  **PAEA has demonstrated actual or threatened harm to its members.**

"PAEA is the only national organization representing PA educational programs in the United States. All the accredited programs in the country are members of the Association. PAEA provides services for faculty at its member programs, as well as to applicants, students, and other stakeholders."[3] *See* Pls. Mot. at 1 n. 1. All accredited PA programs in the nation belong to PAEA and PAEA advocates for them all.

PAEA submitted the Declaration of Reamer Bushardt, the Provost, Vice President for Academic Affairs, and Chief Academic Officer at MGH Institute of Health Professions ("IHP") at Massachusetts General Hospital (Mass General Brigham) (MGB), which is the largest private

---

[3] All 330 PA programs in the United States are members of the PAEA. *See* Complaint, ECF. No, 1, at ¶ 18, filed in *PAEA, at al. v. U.S. Dept. of Education, et al.*, Case No. 1:26-cv-01941-BAH prior to consolidation.

employer in the Commonwealth of Massachusetts. *See* Bushardt Decl. at ¶ 3.[4] Dr. Bushardt

testified about the reputational harm to the profession. *See id. at* ¶¶ 19-20. He further testified

about the significant harm his and other PA programs will suffer because of the absence of

predictability as to the number of enrolling students, *id.* at ¶ 21, the inability to recreate similar

appropriate applicant pools, *id.* at ¶ 22, and smaller and/or unstable cohorts, which will harm the

educational experience of entire classes, *id.* at ¶¶ 23-24. In IHP's PA program, along with most if

not all others, a smaller or unstable cohort will interfere with group learning, peer support,

simulation exercises, and team-based clinical preparation. *Id.* at ¶ 24. Dr. Bushardt testified that

students from lower-income backgrounds, first-generation college graduates, and students from

underrepresented communities will be less likely to attend PA school, which will harm those

students along with the mission of his institution—with those of other PA programs—of

preparing a competent, compassionate healthcare workforce to serve a diverse population. *See id.*

at ¶ 25. Because PA students' clinical rotations require advance planning with hospitals, clinics,

preceptors, schedules, onboarding and supervision, Dr. Bushardt's program and other PA schools'

programs will have difficulty placing PA students into clinical placements. *Id.* at ¶ 26. If PA

programs are unable reliably to fill clinical rotation slots or must make last-minute changes, their

clinical partners will lose confidence and offer those placements to other programs. *Id.* at ¶ 27.

Dr. Bushardt testified that uncertainty about a program's future applicant pool or cohort size will

reduce preceptor willingness to continue partnering with PA programs to continue educating and

---

[4] Dr. Bushardt is a professor in IHP's Department of Physician Assistant Studies and a research associate in the Department of Physical Medicine and Rehabilitation within Harvard Medical School. Bushardt Decl. at ¶ 7. He holds a B.S. in Pharmaceutical Sciences from the University of South Carolina in Columbia (1998), a Pharm.D. from the University of South Carolina (1999), and a B.S. in Physician Assistant Studies from the Medical University of South Carolina in Charleston (2004). *Id.,* ¶¶ 8-10.

training their students, damaging their ability to rely on PA preceptors and other clinicians who invest time in teaching students who are placed under their supervision and direction. *Id.* at ¶ 28.

Dr. Bushardt testified that the misclassification and resulting loan limitations will make recruiting and retention of PA program's faculty more difficult. *See id.* ¶ 29. He declared that the Department's misclassification of PA students will undermine the public's understanding of who and what PAs are and what they do when choosing providers to obtain treatment. The public will have unjustified doubts about whether PAs are true health professionals, even though licensure, certification, and clinical practice ensure that they absolutely are. *See id.* at ¶¶ 31-36. Dr. Bushardt articulates far more than "reputational harm." The Final Rule will harm access to care, and clinicians' ability to provide high-quality, safe, and timely care to all patients those healthcare systems exists to serve, *see id.* at ¶ 36, at a time when the broader community of healthcare consumers is facing an extraordinary deficit of providers. *See* Pls.' Mot. at 2-7.

