**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF NURSE PRACTITIONERS, *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, *et al.*,<br><br>     Defendants. | Civil Action No. 26-1780 (BAH)<br><br>Judge Beryl A. Howell |

| | |
|---|---|
| PA EDUCATION ASSOCIATION, *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>     Defendants. | Civil Action No. 26-1941 (BAH)<br><br>Judge Beryl A. Howell |

**<u>MEMORANDUM OPINION</u>**

In July 2025, Congress enacted a reconciliation act spanning over 1,000 pages that, among many other things, significantly scaled back a two-decade-old federal loan program for students pursuing graduate degrees. Under the preexisting program, graduate students could access two types of federal student loans, regardless of the type of graduate degree they chose to pursue: (1) Direct Unsubsidized Loans, which allowed borrowing up to a capped annual and aggregate amount, and (2) Grad PLUS loans, which allowed borrowing up to the full cost of attendance, serving as a financial backstop to cover whatever the Direct Unsubsidized Loans did not. The reconciliation act—known colloquially as the "Working Families Tax Cuts Act" or the "One Big Beautiful Bill Act" ("Act")—imposed new borrowing limits on Direct Unsubsidized Loans and eliminated altogether the Grad PLUS loans. Going forward, prospective students needing

additional loan assistance for any graduate degree beyond that provided by the capped Direct Unsubsidized Loans must turn to private loans, which are not always available, often impose more burdensome terms and higher interest rates, and are not eligible for federal public service loan forgiveness programs.  Further, the Act imposed different borrowing limits for Direct Unsubsidized Loans depending on the type of degree the student choses to pursue, adding a new distinction between students enrolled in a "graduate" or a "professional" degree program. Graduate students will be permitted to borrow only up to $20,500 annually ($100,000 in aggregate), whereas "professional" students will be permitted to borrow up to $50,000 annually ($200,000 in aggregate).

To facilitate implementation of the new loan caps, Congress defined the key term, "professional degree," under the Act to be the same as the U.S. Department of Education's ("Department") longstanding regulatory definition for the same term "under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025 [the date of the enactment of the Act])."  20 U.S.C. § 1087e(a)(4)(C)(ii).  Congress directed that these statutory changes to the federal student loan program should take effect shortly, on July 1, 2026.  *Id*. § 1087e(a)(4).  The statutory changes are *not* being challenged in the instant consolidated lawsuits, but provide necessary context for the ensuing litigation over subsequent regulatory actions taken by the Department.

On May 1, 2026, the Department—believing the Act's definition of "professional degree" required additional interpretative work beyond the longstanding regulatory definition incorporated wholesale by Congress in the Act—promulgated a new Final Rule amending the preexisting definition to add more stringent requirements.  The Department concluded that under the new definition, only certain degrees in eleven fields qualified as "professional" degrees: Pharmacy

(Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.). All other degrees will be considered "graduate" degrees and thus subject to the lower loan caps, both annual and aggregate. Like the Act, the Rule's effective date is also July 1, 2026, only two months after promulgation of the Final Rule and only a couple short months before the academic year for 2026-2027 begins, as students newly accepted into graduate and professional programs are finalizing how to pay the tuition and associated expenses.

On May 21, 2026, six associations representing individual and organizational members in the fields of advanced practice nursing, therapy, public health, and education collectively filed suit against the Department and its Secretary, in her official capacity, challenging the new regulatory definition of "professional degree" and the imminency of the effective date under the Administrative Procedure Act ("APA"). Plaintiffs also moved for emergency relief, requesting an order staying the new regulatory definition under Section 705 of the APA, and enjoining the Department from applying the statutory loan caps until a lawful replacement rule is promulgated. On June 3, 2026, two associations representing prospective and current physician assistants/associates and their educational institutions filed a separate suit against the same defendants, also challenging the new regulatory definition and moving for emergency relief. These plaintiffs similarly seek an order prohibiting defendants from implementing the regulatory definition, and additionally request an order requiring the Department to treat physician assistants/associates as "professionals" so that students in those fields may enjoy the higher loan limits. The two cases have been consolidated.

For the reasons detailed below, plaintiffs' request to set aside and stay implementation of the new regulatory definition pending judicial review is granted. Plaintiffs in both suits have established that they are likely to succeed on their APA claim that the Rule's definition of "professional degree" is contrary to law, that they would suffer irreparable harm should the Rule go into effect, and that the balance of equities and the public interest are in their favor.

All other requests for additional relief, however, require an overreach of this Court's authority and are denied. Ultimately, the primary source of plaintiffs' understandable angst over the federal student loan limits, apparent from their briefing and declarations, stems largely from the *statutory elimination* of the uncapped Grad PLUS loans. Although plaintiffs' litigation over the Department's *regulatory definition* of "professional degree" increases, on the margins, loan limits for a limited number of fields of study under the Direct Unsubsidized Loans program, this litigation cannot remedy plaintiffs' primary frustration over the elimination of uncapped borrowing to pursue graduate education and the concomitant benefits of enabling more students from working families to earn a graduate degree in a chosen career field and attracting students more broadly to enter the American workforce in fields understaffed and in areas underserved. Indeed, this reality is likely why plaintiffs have also attempted to seek an order preliminarily enjoining, in one fashion or another, application of the statutory caps themselves, even though the legality of the statute is not being challenged—such an order would in effect reinstate the uncapped loans previously available under the now-eliminated Grad PLUS program. Yet "[i]t is Congress that has the authority to change the statute, not the courts." *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 484 (1992); *see also id.* at 483-84 ("[T]he duty of the courts [is] to enforce the judgment of the Legislature, however much we might question its wisdom or fairness."). The Court's role is cabined to ensuring that agency actions adhere to congressional directives. Since the Department's

new definition of "professional degree" does not, plaintiffs' request for a stay of that definition, and only that request, is granted.

## I.     BACKGROUND

Following a review of the statutory and regulatory background that form the basis of this dispute, the factual and procedural history of this case is summarized.

### A.     Congress's Enactment of Loan Limits for Graduate and Professional Students

The Department of Education's Direct Loan program, established in 1993, "is the single largest source of federal financial assistance" for postsecondary education.  Alexandra Hegji, Cong. Rsch. Serv., R45931, Federal Student Loans Made Through the William D. Ford Federal Direct Loan Program: Terms and Conditions for Borrowers (2024), https://www.congress.gov/crs-product/R45931; *see also* 20 U.S.C. Ch. 28, Subch. IV, PT. D.  Implemented by the Department under authority accorded to it under the Higher Education Act ("HEA"), *see* 20 U.S.C. § 1087a, the federal Direct Loan program can offer advantages compared to private loan programs, including lower rates and more flexible repayment options.  *See, e.g.*, Fed. Student Aid, Federal Versus Private Loans, https://studentaid.gov/understand-aid/types/loans/federal-vs-private.

Prior to July 4, 2025, the law provided that graduate-level students in any field of study could cover the full cost of their degrees with federal loans.  Specifically, by regulation, graduate-level students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate).  *See* 34 C.F.R. § 685.203 (2025); *see also* Dep't of Educ., *Notice of Proposed Rulemaking, Reimagining and Improving Student Education* ("NPRM"), 91 Fed. Reg. 4254, 4272-73 (Jan. 30, 2026) (Annual Loal Limits and Aggregate Loan Limits comparison charts).  Additionally, graduate-level students enrolled in certain approved "health profession programs" were eligible for Direct Unsubsidized Loans of up to $224,000 in aggregate, on the basis that those students "engaged in specialized training requiring exceptionally high costs of education."  NPRM

at 4277; Letter Re: Aggregate Loan Limit for Graduate and Professional Students Preparing for the Health Professions, GEN-08-04 (Apr. 14, 2008), https://perma.cc/VJE8-FEKA.  Graduate-level students needing further federal financial assistance could then turn to Direct PLUS Loans, also known as Grad PLUS Loans, which carry a higher interest rate than Direct Unsubsidized Loans and can be used to finance up to the full cost of attendance.

On July 4, 2025, Congress enacted a reconciliation act colloquially known as the "One Big Beautiful Bill Act" or the "Working Families Tax Cuts Act."  Pub. L. No. 119-21, 139 Stat. 72, 335 (2025) ("the Act"); *see also, e.g.*, Fed. Student Aid of the Dep't of Education, One Big Beautiful Bill Act Updates (Apr. 15, 2026), https://studentaid.gov/announcements-events/big-updates (discussing "the One Big Beautiful Bill Act").  Among many other things, the Act amended the Direct Loan program (1) to eliminate the Grad PLUS loan, which had permitted uncapped borrowing up to the cost of attendance, and (2) to impose different borrowing limits for graduate and professional students on other Direct Loans.  *See generally* Alexandra Hegji, Cong. Rsch. Serv., IN12585, Student Loan Types and Limits in the FY2025 Budget Reconciliation Act (2025), https://www.congress.gov/crs-product/IN12585.

Specifically, in section 81001 of the Act, titled "Establishment of Loan Limits for Graduate and Professional Students and Parent Borrowers; Termination of Graduate and Professional PLUS Loans," Congress amended the HEA by adding a new subsection (a)(4) to 20 U.S.C. § 1087e.  Pub. L. No. 119-21, § 81001. The new section 1087e(a)(4) imposes separate student loan caps for "graduate" and "professional" students, with professional students enjoying a higher annual and aggregate borrowing limit than graduate students.  The new annual limit for Direct Unsubsidized loans, which the Act directs to "begin[] July 1, 2026," is $20,500 for a "graduate" student and $50,000 for a "professional" student.  20 U.S.C. § 1087e(a)(4)(A).  The new aggregate limit

beyond the amount borrowed for undergraduate education, also "beginning July 1, 2026," is $100,000 for a "graduate" student (who is not, and has not been, a professional student), and $200,000 for a "professional" student (who is not, and has not been, a graduate student). *Id.* § 1087e(a)(4)(B).

To distinguish between "graduate" and "professional" students, Congress also enacted new statutory definitions for those terms. Congress's definition of a "graduate student" piggy-backs on the definition of a professional degree, providing:

> The term "graduate student" means a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program.

*Id.* § 1087e(a)(4)(C)(i). Congress, in turn, defined a "professional student" with explicit reference to a preexisting regulatory definition of "professional degree" promulgated by the Department, 34 C.F.R. § 668.2, as in effect on the date of the enactment of the Act:

> [T]he term "professional student" means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program.

20 U.S.C. § 1087e(a)(4)(C)(ii). To blunt the harsh impact on expectations of students already enrolled in graduate-level programs, given the imminent effective date of July 1, 2026, the statute contained a grandfathering provision that exempts from the new loan limits students who have already borrowed a federal loan and are "enrolled in a program of study at an institution of higher education" as of June 30, 2026, for the duration of their "expected time to credential" (up to a maximum of "three academic years"). 20 U.S.C. § 1087e(a)(8).

**B.      The Department's Preexisting Regulation, as in effect on July 4, 2025**

To reprise, the Act defined "professional student" to be "a student enrolled in a program of study that awards a *professional degree, as defined under section 668.2 of title 34, Code of Federal*

*Regulations (as in effect on July 4, 2025)*." 20 U.S.C. § 1087e(a)(4)(C)(ii) (emphasis added). On

July 4, 2025, 34 C.F.R. § 668.2 read, in relevant part, as follows:

> Professional degree: A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b) (2025).

