**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN ASSOCIATION OF NURSE
PRACTITIONERS,
   5901 Vega Avenue, Ste. 200, Austin, TX 78735

NATIONAL ASSOCIATION OF PEDIATRIC
NURSE PRACTITIONERS,
   125 Maiden Lane, Ste. 15c, New York, NY
   10038

AMERICAN ASSOCIATION OF COLLEGES OF
NURSING,
   655 K St. NW, Ste. 750, Washington, DC 20001

ASSOCIATION OF SCHOOLS AND PROGRAMS
OF PUBLIC HEALTH,
   1615 L St. NW, Ste. 510, Washington, DC
   20036

NATIONAL EDUCATION ASSOCIATION,
   1201 16th St. NW, Washington, DC 20036

AMERICAN ASSOCIATION FOR MARRIAGE
AND FAMILY THERAPY,
   277 S. Washington Street, Ste. 210, Alexandria,
   VA 22314

             *Plaintiffs*,

     v.

LINDA MCMAHON, in her official capacity as
Secretary of the United States Department of
Education,
   400 Maryland Ave. NW, Washington, DC 20202

UNITED STATES DEPARTMENT OF
EDUCATION,
   400 Maryland Ave. NW, Washington, DC 20202

             *Defendants*.

Case No. 1:26-cv-01780

Consolidated with
Case No. 1:26-cv-1941

**<u>AMENDED AND SUPPLEMENTAL COMPLAINT</u>**

**INTRODUCTION**

1.     For decades, students and graduates seeking to enter their chosen professions—future advanced practice nurses, specialized educators, therapists, and public health officials—have relied on the federal government to help make their dreams accessible. Because of a recent rule issued by the Department of Education, students across the country may no longer have access to funds they need to realize their career goals. And the country will lose out on the benefit of their entry into these important professions.

2.     The Department of Education recently finalized a rule that significantly limits the ability of prospective students pursuing degrees in nursing, counseling, public health, education, and other fields to obtain federal student loans. The Department did so by adopting a regulatory definition of a "professional" degree that narrows access to federal student loans in a way that is inconsistent with the statute that Congress recently enacted. The Department had no authority to rewrite the statute in this way, and the Department's decision to do so is contrary to law and arbitrary and capricious.

3.     After this Court granted preliminary relief staying the provision of this rule implementing this regulatory definition, the Department issued guidance in which it attempted again to define which graduate degrees qualify as "professional" for purposes of federal student loans.  The Department's guidance, like its rulemaking, depart from Congress's instructions, and the Department again acted arbitrarily and capriciously in issuing it.

4.     In doing so, the Department excludes from professional-degree status degree programs that meet the definition Congress enacted and that prepare students for entry into critical professional programs that require specialized training. Plaintiffs the American Association of Nurse Practitioners (AANP), the National Association of Pediatric Nurse Practitioners (NAPNAP), the American Association of Colleges of Nursing (AACN), the

1

Association of Schools and Programs of Public Health (ASPPH), the American Association for Marriage and Family Therapy (AAMFT), the National Education Association (NEA), and their members, are among the entities and individuals that will suffer harm from the rule.

5.      By unlawfully creating a barrier to students obtaining such advanced degrees, the rule will also have significant consequences for the public. A skilled workforce of advanced practice nurses, counselors, public health experts, educators, and other professionals is necessary to ensure the health and well-being of the people of this country. Educating the professional workforce of tomorrow is critical to our future, and this rule will make all of us worse off by interfering with access to educational opportunities for students striving to advance their professional careers.

**PARTIES**

6.      Plaintiff the American Association of Nurse Practitioners (AANP) is a 501(c)(6) membership association headquartered in Austin, Texas, that represents nurse practitioners (NPs) and students aspiring to become NPs. AANP's mission is to empower all NPs to advance accessible, person-centered, equitable, high-quality health care for diverse communities through practice, education, advocacy, research and leadership. AANP supports and advances NP and NP student members through a broad range of professional, educational, advocacy, research, and practice-support initiatives designed to strengthen the NP workforce and improve patient access to high-quality health care.

7.      AANP's membership also includes approximately 169 organizational members comprised of professional nurse practitioner organizations and institutions from across the United States. These organizational members include state and local NP professional membership associations, specialty NP organizations, universities and colleges offering NP educational programs, hospitals and clinics employing NPs, and government or military groups

2

and organizations that support the NP profession and AANP's mission. AANP's organizational members include state nurse practitioner organizations the Nurse Practitioner Association of Maryland (NPAM), the Texas Nurse Practitioners (TNP), the Vermont Nurse Practitioners Association (VNPA), and the APRNs United of Washington State (AUWS). These organizations collectively represent NPs, NP students, educators, and workforce development stakeholders across rural, urban, and underserved communities nationwide, and they regularly collaborate with NP educational programs, workforce initiatives, and state advocacy efforts relating to advanced nursing education and patient access to care.

8.    Plaintiff the National Association of Pediatric Nurse Practitioners (NAPNAP) is a nonprofit membership organization headquartered in New York, NY. NAPNAP has more than 7,000 individual members who hold or are seeking degrees in pediatric advanced practice nursing, are taking continuing education courses to obtain or renew certification and licensure as pediatric or family nurse practitioners, or are faculty members who are teaching pediatric and family nursing students at the master's or doctoral level.

9.    NAPNAP is the nation's first-ever organization established to represent and support nurse practitioners, and it is the only national organization devoted to pediatric advanced practice nursing. NAPNAP's mission is to optimize the health and well-being of infants, children, adolescents and young adults and empower its community of pediatric experts. NAPNAP provides continuing education, clinical practice resources, career support, leadership opportunities and professional community to its members, as well as other advanced practice providers who care for children. NAPNAP also actively supports policies that benefit children and the health care providers who serve them.