3. **The Department acknowledges the harm to borrowers and institutions in the Final Rule.**

Notably, the Final Rule itself discusses the negative impacts it will have on both individual student borrowers and programs. Such harms include reduced student enrollment due to their inability to afford a PA program, a requirement to seek less favorable private financing that may not be accessible to them and is not guaranteed, and ultimately potentially re-considering their decision to pursue a career as a PA at all. *See Final Rule*, 91 Fed. Reg. at 23856. Institutions with impacted programs fare no better. As the Department openly admits, institutions will bear indirect costs due to receiving "less loan revenue" from the government, causing a "loss of revenue for institutions." *Id.* Accordingly, in the face of these admissions, the Department is in no position to challenge Plaintiffs' standing to defend the Final Rule on the

9

merits while appearing to argue "that nothing will change" for Plaintiffs. *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 595 (D.C. Cir. 2022).

C.    **The harm to both AAPA and PAEA members is fairly traceable to Defendants' action and redressable by this Court.**

Defendants argue that the injuries to Plaintiffs are not "fairly traceable" to Defendants' unlawful Final Rule but rather to Congress's overhaul of the Federal student loan programs in the Act. *See* Defs.' Response at 30. But Congress did not rewrite the definition of "professional degree" or exclude PAs from that definition. The Department did. The injury to Plaintiffs is "fairly traceable" to the Department's restrictive definition of "professional degree." *See All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 104 (D.D.C. 2025). And the requested relief—an injunction prohibiting the Final Rule from taking effect and allowing PA students to borrow as professional degree students—would provide redress to Plaintiffs and their members by relieving the hardship caused by the Final Rule's unlawful definition of professional student.

> The Plaintiffs in this case are not "unaffected bystanders" seeking to resolve an abstract grievance . . .. Instead, many of them are actual and foreseeable beneficiaries of a consequential federal [] policy that the Defendants have abruptly changed. Because "commonsense economic inferences" and record evidence show that [implementation of the Final Rule] will cause concrete harm to these Plaintiffs that will be redressed if the Court [enjoins the implementation of the Rule], these Plaintiffs have satisfied the requirements of Article III.

*Or. Env't Council,* Case. 2026 U.S. Dist. LEXIS 125356 at 10.

D.    **The requested relief should apply to all PA students.**

Defendants incorrectly argue that any relief should apply only to Plaintiffs' members who have demonstrated standing. *See* Defs.' Response at 39.  Instead, the Court should stay the Final Rule's implementation under Section 705 of the APA. *See* 5 U.S.C. § 705 (stating a court may "postpone the effective date of an agency action" pending judicial review). Although the

10

Defendants argue that any relief granted should be limited to Plaintiffs that have demonstrated standing, it cites no authority for its restrictive position. That is because a Section 705 stay is based on a court's examination of the authority of an agency to act at all, not on protection of parties who have sued to challenge a rule. *See Make the Road New York v. Noem*, Case No. 25-5320, 2025 WL 3563313, *35 (D.C. Cir. 2025). "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA and related statutory provisions go further by empowering the judiciary to act directly against the challenged agency action." *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018) (internal quotation marks omitted).

## II.    **The Plaintiffs have Demonstrated a Clear Likelihood of Success on the Merits.**

### A.    **The plain words of the statute are clear and unambiguous.**

Defendants assert that Plaintiffs have not demonstrated the likelihood of success on the merits because the Final Rule's definition of professional degree is consistent with Congress's statutory definition[5] and is not arbitrary or capricious under the APA. But all of Defendants' justifications for their new restrictions in the Final Rule's definition of professional degree rely upon multiple arguments of supposed statutory interpretation. However, statutory interpretation is not appropriate unless a term or phrase in the statute is identified as vague or ambiguous, requiring interpretation.  Defendants stated that they are interpreting the term professional degree and that the definition incorporated "a variety of words and phrases that may, without context, appear ambiguous or vague on their face." Defs.' Response at 5, *citing Reimagining and Improving Student Education Notice of Proposed Rulemaking,* 91 Fed. Reg. 4254, 4262 (*hereinafter* "NPRM").  But the Defendants did not identify during the rulemaking or in their

---

[5] Congress incorporated the Department's definition of professional degree from 34 C.F.R. § 668.2(b).