The Department had promulgated that regulatory definition, which "appl[ied] to all Title IV, HEA programs," *id.*, via rulemaking in November 2007. *Id.*; *see also* Federal Student Aid Programs, 72 Fed. Reg. 62014, 62025 (Nov. 1, 2007). At that time, the notice of proposed rulemaking explained that the purpose of the rulemaking was to help "harmonize" the regulatory definitions of "graduate or professional student," "full-time student," "three-quarter time student," "half-time student," and "undergraduate student" in the Department's regulations, noting the then-extant "three definitions of graduate or professional student," "six definitions for half-time student," and "four definitions of undergraduate student." Federal Student Aid Programs, 72 Fed. Reg. 44620, 44622 (Aug. 8, 2007).

Although the Department defined the term "professional degree" in 34 C.F.R. § 668.2, "[t]his definition served a very limited purpose in the Department's regulations" because, prior to July 4, 2025, the same loan limits applied to both graduate and professional students. NPRM at 4262; *see also id.* at 4263 ("[T]he rule existed in a paradigm where there were no significant legal consequences for a degree being counted, or not, as a professional degree."); 34 C.F.R. § 685.101 (2025) (permitting same Direct Loan borrowing for "graduate or professional student[s]"); *id.* § 685.203 (setting same loan limits for "graduate or professional student[s]"). Indeed, prior to the enactment of the One Big Beautiful Bill, the definition in 34 C.F.R. § 668.2 does not appear to be

8

cited anywhere else in Title 34 of the Code of Federal Regulations.  From the Department's promulgation of the regulatory definition of "professional degree" in November 2007 to Congress's incorporation of this definition by reference into the Act in July 2025—a span of over seventeen years—the definition of "professional degree" has stayed the same.  20 U.S.C. § 1087e(a)(4)(C)(ii); 34 C.F.R. § 668.2(b).

## C.    The Department's New Rulemaking, effective July 1, 2026

Following the enactment of the Act, on January 30, 2026, the Department published a Notice of Proposed Rulemaking ("NPRM") that, among other things, proposed a change to the regulatory definition of "professional degree."  *See* NPRM at 4332 (to be codified at 34 C.F.R. § 685.102).    The NPRM's proposed definition imposed new requirements absent from the preexisting definition adopted by Congress and turned an illustrative list of qualifying degrees into an exhaustive one.  *Id.* at 4333.  The NPRM's proposed definition of "professional student" read as follows:

> Professional student: A student enrolled in a program of study that awards a professional degree upon completion of the program;
>
> (1) A professional degree is a degree that:
>
> > (i)  Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> >
> > (ii) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
> >
> > (iii) Generally requires professional licensure to begin practice; and
> >
> > (iv) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition.
>
> (2) A professional degree may be awarded in the following fields:

9

> (i) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* Superimposed on these proposed definitional requirements for "professional degree," the NPRM added another requirement, explaining that a degree is not a "professional degree" "when the degree leads to employment where the employee must be supervised by another professional who has, as required by their license and degree, more education, training, and qualifications than the person being supervised." *Id.* at 4265. Under the new proposed regulatory definition, only certain degrees in eleven fields qualified as "professional degrees"—the ten fields included in the 2007 regulatory definition's illustrative "examples" list plus doctoral degrees in clinical psychology. *Id.*

On May 1, 2026, the Department issued the Final Rule and wholly adopted the NPRM's proposed definition of "professional student," including its construction of what constitutes a "professional degree." Dep't of Educ., *Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations* ("Final Rule"), 91 Fed. Reg. 23768, 23882 (May 1, 2026) (to be codified at 34 C.F.R. § 685.102(b)). The Final Rule is effective July 1, 2026, *id.*, and, because of minor numbering changes and the addition of a subpart marked "[Reserved]," the text of the definition of "professional student" is produced in full again below:

> Professional student: A student enrolled in a program of study that awards a professional degree upon completion of the program;
>
> (i) A professional degree is a degree that:
>
> > (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;

(B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

(C) Generally requires professional licensure to begin practice; and

(D) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.

(ii) A professional degree may be awarded in the following fields:

(A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

(B)  [Reserved]

*Id.* at 23882-83.  Further, the Final Rule also adopted the NPRM's additional requirement that professional degrees cannot "lead[] to employment that ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently." *Id.* 23787.  To summarize, part (i) of the Rule and the additional free-from-supervision requirement make up the definition of a "professional degree," and part (ii) of the Rule lists degrees that the Department has determined satisfies those requirements.

The Department acknowledged that "[m]any commenters opposed the Department's approach to defining professional student, as they believed it to be too narrow," "argued that the Department was adding limitations not found in the statutory or regulatory text," and "urged the department to treat the enumerated examples as illustrative rather than bounded." *Id.* at 23783. Some commenters also specifically advocated for various degree programs—including physician assistant, physical therapy, occupational therapy, social work, graduate-level nursing, and Doctor of Public Health programs—to be added to the list of professional degrees. *Id.*  They argued that these programs "satisfy the 'three-part test' in 34 CFR 668.2: (1) the degree signifies both

11

completion of the academic requirements for beginning practice in a given profession, (2) requires a level of professional skill beyond that is normally required for a bachelor's degree, and (3) professional licensure is generally required." *Id.* These commenters believed "that in excluding these programs, the Department [wa]s improperly narrowing Congress's adopted language." *Id.*

The Department rejected these comments, stating simply that "[t]he Department does not believe that our approach to defining professional student is too narrow nor do we believe it should be expanded to include more degree programs." *Id.* The Department recognized that "Congress defined professional student in Section 455(a)(4)(C)(ii) of the HEA by cross referencing the Department's current definition of professional degree in 34 CFR 668.2 (effectively codifying that regulatory definition)." *Id.* The Department, however, explained that it was "not interpreting the cross-referenced definition as a free-standing test under which any graduate program involving advanced study, clinical preparation, licensure-related requirements, accreditation, or occupational responsibility must be treated as a professional degree program," nor was it "treating the enumerated professional degree examples in 34 CFR 668.2 as indicative of an open-ended category to be added to at the Department's discretion." *Id.* Rather, the Department understood and "appl[ied] the incorporated definition as a bounded and uniform classification informed by the listed examples and the same general class of programs reflected in the enumerated examples." *Id.*

In addition, the Department acknowledged but purposely did not address the downside adverse effects on the workforce repeatedly raised by commentators to the narrow definition of "professional degree" adopted in the Final Rule. Among the adverse effects enumerated is that the reduction of access to funding necessary for students to pursue their graduate and professional education will exacerbate healthcare workforce shortages, particularly in specialized nursing fields

12

and for service in rural and other underserved areas.  Repeatedly, the Department responded to these critiques that "we do not believe that the potential for reduced access or workforce shortages is relevant in how we interpret the term professional student," since "[t]here is nothing in the operative definition or the illustrative list that would suggest that Congress wanted the Department to consider workforce shortages." Final Rule at 23790.  When confronted by concerns that "without access to higher loan limits," certain "highlighted occupations such as nursing, education, and medicine [were] the most likely to experience less diversity in providers, weakened workforce pipelines, and staffing shortages of qualified providers, especially for small businesses and in rural and underserved communities where there is acute need," the Department punted to Congress, stating that "Congress did not instruct the Department to consider need for workers in a given field when applying the definition of professional degree," and thus the new Rule is written "without consideration of how degree attainment affects labor market conditions or adjacent markets such as healthcare" since "[t]he statutory language also does not implore the Department to implement any increased loan limits or protections for fields experiencing workforce shortages." *Id.* at 23811; *see also, e.g., id.* at 23795 (noting concerns "that reduced Federal borrowing capacity may increase reliance on private loans, deter qualified applicants, and constrain the pipeline of advanced practice nurses and certified registered nurse anesthetists, including in rural and underserved communities," but responding that "[t]hose concerns are not relevant . . . because the law does not permit us to use those bases as considerations in determining whether a program is a professional degree."); *id.* at 23800 (declining to consider concern that not including PA programs under the "professional degree" definition was "misaligned with Congressional and Trump Administration priorities" to use PAs "as a solution for rural health workforce shortages via the Rural Health Transformation program," because "Congress did not ask the Department to align the definition of professional

student to any workforce transformation, shortage, or relative importance of such program"); *id.* at 12806-07 (despite "recogniz[ing] the seriousness of those concerns" about Registered Dietitian Nutritionists being "essential to chronic disease management, food insecurity, preventive care, and community health, or that lower loan limits will increase reliance on private loans, reduce diversity, and worsen shortages in nutrition care," these concerns were not considered because "those are not factors that Congress directed the Department to consider when classifying degrees as professional degrees or graduate degrees"); *id.* at 23816 (in response to concerns that "the caps will worsen workforce shortages in fields like nursing education, where faculty must hold graduate degrees but may be unable to finance them under the new limits" and "that a weakened workforce inevitably puts the viability of many health services at risk," the Department responded that "Congress did not instruct the Department to consider need for workers in a given field when applying the definition of professional degree").

Finally, in the preamble to the final rule, the Department recognized that the Higher Education Act's master calendar requirement provides that regulatory changes affecting student financial assistance must be finalized by November 1 to go into effect by July 1 of the following year. *Id.* at 23770 (citing 20 U.S.C. § 1089(c)(1)). Nevertheless, although the Department published the final rule on May 1, 2026—which under the master calendar requirement would push the effective date to July 1, *2027*—the Department made the Rule effective July 1, 2026. In doing so, the Department relied on an "implicit[]" waiver of the statutory requirement, explaining that "[i]t would not have been possible for the Department to undertake every step of the negotiated rulemaking process by November 1, 2025, in order to implement the provisions that become effective in the Working Families Tax Cuts Act by July 1, 2026, which is the statutory effective date." *Id.*

14

### D.    Factual and Procedural History

The factual and procedural history of the two consolidated cases, *American Association of Nurse Practitioners v. McMahon*, No. 26-cv-1780, and *PA Education Association v. Department of Education*, No. 26-cv-1941, are summarized below in turn.

### 1.    *American Association of Nurse Practitioners v. McMahon*, No. 26-cv-1780

On May 21, 2026, six associations collectively filed suit against the U.S. Department of Education and its Secretary, Linda McMahon, in her official capacity.  Complaint ("AANP Compl."), *Am. Ass'n of Nurse Practitioners v. McMahon*, No. 26-cv-1780, ECF No. 1.  The six plaintiff associations (collectively, "*AANP* plaintiffs") are (1) the American Association of Nurse Practitioners ("AANP"), which represents approximately 169 nurse practitioner ("NP") organizations and 119,000 individual members, who are or wish to become NPs, "a type of advanced practice registered nurses (ARPNs) who are educated and clinically prepared at the master's or doctoral level," AANP Compl. ¶¶ 5, 39, Declaration of Jon Fanning (Fanning Decl.) ¶ 5; (2) the National Association of Pediatric Nurse Practitioners, which "represents more than 7,000 individual members," who are students, practitioners, or faculty members in the field of pediatric nursing, AANP Compl. ¶ 7; *see also* Declaration of James Wendorf ("Wendorf Decl.") ¶ 1; (3) the American Association of Colleges of Nursing, which represents "more than 890 colleges and universities" that offer degrees to become APRNs, AANP Compl. ¶ 9; *see also* Declaration of Deborah Trautman ¶¶ 1, 3, 8; (4) the American Association for Marriage and Family Therapy, which represents licensed marriage and family therapists and students aspiring to be such therapists, AANP Compl. ¶ 13; *see also* Declaration of Christine Michaels ("Michaels Decl.") ¶ 1; (5) the Association of Schools and Programs of Public Health, which "represents accredited schools of public health" whose professional degrees include the Master of Public Health ("MPH") and Doctor of Public Health ("DrPH"), AANP Compl. ¶ 42; *see also* Declaration of Laura Magaña

15

¶¶ 2, 3; and (6) the National Education Association, which represents both classroom teachers and educators aspiring to be "specialized instructional support personnel," a category that includes school counselors, speech language pathologists, and school psychologists, AANP Compl. ¶ 40 (citing 20 U.S.C. § 7801(47)); *see also* Declaration of Ronny Lau ¶¶ 3, 15.