3

10.    Plaintiff the American Association of Colleges of Nursing (AACN) is a 501(c)(3) nonprofit membership organization headquartered in Washington, D.C. AACN's members include more than 890 colleges and universities representing both public and private institutions, including schools in all 50 states, the District of Columbia, and Puerto Rico. Nearly 200,000 of the students served by AACN member schools are pursuing post-baccalaureate degrees to become Advanced Practice Registered Nurses (APRNs) and other nurses prepared for faculty, research, and other advanced nursing practice roles. APRNs are licensed to practice in specialized and primary care roles such as nurse practitioners, clinical nurse specialists, certified nurse-midwives, and certified registered nurse anesthetists.

11.    AACN's mission is to lead and champion excellence and innovation in nursing education, research, and practice. AACN seeks to improve the quality of nursing care by strengthening baccalaureate and graduate nursing programs and striving to create a more highly educated nursing workforce. AACN works to establish quality standards for nursing education; assists schools in implementing those standards; influences the nursing profession to improve healthcare; and promotes public support for professional nursing education, research, and practice. AACN is recognized as academic nursing's leading source for technical assistance, faculty training, policy development, and professional enrichment for nursing school deans, faculty, staff, and students.

12.    Plaintiff the Association of Schools and Programs of Public Health (ASPPH) is a 501(c)(3) nonprofit membership association headquartered in Washington, D.C. ASPPH represents more than 150 accredited schools and programs of public health, including a community of more than 103,000 deans, faculty, staff, and students. ASPPH's mission is to function as the voice of academic public health, advancing education, practice, and research and

4

guided by the principles of social justice and a commitment to dismantling racism in academic

public health institutions. To further that mission, ASPPH supports its members through

research, education, and practice, providing professional development opportunities for

practitioners, connecting members with student applicants, and bringing schools and programs

together to advance initiatives to address the nation's most pressing public health challenges.

13.    Plaintiff National Education Association (NEA) is a 501(c)(5) nonprofit

membership organization headquartered in Washington, D.C. NEA's members include aspiring

educators; K–12 classroom teachers; education support professionals; school counselors, school

psychologists, and other specialized instructional support personnel; as well as higher education

faculty and staff, who engage in a variety of educational activities both inside and outside of the

classroom. NEA's mission is to unite its members and the nation to fulfill the promise of public

education to prepare every student to succeed in a diverse and interdependent world. This

includes supporting members' financial well-being through education and advocacy regarding

student loan repayment and ensuring that there are accessible pathways toward becoming

educational professionals that can support our nation's students.

14.    Plaintiff the American Association for Marriage and Family Therapy (AAMFT) is

a 501(c)(6) nonprofit membership organization headquartered in Alexandria, Virginia.

AAMFT's members include licensed marriage and family therapists (LMFTs). LMFTs are

mental health professionals who are trained in psychotherapy and family systems and educated

and trained to diagnose and treat mental and emotional disorders within the context of marriage,

couples, and family systems. AAMFT's mission is to advance the LMFT profession and the

practice of marriage and family therapy, including by establishing and maintaining professional

standards in marriage and family therapy, promoting marriage and family therapists' common

5

professional interests, and more. AAMFT provides its members with practice-specific systemic

marriage and family therapy training, professional development, continuing education, ethical

guidance, leadership opportunities, research, and career development to its members.

15.     Defendant Linda McMahon is the Secretary of the United States Department of

Education, the highest-ranking official at the Department of Education, and is responsible for the

decisions of the Department. She is sued in her official capacity.

16.     Defendant the United States Department of Education is an executive department

of the United States federal government, headquartered in Washington, D.C.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction to adjudicate these claims because this

action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because

Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

18.     This Court may grant declaratory, injunctive, and other relief pursuant to 28

U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705–706, and the Court's inherent authority to enjoin federal

officials from acting unlawfully.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## FACTUAL AND LEGAL BACKGROUND

### A. *Congress's enactment of student loan caps for professional and graduate students*

20.     The Department of Education's Direct Loan program is the single largest source

of federal financial assistance for postsecondary education. *See generally* Alexandra Hegji,

Cong. Rsch. Serv., R45931, Federal Student Loans Made Through the William D. Ford Federal

Direct Loan Program: Terms and Conditions for Borrowers (2024), https://perma.cc/6AWB-

GB8Z; 20 U.S.C. ch. 28, subch. IV, pt. D. There are several types of federal direct loans: direct

subsidized loans, direct unsubsidized loans, direct PLUS loans, and direct consolidation loans. *Id.*

21.     Federal Direct Loans have many advantages over private loans, including lower rates and more flexible repayment options. *See, e.g.*, Federal Student Aid, *Federal Versus Private Loans*, https://perma.cc/HDS3-HTRM .

22.     In July 2025, Congress enacted a reconciliation act that addressed, among many other things, the Direct Loan program. The Act is colloquially known as the "One Big Beautiful Bill Act." Pub. L. No. 119-21, 139 Stat. 72, 335 (2025) ("the Act").

23.     Title VIII of the Act eliminated one type of Direct Loan, known as a Grad PLUS loan, and imposed new borrowing limits on other Direct Loans. *See generally* Alexandra Hegji, Cong. Rsch. Serv., IN12585, Student Loan Types and Limits in the FY2025 Budget Reconciliation Act (2025), https://perma.cc/BHB8-VMLG.