Response any particular "variety of words and phrases" that are vague and ambiguous to justify their statutory interpretations, because there are none. They simply jump into interpretative exercises that justify the new requirements in the Final Rule rather than ever tying them to any words or phrases that are allegedly vague and ambiguous.

In approaching the meaning of a statute (including whether to uphold the Government's Defendants' interpretation), the court's first step is to determine whether the plain language of the statute is unambiguous, and upon such a finding, the court's inquiry "must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (*citing United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)); *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992). The courts, not the agencies, are the final interpreters of the law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

The Defendants acknowledge that the statutory definition of "professional degree" establishes a three-part test and do not dispute Plaintiffs' evidence that PA degrees meet each of the requirements of the plain language of the definition. *See* Defs.' Response at 5, 7. PA degrees meet the three-part test because a student must complete graduate-level academic requirements for a master's degree (exceeding the requirements for a bachelor's degree) for entry into the PA profession. Earning a PA degree also allows PA graduates to take a certification examination necessary to obtain a professional license to practice as a PA, which is required in every state. The Defendants do not dispute that PAs meet these unambiguous requirements. The Court's inquiry should end there. And yet Defendants' arguments on Plaintiffs' likelihood of success on the merits depends almost entirely upon unfounded statutory interpretation.

**B.    The Defendants identify no ambiguity or vagueness, a precondition for interpretation.**

12

Defendants leap headlong into statutory interpretation to argue that the Final Rule is consistent with congressional intent and, therefore, not contrary to law. If not constrained by the requirement to first identifying what terms or parts of the statutory definition ae vague and ambiguous and thus require interpretation, there is no limit to the subjects the Defendants can delve into to justify any change they choose in the Final Rule's definition of professional student.

Defendants interpret the list of degrees in the statutory definition of professional degree, identifying commonalities among some of the listed degrees, not to explain an ambiguous term in the statute, but to justify its extra-statutory requirements in the Final Rule. They rely upon the canon of statutory interpretation *noscitur a sociis* ("a word is known by the company it keeps"). *Yates v. United States*, 574 U.S. 528, 543 (2015). However, this interpretation tool is used only where "words are of obscure or doubtful meaning; and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923).

For the same purpose, Defendants cite to the canon of *ejusdiem generus* ("of the same kind or class"). But again, as the Supreme Court explained in *United States v. Turkette,* courts resort to this canon "when there is some uncertainty as to the meaning of a particular clause in a statute." *United States v. Turkette*, 452 U.S. 576, 581 (1981) (citations omitted).

Thus, the doctrine of using an illustrative list to interpret a statutory term's definition has only been used by the courts when there is an arguably ambiguous statutory term. In the *Chestnut Hill* case cited to by the Defendants, the court was interpreting a term that was not defined in the statute, "recognized national professional organization for the particular activity." *See Chestnut Hill Benevolent Ass'n v. Burwell*, 142 F. Supp. 3d 91, 103 (D.D.C. 2015). The *Chestnut Hill* court examined the short list of recognized national professional organizations that

13

followed in the statute for clues to what that more general term meant. In contrast to the term in the *Chestnut Hills* case, the term "professional degree" is simply and clearly defined by the statute. None of the terms in the statutory definition raise questions of uncertainty necessitating an exercise in statutory interpretation.

Defendants are thus asking this Court to do what the Supreme Court in *Turkette* rejected, to accept their interpretation of the list of degrees in the statute to effectively rewrite the statute to include new requirements on the definition of professional degree, where there is no uncertainty as to the statutory definition.

The Supreme Court cautioned in *United States v. Monsanto* that "interpretive canon[s are] not a license…to rewrite language enacted by the legislature." *United States v. Monsanto*, 491 U.S. 600, 611 (1989) (citation omitted). It is therefore improper not only for Defendants to add additional criteria that narrow the definition of professional degree beyond Congress's intended scope, but also to re-write the statutory language in a way that frustrates congressional intent to choose a broader definition.