Seeking equitable relief and vacatur of the Final Rule's definition of "professional degree," *AANP* plaintiffs' complaint raises three claims, under 5 U.S.C. § 706(2)(A) and (C) of the Administrative Procedure Act ("APA"). In Count I, *AANP* plaintiffs allege that defendants acted contrary to law by adopting a new definition of "professional degree" that differed from the preexisting definition "in effect on July 4, 2025," as referenced in 20 U.S.C. § 1087e(a)(4)(C)(ii). AANP Compl. ¶¶ 60-64. In Count II, *AANP* plaintiffs allege that by making the Rule effective in 2026, defendants again acted contrary to law by failing to meet the November 1 deadline in the Master Calendar provision of 20 U.S.C. § 1089. *Id.* ¶¶ 65-71. Finally, in Count III, *AANP* plaintiffs allege that defendants acted arbitrarily and capriciously when they "limit[ed] the scope of a 'professional degree' programs to eleven enumerated degree program[s]," "failed to meaningfully engage with numerous comments . . . submitted in response to the NPRM," and "failed to consider important parts of the problem including the profound consequences the new definition will have in the areas of nursing, counseling, public health, and education." *Id.* ¶¶ 72-77.

On the same day the complaint was filed, *AANP* plaintiffs also moved for preliminary injunctive relief, seeking an order: (1) setting aside and staying under 5 U.S.C. § 705 the Final Rule's definition of "professional degree," to be codified at 34 C.F.R. § 685.102(b), and (2) enjoining defendants from enforcing the statutory federal loan caps for graduate and professional students, under 20 U.S.C. § 1087e(a)(4), pending promulgation of a lawful replacement rule. *See* Pls.' Mot. for Stay under 5 U.S.C. § 705 and for Preliminary Injunction ("AANP Pls.' Mot.") at 1,

16

ECF No. 4; Pls.' Mem. in Supp. of Pls.' Mot. ("AANP Pls.' Mem."), ECF No. 4-1; [Proposed] Order ("AANP Pls.' Proposed Order"), ECF No. 4-9.  *AANP* plaintiffs anticipate "suffer[ing] irreparable harm unless relief is granted in advance of the July 1, 2026 effective date of the rule." AANP Pls.' Mot. at 2.  On June 10, 2024, briefing on the preliminary injunction motion was completed.  *See* Defs.' Opp'n to Pls.' Mot. ("Gov't's Opp'n to AANP's Mot."), ECF No. 23; Pls.' Reply in Supp. of AANP Pls.' Mot. ("AANP Pls.' Reply"), ECF No. 26.

### 2. *PA Education Association v. Department of Education*, No. 26-cv-1941

Meanwhile, on June 3, 2026, almost two weeks after *AANP* plaintiffs filed their complaint, two associations advocating for Physician Assistants/Associates ("PAs") filed a separate suit against the Department of Education and its Secretary also challenging the Final Rule's definition of "professional degrees."  Complaint ("PA Compl."), *PA Educ. Ass'n v. Dep't of Educ.*, No. 26-cv-1941, ECF No. 1.  The two plaintiff associations in this case (collectively, "*PA* plaintiffs") are (1) PA Education Association ("PAEA"), described as "the only national organization representing 330 PA educational programs in the United States," *id.* ¶ 18, and (2) American Academy of Physician Associates, described as "the national professional society for PAs, with 74,271 members who are PAs, PA students, and those preparing to enter PA schools," *id.* ¶ 23.

Also seeking equitable relief and vacatur of the Rule's definition of "professional degree," *PA* plaintiffs' complaint raises three claims, under 5 U.S.C. § 706(2)(A) of the APA.  In Count I, similar to Count I in *AANP* plaintiffs' complaint, *PA* plaintiffs allege that defendants acted contrary to law by adopting a new definition of "professional degree" that was not "expressly authorized by Congress."  PA Compl., Count I, ¶ 4.  In Count II, *PA* plaintiffs allege that defendants acted contrary to law and arbitrarily and capriciously when they "determin[ed] that professional degree holders must work free from another professional's supervision."  *Id.*, Count II, ¶ 4.  Finally, in Count III, *PA* plaintiffs allege that defendants also acted arbitrarily and capriciously because "[t]he

17

requirements listed in the definition of professional degree in 34 C.F.R. § 685.102(b)(i) of the Final Rule conflict with the actual degree requirements for the degrees listed as professional under subsection (ii)." *Id.*, Count III, ¶ 2.

Like *AANP* plaintiffs, *PA* plaintiffs also filed an emergency preliminary injunction motion. *See* Mot. and Mem. in Supp. of Pls.' Mot. for Preliminary Injunction ("PA Pls.' Mot." or "PA Pls.' Mem."). Seeking somewhat different relief than *AANP* plaintiffs, *PA* plaintiffs ask the Court to (1) "enjoin[] the July 1, 2026 implementation of the [Rule]," and (2) "order[] the Department to treat existing and entering Physician Associate/Physician Assistant students, including those returning after a deferral or a break in their education, as 'professional students' for the purpose of access to the higher student loan limits." [Proposed] Order on Pls.' Mot. for Preliminary Injunction ("PA Pls.' Proposed Order") at 1-2, ECF No. 7-11.

On June 5, 2026, the *AANP* and *PA* suits were consolidated. Min. Order (Jun. 5, 2026), *PA Educ. Ass'n v. Dep't of Educ.*, No. 26-cv-1941. Briefing on *PA* plaintiffs' motion completed a week later than that of the *AANP* plaintiffs, on June 12, 2026. *See* Defs.' Opp'n to Pls.' Mot. for Preliminary Injunction ("Gov't's Opp'n to PA's Mot."), ECF No. 25[1]; Reply Br. of Pls. PA Educ. Ass'n & Am. Acad. of Physician Assocs. Supp. Mot. for Preliminary Injunction ("PA Pls.' Reply"), ECF No. 32. On June 17, 2026, thirteen local governments, city officials, and municipal health corporations filed an amicus brief in support of plaintiffs. Br. of Amici Curiae 13 Local Gov'ts, City Off., & Municipal Health Corp. in Supp. of Pls. ("Local Gov'ts' Amicus Brief"), ECF Nos. 37-1, 43.

---

[1]    Defendants' opposition briefs in the two consolidated cases are substantially similar. As such, citations to the defendants' brief opposing *AANP* plaintiffs' motion will apply to their brief opposing *PA* plaintiffs' motion as well unless otherwise indicated.

### 3. *Hearing on the Emergency Motions*

On June 23, 2026, a hearing lasting over two hours was held regarding plaintiffs' motions in both consolidated cases. Counsel for *AANP* plaintiffs, *PA* plaintiffs, and defendants presented oral arguments in support of their positions. Following the hearing, defendants were directed to submit additional briefing clarifying the scope of the CIP code requirement in part (i)(D) of the Rule and to provide their position as to whether Fed. R. Civ. P. 65(c) applies to stays under 5 U.S.C. § 705, and *PA* plaintiffs were directed to submit any supplementation to their declarations confirming representations made at the hearing. *See* Min. Order (Jun. 23, 2026). Parties filed their supplemental materials later that day. *See* Supp. Decl. of Lisa M. Gables in Supp. *PA* Pls.' Mot., ECF No. 40; Defs.' Supp. Br. ECF No. 41. Both emergency motions are now ripe for resolution.[2]

## II.     LEGAL STANDARD

Section 705 of the APA authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The factors governing issuance of a preliminary injunction also govern issuance of relief under Section 705. *See Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *see also Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016); *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009).

Accordingly, to prevail on a motion for a stay under 5 U.S.C. § 705, the moving party must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008);

---

[2]     In addition to the two consolidated cases filed by associations before this Court, a state-led suit raising similar challenges is currently pending in the U.S. District Court for the District of Maryland. *See Maryland et al. v. Dep't of Education et al.*, No. 26-cv-1957 (D. Md. May 19, 2026). As of the date of this memorandum opinion, no emergency or dispositive motion has been filed yet in the Maryland case.

*see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  The first factor is the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Additionally, when the federal government is the opposing party, the final two factors "merge" into one, *Nken v. Holder*, 556 U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

## III.    DISCUSSION

Following an analysis of plaintiffs' standing, the discussion begins with a review of plaintiffs' argument that the Rule's definition of "professional degree" is contrary to law, concluding that this claim is likely to succeed.  The discussion further finds that plaintiffs have shown that implementation of the Rule will cause them irreparable harm, and that the balance of the equities and the public interest further weigh in favor of granting plaintiffs relief.  The discussion then addresses the proper scope of relief.  Finally, defendants' request that the Court stay its order pending appeal and require plaintiffs to post security commensurate with the amount of funding affected by plaintiffs' requested relief is denied.

### A.    Likelihood of Success on the Merits

In this section, *AANP* and *PA* plaintiffs' standing is discussed first, followed by the substantive merits of their claim that the Rule's definition of "professional degree" is contrary to law, in violation of the APA.  *See* 5 U.S.C. § 706(2).

### 1.  Standing

The "irreducible constitutional minimum of [Article III] standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."

20

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The plaintiff bears the burden of "demonstrat[ing] standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). If a suit is brought by multiple plaintiffs, "[t]o establish jurisdiction, the [Court] need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). At the "early juncture" of a motion for emergency relief, the question is "whether [the plaintiff] is likely to be able to establish standing later in the case." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1229 (D.C. Cir. 2026).

Here, plaintiffs in both consolidated cases consist solely of associations, not individuals. An association or organization may show standing in one of two ways. First, an association or organization may sue "on behalf of its members" for injuries its members have sustained, *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), often referred to as associational standing, *see, e.g.*, *Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 187 (D.C. Cir. 2026). Second, an association or organization may "sue on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982), often referred to as organizational standing, *see, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Each type of standing will be discussed in turn.

### a. *Associational Standing*

"To establish associational standing, an organization must show '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Zeldin*, 174 F.4th at 187 (quoting *Hunt*, 432 U.S. at 343). The latter two factors are not contested by defendants. As to the first factor,

21

both *AANP* plaintiffs and *PA* plaintiffs have likely shown that at least one of their members would have standing to sue in their own right.

One of the plaintiffs in the *AANP* case, AANP itself, is an organization whose members include organizations, such as state nurse practitioner associations and colleges offering nurse practitioner programs. The CEO of AANP attests that "certain [of these] organizational members" have "reported early decreases in student engagement and student membership participation following announcement of the Rule." Fanning Decl. ¶ 35. Further, plaintiffs' organizational members are "evaluating expected declines in enrollment, associated budgeting consequences, and potential programmatic adjustments that may be necessary to respond to reduced student access to federal financial assistance." *Id.* Far from "speculative," *see, e.g.*, Gov't's Opp'n to AANP's Mot. at 29-30, plaintiffs have proffered facts demonstrating that the Rule has already caused concrete membership-related injuries.