24.     In section 81001 of the Act, titled "Establishment of Loan Limits for Graduate and Professional Students and Parent Borrowers; Termination of Graduate and Professional Plus Loans," Congress amended the Higher Education Act by adding a new subsection (a)(4) to 20 U.S.C. § 1087e. Pub. L. No. 119-21, § 81001, 139 Stat at 78. The new section 1087e(a)(4) imposes separate student loan caps for "graduate" students and "professional" students, both within a year and in the aggregate.

25.     The new annual limit for Federal Direct Unsubsidized Stafford loans, which the Act contemplates would come into effect as of July 1, 2026, is $50,000 for professional students, as compared to $20,500 for graduate students. 20 U.S.C. § 1087e(a)(4)(A).

26.     The new aggregate limit beyond the amount borrowed for undergraduate education, also starting July 1, 2026, is also higher for professional students than it is for

graduate students. *Id.* § 1087e(a)(4)(B). The aggregate limit for a professional student who is not, and has not been, a graduate student is $200,000; meanwhile, the aggregate limit for a graduate student who is not, and has not been, a professional student is $100,000. *Id.*

27.    Congress also enacted new statutory definitions for the terms "graduate student" and "professional student." The definition of a graduate student relies on the definition of a professional student: a graduate student is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i). A professional student, in turn, is defined by reference to a preexisting regulation: a professional student is "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii).

### B.  *The Department of Education's preexisting regulation*

28.    The Act's definition of "professional student" references and incorporates a preexisting regulation, 34 C.F.R. § 668.2(b) (2025), as it was written as of July 4, 2025, that arises from a prior rulemaking by the Department of Education. As of July 2025, the regulation read as follows:

> Professional degree: A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b) (2025).

29.    That regulatory definition is part of a set of definitions that "apply to all Title IV, [Higher Education Act] programs." *Id.* It was part of the "general rules that apply to an

8

institution that participates in any student financial assistance program authorized by Title IV of the Higher Education Act of 1965, as amended." 34 C.F.R. § 668.1(a).

30.    The Department promulgated that regulatory definition in 2007. Federal Student Aid Programs, 72 Fed. Reg. 62014, 62024–25 (Nov. 1, 2007). In that notice of proposed rulemaking, the Department explained that the purpose of the rulemaking was to help standardize the regulatory definitions of "graduate or professional student" and "undergraduate student" in the Department's regulations, since at the time there were "three definitions of graduate or professional student" and "four definitions of undergraduate student." Federal Student Aid Programs, 72 Fed. Reg. 44620, 44622 (Aug. 8, 2007). The 2007 regulatory definition of "professional degree" remained unchanged until Congress incorporated it by reference into the Act. 20 U.S.C. § 1087e(a)(4)(C)(ii); 34 C.F.R. § 668.2(b).

### C.  *The Department of Education's new rulemaking*

31.    The Department published its Notice of Proposed Rulemaking (NPRM) in January 2026. Reimagining and Improving Student Education (RISE), 91 Fed. Reg. 4254 (Jan. 30, 2026). The NPRM proposed a new definition of "professional student." *Id.* at 4332 (to be codified at 34 C.F.R. § 685.102). Embedded within the NPRM's proposed definition of "professional student" was a new four-prong definition of "professional degree," which reads as follows:

(1) A professional degree is a degree that:

(i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;

(ii) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

9

(iii) Generally requires professional licensure to begin practice; and

(iv) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition.

*Id.* (to be codified at 34 C.F.R. 685.102(b)).

32.     While similar in some ways to the 2007 regulatory definition, the NPRM's definition of "professional degree" imposed new requirements absent from the preexisting definition adopted by Congress. For example, the NPRM's new definition specified that a "professional degree" is "generally at the doctoral level" and "requires at least six academic years of postsecondary education coursework for completion." *Id*. Neither requirement is part of the 2007 regulatory definition. *See* 34 C.F.R. § 668.2(b).

33.     Further, the NRPM's proposed definition of "professional degree" included an exhaustive list of qualifying degree programs that purportedly satisfy the proposed definition. Under the proposed definition, a professional degree only includes degrees in the following eleven fields: "Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.)." 91 Fed. Reg. at 4261. The NPRM's exhaustive list of qualifying degrees was nearly identical to the illustrative list of professional degrees in the 2007 regulatory definition, with the sole difference being that the NPRM's definition added a Doctorate in Clinical Psychology as an additional qualifying degree. *Id*. at 4263–64.

34.     The Department issued the final rule on May 1, 2026. Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations, 91 Fed. Reg.

10

23768 (May 1, 2026). The final rule is effective July 1, 2026. *Id*. The final rule wholly adopts the NPRM's proposed definition of "professional student," including its narrow construction of what constitutes a "professional degree." *Id*. at 23882 (to be codified at 34 C.F.R. § 685.102(b)). Under the final rule, only eleven degree programs qualify as "professional degrees"—the ten degrees programs included in the 2007 regulatory definition's illustrative list plus doctoral degrees in clinical psychology—and are therefore eligible for the higher loan caps. The final rule's definition of "professional degree" excludes many degree programs that prepare students for a specific profession, and that may qualify as a professional degree under the 2007 regulatory definition adopted by Congress, including, degrees in nursing, education, and public health. *Id*.

35.     In adopting the final rule, the Department acknowledged that Congress required it to use the 2007 regulatory definition of professional degree. *Id*. at 23783 ("Congress defined professional student in Section 455(a)(4)(C)(ii) of the HEA by cross referencing the Department's current definition of professional degree in 34 CFR 668.2 (effectively codifying that regulatory definition), and the Department is implementing that framework in § 685.102 as a loan limit classification."). Nonetheless, the final rule declines to expand the definition of a "professional degree" beyond a set list of eleven qualifying degree programs. *Id*. at 23791–809.