C. **Plaintiffs' arguments against using the list of degrees to construct stricter terms in the definition do not render that part of the statute meaningless.**

Defendants' citation to *Fischer v. United States* is equally unavailing, as that court recognized that statutory interpretation applies when there is a particular clause that needs to be defined. *See Fischer v. United States*, 603 U.S. 480, 485-486 (2024). In *Fischer*, the parties agreed that an "otherwise" clause was intended to be a catch-all phrase covering actions similar to, but not covered by, the action described in the previous clause, but disagreed as to what it meant. *Id.*

Whereas in *Fischer* the court wrestled over the meaning of the "otherwise" clause, Defendants here do not identify any such word that needs interpretation. The term "include but

14

are not limited to" in the statutory definition of professional degree tells us precisely how to view the degree examples listed. 20 U.S.C. § 1087e; 34 C.F.R. 668.2(b). Having satisfied the plain language of the three-part statutory test, the unlisted examples would include any other degree that meets those requirements, such as PA degrees. There is nothing in the language of the statute that is ambiguous or that would suggest otherwise.

In *Burgess v. United States*, the Supreme Court stated that the word "includes", when used in a statute, "is usually a term of enlargement, and not of limitation." *Burgess v. United States,* 553 U.S. 124, 131 n.3 (2008). This means the universe of degrees defined as professional should be broader than the incorporated list of examples, not narrower, as the next phrase in the statute "but not limited to" denotes. By limiting the definition to the exact same list as the incorporated list, with only one additional degree,[6] the Department explicitly ignores the broader scope of professional degrees intended by Congress to obtain loans under the highest loan cap.

### D.    The Department's interpretations do not have a rational basis, are internally inconsistent, introduce vagueness, and are arbitrary and capricious.

Even if the court were to determine that some word or phrases in the statutory definition of professional degree are vague or ambiguous such that it would require interpretation, the Department's changes to the definition are arbitrary and capricious. The Department's new definition and the test they apply to PAs in the preamble to the NPRM[7] and Final Rule are internally inconsistent and introduce, rather than resolve, ambiguities.

---

[6] Defendants appear to describe the use of four-digit CIP codes as a means of allowing more programs to be defined as professional, while keeping classified programs closely related to those that are listed. *See* Defs.' Mot. at 19. This may facially appear to be a way of expanding the list, by plausibly allowing other programs within the same four-digit CIP code as an enumerated degree to be considered professional, but instead it effectively solidifies the conversion of the non-exhaustive list of examples into an exhaustive one.

[7] *Reimagining and Improving Student Education*, 91 Fed. Reg. 4254 (proposed Jan. 30, 2026).

1. **<u>The Final Rule's doctoral requirement conflicts with the statute, conflicts with the list of degrees in the Final Rule, and introduces ambiguity into the definition.</u>**

The Final Rule impermissibly changes the definition of professional degree to require that the degree "is generally at the doctoral level." *Final Rule*, 91 Fed. Reg. at 23784. This addition to the definition is arbitrary and capricious because it conflicts with the explicit criteria and list of examples incorporated in both the statutory definition and the Final Rule's definition. The statutory definition does not require that a professional degree be at the doctoral level. Instead, the first sentence of the statutory definition defines a professional degree as, "[a] degree that signifies [...] a level of professional skill ***beyond that normally required for a bachelor's degree***." 20 U.S.C. § 1087e; 34 C.F.R. 668.2(b) (emphasis added). Both a master's degree and a doctoral degree are generally understood to require skill beyond a bachelor's degree, and if Congress had intended to limit eligibility to doctoral programs generally, it had the ability to do so rather than incorporating a definition that specifically requires a level of professional skill beyond a bachelor's degree.  Further, the statutory definition provides a list of examples of professional degrees of which three are below the doctoral level. *Id.* One of the Law degrees listed (L.L.B.) is a baccalaureate degree and both Theology degrees listed (M.Div. and M.H.L.) are master's degrees, thus three of the 16 examples are below the doctoral level.

The Department also includes the same list of degrees in its new regulatory definition, rendering it internally inconsistent by requiring a degree to be at the doctoral level, while listing professional degrees that are not doctoral. Indeed, the Final Rule's requirement that professional degrees "generally be at the doctoral level" also creates an ambiguity not contained in the statute by using the word "generally." *See Final Rule*, 91 Fed. Reg. at 23784. "Generally" suggests there are some professional degrees that are not doctoral, but the Defendants provide no guidance as to

16

what types of degrees might otherwise qualify here and seem intent on excluding all other non-doctoral degrees.