*AANP* plaintiffs have thus established that at least one of their organizational members is likely to have standing to sue in its own right. As many courts have concluded, "[a]n action that invades an organization's interest in recruiting members" constitutes "an injury for purposes of standing." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring in part) (citing, *inter alia*, *Am. Fed'n. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007) ("[A]n increased difficulty in recruiting union members qualifies as a 'concrete and demonstrable' injury"); and *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir.1975) (holding that a restrictive building plan injured an association of builders "in a very real sense" by decreasing construction and consequently, membership dues for the association)); *see also United Supreme Council v. United Supreme Council*, 792 F. App'x 249, 256 (4th Cir. 2019) (holding, in case about an internal

dispute between factions of a masonic organization, that "economic harm and diminution in membership . . . clearly constitute injury in fact"); *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, 792 F. Supp. 3d 227, 267 (D. Mass.), *vacated and remanded on other grounds*, 162 F.4th 155 (1st Cir. 2025) ("A membership organization suffers injury from government action that has the effect of discouraging or reducing membership in that organization." (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459-60 (1958)).

Defendants' objection that plaintiffs have not "specifically identif[ied] members who have suffered the requisite harm" is well taken but premature.  Gov't's Opp'n to AANP's Mot. at 26 (internal quotation marks omitted) (quoting *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011)).  In *Centro de Trabajadores Unidos v. Bessent*, concerning a preliminary injunction motion brought by nonprofit organizations challenging the Internal Revenue Service's disclosure of tax information to the Department of Homeland Security for immigration enforcement purposes, the D.C. Circuit rejected a similar argument from the government that plaintiffs "ha[d] not identified any specific members."  167 F.4th at 1229.  The Circuit explained that "this is not the merits stage," and "the question on a motion for a preliminary injunction is whether [plaintiffs are] likely to be able to establish standing later in the case."  *Id.*  Consequently, the Circuit concluded that since the nonprofit-organization plaintiffs had provided "detailed information about multiple members who would have standing to sue," including that "some" unnamed members "face 'outstanding orders of deportation' and are 'in immediate danger of having information in their tax filings used against them by immigration enforcement,'" the plaintiffs were "likely enough" to establish standing.  *Id.*  Similarly, here, at least one plaintiff in the *AANP* case, AANP itself, has provided detailed information about certain organizational

members' membership- and revenue-related injuries that can be attributed to the Rule. At this "early juncture," this information is "enough." *See id.*[3]

Similarly, *PA* plaintiffs have proffered facts indicating that at least one of their members is likely to have standing.[4] One individual member of the American Academy of Physician Associates, Benjamin Pinckney, attested to his longstanding desire to attend PA school, detailed actions taken consistent with that goal, and stated that attaining a PA degree will no longer be financially feasible for him under the new Rule. Specifically, Pinckney represents that he has wanted to become a health care provider since 1999 when a PA saved his life. Pinckney ¶¶ 6, 10, 13. In 2020, Pinckney enrolled in college to "fulfill [his] dream of providing medical care to patients," and during that time joined the American Academy of Physician Associates. *Id.* ¶¶ 17, 20. When the NPRM was published, Pinckney responded to the association's request to its members to "submit information about how they would be impacted if the rule takes effect." *Id.*

---

[3]     *AANP* plaintiffs provided only one declaration from an individual member: Brittany Fair, who is "a member of the National Education Association." *See* Decl. of Brittany Fair ¶ 2, ECF No. 4-2. Ms. Fair attests that she has been employed as a "classroom teacher for six years," *id.* ¶ 5, but she "want[s] to become a certified school psychologist" and her "desired [educational] path" is to enroll in a post-master's certification program and eventually enroll in an Education Specialist degree program. *Id.* ¶¶ 9-10. Her declaration, however, does not indicate that she has applied to either program, or taken any concrete steps in her six years as a classroom teacher to achieve her "desired path." *Id.* ¶ 9. Defendants correctly point out, Gov't's Opp'n to AANP's Mot. at 27, well-established law that "general averments, conclusory allegations, and speculative some day intentions are inadequate to demonstrate injury in fact," *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 137 (D.C. Cir. 2022) (quoting *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006)). Nevertheless, plaintiffs' likely inability to establish Ms. Fair's standing to sue in her own right, based on the information provided, is not fatal to *AANP* plaintiffs' claims. "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). For all the reasons discussed in this and the next section, *AANP* plaintiffs have established standing in other ways.

[4]     *PA* plaintiffs submitted ten declarations in conjunction with their motion for a preliminary injunction: five are from organizational declarants, and five are from individual declarants. *See* No. 26-cv-1941, ECF Nos. 7-1 to 7-10. Of the five individual declarants, four bear no relevance to the standing question: two are not members of plaintiffs' organizations, *see* Decl. of Olivia Trull, ECF No. 7-7; Decl. of Jasmine Vasquez, ECF No. 7-9; one is a current PA student who is grandfathered into the current federal loan system and thus not subject to the new loan caps, *see* Decl. of Julianna Sloan, ECF No. 7-6; and one is a practitioner who has already obtained her PA degree using federal student loans, *see* Decl. of Laura L. Cunningham, ECF No. 7-5. Benjamin Pinckney is the only individual declarant who is both a member of one of plaintiffs' organizations and a prospective PA student. *See* Decl. of Benjamin Pinckney, ECF No. 7-8; *see also* Supp. Decl. of Lisa M. Gables ¶ 4, ECF No. 40 (acknowledging that Olivia Trull and Jasmine Vasquez and not members of plaintiffs' organizations).

¶ 20. The centralized application process for PAs opened approximately a month before his college graduation, on April 30, 2026; the Rule was published on May 1, 2026. *Id.* ¶ 22. Pinckney represents that "[i]f the rule is allowed to take effect, [he] will be unable to attend graduate school to become a PA because [he] will be unable to afford it." *Id.* ¶ 23.[5] These facts suffice to show injury in fact caused by the Rule. Since Pinckney would likely have standing to sue in his own right, *PA* plaintiffs have demonstrated that they likely have associational standing.

In sum, *AANP* and *PA* plaintiffs have both demonstrated that they are likely to show associational standing.

### b. Organizational Standing

In addition to establishing a likelihood of associational standing through members, *AANP* and *PA* plaintiffs likely have established standing to sue in their own right. For an organization to make such a showing, an organization must establish the same three elements as individuals. *Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). The organization must establish that it has suffered a "concrete and demonstrable injury to the organization's activities," *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025) (citation omitted), and that the injury "is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision," *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618.

---

[5] Defendants raise a fair argument that plaintiffs have not demonstrated, unambiguously, that their individual members' inability to pursue their chosen degree is caused by the challenged *regulatory* definition preventing access to the higher loan cap of $200,000, rather than the *statutory* elimination altogether of Grad PLUS loans, which had allowed for uncapped borrowing up to the cost of attendance. The former could be remediable by staying the regulatory definition; the latter would not. *See* Gov't's Opp'n to PA's Mot. at 29 (arguing that "although [Pinckney] alleges that he would be unable to afford a PA program if the Rule were to take effect and subject him to the lower loan cap, he does not allege he would be able to afford a PA program if the higher loan limits apply" (citation omitted)). At final judgment, plaintiffs would need to show that individual members alleging injury from the regulatory definition would be able to attend the desired program, somewhere, with a higher loan limit of $200,000. At this preliminary juncture, however, plaintiffs need only show that they are "likely to be able to establish standing later in the case." *Centro de Trabajadores Unidos*, 167 F.4th at 1229. Here, Pinckney attests that he will be unable to afford PA schooling "[i]f the *rule* is allowed to take effect." Pinckney Decl. ¶ 23 (emphasis added). Pinckney's attestation that the "rule" is the cause of the injury suffices at this stage to establish likelihood of traceability and redressability for standing purposes.

25

Critically, an organization "may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (internal quotation marks omitted); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (holding that an organization cannot manufacture standing through injuries that "arise[ ] from the effect of the regulations on [their] lobbying activities" or any "pure issue-advocacy" on their part). Rather, the organization must show that a defendant's policy and practice has "directly affected and interfered with" its "core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. Both *AANP* and *PA* plaintiffs likely have established this.

As discussed above, an organization suffers an injury for standing purposes when a defendant's actions "invades [the] organization's interest in recruiting members," which "hinders that organization's ability to function." *Fair Hous. Council*, 666 F.3d at 1225. An organization can also demonstrate injury in fact by showing that a defendant's actions will impede their ability to "obtain[] funding, or collect[] dues," *id.*, as "[m]onetary costs are of course an injury" for standing purposes, *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025). *See also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 (9th Cir. 2018) (holding that the plaintiffs established organizational standing by declaring that "a large portion of their funding . . . is tied to the number of asylum applications they pursue," and that "[i]f these individuals became categorically ineligible for asylum" because of the challenged rule, the plaintiffs would "lose a significant amount of business and suffer a concomitant loss of funding"); *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1120 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020) ("Organizations can demonstrate organizational standing by showing that the Rule will cause them to lose a substantial amount of funding. For standing

26

purposes, a loss of even a small amount of money is ordinarily an injury." (quoting *E. Bay Sanctuary*, 932 F.3d at 767)).

Here, at least one organizational plaintiff in both the *AANP* and *PA* cases have proffered facts indicating that the Rule will cause them to suffer membership declines or monetary loss, both of which are concrete injuries that interfere with plaintiffs' "core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. In the *AANP* suit, for example, one organizational plaintiff— the American Association for Marriage and Family Therapy—has proffered evidence that membership dues constitute approximately 48% of its operating budget, and that the expected decline in student enrollment from the Rule will reduce dues revenue. Michaels Decl. ¶ 17. Another organizational plaintiff—the National Association of Pediatric Nurse Practitioners— anticipates loss of current and prospective members, with membership dues constituting approximately 25% of its annual revenue. Wendorf Decl. ¶ 13. Similarly, in the *PA* suit, the American Academy of Physician Associates declares that "by reducing the number of students able to enter and complete PA school, necessarily reducing the number of practicing PAs," the Rule "interfer[es] with the mission of the AAPA," which is funded by membership dues and courses offered to PAs to allow them to maintain their credentials and continue to update their clinical expertise. Gables Decl. ¶ 6, 41.

Defendants' objection that plaintiffs' injuries "depend entirely on the independent decisions of third-party students" fails, *see* Gov't's Opp'n to AANP's Mot. at 29, because students' decisions not to enroll in degree programs due to reduced access to federal loans are a "predictable effect of Government action on the decisions of third parties," *Dep't of Commerce v. New York*, 588 U.S. 752, 768-70 (2019). Indeed, the Department itself expressly acknowledged in promulgating the Final Rule the significant impact the Rule will have on graduate and professional

students and their parents, given that "prior to the Working Families Tax Cuts Act, graduate students and parents of dependent undergraduates were able to borrow up to an institution's full cost of attendance annually and with no aggregate limit," but as of "July 1, 2026, the Working Families Tax Cuts Act imposes annual and aggregate limits on these loans." Final Rule at 23855. In fact, "[b]etween 2026-2035, the Department estimates that the final regulations will result in 9.9 million fewer non-consolidated student loans issued, and a total reduction in non-consolidated Federal student loan disbursements by $223.9 billion." *Id.* In light of these facts, the Department reasonably predicts that students may need to "reconsider their enrollment" and "may have to reduce their enrollment due to the inability to afford the cost of their program." *Id.* at 23856. Plaintiffs have proffered initial evidence suggesting that the Department's prediction is bearing out as expected: At least one of plaintiffs' organizational members is already seeing early decreases in student engagement and membership participation following announcement of the Rule. Fanning Decl. ¶ 35. Plaintiffs' asserted injuries resulting from declining student enrollment thus are not "overly speculative" as defendants claim. Gov't's Opp'n to AANP's Mot. at 29.