36.     In essence, the Department took the 2007 regulatory definition's non-exhaustive, illustrative list of professional degrees and converted it to an exhaustive list of qualifying degree programs. In doing so, the final rule categorically excludes various degree programs that would qualify as "professional degrees" under the 2007 definition adopted by Congress but were not included in that definition's illustrative list of examples. Indeed, the final rule acknowledges that it is possible for a degree program "to satisfy the three parts of the operative test" from the 2007 definition, but to still not be treated as a "professional degree" under the final rule's new

11

definition. *Id*. at 23795. That is because the final rule lays new requirements on top of the 2007 definition. Under the final rule, not only must a degree program satisfy the operative test that formed the entirety of the 2007 definition that Congress adopted, it must also "satisfy contextual requirements" that are never clearly stated in the 2007 definition. *Id*. at 23795-99.

37.    Unsurprisingly, "[m]any commenters opposed the Department's approach to defining professional student, as they believed it to be too narrow," "argued that the Department was adding limitations not found in the statutory or regulatory text" and "urged the department to treat the enumerated examples as illustrative rather than bounded." *Id*. at 23783. Many commenters explained that various degree programs not covered by the final rule nonetheless "satisfy the 'three-part test' in 34 CFR 668.2" and "that in excluding these programs, that the Department is improperly narrowing Congress's adopted language." *Id*. While the final rule acknowledges some of these comments, it rejects them based on little more than the conclusory statement that "[t]he Department does not believe that our approach to defining professional student is too narrow nor do we believe it should be expanded to include more degree programs." *Id.*

38.    In adopting its new definition of a "professional degree," the Department relied on factors that Congress did not intend it to consider, such as whether an individual obtaining the degree would be employed under the supervision of another professional, whether the licensure requirements for a given profession have changed over time, or whether certain professional degrees are accorded at the doctoral level. The Department further applied some of these extra-textual factors inconsistently, alternatively reasoning that differences in state licensure requirements are irrelevant in some instances but dispositive in others. The Department also failed to consider important aspects of the problem before it, such as the likelihood that its new

12

rule would pose devastating consequences on professional fields such as nursing, education, public health, and therapy. The Department also failed to explain why it rejected reasonable alternatives to its chosen rule, such as the adoption of a definition that more closely tracked the statutory language. For these and other reasons, the Department acted arbitrarily and capriciously.

39.    In the preamble to the final rule, the Department recognized that the Higher Education Act's master calendar requirement provides that regulatory changes affecting student financial assistance must be finalized by November 1 to go into effect by July 1 of the following year. *Id*. at 23770 (citing 20 U.S.C. § 1089(c)(1)). The Department nonetheless made the rule effective July 1, 2026, by purportedly relying on an "implicit[]" waiver of the statutory requirement. *Id*.

**D.  *The Degree Programs Pursued by Plaintiffs' Student Members and Offered by their Institutional Members Would Qualify as Professional Degree Programs under the 2007 34 CFR 668.2 Definition.***

40.    AANP and NAPNAP represent students in programs to become nurse practitioners (NPs). The post-baccalaureate nursing degree programs required to become a nurse practitioner meet the professional degree definition. NPs are a type of advanced practice registered nurses (APRNs) who are educated and clinically prepared at the master's or doctoral level. To become licensed, all NPs must complete a Master of Science in Nursing (MSN) or Doctor of Nursing Practice (DNP) program and successfully pass a national board certification examination in their population focus area before applying for state licensure. These degrees accordingly signify completion of the academic requirements for beginning practice. They also signify a level of professional skill beyond that required for a bachelor's degree, providing advanced clinical education, didactic instruction, and supervised clinical training required for entry into NP practice. Finally, NPs are licensed in all fifty states, the District of Columbia, and

13

U.S. territories, and they must comply with the licensure laws and regulatory requirements of the jurisdiction in which they practice. Among those served by AACN member schools are students pursuing a MSN, DNP, or other post-baccalaureate nursing degree, including Doctorate of Nurse Anesthesiology Practice (DNAP) degrees and the Doctor of Philosophy in Nursing (PhD) degrees. Post-baccalaureate nursing programs prepare students with a level of professional skill beyond that which is normally required for a bachelor's degree because they require graduate-level academic coursework, extensive supervised clinical education, and preparation for advanced, autonomous, or expanded professional practice. The majority of graduates of advanced nursing degree programs also pursue advanced national certifications and state licensure that authorize independent clinical practice as APRNs.

41.     NEA's membership includes those who aspire to be "specialized instructional support personnel" (SISPs) who are defined by federal law as "school counselors, school social workers, and school psychologists" and "other qualified *professional* personnel, such as school nurses, speech language pathologists, and school librarians, involved in providing assessment, diagnosis, counseling, educational, therapeutic, and other necessary services . . . as part of a comprehensive program to meet student needs." 20 U.S.C. § 7801(47) (emphasis added).

42.     Relevant here, these specialized education degrees include all graduate degrees, including Master of Education (M.Ed.) and Master of Social Work (M.S.W.) degrees, in school counseling, school social work, school library media or library sciences, reading, literacy or related fields; the Master of Arts (M.A.) in Reading Education and Master of Science (M.S.), one of which must generally be held in order to become a Reading Specialist; and the Master of Library Science (M.L.S.) and Master of Library and Information Science (M.L.I.S.).

14

43.     The completion of specialized post-baccalaureate degrees, which provide professional skills beyond those provided in bachelor's degree programs, are required for entry to SISP professions, many of which require licensure. For example, a master's degree in school counseling signifies completion of academic requirements for beginning practice as a school counselor. To practice as a school counselor, a graduate of a master's program must generally apply for and receive a license from the state.