As the Defendants acknowledge, the Department tries to justify the decision to add the doctoral requirement by stating that even though the statutory definition does not "explicitly state that a degree must generally be at the doctoral-level . . . the illustrative list of degrees suggests that this must be the case, as it contains only three non-doctoral degrees." *See* Defs. Response. at 6, *citing NPRM*, 91 Fed. Reg. at 4262. Defendants have no plausible explanation why the presence of doctoral and non-doctoral degrees on the list does not support the plain English reading of the statutory requirement that the qualifying degrees simply be "at a level of professional skill beyond that normally required for a bachelor's degree," or why the Defendants can explain away the non-doctoral degrees and justify that professional degrees all be generally of the doctoral level, when master's degrees meet the statutory criterion of the three-part test. *Id.*; 20 U.S.C. § 1087e; 34 C.F.R. § 668.2(b).

The Defendants continue to justify the doctoral requirement by pointing to the National Center for Education Statistics ("NCES") definition of "first professional degree" which was the source for the Department's regulatory definition adopted in 2007. *See Federal Student Aid Programs*, 72 Fed. Reg. § 44662, 44620 (Aug. 8, 2007). Defendants support the doctoral requirement by noting that the definition of "first professional student" stated that a first professional degree required "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *See* Defs. Mot. at 6, *citing NPRM*, 91 Fed. Reg. at 4262. First, while this requirement was included in the NCES glossary definition, the Department chose not to include this requirement in the regulatory definition of professional degree that it adopted in 2007 (and which is the definition incorporated

by reference into the Act). *See Federal Student Aid Programs*, 72 Fed. Reg. 62014, 62024–25 (Nov. 1, 2007); 34 C.F.R. § 668.2(b). Second, the cited regulatory history actually supports the inclusion of master's degrees in the definition of professional degree by requiring at least six years of higher education. Most bachelor's degree programs are completed in four years and a typical master's degree program is completed in two, resulting in six years of higher education and the conferral of a master's degree. Thus, a bachelor's degree followed by a master's degree (the typical pathway for most PA programs) meets precisely the minimum course of study length requirements of the NCES definition.

2. <u>**The Department's supervision requirement in the preamble to the Final Rule is inconsistent with the statutory definition and regulatory definition and should be invalid.**</u>

In the preamble to the NPRM and the Final Rule, the Department effectively adopts a supervision requirement to exclude PA degree programs from the professional degree definition. *See Final Rule*, 91 Fed. Reg. at 23800. Using a *de facto* requirement of this nature to exclude programs from the professional degree definition is arbitrary and capricious and should be declared invalid. *See Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003) ("Because the preamble to [a] rulemaking is inconsistent with the plain language of the regulation [...] it is invalid") (citation omitted).

In the Final Rule, the Department states it is "not persuaded" that PAs are professional degrees, in part, because "after the [PA] graduate becomes licensed, their practice must generally be supervised by medical doctors." *Final Rule,* 91 Fed. Reg. at 23800. Despite Defendants' statement that supervision is not a "freestanding disqualifying criteria", by using supervision as a dispositive factor in denying PA students (and others) access to the higher loan limits, it is using such analysis as a *de facto* requirement. *See* Defs.' Response at 20.

18

Indeed, the Defendants admit that a supervision requirement is not in the regulatory definition, noting "the Department did not adopt anything related to supervision as 'freestanding, disqualifying criteria' in the regulatory text." *See* Defs.' Response at 20. However, the Department still uses its analysis of the supervision requirements associated with PA practice as the basis for the exclusion of PA programs from the professional degree definition. *See Final Rule,* 91 Fed. Reg. at 23800. Nothing in the statute contemplates that a graduate who earns a professional degree must be free from supervision in their eventual career for the degree to be considered professional. The topic was never presented during the negotiated rulemaking sessions or included in the language that achieved consensus, and the Department does not identify any vagueness or ambiguity that requires this analysis to provide clarity. *Id.* Accordingly, excluding PA programs from the professional degree definition on this basis imposes restrictions that are arbitrary and capricious.