Defendants also fail to persuade in arguing that "[p]laintiffs' alleged revenue and tuition shortfalls are . . . not traceable to the Rule" but rather the "statutory caps and elimination of Grad PLUS loans, both of which would limit available federal funds to students regardless of the Rule." Gov't's Opp'n to AANP's Mot. at 30. Although the elimination of the Grad PLUS programs are likely affecting enrollment as well, those harms do not replace, but rather compound, the harms caused by the Department's likely unlawful regulatory definition of "professional degree" for loan eligibility purposes. As plaintiffs explain, their harms are caused by the Department's likely "unlawful decision to classify degree programs that satisfy Congress's definition of 'professional degree' as ordinary graduate programs subject to lower borrowing limits." AANP Pls.' Reply at

12. "Absent that incorrect classification," certain students will likely "be able to take out loans up to the $200,000 lifetime cap" for "professional" students, as compared to the lower $100,000 cap for "graduate" students. *Id.* at 12-13.[6] Defendants' challenges to the causation requirement of standing thus fall short.

Accordingly, plaintiffs in both cases have also established that they will likely be able to establish organizational standing.

### 2. Plaintiffs' Contrary-to-Law APA Claim

Both *AANP* plaintiffs and *PA* plaintiffs argue that the Rule's definition of "professional degree" is contrary to law, in violation of the APA, *see* 5 U.S.C. § 706(2), because the definition conflicts with the preexisting regulation that Congress expressly adopted by statute. *See* AANP Pls.' Mem. at 20-23; PA Pls.' Mem. at 8-11. Under the APA, an agency acts "contrary to law" if its actions are not "authorized by the statutory text," *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006), as an agency "may not act contrary to the will of Congress when exercised within the bounds of the Constitution," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233 (1986); *see also Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 5 (D.D.C. 2008) ("The Executive must comply with the duly enacted commands of Congress."). Plaintiffs have shown that the Rule's new definition of "professional degree" is likely inconsistent with the definition of

---

[6] Defendants also challenge *AANP* plaintiffs' "other alleged operational expenditures," Gov't's Opp'n to AANP's Mot. at 30, and *PA* plaintiffs' "overarching theory of reputational harm based on the Rule's exclusion of PA degrees from "professional degree" status," Gov't's Opp'n to PA's Mot. at 31. Since plaintiffs are found to have demonstrated injury in other ways, these alternative arguments need not be reached. *See Nucor Steel-Arkansas v. Pruitt*, 246 F. Supp. 3d 288, 293 n.3 (D.D.C. Mar. 31, 2017) ("In order to demonstrate that it has standing to sue, a plaintiff needs to identify only one type of cognizable injury-in-fact, and therefore, a court 'need not address' alternative theories of injury once one injury-in-fact is established." (citing *Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014))).

"professional degree" set forth in the Act, and therefore are likely to succeed on the merits of that claim.[7]

When Congress imposed separate student loan caps for "graduate" and "professional" students under the Act, Congress incorporated by reference the longstanding regulatory definition in use by the Department since 2007, and in doing so codified that regulatory definition. The D.C. Circuit in *National Cable Television Association, Inc. v. FCC*, for example, considered a federal statute that adopted an agency regulation in a similar manner as here, and likewise concluded that "in adopting the [agency's] waiver rule, Congress codified the rule as it was interpreted by the Commission at the time of adoption." 914 F.2d 285, 289 (D.C. Cir. 1990) (reviewing provision in the Cable Communications Policy Act of 1984, 47 U.S.C. § 533(b)(4) (repealed 1996), that instructed that any waivers to a certain statutory prohibition "be made in accordance with section 63.56 of title 47, Code of Federal Regulations (as in effect September 20, 1984)"); *see also Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1277 (11th Cir. 2013) (explaining that by statutorily providing that "[t]he economic embargo of Cuba, as in effect on March 1, 1996, includ[ed] all restrictions under part 515 of title 31, Code of Federal Regulations," Congress "codifie[d] the regulatory sanctions that were in place on March 1, 1996").

---

[7]    Since both *AANP* and *PA* plaintiffs are likely to succeed on this shared claim that the Rule's definition of "professional degree" is contrary to law under the APA, *AANP* plaintiffs' alternative claim that "[t]he Rule is contrary to law because its effective date violates the Higher Education Act's master-calendar requirement," AANP Pls.' Mem. at 16-20, and *PA* plaintiffs' alternative argument that "[t]he Department's alteration of the definition of 'professional degree' to exclude PAs was arbitrary and capricious in violation of the law," PA Pls.' Mem. at 11-23, are not addressed. Further, as *AANP* plaintiffs explain, although their complaint "also pleads a claim that the Rule is arbitrary and capricious (Count III), [their emergency] motion relies on the likelihood of success only of Plaintiffs' APA contrary-to-law claims (Counts I and II)." AANP Mem. at 15 n.2. This discussion therefore also does not address *AANP* plaintiffs' Count III claim that the Rule arbitrarily and capriciously limited the scope of professional degrees to a list of eleven programs, failed to engage with comments, and failed to consider "the profound consequences" of the new definition "in the areas of nursing, counseling, public health, and education." AANP Pls.' Compl. ¶¶ 74-77.

Thus, by expressly adopting the definition of "professional degree" "under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025)," Congress codified the preexisting regulatory definition at the time of enactment. 20 U.S.C. § 1087e(a)(4)(C)(ii). The Act therefore defines "professional degree," under the operative version of 34 C.F.R. § 668.2 on July 4, 2025, as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

In adopting this 2007 regulatory definition, Congress provided three, and only three, criteria for a program to qualify as a professional degree: (1) the degree signifies "completion of the academic requirements for beginning practice in a given profession"; (2) the degree signifies "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) licensure is "generally required." Congress also adopted the illustrative list of "*examples* of [] professional degree[s]," along with the caveat that the full universe of professional degrees was "*not limited to*" those listed. Notably, Congress did not add any new criteria to this longstanding regulatory definition or otherwise edit the definition in any way.

The Rule, however, while similar in some ways to the 2007 regulatory definition, makes at least five material changes to the definition that Congress codified. The new definition expressly adds four of the material changes, specifying that a "professional degree" is "generally at the doctoral level," "requires at least six academic years of postsecondary education coursework for completion," and must fall within "a four-digit CIP code . . . in the same intermediate group as the fields listed in" the list of ten examples adopted by the Act or in Clinical Psychology. NPRM at 4332.

31

As the fourth material change, the Rule converted the list of ten "examples" of professional degree fields in the 2007 regulatory definition adopted by Congress, *see* 34 C.F.R. § 668.2(b), into an exclusive list of qualifying degrees that is nearly identical to the illustrative list. The sole difference, compared to the ten "examples" in the 2007 regulatory definition, is the addition of doctoral degrees in Clinical Psychology. Thus, under the new definition, a professional degree only includes degrees in the following eleven fields: "Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.)." NPRM at 4261. No other degrees besides those in these eleven fields are considered "professional degrees" under the Rule.

Finally, in the preamble to the NPRM, the Department added a fifth material change, requiring that a professional must not "be supervised by another professional" with "more education, training, and qualifications." NPRM at 4265 ("[T]he Department does not believe that the statute permits the classification of degrees as 'professional' when the degree leads to employment where the employee must be supervised by another professional who has, as required by their license and degree, more education, training, and qualifications than the person being supervised."). The Department explained that these additional requirements were developed from the "context[] . . . provided by the illustrative list of advanced degrees included within the definition of professional student." Final Rule at 23789. None of these "contextual" requirements, however, is included in the text of the 2007 regulatory definition. *See* 34 C.F.R. § 668.2(b).

Plaintiffs are likely to show that the Department lacked the authority to make these material changes to Congress's required definition. In the Act, Congress expressly adopted the regulatory

definition of "professional degree" that was "in effect on July 4, 2025." 20 U.S.C. §1087e(a)(4)(C)(ii). Congress did not direct the Department to evaluate and update the regulatory definition already in 34 C.F.R. § 668.2 with any new eligibility criteria, let alone five material changes to the statutorily adopted regulatory definition. In fact, Congress did the opposite. By adopting the preexisting definition as it was in effect on a specific date, Congress removed any discretionary authority the Department may have had to narrow the definition for the purpose of determining federal loan caps. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Congress explicitly directed the Department to apply the preexisting regulatory definition set forth in 34 C.F.R. § 668.2 as the relevant test, and the Department has no power to revise the definition Congress codified or to add additional substantive criteria.

By the Department's own admission, the new Rule excludes certain degrees that would have probably "satisf[ied] the operative definition's three-part test" adopted by the Act, but do not satisfy the Rule's five additional, narrowing requirements. Final Rule at 23789. For example, in its response to comments challenging the NPRM, the Department "agree[d] that nurse practitioners, clinical nurse specialists, certified nurse midwives, and certified registered nurse anesthetists [collectively, APRNs], hold unique roles that are specialized in nature and all require training at the graduate level," and thus "can all be considered to hold a fundamentally distinct profession." *Id.* at 23788. The Department further acknowledged that degrees in those professions "may satisfy the operative definition's three-part test." *Id.* Nevertheless, the Department declined to classify those degrees as "professional degrees" because, according to the Department, "they d[id] not satisfy the contextual requirements provided by the illustrative list of advanced degrees included within the definition of professional student." *Id.* at 23789. In explaining its reasoning,

33

the Department stated that some APRN degrees (1) were at the "master's-level" unlike most (but not all) of the degrees on Congress's illustrative list; (2) could be obtained in fewer years than most (but not all) of the degrees in the illustrative list; and (3) that a minority of States require APRNs to be associated with a physician to practice. *Id.* at 23796-97.

The Department's determination that "meeting the operative definition's three-part test, alone, would not . . . satisfy[] all elements of the definition of professional student," is likely contrary to the statutory definition of "professional degree." Just as the Department believed Congress did not instruct the Department to consider, in implementing the Act, adverse effects on staffing in healthcare and education, diversity in the workforce, rural and underserved communities, and working families—which silence the Department heeded to avoid engaging with analysis about the Act's various effects on the economy and public health—so too did Congress not direct the Department to develop a "contextual" set of factors to add to the three-part test derived from the text of the adopted-regulatory definition. Put differently, the Department restricted its analysis, due to lack of congressional instructions, when considering real-world factors militating in favor of *broadening* the definition; its decision to nevertheless go beyond congressional instructions to *restrict* the definition of "professional degree" is as puzzling as it is legally erroneous.

The Department misses the mark in arguing that the new requirements are derived from applying *noscitur a sociis* and *ejusdem generis* principles to the Act's list of "example" professional degrees. Gov't's Opp'n to AANP's Mot. at 17-18 (contending that "Congress's incorporation of that list must 'have some legal consequence,'" and "[t]he Department therefore could not ignore the incorporated list from § 668.2" (quoting Final Rule at 23789)). "As the Supreme Court has observed, canons of statutory interpretation are principally 'useful in close

34

cases, or when statutory language is ambiguous.'" *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1341 (D.C. Cir. 1998), *abrogated on other grounds by Jam v. Int'l Fin. Corp.*, 586 U.S. 199 (2019) (quoting *United States v. Monsanto*, 491 U.S. 600, 611 (1989)); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting petitioner's invocation of the canons *noscitur a sociis* and *ejusdem generis*, because "we are unpersuaded by petitioner's attempt to create ambiguity where the statute's text and structure suggest none"); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) ("The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." (citation omitted)).  Indeed, the Court has cautioned against "woodenly apply[ing] limiting principles every time Congress includes a specific example along with a general phrase," especially when "[n]othing in the statutory context requires a narrowing construction." *Ali*, 552 U.S. at 227; *see also, e.g.*, *id.* (noting that in *Harrison*, 446 U.S. at 589 n.6, the Court "reject[ed] an argument that *ejusdem generis* must apply when a broad interpretation of the clause could render the specific enumerations unnecessary," where the Court discerned no uncertainty in the meaning of the broadly drafted clause); *Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 646 (1990) (noting that "technically unnecessary" examples may have been "inserted out of an abundance of caution").