44.     AAMFT's membership is composed of licensed marriage and family therapists (LMFTs), therapists who are educated and trained to diagnose and treat mental and emotional disorders within the context of marriage, couples, and family systems. The achievement of an MFT degree signifies entry into the profession of marriage and family therapy because it meets the academic requirements for professional licensure, which is required for providers of mental health and substance use therapy in all 50 states and the District of Columbia. A marriage and family therapy degree also signifies a level of professional skill beyond that normally required for a bachelor's degree: To become an LMFT, an applicant for licensure must have graduated with a master's or doctoral degree in marriage and family therapy or a closely related field, pass a clinical exam, and complete two to three years of supervised clinical experience. No bachelor's degree requires a comparable level of professional skill.

45.     ASPPH represents accredited schools of public health, with a membership of approximately 150 member schools and programs of public health. ASPPH's member institutions confer professional degrees that signify advanced public health training, particularly the Master of Public Health (MPH) and Doctor of Public Health (DPH) degrees, which bring essential expertise in disease prevention, health promotion, and beyond. The achievement of an MPH or DRPH degree prepares graduates for immediate practice and leadership in public health

15

and represents a level of professional skill beyond that normally required for a bachelor's degree. In addition, public health graduates commonly pursue credentialing such as the Certified in Public Health ("CPH") credential, and many public health positions require or strongly prefer accredited graduate-level professional training.

### E.  *The Rule Prevents Prospective Students from Financing Their Degrees*

46.     Degrees in nursing, public health, education, and marriage and family therapy require a substantial financial investment. Many students pursuing degrees in these fields finance their education with loans that exceed the yearly and aggregate caps for "graduate" degrees.

47.     If the Rule is permitted to take effect, students pursuing these degrees will face a cascade of harms. Students who cannot pay out of pocket will be left to seek higher-cost private loans, forcing them to pay higher interest rates, face a range of additional unfavorable terms, and forfeit access to Public Service Loan Forgiveness. Some students will be unable to access private loans due to credit history, thus creating a barrier to economic advancement. And many prospective students facing these barriers will necessarily postpone their educational goals or decide not to pursue these degrees altogether.

48.     Accordingly, by restricting students from accessing necessary financial aid, the Rule will make it impossible for many prospective students to seek degrees in these fields, especially graduates from low- and middle- income backgrounds.

49.     As fewer students will enroll at academic institutions offering these degree programs, those institutions will experience a strain on institutional budgets and impairment of their ability to sustain critical programs and services, including academic programs, faculty hiring, clinical placements, and student support services.

**F.**   ***The Rule Harms Plaintiffs and Their Members.***

50.   Because NP education programs require substantial financial planning and frequently depend on federal student financial assistance, the Rule is already creating uncertainty among students and educational institutions regarding the affordability and accessibility of post-baccalaureate NP education. AANP and its members are already receiving and responding to concerns from prospective and current NP students regarding their ability to finance MSN and DNP education programs if the Rule takes effect.

51.   As AANP and AACN member universities and colleges anticipate declines in student enrollment resulting from reduced access to adequate federal financial assistance, they will experience financial instability from loss of tuition revenue; reductions in program capacity, specialty offerings, and student support services; difficulty recruiting and retaining qualified faculty; and impairment of workforce development initiatives designed to address provider shortages and expand patient access to care.

52.   AANP itself will also be forced to devote substantial organizational resources, staff time, advocacy efforts, member support services, and educational programming to addressing the harms caused by the Rule. AANP will need to respond to member concerns, educate prospective and current NP students regarding the Rule's impact, engage in advocacy and public education efforts, and attempt to mitigate anticipated workforce shortages. These diversions of organizational resources impair AANP's ability to devote resources to its other core programs and initiatives, such as continuing education. In turn, NPs will have access to fewer continuing education opportunities even though NPs must meet a certain number of continuing education hours per year under each state's licensure requirements. And because nurse practitioners play a critical role in expanding access to high-quality care, particularly in

17

rural and underserved communities, the Rule undermines broader public health and workforce goals that AANP actively works to advance.

53.     The Rule also will cause significant harm to NAPNAP and its members. Many NAPNAP members are early in their career and are the most likely to be seeking advanced degrees in nursing. NAPNAP members seeking to advance their careers through Doctor of Nursing Practice or PhD programs will be adversely affected by the Rule, which restricts access to affordable student loans. Master's and doctoral programs in nursing typically cost more per year than the $20,500 cap in the Rule.

54.     NAPNAP as an organization will also face loss of current and prospective members and related membership revenue; reduced subject matter expert capacity to develop continuing education, clinical practice resources and/or patient education; loss of income related to fewer participants in continuing education programs (e.g. annual conferences, symposia, and online learning); and termination of staff due to reduced operating revenue. Master's and doctoral nursing students who are unable to secure affordable financial assistance to continue their advanced nursing career goals will be less likely to join NAPNAP or renew their NAPNAP membership, causing NAPNAP to suffer a decline in membership revenue as soon as the upcoming academic year starting in August 2026.

55.     Many students have advised AACN that they will need to delay or abandon their pursuit of graduate education without sufficient federal loan support to cover tuition, clinical education fees, and living expenses. More than 80% of post-baccalaureate nursing student respondents reported that capping the annual student loan limit at $20,500 and the aggregate loan limit at $100,000 would negatively impact their ability to finance their education.