Additionally, the decision to focus on supervision is arbitrary, as it does not resemble the other criteria in the statutory definition, or the definition adopted via rulemaking. Supervision or collaboration requirements, involved in practice, are characteristics of the profession, not the degree. The requirements of the three-part test in the statutory definition, pertaining to "completion of the academic requirements for beginning practice in a given profession", "a level of professional skill beyond that normally required for a bachelor's degree", and a general requirement for "professional licensure", all represent characteristics of the degree. 34 C.F.R. 668.2(b). Even the factors improperly added via rulemaking, regarding CIP codes, required number of years of education, and the doctoral level, describe the degree program, not what happens in practice after a student has graduated and obtained licensure. *Final Rule,* 91 Fed. Reg. at 23882. Indeed, the Defendants' assert that "a J.D. is still a professional degree even if a

19

recipient never takes or passes the bar." See Defs.' Response at 23. Again, this focuses on the nature of the degree itself, not the practice of the profession. In addition, Plaintiffs disagree with Defendants' characterizations of the supervision requirements for PAs, and other professions, which also make the addition of this requirement arbitrary and capricious. Therefore, analysis about a profession's requirements for supervision or collaboration is not pertinent to the professional degree itself and should not be used to define which degree programs are encompassed in the definition.

III.    **The Court Should Not Issue a Stay Pending Appeal or Require Plaintiffs to Post Security.**

The Defendants request that if the Court enters injunctive relief, the Court also issue a stay pending appeal and order Plaintiffs to post security. See Defs.' Response at 40. The facts of this case do not support the issuance of stay and Plaintiffs urge the Court to also hold that a bond is not required. If the Court determines it must issue a bond, Plaintiffs request a nominal amount.

A.    **The factors regulating the issuance of a stay are not met.**

The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion. See Nken v. Holder, 556 U.S. 418, 433-34 (2009). The Defendants have not demonstrated that a stay is warranted under the factors set forth in Hilton v. Braunskill, 481 U.S. 770, 776 (1987). Further, as the factors for granting a stay are very similar to the factors for granting a preliminary injunction, it would be contradictory to conclude that Plaintiffs have prevailed on their motion for a preliminary injunction, but then to also determine that the Defendants have met a similar test to stay the awarded injunctive relief. Perhaps that is why, courts consider a stay pending appeal to be an "extraordinary remedy." M.M.V. v. Barr, 459 F. Supp. 3d 1, 4 (D.D.C. 2020). Importantly, the Defendants will not suffer irreparable injury if an injunction is granted, and any prospective monetary harms are de minimis because federal loans

20

administered at the professional degree level to PA students will be repaid. The Defendants also do not acknowledge the very real public interest in the public health that is promoted by ensuring continued access to PA education through the higher level of loan limits afforded to professional students. Thus, a stay pending appeal is not warranted.

## B.    A bond is not warranted.

In addition, the Plaintiffs respectfully request that the Court refrain from ordering Plaintiffs to post a security. *See P.J.E.S. ex. rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (holding that the District Court has "the discretion to require no bond at all") (citation modified). Plaintiffs acknowledge the requirement in Federal Rule of Civil Procedure 65(c) that the Court may issue preliminary injunctive relief only if the movant provides security in an amount the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c). Here, the Plaintiffs believe a bond is not warranted for the following reasons.

### 1.    <u>The Defendants will not incur significant costs or damages.</u>

In this instant case, the "costs and damages sustained" by Defendants, if injunctive relief is granted, are *de minimis*. Fed. R. Civ. P. 65(c). Defendants argue that the Government will be harmed if required to "make specific payments it is legally not required to make, and which may not be fully recoverable." *See* Defs.' Response at 40. The funds at issue, in this case, are student loans, which borrowers are obligated to repay via Master Promissory Notes, which provide security to the Government.[8] Not only are these loans securitized with a contractual obligation of repayment, but the Government also collects interest on such loans, which can generate a small

---

[8] The Master Promissory Note is a legal document in which the borrower promises to repay their loan(s) and any accrued interest and fees to the U.S. Department of Education. *See* U.S. Dep't of Ed., *Master Promissory Note (MPN)*, https://studentaid.gov/mpn/.

surplus because the Government borrows at low rates and charges student borrowers higher rates.[9] Historically, federal budget estimates projected that certain Federal Direct Loan programs, which include graduate and professional student loans, would at least break even and, in some years, generate net savings for the Government.[10] Further, there is little to no risk of default on the loans because PA programs have exceedingly low default rates. *See* Fletcher Decl. at ¶ 11. It would therefore be appropriate for the Court to forego a security in this case, as Defendants' have not demonstrated a tangible monetary harm that is not already secured by the student borrowers' repayment obligations.