Again, as discussed extensively above, Congress could not have been clearer as to the meaning of "professional degree," having expressly adopted in its entirety the longstanding definition set forth in 34 C.F.R. § 668.2.  The Department's reliance on the canons of interpretation is therefore misguided.  If "the statutory scheme is coherent and consistent," the "inquiry must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (citation omitted).  Here, "[s]ince [the Court] do[es] not find the statute in the least bit ambiguous, [the Court] ha[s] no need to employ, nor any legitimate purpose in employing, canons of construction designed to reconcile confusing

language." *United States v. Espy*, 145 F.3d 1369, 1371 (D.C. Cir. 1998).  Further, nothing suggests that the "examples" provided in the list are meant to run the gamut of all possible types of professional degrees such that they would delineate the outermost bounds of the definition, which is effectively the treatment accorded the illustrative list by the Department.  Indeed, the most natural reading of the clause, "*[e]xamples* of a professional degree include *but are not limited to*," is that the succeeding list of ten fields of study comprises only a subset of the total universe of professional degrees.  20 U.S.C. § 1087e(a)(4)(C)(ii) (adopting 34 C.F.R. § 668.2(b) (2025)) (emphases added).  This language clearly allows for and assumes the existence of other degrees that meet the three criteria set forth in the 2007 regulatory definition adopted by Congress.  The fact that the Department, applying its new and narrower regulatory definition, only found one more field of study, Clinical Psychology (Psy.D. or Ph.D.), to add to the list of professional degrees only further underscores the new definition's departure from congressional intent.

Defendants also fundamentally misunderstand and amateurly employ the canons they purport to rely on.  Under the canon of *noscitur a sociis*, a word is "given more precise content by the neighboring words with which it is associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008).  For example, in a statute that imposes "an obligation to repay funds received as an educational benefit, scholarship, or stipend," whether the ambiguous term "educational benefit" includes an educational loan can be elucidated by considering the other terms in the list, "scholarship" and "stipend."  *In re McDaniel*, 973 F.3d 1083, 1094-95 (10th Cir. 2020); *id.* (affirming the lower court's holding that "the phrase 'funds received as an educational benefit' does not include student loans because each of the terms in the series 'educational benefit, scholarship, or stipend' signify conditional grants of money that generally need not be repaid by their recipients, whereas loaned money must be repaid").  The purpose of the *noscitur a sociis*

36

canon is "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). In this case, there is no "one word" that requires interpretation in order to glean the meaning of that word. Defendants do not claim, for instance, that any of the specific words in the list of examples is ambiguous. Indeed, the list of examples could not be clearer in articulating the field of study and the qualifying degrees. The reliance on *noscitur a sociis* is thus misplaced.

Nor would *ejusdem generis* apply. *Ejusdem generis*, a related canon, teaches that "a general or collective term at the end of a list of specific items" is typically "controlled and defined by reference to the specific classes . . . that precede it." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (internal quotation marks omitted). For example, in a statute listing "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," *ejusdem generis* can be applied to interpret the residual term "any other class of workers engaged in foreign or interstate commerce" in reference to the preceding terms "seamen" and "railroad employees." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001). Here, in contrast, the list of examples is not a list of specifics followed by a generic catchall term needing further definition—the list does not read, for instance, "doctors, lawyers and *other professionals*," such that the meaning of "other professionals" would be defined by reference to the two specific terms, "doctors" and "lawyers." Rather, the list of "examples" is just that: simple examples. The catchall term at the end of the list to trigger the *ejusdem generis* canon is thus absent. *See, e.g.*, *Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 76 (2d Cir. 2022) (holding that *ejusdem generis* cannot be applied to the clause, "any remuneration (including any kickback, bribe, or rebate)," because "'any remuneration' cannot fairly be characterized as a 'residual' phrase" and "the parenthetical— '(including any kickback, bribe, or rebate)'—is better read as a list of non-exhaustive examples").

37

In any event, even if the canons of *noscitur a sociis* and *ejusdem generis* did apply, the Department's extrapolated set of new requirements from the list of "examples" is flawed.  As the Supreme Court has instructed, for any inferences to be drawn from a list of items based on either *noscitur a sociis* or *ejusdem generis* principles, a "common attribute [must] connect[] the specific items." *Ali*, 552 U.S. at 225.  Said differently, for the interpretation to be supported by the statutory text, "all of the terms must share a common denominator to which the list may be reduced." *Geston v. Anderson*, 729 F.3d 1077, 1083 (8th Cir. 2013); *see, e.g.*, *Harrison*, 446 U.S. at 588 (holding that "[t]he flaw in [respondents' *ejusdem generis*] argument"—that certain enumerated provisions support the interpretation that the Administrator must act only after notice and opportunity for a hearing—"is that at least one of the specifically enumerated provisions . . . does not require the Administrator to act only after notice and opportunity for a hearing").  Defendants do not disagree. *See* Jun. 23, 2026 Tr. of Mot. for Preliminary Injunction at 73:16-21 ("Hr'g Tr."), ECF No. 44 (defendants' counsel agreeing with the Court that the *ejusdem generis* canon does not permit "ignor[ing] parts of the list").  Cherry-picking from the list those parts with shared attributes and simply disregarding from the list those parts without those attributes is simply not allowed—but that is what the Department did here.

To be more specific, the Department explained in the Rule that the new definition reflects characteristics common among the examples of professional degrees listed in Section 668.2. Rule at 23796.  As plaintiffs point out, and defendants do not appear to contest, the new requirements added by the Rule "cannot be met by all of [the] degrees on the list deemed as professional in the same regulation."  PA Pls.' Mem. at 11.  For example, the Department has refused to add any degree *not* at the doctoral level to the preexisting list of ten "professional degree" fields.  *See, e.g.*, Final Rule at 23796-97 (finding that APRN degrees were not "professional degrees" because some

APRN degrees were at the "master's-level").  Yet, as the Department itself recognized, the preexisting list of ten "professional degree" fields adopted by Congress contains three non-doctoral degrees: theology degrees (M.Div., or M.H.L.) and the L.L.B. (Bachelor of Law) degree.  Final Rule at 23796 (recognizing that "the illustrative list of degrees contains . . . three non-doctoral degrees").  In other words, some of the examples of "professional degree" approved by Congress would *fail* the Department's new regulatory requirement that professional degrees be at the doctoral level.  *Id.*  Similarly, the Department's new requirement that a professional degree require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework," also imposes a requirement that cannot be met by all the "example" degrees provided by Congress.  Final Rule at 23796 (finding only that the degrees included in the illustrative list "*generally* require at least six academic years, including at least two years of post-baccalaureate level coursework" (emphasis added)).

In short, plaintiffs are likely to establish that the Department's interpretation of the illustrative list fails to adhere to the statutory text.  *See Murphy v. IRS*, 493 F.3d 170, 176 (D.C. Cir. 2007) (noting that if "the regulation conflicts with the plain text . . . the statute clearly controls").  Having found likelihood of success on at least one of plaintiffs' APA claims, the discussion turns next to the question of whether plaintiffs are likely to suffer irreparable harm absent preliminary relief.

### B.    Irreparable Harm

To establish the next requisite factor for preliminary relief, plaintiffs must demonstrate "a clear and present need for equitable relief to prevent irreparable harm."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks omitted).  That injury must be "actual and not theoretical" and must be such that "adequate compensatory or other corrective relief" will likely not be possible "at a later date, in the ordinary course of litigation."  *Id.* (citation omitted).

Although "economic loss does not, in and of itself, constitute irreparable harm," *id.*, threat of unrecoverable economic loss does amount to irreparable harm, *see Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022) (noting that "unrecoverable monetary loss is an irreparable harm"). For many of the same reasons provided in the analysis of injury in fact for plaintiffs' standing, *see supra* Part III.A, plaintiffs have shown a likelihood of irreparable harm.

Plaintiffs have shown that their prospective student members are likely to suffer irreparable harm absent a stay of the Rule. As discussed above, by applying a definition of "professional degree" that is likely far narrower than Congress intended, the Rule subjects plaintiffs' individual prospective student members to lower loan caps. Some of these prospective students may be forced to "forgo their educational and professional goals," AANP Pls.' Mem. at 23. As several district courts have held, lost educational opportunities and an inability to pursue one's chosen vocation are sufficient to establish irreparable harm. *See, e.g.*, *Bonnette v. D.C. Ct. of Appeals*, 796 F. Supp. 2d 164, 186–87 (D.D.C. 2011) (CKK) ("The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation." (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011))); *Saxena v. Noem*, No. 5:25-cv-5035, 2025 WL 1413266, at *7 (D.S.D. May 15, 2025) ("[M]any district courts have found that the loss of timely academic progress constitutes irreparable harm." (citing *Doe v. Noem*, No. 3:25-cv-23, 2025 WL 1161386, at *6 (W.D. Va. Apr. 21, 2025) (collecting cases))). Other prospective students may be pushed to "accept economically burdensome private loans," which are injuries that cannot be fully rectified by any final judgment at the conclusion of litigation. AANP Pls.' Mem. at 23; *cf. Yin v. Diaz*, 773 F. Supp. 3d 1344, 1378 (S.D. Fla. 2025), *appeal filed*, No. 25-11027 (11th Cir. Mar. 31, 2025) ("[T]he evidence establishes that the Plaintiffs have suffered and will continue to

40

suffer significant monetary loss—including loss of tuition waivers traceable to the revocation of their teaching assistantship offers—that is not recoverable, constituting irreparable harm.").

Further, plaintiffs have also shown that at least a few of them or their organizational members will be irreparably harmed by decreases in membership and a concomitant loss in membership dues, among other harms. As detailed above, several plaintiffs or their organizational members have proffered facts suggesting that the Rule will cause membership declines and revenue decreases for the organizations. *See, e.g.*, Fanning Decl. ¶ 35 ("report[ing] early decreases in student engagement and student membership participation following announcement of the Rule"); Michaels Decl. ¶ 17 (providing that "[m]embership dues are AAMFT's [the American Association for Marriage and Family Therapy's] primary revenue source, constituting [approximately 48%] of AAMFT's operating budget"); Wendorf Decl. ¶ 13 (providing that "membership revenue accounts for approximately 25% of [the National Association of Pediatric Nurse Practitioners'] annual revenue"). Plaintiffs have further proffered, among other things, that reduction in membership and dues will require them to cut educational programing, conferences, research, student engagement initiatives, and workforce development initiatives. *See, e.g.*, Fanning Decl. ¶ 23; Michaels Decl. ¶ 18; Wendorf Decl. ¶ 14. Critically, these expected harms will likely persist for at least the duration of this upcoming school year, as most prospective students who decide to forgo their chosen degree because of the Rule will not be able to consider applying to their programs again until the next school year. Such prolonged harms will make the task fundamentally more difficult for these organizations to accomplish their primary missions and cannot be fully remedied at final judgment. *Newby*, 838 F.3d at 9.