56.     AACN's work to promote quality nursing education and meet nursing workforce demands also will be compromised as fewer nurses pursue advanced education because of the lower student loan cap. With fewer students completing post-baccalaureate programs, the shortage of nurse faculty will intensify, further inhibiting schools from accepting all qualified applicants into their programs. 77% of AACN member deans who responded to a recent survey reported that the new loan caps will negatively impact faculty at their school, including at the MSN, DNP, and PhD levels. AACN's work to ensure a well-educated nursing workforce will be diminished, impacting access to quality care and threatening the supply of RNs, APRNs, nurse faculty, nurse researchers/scientists, clinical leaders, and top nursing administrators.

57.     In addition, limiting access to federal financial aid to inadequate levels for post-baccalaureate nursing programs will impact AACN's member schools because programs such as post-baccalaureate entry-level master's programs, full-time DNP and PhD programs, and nurse anesthesia (DNAP) programs require year-round enrollment and carry tuition levels that reflect clinical intensity. Reducing access to degree programs that prepare future nurse faculty, including MSN, DNP, and PhD degrees, will have a negative impact on enrollment and graduations from baccalaureate programs that prepare entry-level nurses, which will have long lasting consequences for the nursing workforce. 71% of AACN member dean respondents anticipate that new loan caps will have negative downstream consequences on their school's baccalaureate enrollment. These consequences threaten the long-term stability of the healthcare system, particularly in rural and underserved communities that already face provider shortages and rely heavily on advanced practice nurses for access to care.

58.     NEA provides its members with robust training, guidance, and resources to aid them in navigating financial aid and resulting student loan debt. NEA hosts recurring virtual

19

webinars that update members on financial aid topics, guide members using NEA-sponsored student debt repayment planning software, and outline the process for obtaining Public Service Loan Forgiveness. NEA staff also engage in one-on-one support for members struggling with the loan repayment process and attempting to contact the U.S. Department of Education. NEA's website also offers comprehensive educational resources that members may reference and engage with at any time. Beyond nationwide member initiatives, many state and local NEA affiliates employ staff to specifically assist members with their student loan debt repayment concerns.

59.     As NEA members immediately face an increased burden of student debt due to inadequate federal financial aid, NEA will need to devote significant additional resources to expanding its student debt counseling programs, revising trainings, webinars, and website materials to address the new caps and the heightened repayment challenges their members will face. The Rule will thus impede NEA from achieving its mission to ensure that higher education is accessible and affordable for all Americans.

60.     In addition, individual NEA members will be harmed. For example, the loan caps will preclude NEA member Brittany Fair from pursuing a career as a school psychologist, which requires both a master's degree and an education specialist degree. Because of Fair's existing debt from her prior master's degree, the new $100,000 lifetime federal loan cap for graduate degrees will make it difficult or impossible for Fair to complete the education required to pursue her chosen career path.

61.     The Rule likewise threatens AAMFT's ability to accomplish its fundamental mission of supporting the education, training, and professional development of marriage and family therapists nationwide. AAMFT will suffer an immediate reduction in membership dues, a

20

major revenue source, due to a significant decline in the total number of individuals enrolling in marriage and family therapy graduate programs. AAMFT also expects a significant reduction in the number of individuals purchasing training from AAMFT and attending AAMFT conferences, as well as a loss of advertising revenue due to a profession with declining enrollment. These harms will result in the termination of staff and the elimination of valuable programming, curtailing AAMFT's ability to provide continuing education and training to its members and clinicians and impeding its ability to advance the marriage and family therapy profession.

62.    ASPPH and its member institutions will also suffer harm due to the rule. Public health institutions and programs will suffer direct and immediate harms from decreased applications, enrollment, and corresponding losses in tuition revenue. As the final rule increases the cost of pursuing higher education and limits students' financing options, fewer prospective students will enroll in advanced degree programs offered by ASPPH's public health institution members. Reduced enrollment will, in turn, strain institutional budgets and impair ASPPH member institutions' ability to sustain academic programs, faculty hiring, clinical placements, and student support services. These harms to ASPPH's members are likely to directly injure ASPPH itself by reducing participation in ASPPH's conferences, educational programming, and other member services, diminishing membership growth and retention, and reducing membership dues and other revenue that ASPPH relies on to carry out its organizational mission.

## G. *The Present Action and the Department's Guidance*

63.    On May 21, 2026, Plaintiffs filed the instant action and a motion for preliminary relief. ECF Nos. 1, 4. On June 24, 2026, the Court issued an order and memorandum opinion granting that motion in part and denying it in part. ECF Nos. 45, 46. The Court granted Plaintiffs' requests to preliminarily set aside and stay implementation of the Rule's regulatory

21

definition of "professional degree," comprised of part (i) of the Rule's definition and the additional free-from-supervision requirement in the Rule's preamble. *Id.*

64.     On June 29, 2026, Defendants filed a notice of Department Action notifying the Court and parties that it had "published technical guidance for institutions regarding the classification of degree programs for the duration" of the Court's stay. ECF No. 47 at 1. The June 29 Guidance purported to identify a list of CIP Codes that the Department intended to designate as professional degree programs "for the purpose of administering statutory loan limits," with the caveat that they are "administrative designations" provided "solely to facilitate implementation of the Court's order." ECF No. 47-1 at 1.

65.     The Guidance identifies 29 six-digit CIP codes/programs treated as awarding professional degrees. The guidance included CIP codes corresponding to the degrees listed in 668.2(b), as well as, in relevant part, stating the following CIP codes relating to nursing degrees: "51.3801, Registered Nursing/Registered Nurse (MSN); 51.3804, Nurse Anesthetist (DNAP); and 51.3818, Nursing Practice (DNP)." ECF No. 47-1 at 2" and the following CIP codes for specialized education degrees: 51.0203, Speech-Language Pathology/Pathologist (SLP); 51.0202, Audiology/Audiologist (AuD); and 42.2805 School Psychology (Psy.D.).