### 2.  <u>**The Defendants failed to justify a bond amount.**</u>

Defendants fail to state a material monetary harm that would be properly remedied by a security and do not justify requiring Plaintiffs to post a bond under the circumstances. Plaintiffs here are seeking an injunction against the Department's Final Rule establishing the definition of professional degree because of the irreparable harm that would result if PA students cannot access the higher level of Direct Loans, allowed by Congress, to finance their education. *See Nat'l Endowment for Democracy v. United States,* 795 F. Supp. 63, 73 (D.D.C. Feb 25, 2025) (the court did not require a bond because "where the government is alleged to have unlawfully withheld millions of dollars of previously committed funds ... it would defy logic ... to hold Plaintiffs hostage for the resulting harm."). Defendants also do not explicitly request a specific

---

[9] *See, e.g.*, U.S. Dep't of Education, Fiscal Year 2026 Budget Summary at 35 (listing the interest rates for loans made in Award year 2024-2025).

[10] For example, the Fiscal Year 2018 Budget expected Federal Direct student loans to return more in repayments and interest than they would cost as shown by a negative subsidy rate. *See* Off. Mgmt. and Budget, *Federal Credit Supplement, Budget of the U.S. Government Fiscal Year 2018* (2018). The Plaintiffs do not cite more recent data due to the unprecedented repayment and interest suspension implemented during the COVID-19 pandemic. *See* U.S. Gov't Accountability Off., GAO-22-105365, *Student Loans: Education has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes*, at 12– 14 (2022).

amount of security. However, if their citation to the $51-52 million dollar estimate from the Final Rule is read to be a proposed security amount, such a proposal fails to account for the actual scope of Plaintiffs' request for a preliminary injunction. *See* Defs.' Response at 40. Plaintiffs seek only to extend the definition of professional student to include PA students during the preliminary injunction. It would be unreasonable to require Plaintiffs seeking such narrow relief to be responsible for the entire *estimated* cost savings associated with the broad application of the professional degree definition.

**C.     If the Court requires a bond, the amount should be nominal.**

As Defendants acknowledge, the Court has "broad discretion" when setting a security amount. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); Defs.' Response at 40. As a general matter, federal courts tend to require substantial securities "only in suits between private parties with significant monetary interests at stake." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64 (D.D.C. 2025) (citations omitted). As discussed above, the true monetary interests at stake are exceptionally low, since the anticipated expenditures by the Defendants are associated with loans instead of grants or wages. While Plaintiffs do not believe a security is required in this circumstance, if the Court concludes that a security in some amount must be ordered to comply with the Federal Rules of Civil Procedure, Plaintiffs respectfully request that the bond be for a nominal amount, such as $100. *See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 64 (D.D.C. 2026). As discussed above, the government funds impacted by the requested preliminary injunction are federal loans, which will be repaid by the student borrowers, and with a much higher likelihood of recoupment than the grants at issue in *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.* Thus, the Plaintiffs urge the Court to also find that, at most, a nominal bond amount is appropriate.

**CONCLUSION**

For the foregoing reasons, the court should grant Plaintiffs' motion.

Respectfully submitted,

Date: June 12, 2026

/s/ *Paul D. Cullen, Jr.*           
Paul D. Cullen, Jr. / Bar No. 463759
Kathleen Balthrop Havener / Bar No. 432638
The Cullen Law Firm, PLLC
1101 30th Street
Suite 500
Washington, DC 20007
202-298-4775
kathleen@cullenlaw.com
202-298-4774
paul@cullenlaw.com

*Attorneys for Plaintiffs*

*PA Education Association and*
*American Academy of Physician Associates*

24

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 12, 2026, a true and correct copy of the above document

was provided to all counsel of record through the Court's ECF system.

/s/ *Paul D. Cullen , Jr.*____

Paul D. Cullen, Jr.