Accordingly, plaintiffs have demonstrated that they face irreparable harm.

### C.      Balance of the Equities and Public Interest

The final two factors, the balance of the equities and the public interest, merge where the government is the opposing party. *Nken*, 556 U.S. at 435.  These factors also weigh in favor of granting relief to plaintiffs.

Defendants argue that the government will be harmed by the grant of relief because more taxpayer dollars will be spent on federal loan subsidies and students and families will be incentivized to take on increased debt for postsecondary education.  Gov't's Opp'n to AANP Mot. at 31.  The government, however, "cannot suffer harm from an injunction that merely ends an unlawful practice."  *See R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ((quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  As discussed above, the Rule is likely contrary to law: The Rule's definition of "professional degree," and thus the category of students benefiting from the high loan caps, is likely narrower that what Congress intended.  "[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate."  *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977).  For this reason, "[t]he public interest is served when administrative agencies [like the Department] comply with their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).[8]

---

[8]      Defendants also argue that increases in financial assistance contribute to increases in tuition, and setting federal student loan limits may "provide an incentive to institutions to limit tuition increases."  Gov't's Opp'n to AANP's Mot. at 31 (quoting NPRM at 4299).  According to plaintiffs, "[t]his assertion is speculative at best" and "is based on a nearly 40-year old (1987) opinion piece *in The New York Times* entitled 'Our Greedy Colleges,' authored by President Ronald Reagan's Secretary of Education William Bennett, who asserted that '[i]ncreases in financial aid in recent years have enabled colleges and universities blithely to raise their tuitions, confident that Federal loan subsidies would help cushion the increase.'"  AANP Pls.' Supp. Ex. 3, Comment by Nat'l Educ. Ass'n to Under Secretary of Educ. Nicholas Kent re: NPRM (Mar. 2, 2026) ("NEA Comment") at 4, ECF No. 26-4 (quoting William Bennett, *Our Greedy Colleges*, N.Y. Times (Feb. 18, 1987), http://www.nytimes.com/1987/02/18/opinion/our-greedy-colleges.html).  Plaintiffs, critiquing the Bennett Hypothesis, argue that "myriad factors [are] thought to be playing some role in contributing to the escalation of college prices," "includ[ing] general inflation and declines in state subsidies to public higher education institutions."  NEA Comment at 5 (internal quotation marks and citations omitted) (collecting research).  At bottom, the empirical support for the Bennett Hypothesis appears to be mixed at best and thus entitled to little weight in the balance of the equities analysis.  *See* Final Rule at 23810 (some

In any event, defendants' asserted harms are outweighed by harms suffered by plaintiffs and the public. As plaintiffs explain, their individual student members will "be forced to either forgo their educational and professional goals or accept economically burdensome private loans." AANP Pls.' Mem. at 23. The loss of educational and vocational opportunities for prospective professional students is also detrimental to the public, particularly in underserved communities that may face a shortage of healthcare and other critical professional services. *See, e.g.*, AANP Pls.' Mem. at 27 (arguing that "many nursing students will have difficulty financing their advanced education under the Rule," "[b]ut nurses who complete advanced education help to fill critical gaps in the healthcare system, particularly in rural and underserved communities that already face provider shortages and rely heavily on advanced practice nurses for access to care"); *see also* Local Gov'ts' Amicus Brief at 3 (detailing harms to residents and the public fisc from "fewer qualified workers in critical fields such as nursing, education, public health, [and] social work").

Having shown likely success on the merits, likely irreparable harm in the absence of preliminary relief, and a balance of the equities and the public interest in their favor, plaintiffs have thus satisfied the requirements for emergency relief. The scope of the relief is discussed next.

### D.    Relief

As relief, *AANP* plaintiffs request an order: (1) setting aside and staying under 5 U.S.C. § 705 the Final Rule's definition of "professional degree," and (2) "enjoin[ing] [defendants] from enforcing the statutory caps on the availability of federal student loans" for graduate and professional students under 20 U.S.C. § 1087e(a)(4), "until the Department promulgates a new [lawful] rule." See AANP Pls.' Proposed Order at 1 (capitalization altered). *PA* plaintiffs, in comparison, seek a simultaneously broader and more specific order (1) "enjoin[ing] the July 1,

---

commentators argued existing research disproved this hypothesis, whereas the Department argued existing research supported this hypothesis).

2026 implementation of the [Rule] published May 1, 2026," and (2) "order[ing] the Department to treat existing and entering Physician Associate/Physician Assistant students, including those returning after a deferral or a break in their education, as 'professional students' for the purpose of access to the higher student loan limits." [Proposed] Order on Pls.' Mot. for Preliminary Injunction ("PA Pls.' Proposed Order") at 1-2, ECF No. 7-11.[9]

At the hearing, the Court inquired whether the Rule's definition of "professional degree" could be stayed only as to part (i) of the Rule, which sets forth the various requirements that must be met for a degree to qualify as "professional," without also staying part (ii) of the Rule, which lists specific degrees in eleven fields that the Department has determined qualified as "professional degrees." H'rg Tr. at 50:15-21, 51:24-52:6 (AANP); *id.* at 92:18-19 (PA); *id.* at 70:17-71:7, 83:14-22. Defendants' counsel answered in the affirmative, *id.* at 83:14-22, and *AANP* plaintiffs' counsel did as well, with the caveat that the degrees listed in part (ii) would not be interpreted as the *only* degrees that qualified, *id.* at 51:24-52:6. *PA* plaintiffs, on the other hand, argued that the Rule's definition of "professional degree" must be stayed in its entirety, parts (i) and (ii) together. *Id.* at 93:2-8.

Plaintiffs' request to set aside and stay the Rule's definition of "professional degree" under 5 U.S.C. § 705 is granted in part—specifically, the regulatory definition from part (i) of the Rule and the additional free-from-supervision requirement is stayed, but the list of qualifying degrees in part (ii) of the Rule is not. All other requests for additional relief are denied. Section 705 of

---

[9]     *PA* plaintiffs' requests for relief have been inconsistent. *PA* plaintiffs' proposed order requests that the Court "enjoin[] . . . the implementation of the [Rule]," an equitable remedy, *see* PA Pls.' Proposed Order at 1; plaintiffs' memorandum in support similarly asks only for a "preliminary injunction," *see generally* PA Pls.' Mem. Plaintiffs' reply brief, meanwhile, switched to asking for a "stay [of] the Final Rule's implementation under Section 705 of the APA." PA Pls.' Reply at 10. At oral argument, *PA* plaintiffs' counsel did not dispute the understanding that *PA* plaintiffs are seeking a Section 705 stay, and so *PA* plaintiffs' request will be construed accordingly. H'rg Tr. at 23:10-12 (AANP's counsel stating that AANP's "understanding of the PA plaintiffs' briefing is that they, like [AANP], request a 705 stay); *id.* at 38:17-25 (plaintiff's counsel responding "That's correct," when asked by the Court whether a § 705 stay was "one portion of the relief that you share with the other plaintiffs").

the APA allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. As the D.C. Circuit has repeatedly held, APA remedies are not party-restricted and permit a court to stay or vacate an unlawful agency action in its entirety. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))). "[C]ourts in this and other circuits have applied that same rule to section 705 stays." *Neguse v. ICE*, 813 F. Supp. 3d 45, 100 (D.D.C. 2025) (collecting cases). Indeed, although the Supreme Court has limited the power of federal courts to issue nationwide injunctions, the Court made clear that its decision concerned only "a federal court's equitable authority under the Judiciary Act" and said "[n]othing" about "federal courts['] [authority] to vacate federal agency action" under the APA. *Trump v. CASA, Inc.*, 606 U.S. 831, 847 & n.10 (2025); *see also* Oral Argument Tr. at 35:18-25, *United States v. Texas*, No. 22-58 (Nov. 29, 2022) (Roberts, C.J.) (quipping that for "those of us who were on the D.C. Circuit," judges vacated regulations "five times before breakfast," and remarking that limiting APA relief to specific parties before the court would be "fairly radical and inconsistent" with "established practice under the APA").

Here, as discussed, plaintiffs have shown that the Rule's definition of "professional degree" is likely contrary to law because Congress intended the Department to apply the preexisting definition of "professional degree," that they would suffer irreparable harm should the Rule go into effect, and that the balance of equities and the public interest are in their favor. The regulatory

45

definition consists of part (i) of the Rule and the additional free-from-supervision requirement in the preamble to the Rule. Accordingly, part (i) and the free-from-supervision requirement, which would have gone into effect on July 1, 2026, are set aside and stayed pending final resolution of this litigation.[10]

Both *AANP* plaintiffs and defendants agree that, if the Court should issue a stay, then staying part (i) would suffice to address the likely APA violation; neither *AANP* plaintiffs nor defendants challenge the promulgation of part (ii) on the understanding that the list of qualifying degrees is not exclusive. Hr'g Tr. at 51:24-52:6, 83:14-22. *PA* plaintiffs, on the other hand, want the Court to go one step further and stay part (ii) as well. *Id.* at 93:2-8. Yet *PA* plaintiffs have not demonstrated how the inclusion of part (ii), which concerns degrees not relevant to *PA* plaintiffs, causes them or their members concrete harm such that they would have standing to challenge the list of qualifying degrees. Nor have *PA* plaintiffs presented any persuasive argument as to why parts (i) and (ii) cannot be severed. *PA* plaintiffs' request to stay part (ii) of the Rule as well is therefore denied.

Moving on to the additional relief requested, *AANP* plaintiffs' additional request that defendants be enjoined from enforcing the *statutory* federal loan caps mandated by Congress, *see* 20 U.S.C. § 1087e(a)(4), is denied. Plaintiffs are mistaken in asserting that the statutory loan caps cannot be enforced until the Department promulgates a lawful "replacement rule." *See* AANP Pls.' Mem. at 30 (asserting that "vacatur would leave the new student loan caps unimplemented"

---

[10] Although the substantive merits of *AANP* plaintiffs' APA claim that the Department violated the Master Calendar requirement are not addressed, *see supra* n.7, the Court agrees with defendants that staying the effective date of the Rule's definition of "professional degree" would render that consideration unnecessary at this juncture. The Master Calendar requirement applies only to "regulatory *changes*" affecting student financial assistance that are "*initiated* by the Secretary." 20 U.S.C. § 1089(c)(1) (emphases added). Since the new challenged definition is stayed, what remains is the *statutory* definition, which is neither a regulatory "change[]" nor one "initiated by the Secretary" subject to Master Calendar requirements. *Id.*

because "the Department cannot lawfully apply the caps until it performs a lawful new rulemaking"). To the contrary, the statutory definition already provides the operative test—*i.e.*, the preexisting three criteria under 34 C.F.R. § 668.2, as codified by Congress. *See* 20 U.S.C. §1087e(a)(4)(C)(ii) (defining "professional degree" as it was defined by 34 C.F.R. § 668.2 "on July 4, 2025"). Staying implementation of part (i) the Rule's new definition of "professional degree" pending judicial review does not change the validity or force of the statutory definition. The Department—as defendants themselves argue in the event the Court finds for plaintiffs on the merits—may simply "apply the existing definition incorporated into the statute" to enforce the statutory loan caps without waiting for the completion of new rulemaking. Gov't's Opp'n to AANP's Mot. at 34. In fact, the Department's preamble to the Rule reveals that it has already done this three-part analysis for many degree programs. *See, e.g.*, Final Rule at 23789 (finding that "Master of Science in Nursing (MSN), Doctor of Nursing Practice (DNP), [and] Doctor of Nurse Anesthesia Practice (DNAP)" "may satisfy the operative definition's three-part test").[11] Defendants, through counsel, have additionally represented that in the event of a stay of the new regulatory definition, determinations could be made "relatively quickly" as to whether certain degrees satisfy the preexisting definition's three-part test. Hr'g Tr. at 85:5-6. *AANP* plaintiffs' request to enjoin enforcement of the *statutory* federal loan caps is therefore denied.[12]

---

[11]    *See also, e.g.*, Final Rule at 23792 ("[A]n MBA [Master of Business Administration] does not satisfy the incorporated professional degree definition where it is not required for entrance into a specific profession and does not itself carry accompanying licensure."); *id.* at 23793 ("M.Ed. [Master of Education] and Ed.D. [Doctor of Education] do not satisfy the incorporated professional degree definition because they are not required for entrance into a specific profession or for licensure."]; *id.* at 23801 ("Since licensure is not required for epidemiology or other public health positions, the MPH, DrPH, and related Master's in Epidemiology are not considered professional degrees."); *id.* at 23807-08 ("Master of Public Policy (MPP)/Master of Public Administration (MPA) and Other Academic, Research, or General Graduate Fields" "do not meet all of the conditions of the three-part operative test. Generally speaking, individuals can enter the public policy or public administration fields and civic-oriented or public-facing roles without an advanced degree (or any type of degree), and licensure is not required to enter such fields.").