66.     This list was unclear in several respects as to the included degrees. For instance, despite listing "MSN," "DNAP," and "DNP" in parentheticals, the list excluded numerous CIP codes under which students can pursue MSN, DNAP, and DNP degrees, failing to include, for instance, CIP Code 51.3804, Nurse Anesthetist; CIP Code 51.3805, Family Practice Nurse/Nurse Practitioner, or CIP Code 51.3806, Maternal/Child Health and Neonatal Nurse/Nursing. *Id.*

67.     The Guidance further identified 25 six-digit CIP codes/programs that were not treated as awarding professional degrees during the court's preliminary stay. As its sole

explanation for excluding those degrees, the Department stated that "[d]ue to the Court's stay and based upon its construction of 20 U.S.C. § 1087e(a)(4)(C)(ii), which is different than the Department's construction of that provision as proposed in the RISE Final Rule, the following programs are not considered programs that award professional degrees for the duration of the stay." ECF No. 47-1 at 3-4. That list excludes, among other degrees, CIP Code 42.2806 Educational Psychology, a specialized education degree meeting the statutory definition of "professional degree" program. The Department provided no additional reasoning for excluding these degrees.

68.    The Department provided no guidance with respect to degrees not included in either list, including public health degrees, MFT degrees, Nursing PhDs, or the unlisted and excluded specialized education degrees.

69.    On July 10, 2026, Defendants filed an updated Notice of Department Action. This notice made minimal changes, but stated that the Department was "now providing additional clarity that the 6-digit CIP codes for the Registered Nursing/Registered Nurse (MSN) (51.3801) and Nursing Practice (DNP) (51.3818) include any program within the same four-digit CIP code, as assigned by the institution or determined by the Secretary, provided it awards the same credential." ECF No. 50-1. The relevant "four-digit CIP code" is 51.38, the code used for "Registered Nursing, Nursing Administration, Nursing Research and Clinical Nursing." Detail for CIP Code 51.38, *National Center for Education Statistics,* https://perma.cc/QRR4-6V4M. The Department's caveat that any degree program within CIP code 51.38 is included as professional "provided it awards the same credential" accordingly refers solely to MSN and DNP degrees awarded within that CIP code.

23

70.    The Department's Guidance independently harms Plaintiffs and their members because it continues to exclude or fail to recognize their members' degree programs, which qualify as professional degrees under the definition Congress adopted. Although the Guidance clarified that certain MSN and DNP programs within CIP code 51.38 will be treated as professional, the Guidance continues to exclude other doctoral nursing programs, including Doctor of Philosophy (Ph.D.) in Nursing, and it fails to recognize numerous advanced nursing specialties that prepare students for licensed professional practice. The Guidance likewise omits or excludes the public health, MFT, and specialized instructional support personnel degree programs, causing harm to members of ASPPH, AAMFT, and NEA.

## CAUSES OF ACTION

### Count I

### Violation of the Administrative Procedure Act—Contrary to Law
### (Final Rule – Definition of Professional Degree)

71.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

72.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

73.    Congress was clear: it adopted the specific definition of "professional degree" in Department of Education regulations "as in effect on July 4, 2025," 20 U.S.C. §1087e(a)(4)(C)(ii), to differentiate between "graduate degree" and "professional degree" programs. Congress did not direct the Department to promulgate a new definition for either degree programs; indeed, Congress provided no authority and no discretion for the Department to modify the definition in any way.

24

74.     The Department's RISE rule amends the definition of "professional degree" that Congress adopted in multiple, significant ways, including by converting Congress's adoption of an illustrative list of degrees into an exhaustive one; adding only a single additional degree program to the list of professional degree and excluding others that meet the previous regulatory definition; and adding a four-digit CIP code not in the statutory definition.

75.     Because the Department's decision to use a definition of "professional degree" other than the one Congress adopted is contrary to law, the Court must declare it unlawful and set it aside pursuant to 5 U.S.C. § 706(2).

## Count II
### Violation of the Administrative Procedure Act—Contrary to Law
### (Final Rule – Master Calendar Requirement)

76.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

77.     A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

78.     The Higher Education Act in 1986 includes a "master calendar" provision that imposes strict deadlines for the Department of Education to complete its rulemakings, and that specifies the legal effect of the Department's late-issued rules. *See* 20 U.S.C. § 1089.

79.     The master calendar provision requires that "any regulatory changes initiated by the Secretary affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." *Id.* § 1089(c)(1).

25

80.    The Department of Education failed to meet this deadline. The RISE rule becomes effective in July 2026, but the rule was not published until May 2026, nearly six months after the November 2025 deadline to promulgate a rule that becomes effective this year.

81.    There is no indication that Congress intended to waive the master calendar provision, and the Department was required to comply with the deadlines set forth in the provision. The Department erred by reading an implicit atextual exception into the statute when Congress chose not to create such an exception.

82.    Because the RISE rule does not comply with the master calendar provision, the Rule should be set aside.

### Count III
### Violation of the Administrative Procedure Act—Arbitrary and Capricious
### (Final Rule)

83.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

84.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

85.    The Department of Education's decision to limit the scope of a "professional degree" program to the eleven enumerated degree programs is arbitrary and capricious for many reasons, including that the Department never explains its policy decision beyond falling back on the (erroneous) assertion that its definition is compelled by the statute. The APA required the Department to provide reasoning and evidence in support of its decision to include some degree programs and not others, and its failure to do so renders the new definition arbitrary and capricious.