[12]    *AANP* plaintiffs' reply brief, in response to defendants' criticism that the requested injunction "infringe[s] on Congress's discretion," claim that they "are not asking that the Court enjoin the statutory loan caps." AANP Pls.' Reply at 16. This assertion, however, is clearly contradicted by *AANP* plaintiffs' own memorandum and proposed

47

Similarly, *PA* plaintiffs' request "for an order commanding the Department to treat PA students as 'professional students'" for loan eligibility purposes is also denied.  *See* PA Pls.' Mem. at 21.  *PA* plaintiffs in effect urge the Court to assume the mantle of the regulatory agency and make findings in the first instance as to which degrees satisfy the statutory definition of "professional degree."  As a general rule, however, an agency is "entitled to construe its own regulations in the first instance."  *Noble Energy, Inc. v. Salazar*, 671 F.3d 1241, 1246 (D.C. Cir. 2012) (citation and internal quotation marks omitted); *see also Conservation L. Found. v. Nat'l Oceanic & Atmospheric Admin.*, 37 F. Supp. 3d 254, 272 (D.D.C. 2014) ("When an agency commits a legal error, a court 'normally remand[s] . . . to the agency.' (quoting *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001))).  This principle makes good sense.  Here, as evident across over 200 pages of rulemaking, the Department has already expended considerable effort and time considering how to implement the new federal student loan caps imposed by the Act.  *See generally* NPRM; Final Rule.  The Department also has expert knowledge about the many graduate degree programs, and over a decade of institutional knowledge about the meaning and application of the 2007 regulatory definition.  Whether a PA degree, or any other type of graduate degree, is a "professional degree" is thus a question best reserved for the agency to consider in the first instance, based on application of the proper three-criteria standard set forth in 34 C.F.R. § 668.2

---

order.  *See* AANP Pls.' Mem. at 30 ("Upon staying the Rule's new regulatory definition of a professional degree, the Court should also issue a preliminary injunction that prohibits the Department from applying the new student loan caps until the Department issues a replacement rule that is consistent with the statute."); AANP Pls.' Proposed Order (proposing that the Court, *inter alia*, "ORDER[] that Defendants are ENJOINED from enforcing the statutory caps on the availability of federal student loans that apply to students pursuing 'graduate' and 'professional degrees,' 20 U.S.C. § 1087e(a)(4), until the Department promulgates a new rule defining 'professional degree' consistent with its statutory obligations").  On reply, and emphasized again at the hearing, *AANP* plaintiffs also make a new request not found in any prior filing: that the Court order defendants "to apply the higher loan limits set by Congress to all graduate students while this case is pending," AANP Pls.' Reply at 16, or alternatively to order defendants to apply to higher loan limits to plaintiffs' members only while this case is pending, Hr'g Tr. at 25:10-12.  Plaintiffs provide no legal basis for their request that the Department provide loans at the higher limit across the board without consideration for whether the student is pursuing a "professional degree."  Such an order from the Court would impermissibly supersede the statutory text and require defendants to act contrary to congressional mandate to implement a two-tiered loan cap, and as such this request is also denied.

(Jul. 4, 2025).  *See, e.g.*, *United States v. Schwarzbaum*, 24 F.4th 1355, 1367 (11th Cir. 2022) (remanding to the agency to recalculate plaintiff's tax penalties because, "[o]rdinarily, if an agency has misapplied the law the case must be remanded to the agency to make a new determination." (internal quotation marks omitted and alterations accepted)); *Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010) (holding that "the agency should be given an opportunity in the first instance to make legal determinations entrusted to it by Congress," including "whether women in Guatemala constitute a particular social group" for asylum purposes).

In sum, plaintiffs' request to set aside and stay the new regulatory definition of "professional degree" is granted as to part (i) of the Rule and the free-from-supervision requirement, but plaintiffs' additional requests for relief are denied.

### E.    Bond and Stay Motion

Defendants request that any injunctive relief be accompanied by a bond pursuant to Federal Rule of Civil Procedure 65(c).  Gov't's Opp'n to AANP's Mot. at 39 ("estimating taxpayer savings of the professional student definition at \$51-52 million" (citing Final Rule at 23769)); Hr'g Tr. at 81:6-7 (defendants' counsel stating "we have not requested a particular amount" of bond).  Under Rule 65(c), a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  As the text of Rule 65(c) makes clear, Rule 65(c) applies only to issuances of a "preliminary injunction" or a "temporary restraining order."  *Id.*  In this case, however, no preliminary injunction or temporary restraining order is being issued; the only relief granted to plaintiffs is a stay of agency action under Section 705 of the APA.  *See* 5 U.S.C. § 705 (providing, in relevant part, only that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on

application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings").

As many courts have observed, "§ 705 of the APA contains no such requirement" for a security, and Rule 65(c) does not apply because a stay is neither a preliminary injunction nor a temporary restraining order. *Cabrera v. Dep't of Lab.*, 792 F. Supp. 3d 91, 107 n.3 (D.D.C. 2025) (Friedrich, J.); *see also Neguse*, 813 F. Supp. 3d at 100 (Cobb, J.) ("A stay under APA section 705 is neither a preliminary injunction nor a temporary restraining order, and Rule 65(c) therefore does not apply."); *Mich. Citizens for an Indep. Press v. Thornburgh*, No. 88-cv-2322 (JHG), 1988 WL 90388, at *8 n.12 (D.D.C. Aug. 17, 1988) (JHG) ("No bond will be required from plaintiffs in this case, because the APA stay provision does not impose a security requirement." (citing 5 U.S.C. § 705)); *Afr. Cmtys. Together v. Lyons*, No. 25-cv-6366 (PKC), 2026 WL 1382944, at *3 n.2 (S.D.N.Y. May 18, 2026) ("Unlike a preliminary injunction motion under Rule 65(c), Fed. R. Civ. P., security is not required for the Court to grant a stay under section 705."); *Asylum Seeker Advoc. Project v. U.S. Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708, 722 (D. Md. 2025) (Gallagher, J.) (declining to impose a bond pursuant to Rule 65(c) because "staying agency action pursuant to § 705 of the APA . . . has no bond requirement"); *Prairie Prot. Colo. v. USDA APHIS Wildlife Servs.*, No. 19-cv-2537 (WLM), 2019 WL 4751785, at *1 n.3 (D. Colo. Sept. 30, 2019) ("The major practical difference, it appears, between a Rule 65 proceeding and a § 705 proceeding is that Rule 65(c) requires a court granting an injunction to consider a bond amount, whereas § 705 contains no such requirement."). Indeed, the government cites no authority that required a bond to grant a stay under Section 705. *See generally* Gov't's Supp. Br. at 2-4; Gov't's Opp'n at 38-

39; *see also Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 n.14 (D. Md. 2025) (SAG) ("This Court is unaware of any other court finding that Section 705 relief requires a bond.").

In seeking a bond both for any preliminary injunction granted under the Court's equitable powers and any stay under 5 U.S.C. § 705, defendants equate the two reliefs and argue that they "serve the same function." *See* Gov't's Supp. Br. at 3. Yet meaningful differences separate an injunction from a stay. *See Nken*, 556 U.S. at 428 ("An injunction and a stay have typically been understood to serve different purposes."). "The former is a means by which a court tells someone what to do or not to do," "with the backing of its full coercive powers." *Id.* Under its equitable powers, a court generally has broad discretionary power in fashioning injunctive relief: An injunctive order can require a party to refrain from doing a specific act, but it can also require a party to affirmatively perform a specific act. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1124 (9th Cir.), *cert. granted*, 146 S. Ct. 604 (2025). A stay, by contrast, can only "temporarily suspend[] the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Nken*, 556 U.S. at 428-29; *id.* ("A stay 'simply suspend[s] judicial alteration of the status quo.'" (internal quotation marks and citation omitted)). For this reason, stays or vacaturs of agency action are often considered "a less drastic remedy" than the "extraordinary" remedy of an injunction. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (quoting *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022)). Indeed, this case perfectly illustrates the practical effects that the distinction between an injunction and a Section 705 stay may have: plaintiffs' request for a stay of the regulatory definition pending judicial review is granted, but plaintiffs' broader equitable requests to enjoin defendants from implementing the statutory caps or to order defendants to affirmatively designate PAs as

"professionals" is denied. Any argument that Rule 65(c)'s use of the term "injunction" implicitly includes "stays" is thus unpersuasive.

At bottom, the text of Rule 65(c) and 5 U.S.C. § 705, the robust consensus from persuasive authority, and the meaningful differences between an injunction and a stay, all support the conclusion that Rule 65(c)'s security requirement does not apply to stays of agency action under Section 705. Since the Court grants a stay under Section 705, and not a preliminary injunction under Rule 65(c), defendants' request for an injunction bond is accordingly denied.

Lastly, defendants' request for an administrative stay and a stay pending appeal is denied. Gov't's Opp'n to AANP Mot. at 38; Gov't's Opp'n to PA Mot. at 40. For all the reasons explained, plaintiffs are likely to succeed on the merits of at least one of their APA claims, and defendants will not be irreparably harmed by an order staying the regulatory definition proposed by the Rule.

## IV.    CONCLUSION

For the foregoing reasons, *AANP* plaintiffs' Motion for Stay under 5 U.S.C. § 705 and for Preliminary Injunction, *see* No. 26-cv-1780, ECF No. 4, and *PA* plaintiffs' Motion for Preliminary Injunction, *see* No. 26-cv-1491, ECF No. 7, is GRANTED in part and DENIED in part. Specifically, *AANP* plaintiffs' and *PA* plaintiffs' requests to preliminarily set aside and stay implementation of the regulatory definition of "professional degree"—comprised of part (i) of the Rule and the additional free-from-supervision requirement in the preamble to the Rule—are granted. All other requests are denied. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  June 24, 2026

_____
**BERYL A. HOWELL**
United States District Judge

52