26

86.    In addition, the Department's stated reasons for excluding advanced nursing degrees, public health degrees, specialized education degrees, and MFT degrees, are also arbitrary and internally inconsistent.

87.    Further, the Department failed to meaningfully engage with numerous comments that were submitted in response to the NPRM, including comments explaining why Plaintiffs' degree programs satisfy the statutory criteria, why the Department's stated basis for excluding them is not permissible or based on evidence, and comments that speak specifically to the detrimental effects that the new definition of "progressional degree" will have in the areas of nursing, counseling, public health, and education.

88.    Additionally, the Department failed to consider important parts of the problem including the profound consequences the new definition will have in the areas of nursing, counseling, public health, and education, the limitations that the rule will impose on students' ability to secure the funding necessary to obtain the educational prerequisites to enter these fields, and the resultant constraints on the supply of professionals in the critical areas.

89.    For these, and other reasons, the new rule's definition of "professional degree" is arbitrary and capricious, and the Court must declare it unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(A).

## Count IV
### Violation of the Administrative Procedure Act – Contrary to Law
### (Guidance)

90.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

91.    The Department's June 29, 2026 Guidance, as modified on July 10, 2026 (the "Guidance"), constitutes final agency action because it establishes the Department's operative

classifications governing which degree programs will receive the higher statutory loan limits during the pendency of this litigation and determines the rights and obligations of institutions and students administering and seeking federal student aid.

92. The Guidance is contrary to law for the same reasons as the RISE Rule. The Guidance deviates from the definition of "professional degree" supplied by Congress by creating an exhaustive list of qualifying degree programs that excludes numerous degree programs which satisfy the three elements of the statutory definition.

93. Because the Guidance does not faithfully implement the statutory definition of "professional degree," the Court must declare it unlawful and set it aside pursuant to 5 U.S.C. § 706(2).

## Count V
### Violation of the Administrative Procedure Act – Contrary to Law
### (Guidance – Master Calendar)

94. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

95. The Department's Guidance violates the master calendar provision of the Higher Education Act for all the same reasons as the RISE Rule. The master calendar provisions requires regulatory changes to be published in final form by November 1 prior to the start of the award year that they become effective. The Guidance constitutes a regulatory change within the Master Calendar provision's meaning because it establishes binding classifications governing which degree programs qualify for the higher statutory loan limits and thereby changes the rules governing Title IV programs. 20 U.S.C. § 1089(c). The Guidance was not published prior to November 1, 2025, and therefore cannot become effective during the 2026 award year.

28

96.     Because the Guidance rule does not comply with the master calendar provision, the Rule should be set aside.

**Count VI**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Guidance)**

97.     The Guidance is arbitrary and capricious because the Department failed to articulate a reasoned basis for the classifications it adopted. Although the Department identified certain six-digit CIP codes as qualifying for treatment as professional degree programs and others as not qualifying, it provided no explanation for why particular programs were included or excluded, nor did it identify the standards it purported to apply in reaching those determinations.

98.     The Guidance also fails to explain why numerous degree programs that satisfy the statutory and regulatory definition of a professional degree, including public health degrees, MFT degrees, and specialized education degrees, were excluded. Nor does the Department explain why excluded degree programs were treated differently from programs included in the Guidance despite similar educational, licensure, and professional characteristics.

99.     Because the Department failed to provide a reasoned explanation for the classifications reflected in the Guidance, failed to consider important aspects of the problem, treated materially similar degree programs inconsistently without explanation, and left numerous affected programs entirely unaddressed, the Guidance is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

100.    Plaintiffs respectfully request this Court:

a.      Declare that the Department of Education's final rule codifying a definition of "professional degree," 91 Fed. Reg. at 23882-23883 (to be codified at 34

29

C.F.R. § 685.102(b)), and its subsequent Guidance violate the APA and are otherwise

unlawful;

      b.      Declare that the degree programs offered and pursued by Plaintiffs'

members, including certain degrees in nursing, counseling, public health, and education,

are "professional degrees" under 34 C.F.R. § 668.2(b) (2025);

      c.      Stay the Department's new rule defining "professional degree" and

preliminarily enjoin the Department from relying on or enforcing that definition;

      d.      Vacate and set aside the Department's rule defining "professional degree"

and the Department's Guidance purporting to apply its definition of that phrase, and

permanently enjoin the Department from relying on or enforcing its definition reflected in

the rule or in the Guidance;

      e.      Permanently enjoin the Department to treat the degree programs offered

and pursued by Plaintiffs' members, including certain degrees in nursing,

counseling, public health, and education, as "professional degrees" and therefore apply

the higher limits applicable to professional degrees under the statute to those degrees;

      f.      Permanently enjoin the Department from enforcing statutory caps on the

availability of federal student loans that apply to students pursuing graduate degrees, and

require the Department to treat post-baccalaureate degree programs as "professional

degrees" and therefore apply the higher limits applicable to professional degrees under

the statute to those degrees, until the Department promulgates a new rule defining

"professional degree" consistent with its statutory obligations;

      g.      Award reasonable attorneys' fees and costs pursuant to applicable law;

      h.      Award any other relief the Court deems just and appropriate.

Dated: July 30, 2026

Respectfully submitted,

/s/ *Joel McElvain*
Joel McElvain (DC Bar No. 448431)
Elena Goldstein (DC Bar No. 90034087)
Tsuki Hoshijima (DC Bar No. 90043312)
Ryan Cooper (DC Bar No. 1645301)
Jennie L. Kneedler (DC Bar No. 500261)
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
egoldstein@democracyforward.org
thoshijima@democracyforward.org
rcooper@democracyforward.org
jkneedler@democracyforward.org


 /s/ *Daniel F. Jacobson*
Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

31