**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF NURSE PRACTITIONERS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**LINDA MCMAHON, et al.,**<br><br>**Defendants.** | **Case No. 26-cv-01780-BAH**<br><br>**consolidated with**<br>**Case No. 26-cv-01941-BAH** |

**Paul D. Cullen, Jr. / Bar No. 463759**
**Kathleen Balthrop Havener / Bar No. 432638**
**The Cullen Law Firm, PLLC 1101 30th Street, Suite 500**
**Washington, DC 20007**
**202-298-4774**
**paul@cullenlaw.com**
**202-298-4775**
**kathleen@cullenlaw.com**

*Attorneys for Plaintiffs*
*PA Education Association and*
*American Academy of Physician Associates*

# MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFFS PA EDUCATION ASSOCIATION AND AMERICAN ACADEMY OF PHYSICIAN ASSOCIATES

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES.......................................................................... iii

I. INTRODUCTION................................................................................ 1

II. BACKGROUND .................................................................................. 2

A. Congress codified the existing regulatory definition of "professional degree." ........ 2

B. The Department replaced Congress's definition with a narrower regulatory test. ... 3

C. The Court found that Plaintiffs are likely to succeed in their APA challenge to the Department's revisions to the statutory definition of professional degree. .................. 5

D. Even under the preliminary injunction, the Defendants have warned schools against awarding loans at the professional degree level. ........................................ 6

E. PAs are a critical component of the U.S. healthcare system. .............................. 8

III. PLAINTIFFS HAVE STANDING. ............................................................ 9

A. AAPA has associational standing. ....................................................10

1. Kyla Vaughan has been injured by the Final Rule and would have standing to challenge it.......................................................................10

2. Brian O'Neal would have standing to challenge the Final Rule. ...........................11

3. Hannah Hollis will be injured if the Final Rule is implemented. ...........................12

4. Olivia Trull will be injured by the Final Rule absent a permanent injunction....12

B. PAEA has associational standing.........................................................13

C. AAPA and PAEA have organizational standing..........................................15

1. AAPA has organizational standing.......................................................16

2. PAEA has organizational standing.......................................................16

IV. LEGAL STANDARD .......................................................................... 19

V. ARGUMENT ..................................................................................... 20

**A. The Final Rule is not in accordance with law because it departs from the statutory definition of "professional degree" in multiple ways. .......................................... 20**

**1. The Final Rule denies professional degree loans to students pursuing master's degree…................................................................................... 21**

**2. The Final Rule denies professional degree loans to students pursuing academic years……………………………………………………………………..22**

**3. The Final Rule's exclusive list of degrees it deems as "professional"and related CIP code requirement excludes degrees that Congress intended to include……………………………………………………………………...23**

**4. The Department also created a "free-from-supervision" requirement to exclude PA students from obtaining professional degree loans……………………………25**

**5. The Court should set aside each of the Department's deviations from the statutory definition of "professional degree."……………………………………...26**

**B. The Final Rule is arbitrary and capricious because it has no basis on a statute or rule, is not the product of reasoned decision making, and is internally inconsistent……………………………………………………………………..........27**

**1. The Department's "free-from-supervision" requirement is not authorized by statute, not written into the new regulatory text, and conflicts with the text of the Final Rule………………………………………………………………......28**

**2. The free-from-supervision requirement is not authorized by the statute or regulation..………………………………………………………………………29**

**3. The free-from-supervision requirement is not the product of reasoned decision making……………………………………………………………………..30**

**4. The Final Rule's list of professional degrees conflicts with its doctoral requirement……………………………………………………………………..32**

**C. The appropriate remedy is vacatur and remand………………………………………34**

**VI. CONCLUSION ........................................................................................................ 35**

# TABLE OF AUTHORITIES

## CASES

### Supreme Court

*Burgess v. United States*, 553 U.S. 124 (2008).....24

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).....27-28

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).....15-16

*Gonzales v. Oregon*, 546 U.S. 243 (2006).....20

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).....15

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).....10

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986).....20

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986).....27

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024).....19, 20

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).....9

*MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218 (1994).....19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).....20, 27

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)..... 9

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)..... 19, 20

### Courts of Appeals

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020).....16

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017).....27

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018).....16

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012) (Ikuta, J.concurring).....16

*Fogg v. Ashcroft*, 254 F.3d 103 (D.C. Cir. 2001)..... 34

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989)....................34

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014)....................10

*Murphy v. IRS*, 493 F.3d 170 (D.C. Cir. 2007).................... 27

*Nat. Res. Def. Council v. U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, (D.C. Cir. 2018).............. 28

*Nat'l Cable Television Ass'n, Inc. v. FCC*, 914 F.2d 285 (D.C. Cir. 1990)....................21

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)....................34

*Noble Energy, Inc. v. Salazar*, 671 F.3d 1241 (D.C. Cir. 2012)....................34-35

*Odebrecht Constr., Inc. v. Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013)........21

*Perdomo v. Holder*, 611 F.3d 662 (9th Cir. 2010).................... 35

*Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183 (D.C. Cir. 2026).................... 10

*United States v. Schwarzbaum*, 24 F.4th 1355 (11th Cir. 2022).................... 35

*World Shipping Council v. FMC*, 152 F.4th 215 (D.C. Cir. 2025).................... 27

**District Courts**

*American Association of Nurse Practitioners v. McMahon,* No. 26-cv-01780 (BAH), Order (D.D.C. June 24, 2026), ECF No. 45 .................... 5

*American Association of Nurse Practitioners v. McMaho*n, No. 26-cv-01780 (BAH), Memorandum (D.D.C. June 24, 2026), ECF No. 46 .................... *passim*

*Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28 (D.D.C. 2003).................... 29

*State of Maryland, et al. v. U.S. Dep't of Education*, et al. (D. Md. Case No. 1:26-cv-01957-ABA).................... 15

**STATUTES**

5 U.S.C. §§ 701-706.................... 35

5 U.S.C. § 706(2)(A), (C).................... 19, 27, 35

20 U.S.C. § 1087e(a)(4)(C)(ii).................... passim

**REGULATIONS**

34 C.F.R. § 668.2(b) (July 4, 2025)………............................................................................ passim

**PUBLIC LAWS**

One Big Beautiful Bill Act, Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025)..... 2, 8, 12, 25

**FEDERAL REGISTER NOTICES**

Federal Student Aid Programs 72 Fed. Reg. 62014 (Nov. 1, 2007)............................................... 3

Reimagining and Improving Student Education, 91 Fed. Reg. 4254 (Jan. 30, 2026)("NPRM") …………………………………………………………………………………... 4, 25

Reimagining and Improving Student Education, 91 Fed. Reg. 23768 (May 1, 2026) ("Final Rule") ……………………………………………………………………………… passim

**RULES**

Federal Rule of Civil Procedure 56………............................................................................ 1, 35

## I. INTRODUCTION

Plaintiffs PA Education Association ("PAEA") and American Academy of Physician Associates ("AAPA") respectfully move under Federal Rule of Civil Procedure 56 for summary judgment under the Administrative Procedure Act ("APA") on their claims challenging the U.S. Department of Education's unlawful redefinition of "professional degree" for purposes of the William D. Ford Federal Direct Loan Program ("Direct Loan program"), which would limit PA degree candidates to a borrowing limit of $20,500 per year and $100,000 in the aggregate.

This case turns on a straightforward statutory command: Congress incorporated the Department's existing definition of "professional degree" into a new statute that created annual and aggregate loan limits for students pursuing professional degrees. The Department then promulgated a rule that replaced that unambiguous statutory definition with a conflicting, narrower regulatory test not authorized by Congress. The Department's new test would deny higher-level federal student loan amounts to entire categories of professional students, including Physician Assistant/Associate ("PA") degree candidates, whom Congress intended to include.

In its June 24, 2026, Memorandum Opinion on Plaintiff's motion for preliminary relief, the Court held that Plaintiffs are likely to succeed on the merits because the Final Rule adds criteria Congress neither enacted nor authorized. *See* Mem. Op., Dkt. No. 46 at 4, 26, 29-30. That conclusion follows from the statutory text, the Department's own admissions, and the Court's careful analysis of the governing law. This case is now appropriate for final judgment because the dispositive issue is legal and the material facts are undisputed.

Plaintiffs respectfully ask the Court (1) to enter summary judgment in favor of AAPA and PAEA, (2) to declare the challenged provisions unlawful, (3) to vacate the regulatory definition of "professional degree" to the extent it departs from the statutory definition, (4) to vacate the Department's finding in the preamble of the rulemaking that specifically excludes PA degrees

from being treated as professional degrees under the challenged regulatory definition, and (5) to remand the rule to the Department for application of the three-part definition codified by Congress.

## II. BACKGROUND

### A. Congress codified the existing regulatory definition of "professional degree."

Since 2006, graduate and professional students have relied upon the Direct Loan Program, including Grad PLUS loans, to cover the student's full cost of attendance, including tuition and living expenses. In the One Big Beautiful Bill Act (the "Act"), Congress amended the Higher Education Act to eliminate the uncapped loans offered under the Grad PLUS program and to establish separate annual and aggregate Direct Unsubsidized Loan limits for "graduate" and "professional" students. Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025); 20 U.S.C. § 1087e(a)(4)(A)-(B). Graduate students are subject to lower caps of $20,500 annually and $100,000 in aggregate. Professional students are eligible for higher borrowing limits of $50,000 annually and $200,000 in aggregate. 20 U.S.C. § 1087e(a)(4)(A)-(B).

Congress expressly defined "professional student" by reference to the "professional degree" definition in 34 C.F.R. § 668.2(b) as it existed on July 4, 2025. *See* Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025) ; 20 U.S.C. § 1087e(a)(4)(C)(ii). That statutory definition contains three criteria and an illustrative, non-exhaustive list of examples. *Id*. The incorporated definition of "professional degree" is:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree *include but are not limited to* Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b) (2025) (emphasis added). This definition of "professional degree" had been in effect in the Department's regulations since 2007, over 17 years before the Act was passed. *See* Federal Student Aid Programs, 72 Fed. Reg. 62014 (Nov. 1, 2007). Thus, Congress codified the regulatory definition into the statute. It did not authorize the Department to rewrite it.

The now-statutory definition of "professional degree" contains three criteria: (1) the degree must signify completion of the academic requirements for beginning practice in a profession; (2) the degree must signify a level of professional skill beyond that normally required for a bachelor's degree; and (3) professional licensure must generally be required. 20 U.S.C. § 1087e(a)(4)(C)(ii), *citing* 34 C.F.R. § 668.2(b) (2025); *see* Dkt. No. 46 at 6, 8, 12, 31. Plaintiffs' comments during the rulemaking demonstrated that PA programs satisfy each criterion: graduation from an accredited PA program is required to sit for the Physician Assistant National Certifying Examination (PANCE) and obtain state licensure; PA programs culminate in master's degrees requiring extensive didactic and clinical education beyond the baccalaureate level; and licensure is required to practice as a PA in every State, the District of Columbia, and all U.S. territories. *See* Comments of the PA Education Association, RISE_AR_0013323-35;[1] Comments of the American Association of Physician Associates, RISE_AR_0013076-90.[2]

**B. The Department replaced Congress's definition with a narrower regulatory test.**

Ignoring Congress' binding definition, the Department proposed a new, materially narrowed definition of "professional degree." *See* Reimagining and Improving Student

[1] The Comments submitted by PAEA accompany the Declaration of Sara Fletcher in Support of Plaintiffs' Motion for Summary Judgment, attached as Ex. 1.

[2] Comments submitted by AAPA accompany to the Declaration of Lisa Gables in Support of Plaintiffs' Motion for Summary Judgment, attached as Ex. 12.

Education, 91 Fed. Reg. 4254 (proposed Jan. 30, 2026) (to be codified at 34 C.F.R. pt. 668) ("NPRM").

The Proposed and Final Rule defined a "professional degree" as follows:

> (i) A professional degree is a degree that:
> (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> (B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
> (C) Generally requires professional licensure to begin practice; and
> (D) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.
>
> (ii) A professional degree may be awarded in the following fields:
> (A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.)

Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations, 91 Fed. Reg. 23768, 23882-83 (May 1, 2026) ("Final Rule"). PA programs were excluded from the now-exclusive list of professional degrees in subsection (ii). *Id.*

Additionally, in the preambles to the NPRM and the Final Rule, the Department imposed an additional "free-from-supervision" requirement to exclude PA degrees. The Department unilaterally decided that PA degrees would not be considered professional, because, according to the Department, they lead to work ordinarily performed under the supervision of another licensed professional in a different occupation. *Id.* at 23799-800.

The Department received thousands of comments to the NPRM, including from the Plaintiffs PAEA and AAPA and many of their members, criticizing the narrowed definition as contrary to law, describing the several ways that the definition of "professional degree" in the

Final Rule departs from the statute, and explaining how the rule would be detrimental to PA students, including AAPA members, pursuing degrees that would otherwise meet the statutory definition of "professional degree" and to the educational institutions who provide PA degree programs and are PAEA members. *See* Comments of PA Education Association, RISE_AR_0013323-0013335 (attached as part of Ex. 1); Comments of American Association of Physician Associates, RISE_AR_0013076-0013090 (attached as part of Ex. 12). *See also* Comments of Baylor University, RISE_AR_008265-67, Lake Erie College, RISE_AR_0010750-52, Lincoln Memorial University, RISE_AR_0012479-80, and South University, RISE_AR_0008951-70, attached as Ex. 8 through 11.

Although PA degrees meet the statutory definition of "professional degree," they do not meet the regulatory definition in the Final Rule because they are not doctoral degrees, are not among those degrees listed in the definition and, therefore, are not among the degrees within a four-digit CIP Code covered by the definition, and they fail the "free-from-supervision" provision devised by the Department to disqualify PA students (and others) from "professional degree" level loans.

### C. The Court found that Plaintiffs are likely to succeed in their APA challenge to the Department's revisions to the statutory definition of professional degree.

On June 24, 2026, the Court issued a preliminary injunction setting aside and staying part (i) of the regulatory definition of "professional degree" in the Final Rule. *See* Order, No. 26-1780, Dkt. No. 45. In its accompanying Memorandum Opinion, the Court found in the Final Rule at least five material changes from the definition Congress codified: (1) the doctoral-level requirement, (2) the six-year coursework requirement, (3) the CIP-code restriction, (4) the conversion of an illustrative list into an exclusive list, and (5) the "free-from-supervision" requirement. *See* Dkt. No. 46. The Court further held that Plaintiffs are likely to show that the

Department lacked authority to make the changes it made because Congress did not direct the Department to evaluate and update the incorporated definition. *Id.*

**D. Even under the preliminary injunction, the Defendants have warned schools against awarding loans at the professional degree level.**

After the Court's Preliminary Injunction was issued, the Department published an electronic announcement on June 29, 2026, explaining how it intended to comply with the Court's order. *See generally*, U.S. Dep't of Educ., GENERAL-26-42, Update to List of Professional Degree Programs Due to Court Order (June 29, 2026, updated July 10, 2026); Notice of Updated Dep't. Action, Dkt. No. 50-1 (hereinafter, "E-Announcement"). Two aspects of the Department's guidance are notable.

First, the Department issued a revised list of "professional degree" programs, which includes "Physician Associate/Assistant (MSPA; PA)" programs codified via the 51.0912 CIP Code. *Id.* The Department acknowledged that PA degrees are professional degrees "consistent with the Court's order and construction of 20 U.S.C. §1087e(a)(4)(C)(ii)" and that PA students are therefore eligible for the corresponding higher level loans limits for professional students under the statute. *Id.* at 2. Thus, by the Department's own admission, PA programs are "professional degree" programs under Congress's statutory definition.

Second, the Department warned educational institutions:

> During the pendency of the ongoing litigation, institutions may wish to consider, for programs now temporarily classified as awarding professional degrees pursuant to the Court's order, limiting loan amounts to the graduate-level caps to mitigate potential disruption to student borrowers resulting from changes in program classification that may arise from the ongoing litigation.

*Id*. at 4.

As this statement implies, schools have a certain amount of discretion to decide the amounts of federal loans they offer their students, within the limits proscribed by the law. *See*

Final Rule, 91 Fed. Reg. at 23885. Several of Plaintiffs' declarations describe how the Department's statement was internalized by some educational institutions as a warning not to offer professional degree level loans to students during the preliminary injunction; because if the Department were to prevail in this litigation, those schools would subsequently be required to lower the loan amounts available to PA students to the graduate degree level, and that would cause significant disruption to the students relying upon the higher loan limits and to the schools they are attending. *See, e.g.*, Decl. of Sara Fletcher in Support of Pls.' Mot. for Summ. J. ("Fletcher Dec.") attached as Ex. 1, at ¶¶ 11-13; Decl. of Lisa Gables in Support of Pls.' Mot. for Summ. J. ("Gables Dec."), attached as Ex. 12, at ¶¶ 10-11; Decl. of Brian O'Neal in Support of Pls.' Mot. for Summ. J. ("O'Neal Dec."), attached as Ex. 4, at ¶ 9; Decl. of Kyla Vaughan in Support of Pls.' Mot. for Summ. J. ("Vaughan Dec."), attached as Ex. 3, at ¶ 10.

A student who drops out of their PA program because the higher loan limits they needed to afford a PA program are no longer available will face great disruption to their life. They may have disrupted their life by quitting a job, moving to a new town, entering a lease contract to pursue the opportunity to attend PA school – all for naught and at enormous expense. *See e.g.*, Vaughan Dec. at ¶¶ 6-10. They can no longer expect future employment as a PA that would enable them to repay the loans they already owe. Furthermore, the schools would then have empty places in the affected cohorts, resulting in decreased tuition payments from the cohort during the second- and third-year of classes; as well as significant disruption to the PA programs' clinical placements. *See e.g.*, Decl. of Reamer Bushardt in Support of Pls' Mot. for Summ. J. ("Bushardt Dec."), attached as Ex. 2, at ¶¶ 20-22, 25-28. The Department's warning has frustrated the relief from irreparable harm to students and PA programs that the Court's injunction intended.

**E. PAs are a critical component of the U.S. healthcare system.**

PA programs meet every component of the definition of "professional degree," as defined by Congress. The education and training required to enter the PA profession is considerable. It is intensive, demanding, and—perhaps most notable here—expensive to provide. The Final Rule relegates PA programs—which train essential healthcare workers whose professional efforts could ease the ensuing healthcare workforce crisis—to the category of "graduate" programs. PA students will have access to only $20,500 per year in federal direct educational loans—an amount that does not even cover a student's tuition in the vast majority of cases. *See* Bushardt Dec. at ¶ 5; Decl. of Olivia Trull in Support of Pls.' Mot. for Summ. J. ("Trull Dec."), attached as Ex. 5, at ¶¶ 5, 10. The Final Rule is perversely counter to the goal of meeting the healthcare system's—and the nation's—critical needs. The definition fails to account for the significant education and training required to enter these professions and will certainly deter prospective students from pursuing healthcare careers. It will inevitably result in fewer qualified, essential clinicians reducing access to essential care. *See* Bushardt Dec. at ¶¶ 45,48.

According to the American Hospital Association,[3] the narrowed definition of a "professional degree" will make the nation's healthcare shortages worse. As the need for healthcare workers continues to grow, reduced loan access will likely:

- Increase out-of-pocket costs for students or force students to take on a patchwork of private loans at higher cost.
- Reduce enrollment in advanced practice [ ] healthcare programs (like PA programs) because prospective students cannot finance tuition and living costs.

[3] *See Fact Sheet: Federal Student Loan Limits for Graduate and Professional Programs*, Am. Hosp. Ass'n (May 2026), https://www.aha.org/fact-sheets/2026-02-11-fact-sheet-federal-student-loan-limits-graduate-and-professional-programs.

- Shrink the pipeline of qualified faculty, making it harder for schools to expand enrollment in undergraduate, graduate, and doctoral programs, and thereby exacerbating existing workforce shortages.
- Narrow the supply of clinicians who provide primary care, maternal health, behavioral health, and rural/safety-net services and long-term support services.
- Disproportionately impact rural and underserved areas by limiting access to high-need critical services.
- Result in longer wait times for patients, delayed diagnoses and increased emergency visits, ultimately raising costs and straining health systems.

Healthcare — and hospital care in particular — requires a full team of highly trained healthcare professionals working together to provide superior, broad-based, patient-centered care. An interdisciplinary model is important in approaching increasingly complex healthcare needs. If the Final Rule is not permanently enjoined, and PA students will be limited to annual federal direct loans capped at $20,500, the PA profession will be limited to individuals with sufficient wealth or family support to cover the ever-increasing cost of PA education and training. The Final Rule will irreparably harm students preparing to be PAs, the institutions that offer PA programs, the professional associations that advocate for them, and patient access to high-quality care delivered by PAs. This will weaken our healthcare system, is contrary to the nation's best interest, and have lasting negative consequences for the strength, stability, and capacity of the nation's healthcare workforce, at a time when there is a significant shortage of primary healthcare providers nationwide, and especially in rural and other traditionally underserved communities.

## III. PLAINTIFFS HAVE STANDING.

The Article III requirements for standing are injury in fact, causation, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Only one plaintiff needs to have standing for the Court to adjudicate the

case. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). At the preliminary stage, the Court held that Plaintiffs were likely to establish both associational and organizational standing. *See* Dkt. No. 46 at 25.

**A. AAPA has associational standing.**

An association may sue on behalf of its members when (1) its members would otherwise have standing in their own right, (2) the interests it seeks to protect are germane to the association's purpose, and (3) neither the claim asserted nor the relief requested requires individual-member participation. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 187 (D.C. Cir. 2026); *see also* Gables Dec. at ¶¶ 6, 8-9. As the Court recognized, AAPA's membership includes PA students and individuals preparing to enter PA school. *See* Dkt. No. 46 at 17. Their injuries are concrete, caused by the Final Rule's classification of PA degrees under the lower loan caps for graduate degrees, and redressable by vacatur of the unlawful definition.

The Court noted in footnote 5 of its Memorandum Opinion granting preliminary relief that Plaintiffs must show that members injured by the regulatory definition would be able to attend a desired PA program somewhere with the higher $200,000 loan limit. Plaintiffs submit four declarations that attest to this circumstance. *See* Dkt. No. 46 n.5.

**1. Kyla Vaughan has been injured by the Final Rule and would have standing to challenge it.**

Kyla Vaughan, a member of AAPA, was admitted to the Master of Science in Physician Assistant Studies ("MSPAS") program at North Carolina Agricultural and Technical State University ("NC A&T") to the entering cohort for Fall 2026, NC A&T's second cohort ever to its fledgling PA school. *See* Vaughan Dec. at ¶¶ 3-4.

At an orientation held in May, Vaughan and other admitted students were told about the Department's new rule limiting loan amounts for PA students to $20,500 per year. *Id.* at ¶¶ 6-7. After the injunction was entered, a representative of NC A&T's financial aid office assured Ms. Vaughan that the school would be adjusting its financial aid awards to include the higher loan limit amount for PA students permitted under the injunction, and specifically, that Ms. Vaughan's financial aid package would be updated to reflect the higher loan amount. *Id.* at ¶ 8. Based on NC A&T's representation, Ms. Vaughan relocated from Newport News, VA to Greensboro, NC at significant expense and entered into a lease for a residence in Greensboro. *Id.* at ¶ 9.

Ms. Vaughan began classes on August 19, 2026. But Ms. Vaughan's school never updated its financial aid packages, because, according to a representative of NC A&T's financial aid office, NC A&T "never received word from the Department of Education that the higher loan limits were appropriate for PA students." *Id.* at ¶10. As a result of the financial shortfall created by NCA&T's failure to adopt the higher loan limitation, Ms. Vaughan's academic and personal circumstances were thrown into chaos and her ability to continue in her PA program jeopardized. *See id.* at ¶¶ 12-15. Ms. Vaughan will be unable to continue in her program at the lower loan limit. But a permanent injunction against the imposition of the Final Rule would allow Ms. Vaughan to complete her PA program. *See id.* at ¶ 16.

**2. Brian O'Neal would have standing to challenge the Final Rule.**

Brian O'Neal, an AAPA member, was admitted to the PA program at the University of Maryland Eastern Shore (UMES) and started classes on August 24, 2026. *See* O'Neal Dec. at ¶ 6. UMES chose to restrict loans to PA students for this academic year to the lower $20,500 limit because of uncertainty about the eventual outcome of this litigation. *Id.* at ¶ 9. With the aid package Mr. O'Neal received, he has the financial wherewithal to complete the current academic year, but his savings will then be entirely exhausted. He cannot continue his PA program beyond

this year unless he is able to obtain future loans under the higher professional-degree loan limit. *Id.* at ¶¶ 11-12.

**3. Hannah Hollis will be injured if the Final Rule is implemented.**

In May 2026, AAPA member Hannah Hollis began a three-year dual degree program at The George Washington University ("GW") in D.C. to pursue a Master of Public Health ("MPH") and a PA degree. *See* Decl. of Hannah Hollis in Support of Pls.' Mot. for Summ. J. ("Hollis Dec."), attached as Ex. 7, at ¶ 8. Ms. Hollis was then eligible to borrow up to the cost of attendance for her MPH program under the Grad PLUS program, which is no longer available to graduate or professional degree students who begin their programs after July 1, 2025. *See* Pub. L. 119-21 § 81001(1)(C), 139 STAT. 334 (2025).

However, because the MPH and PA degrees are considered two separate programs for purposes of federal aid, Ms. Hollis will not have legacy status for her PA degree and will lose access to Grad Plus. *See* Final Rule, 91 Fed. Reg. at 22817, 23883. Instead, Ms. Hollis will be considered a new borrower beginning in summer 2027, before she begins the didactic portion of her PA studies. *Hollis Dec.* at ¶ 11. Unless the higher loan limit remains available to PA students—*i.e.*, unless the Rule is permanently enjoined—she will be subject to the lower federal loan limit for graduate students when she begins her PA studies. In that event, Ms. Hollis may be unable to complete her PA degree. With the higher loan amount of $50,000 per year, however, she will be able to complete her PA program. *See id.* at ¶¶ 11-14.

**4. Olivia Trull will be injured by the Final Rule absent a permanent injunction.**

Olivia Trull is a current AAPA member who started PA school at Northwest University in Kirkland, Washington on August 24, 2026. Ms. Trull was able to begin her studies because Northwest University raised the loan limits for PA students after this Court's preliminary

injunction. She will not be able to complete her 28-month program unless the injunction is made permanent. *See* Trull Dec. at ¶ 6-10.

Based on the harm to its members if the Department's Final Rule is not permanently enjoined, AAPA has associational standing.

**B. PAEA has associational standing.**

PAEA has associational standing through its member PA educational programs. PAEA is the national organization representing PA educational programs, and the Final Rule directly affects those programs by threatening enrollment, cohort stability, admissions planning, clinical-placement planning, and program resources. *See* Bushardt Dec. at ¶¶ 6-7, 14, 15-20, 23, 35. The Court held that organizational members experiencing decreases in student engagement, expected enrollment declines, budgeting consequences, and programmatic disruption suffer concrete injuries sufficient for associational standing. *See* Dkt. No. 46 at 22-23 (describing harms to AANP that are analogous to the harms to PAEA). Those injuries are traceable to the challenged regulatory definition. Indeed, the Department itself predicted that reduced borrowing capacity would cause students to reconsider enrollment or reduce enrollment, and they are redressable because applying the statutory three-part professional-degree definition would remove the unlawful lower-cap classification for programs satisfying that definition, including PA programs. *Id.* at 28-29.

Institutions offering PA programs will be harmed by the Final Rule and are currently being harmed by both the Final Rule and the Department's guidance. *See* E-Announcement, Dkt. No. 50-1. PA programs train future medical professionals who practice in every healthcare setting. The lower loan amounts that institutions disbursed, based on the Department's E-Announcement, have caused accepted but not yet enrolled PA students to reconsider (1) whether they should enroll at all, (2) deferring their PA education, (3) or attending a program other than

the one they have chosen. This in turn creates immediate uncertainty as to how many PA students will enroll at member institutions. This uncertainty alone disrupts admissions planning and student counseling. *See* Bushardt Dec. at ¶¶ 12-15. Accreditation standards prohibit PA schools from admitting more students than they intend to enroll, even if they are uncertain whether admitted students will actually attend.[4] Students' uncertainty about their ability to finance their education creates a real risk of instability within a program.

PA programs depend on a stable cohort. *See* Bushardt Dec. at ¶ 22. PA educational programs emphasize team-based and interprofessional learning. A smaller or unstable cohort will interfere with group learning, peer support, simulation exercises, and team-based clinical preparation. *See id.*

Students from lower-income backgrounds, first-generation college graduates, and students from underrepresented communities will be more likely to abandon PA education if the federal misclassification is allowed to stand. *See* Bushardt Dec. at ¶ 25. The misclassification of PA students as "graduate students" instead of "professional students" will harm the mission of PA programs to prepare a diverse health care workforce to serve an ever more increasingly diverse population. *Id.*; *see also id*. at ¶¶ 40-41.

PA programs must prepare PA students by means of clinical rotations. This requires significant advance planning with hospitals, clinics, preceptors, schedules, as well as other professionals who accomplish onboarding and supervision. If PA program enrollment is uncertain, PA programs will have difficulty matching students and placing them into planned

---

[4] *See Accreditation Standards for PA Education, Sixth Edition,* Accreditation Rev. Comm'n on Educ. for the Physician Assistant (Aug. 18, 2025), https://www.arc-pa.org/wp-content/uploads/2025/10/Standards-6e-10-03-25-Pub-10-09-25.pdf at 148 (Standard E1.09(d) requires PA programs to seek approval before increasing their maximum entering class size).

clinical placements. If PA programs are unable reliably to fill clinical rotation slots or must make last-minute changes, their clinical partners will lose confidence and offer those placements to other programs. *Id.* at ¶¶ 26-27. PA programs necessarily rely on PA preceptors and other clinicians who invest time in teaching students who train under their supervision and direction. Uncertainty about a program's future applicant pool or cohort size will reduce preceptors' willingness to continue partnering with PA programs to continue educating and training their students. *Id.* at ¶ 28.

A number of other PAEA member institutions have articulated the harms they anticipate to their programs if the Final Rule is implemented.[5] Tricia Serio, the Provost of the University of Washington ("UW") submitted a declaration in *State of Maryland, et al. v. U.S. Dep't of Education, et al.* (D. Md. Case No. 1:26-cv-01957-ABA), a copy of which attached as Ex. 7, describing the many ways the rule would damage not only UW's PA students but its PA program and the general public. *See* Ex. 7 at ¶¶ 26-34. Similarly, the comments of Baylor University, Lake Erie College, Lincoln Memorial University, and South University, attached as Ex. 8 through 11, set forth the injuries that the Final Rule will cause to PAEA's member institutions. *See* Ex. 8, RISE_AR_0008265-67, Ex. 9, RISE_AR_0010750-52, Ex. 10 at RISE_AR_0012479-80, and Ex. 11, RISE_AR_0008966-68.

Based on these harms, PAEA has associational standing.

### C. AAPA and PAEA have organizational standing.

An organization may sue for injuries to its own activities when government action directly affects and interferes with its core business activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367,

[5] The schools whose Declarations and Comments are referenced motion are members of PAEA. *See* Fletcher Dec. at ¶ 21.

394-95 (2024); *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). Relevant injuries include impairment of membership recruitment, reduced membership participation, loss of dues or course revenue, diversion from core educational and professional activities, and disruption of programs central to the associations' missions. *See* Dkt. No. 46 at 28-29; *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025); *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 (9th Cir. 2018).

**1. AAPA has organizational standing.**

AAPA's own injuries satisfy the standing requirements. The Final Rule will reduce the number of students able to enter and complete PA school, necessarily reducing the number of practicing PAs, potential AAPA members, and participants in AAPA programming. According to AAPA's CEO, these injuries include unexpected and unplanned for expenditures of resources, engagement of legal counsel to help craft guidance to members, and more. *See* Gables Dec. at ¶¶ 16-18. If the Final Rule is implemented, AAPA is likely to lose members, which will negatively impact its revenue, reducing the Continuing Medical Education it can offer and diminishing its advocacy efforts and its ability to sponsor scholarly research, as well as its mentoring and outreach programs. *Id.* at ¶¶ 19-23. Its conferences will lose sponsorships because of the potential decrease in attendance. *Id.* at ¶ 24.

These injuries directly interfere with AAPA's mission as the national professional society for PAs and with its dues- and education-based activities and confer organizational standing upon AAPA.

**2. PAEA has organizational standing.**

PAEA likewise suffers direct organizational injury because the Final Rule undermines the stability and operation of PA educational programs—the very constituency PAEA exists to

serve—and forces PAEA to devote resources to responding to student, program, and public confusion caused by the Department's misclassification. If the Final Rule's definition of "professional degree" takes effect, fewer PA programs and prospective students may utilize PAEA's services, reducing PAEA's revenue. These harms are not abstract policy disagreements; they are concrete operational injuries traceable to the Final Rule and redressable by vacating the unlawful definition.

Even after the injunction was entered, the Department's guidance discouraged PA programs from disbursing loans up to the higher limit of $50,000 "to mitigate potential disruption to student borrowers resulting from changes in program classification that may arise from the ongoing litigation." *See* E-Announcement, Dkt. No. 50-1. The Department implied that the injunction would be lifted in the future either through an appeal (during the period before the filing deadline passed) or by its success on the merits. It reminded institutions that students who were given loans at the higher level might not be able to complete their programs once the lower loan limits were reinstated. One PAEA member institution. James Madison University, stated on its website:

> Under the authority granted to institutions in the One Big Beautiful Bill Act (a.k.a. Working Families Tax Cut Act), JMU is setting the loan limit for [listed] programs at $20,500, rather than the $50,000 limit possible under the court-ordered preliminary stay. This means all JMU graduate, professional, and doctoral programs have a $20,500 maximum annual limit for the Federal Direct Unsubsidized Loan. The primary reason for this decision is that the court order is preliminary and temporary, meaning it could be reversed, which would reduce loan limits for these programs back down to the $20,500 limit. Our concern is the potential harm to students if we award them $50,000 and then the stay is overturned;

> if that happens, it could put students in a challenging financial situation.[6]

The Department successfully influenced institutions to refrain from making loans at the permitted higher limit, which inevitably negatively impacted entering PA students and likely discouraged some students from enrolling in PA programs at all. *See* Fletcher Dec. at ¶ 13.

A larger than usual number of admitted PA students deferred their entry into PA school this year because of the uncertainty that they will receive adequate funding to complete their PA programs. *Id.* at ¶ 15. Smaller and less well-funded institutions may be unable to withstand uncertainty in enrollment, leading to disruptions in institutional planning and significant financial costs. *Id.* at ¶ 16. PAEA will suffer a reduction in its membership if PA programs close.

A key component of PAEA's mission is the administration of its research fellowship and grant programs that support PA faculty members' efforts to produce high-quality scholarly work. Any reduction in PAEA's revenue will impact PAEA's ability to fund these programs, which in turn will negatively impact the researchers and scholars who would usually benefit from these programs. *Id.* at ¶ 18.

PAEA also provides Continuing Medical Education (CME) opportunities through professional development workshops and meetings. CME consists of educational activities that serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships that PAs use to provide services for patients, the public, or the profession. If, as a result of the Rule's lowered loan limits, PA programs graduate fewer PAs who enter practice and become PA faculty members, then fewer PAs will be available to pursue PAEA's CME offerings,

---

[6] *See Graduate Direct Loan Updates*, James Madison Univ., https://www.jmu.edu/financialaid/newsletters/federal_updates/obbba/obbba-gr-direct-loans.shtml (last visited Sept. 29, 2026).

which will seriously limit the number and quality of CME courses that PAEA can offer and have a deleterious effect on PAEA's revenue. *Id.* at ¶ 19.

PAEA sponsors and administers the Centralized Application Service for Physician Assistants (CASPA®), a user-friendly, secure, internet-based application platform that enables prospective PA students to apply to multiple PA programs with one application. Using PAEA's CASPA® application platform, an aspiring PA student can submit applications to multiple PA programs of interest. Should students not apply or apply to fewer programs due to uncertainty in their ability to finance their education, this would result in a direct reduction in PAEA's revenue stream, which in turn endangers all PAEA's objectives because PAEA's overall budget is diminished. *Id.* at ¶ 19.

Because the Rule will directly harm PAEA itself, PAEA has organizational standing.

## IV. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case under the APA, the district court sits as an appellate tribunal and asks whether the agency action is unlawful on the administrative record. The APA requires courts to "decide all relevant questions of law" and to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). The court's authority under the APA includes setting aside any agency action that is "inconsistent" with the law. *See Loper Bright Enter. v. Raimondo,* 603 U.S. 369, 392 (2024).

An agency may not redefine a statutory term in a way that narrows, expands, or contradicts Congress's definition. *See id.*; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 231–32 (1994). Where Congress has spoken

directly to the question at issue, the agency must give effect to Congress's command. Courts exercise independent judgment in determining whether an agency has acted within its statutory authority. *See Loper Bright Enter.*, 603 U.S. at 412. An agency may not act contrary to the will of Congress, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233 (1986), and agency action is contrary to law when it is not authorized by statutory text. *Gonzales v. Oregon*, 546 U.S. 243, 255-256 (2006).

The principle applies when Congress fixes a statutory definition by incorporating an existing regulation as of a particular date: the agency must apply that incorporated definition, not narrow, expand, or replace it by rulemaking. "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp*, 573 U.S. at 328. Additionally, agency action violates the APA as arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

## V. ARGUMENT

### A. The Final Rule is not in accordance with law because it departs from the statutory definition of "professional degree" in multiple ways.

Under the APA, the Final Rule is unlawful because it adds requirements for consideration as a "professional degree" that do not appear in the Higher Education Act or the incorporated statutory definition. These added limitations cannot be reconciled with the unambiguous statutory text. Congress did not define "professional degree" in broad terms and leave implementation to the Department's unfettered discretion, nor did it instruct the Department to devise new limitations from the examples in the incorporated regulation. *See* Dkt. No. 46 at 29, 33. Instead, Congress selected an existing Department regulation and established the incorporated definition as the one "in effect on July 4, 2025." *Id.*; 20 U.S.C. § 1087e(a)(4)(C)(ii).

That statutory choice matters. When Congress adopts an agency rule by reference as of a particular date, it codifies the adopted rule as it then existed. *See Nat'l Cable Television Ass'n, Inc. v. FCC*, 914 F.2d 285, 289 (D.C. Cir. 1990); *Odebrecht Constr., Inc. v. Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268, 1277 (11th Cir. 2013). As the Court observed, by adopting the preexisting definition as it stood on a specific date, Congress removed whatever discretion the Department previously may have had to narrow the definition for loan-cap purposes. *See* Dkt. No. 46. The definition prescribed by Congress is the exact text of the "professional degree" definition contained in 34 C.F.R. § 668.2(b) on July 4, 2025. Any departures from that definition are contrary to Congressional intent.

In its Memorandum Opinion accompanying the preliminary injunction order, the Court found at least five material changes in the Final Rule from the definition Congress codified: the doctoral-level requirement, the six-academic years of coursework requirement, the CIP-code restriction, the conversion of an illustrative list of degrees into an exclusive list of specific degrees, and the free-from-supervision requirement. *See generally* Dkt. No. 46. Through each of these limitations, the Department denies higher professional degree loan amounts to students whom Congress intended to receive them.

**1. The Final Rule denies professional degree loans to students pursuing master's degrees.**

The statutory definition defines a "professional degree" as one conferring "a level of professional skill beyond that normally required of a bachelor's degree." 20 U.S.C. § 1087e(a)(4)(C)(ii) (incorporating the definition of "professional degree" in 34 C.F.R. § 668.2(b) as in effect on July 4, 2025). The Final Rule requires, however, that a "professional degree" be "generally at the doctoral level." Final Rule, 91 Fed. Reg. at 23882. Adding this requirement narrows the statutory definition to exclude master's degree programs that demonstrate "a level of

skill beyond that normally required of a bachelor's degree." 34 C.F.R. § 668.2(b) (2025). The Department therefore denies higher federal loan amounts to many professional students, as defined by Congress: those pursuing degrees above the baccalaureate but below the doctoral level that meet the requirements of the statutory definition. PA students are among those wrongfully excluded.

Had Congress intended to limit the scope of "professional degree" programs to doctoral programs or otherwise exclude master's degree programs, it could have done so. It did not. Instead, the sole credential level requirement appears to be that the degree program must be beyond a bachelor's degree. This clearly contemplates master's degrees, as they are beyond a baccalaureate degree. The list of example degrees in the statutory definition of professional degree includes two master's degree, providing further support that Congress did not mean to exclude master's degrees from the professional degree definition. 34 C.F.R. § 668.2(b) (2025). The Department's doctoral-level requirement is not in accordance with law, and the Department acted beyond its authority to impose it in a new regulation.

**2. The Final Rule denies professional degree loans to students pursuing post-baccalaureate degrees that take less than six postsecondary academic years.**

The Final Rule also requires that "professional degrees" include "at least six academic years of postsecondary education coursework for completion." The statutory definition makes no reference to a minimum number of years of postsecondary coursework. *Compare* Final Rule, 91 Fed. Reg. at 23882 *and* 34 C.F.R. § 668.2(b) (2025). This new requirement therefore denies higher federal loan limits for students who may be able to achieve a degree that meets all of the statutory requirements in fewer than six academic years.

This six-year requirement may exclude accelerated PA programs which allow students to achieve both a bachelor's degree and master's degree in a shorter timeframe. Yet, Congress did

not seek to exclude such degrees from the statutory definition solely based on the number of years it takes to complete the program. If an accelerated PA program leads to a degree that meets the requirements contained in the statutory definition, it should be considered a professional degree. The Final Rule's impermissible definition should not restrict PA students to the lower loan limitations solely because they choose a more intensive accelerated program that only requires five total years of postsecondary education.

**3. The Final Rule's exclusive list of degrees it deems as "professional" and related CIP code requirement excludes degrees that Congress intended to include.**

The Final Rule impermissibly converted the statute's non-exhaustive list of "professional degree" examples of into an exclusive list. *See* Final Rule, 91 Fed. Reg. at 23882. In the statute, the degree examples that follow the definition are expressly non-exclusive, introduced with the term "include but are not limited to." 34 C.F.R. 668.2(b) (2025). The Department's Final Rule removes this clause entirely and changes the language to state "a professional degree may be awarded in the following fields" and then lists the statutory examples, adding Clinical Psychology (Psy.D. or Ph. D). Final Rule, 91 Fed. Reg. at 23882. The Department then effectively locks in this list as exclusive with another new requirement, only classifying a qualifying program outside of the list as professional if it "[i]ncludes a four-digit program CIP code…in the same intermediate group as the fields listed." *Id*. This new requirement explicitly ties classification of a degree as professional to the now-exclusive list of examples. The CIP codes of the listed professional degrees contain few additional degrees that could be classified as professional degrees beyond those already named in the Final Rule.

In the National Center for Educational Statistics ("NCES") CIP Code database, the four-digit CIP Codes for Chiropractic (51.01), Dentistry (51.04), Medicine (51.12, which includes Osteopathic Medicine and Podiatry), Optometry (51.17), and Law (22.01) only include the

enumerated degree programs.[7] Even for Pharmacy (51.20), Theology (39.06), and Clinical Psychology (42.28), the other named degrees are either close variations of the same profession (e.g. School Psychology, Family Psychology, Forensic Psychology, etc. for 42.28, Talmudic Studies for 39.06, and Clinical, Hospital, and Managed Care Pharmacy for 51.20) or related programs that clearly fail to satisfy the statutorily incorporated criteria (e.g. Pre-Theology/Pre Ministerial Studies for 39.06 and Pharmaceutical Marketing and Management for 51.20).[8] Thus, the CIP Code requirement keeps the definition of "professional degree" narrowly tied to the listed degrees, despite the fact that Congress incorporated the words "include but not limited to" in the definition to broaden it.

This is not interpretation; it is revision. It fundamentally changes the character of the statutory list and narrows the universe of professional degrees in a way Congress did not intend. In *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008), the Supreme Court stated that the word "includes" when used in a statute "is usually a term of enlargement, and not of limitation." This means that the ultimate universe of degrees defined as professional should be broader than the incorporated list of examples, not narrower. By limiting the definition to the exact same list as the incorporated list, with a single addition, the Department defies congressional intent by not properly recognizing the expanded breadth of eligible programs intended by the terms of the statute. The incorporated definition is better read as setting forth three straightforward, unambiguous criteria, under which the programs in the list of examples *and* any programs beyond that list that satisfy the stated requirements are classified as professional degrees. This was misinterpreted by the Department and led to improper revision.

---

[7] *See* National Center for Education Statistics, *Browse CIP Codes,* https://nces.ed.gov/ipeds/cipcode/browse.aspx?y=55.
[8] *Id.*

As many comments during the rulemaking described, this requirement denies higher level professional degree loans to students pursuing all post-baccalaureate degrees, including both master's and doctoral degrees, that otherwise meet the statutory requirements but do not appear on the Department's list, including PA degrees.

**4. The Department also created a "free-from-supervision" requirement to exclude PA students from obtaining professional degree loans.**

Finally, in the preamble to the Final Rule, the Department specifically identified PA degrees, declining to classify them as "professional degrees" because they lead to "employment where the employee must be supervised by another licensed professional who is, by virtue of their licensure, more qualified or skilled than the person being supervised." *See* Final Rule, 91 Fed. Reg. at 23800; NPRM, 91 Fed. Reg. at 4266. The Department cites its analysis in the NPRM, in which it observed that most states require a PA to collaborate with (or be supervised by) a physician or other healthcare provider in order to practice and prescribe medication. *See id*. This criterion is not contained within the governing statute or the Department's own definition in the Final Rule. The Department uses language in the Preamble of the NPRM and Final Rule to justify this substantive decision, but the "free-from-supervision" requirement is without justification.

Congress did not enact a "free-from-supervision" requirement in the definition of "professional degree". *See* Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025); 20 U.S.C. § 1087e(a)(4)(C)(ii). In fact, the statutory definition of professional degree does not mention the concept of supervision in any context. 34 C.F.R. § 668.2(b) (2025). Rather, it asks whether the degree signifies completion of the academic requirements for beginning practice, whether the degree reflects professional skill beyond a bachelor's degree, and whether licensure is generally

required. *Id*. The Department's supervision rationale therefore adds a substantive condition that Congress did not authorize.

Remarkably, the Department's regulatory definition of the Final Rule also does not mention supervision in any context, nor list freedom from supervision as a requirement. *See* Final Rule, 91 Fed. Reg. at 23880-23900. The new "professional degree" definition promulgated by the Department does not refer to freedom from supervision as a required characteristic of a "professional degree" or any requirement regarding professional supervision or scope of practice. *Id.* As such, the Department attempts to use preamble language to effectuate a new requirement that cannot be found anywhere in the statute or final regulatory text.

In its Memorandum Opinion accompanying the Preliminary Injunction, the Court concluded that this "free-from-supervision" requirement constituted a "material change" to the statutory "professional degree" definition and held that the Department lacked authority to make such a change. *See* Dkt. No. 46. The specific denial of higher loan limits to PA students on this basis is outside the Department's authority and contrary to law. *Id.* The Court should specifically set aside the Department's determination in the preamble of the Final Rule that disqualifies PA degrees from being professional degrees.

**5. The Court should set aside each of the Department's deviations from the statutory definition of "professional degree."**

The Court's Memorandum Opinion concluded that Plaintiffs are likely to establish that the Department's definition materially departs from Congress's required definition because it adds criteria that are neither contained in nor fairly derived from the codified regulation. *See* Dkt. No. 46. That same reasoning resolves the question on the merits. The statutory scheme is plain: Congress chose the July 4, 2025, definition. 20 U.S.C. § 1087e(a)(4)(C)(ii). The Department must apply that definition. *See* Dkt. No. 46.

The Final Rule's additional requirements are contrary to law, and the Department exceeded its statutory authority in promulgating them. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("An agency literally has no power to act . . . unless and until Congress confers power upon it."). The Department elected not to apply the statutory definition, instead re-writing the definition with five additional criteria that conflict with the statutory text. *See* Dkt. No. 46. If a regulation conflicts with statutory text, "the statute clearly controls." *Murphy v. IRS*, 493 F.3d 170, 176 n.* (D.C. Cir. 2007).

The Final Rule's additional requirements should, therefore, be set aside, as they are not in accordance with law and exceed the Department's statutory authority.

**B. The Final Rule is arbitrary and capricious because it has no basis on a statute or rule, is not the product of reasoned decision making, and is internally inconsistent.**

The Court did not need to consider Plaintiffs' arbitrary-and-capricious arguments at the preliminary stage. However, the administrative record confirms that the Rule cannot survive such review. *See* 5 U.S.C. § 706(2)(A). The APA requires a court to invalidate agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* "Arbitrary and capricious" review is invoked whenever an agency plainly lacks the statutory authority to take the actions at issue. *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017). A rule is arbitrary and capricious if an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43; *World Shipping Council v. FMC*, 152 F.4th 215, 221 (D.C. Cir. 2025). An agency must at least reasonably explain its decision to survive arbitrary and capricious review. *FCC v. Prometheus*

*Radio Project*, 592 U.S. 414, 423 (2021). And it is arbitrary and capricious for the agency's decision making to be "internally inconsistent." *Nat. Res. Def. Council v. U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, 1214, (D.C. Cir. 2018).

The Final Rule is arbitrary and capricious in several ways. The "free-from-supervision" requirement in the rulemaking preamble, which disqualifies PA degrees from being considered "professional degrees," has no statutory or regulatory support, is not the product of reasoned decision making, and raises an internal conflict with the new regulatory definition in the Final Rule. Additionally, several of the degrees that the Department deemed as professional in the text of the Final Rule also raise internal conflicts with the Final Rule's requirement that a "professional degree" generally be at the doctoral level. Each of these issues was raised to the Department via comment letters during the notice-and-comment period of the rulemaking and support the finding that the Department's rulemaking decisions were arbitrary and capricious.

**1. The Department's "free-from-supervision" requirement is not authorized by statute, not written into the new regulatory text, and conflicts with the text of the Final Rule.**

In the preamble to the NPRM and the Final Rule, the Department effectively adopts a free-from-supervision requirement to exclude PA degree programs from being considered "professional degree" programs. *See* Final Rule, 91 Fed. Reg. at 23800. The Department stated it is "not persuaded" that PAs are professional degrees, in part, because "after the [PA] graduate becomes licensed, their practice must generally be supervised by medical doctors." *See* Final Rule, 91 Fed. Reg. at 23800. Despite Defendants' statement, during the preliminary stage, that supervision is not a "freestanding disqualifying criteria," the Department's reliance on supervision to explain its ultimate determination denying PA programs inclusion as "professional degree" programs creates a *de facto* requirement. *See* Defs.' Response, Dkt. No. 23, at 20. This

requirement is not authorized by the Act or any regulation, conflicts with the Final Rule's regulatory language, and is therefore arbitrary and capricious in violation of the APA.

**2. The free-from-supervision requirement is not authorized by the statute or regulation.**

The statutory definition sets forth three clear characteristics a degree must possess to be considered professional: 1) "completion of the academic requirements for beginning practice in a given profession," 2) "a level of professional skill beyond that normally required for a bachelor's degree," and 3) generally is a requirement for "professional licensure." 34 C.F.R. § 668.2(b) (2025). Nothing in the statutory definition contemplates the nature of a student's post-degree work or provides that a graduate who earns a "professional degree" must be free from supervision in their eventual career for the degree to be considered professional.

Nor does this requirement derive from the past regulatory setting of the professional degree definition (prior to the Act) or the new regulatory language implemented by the Department. Even the factors improperly added via rulemaking, regarding CIP codes, minimum number of years of postsecondary education, and the doctoral level requirement, describe the degree program, not what work conditions a degree holder must experience after licensure. *See* Final Rule, 91 Fed. Reg. at 23882.

When a preamble to a rulemaking is inconsistent with the plain language of the regulation, it is invalid. *See Barrick Goldstrike Mines, Inc. v. Whitman,* 260 F. Supp. 2d 28, 36 (D.D.C. 2003). The Defendants admit that a supervision requirement is not in the regulatory definition, noting "the Department did not adopt anything related to supervision as 'freestanding, disqualifying criteria' in the regulatory text." *See* Defs.' Resp. at 20; Dkt. No. 23. The agency even disclaimed the relevance of post-degree activity for other professions. *See id.* ("a J.D. is still a professional degree even if a recipient never takes or passes the bar."). The decision to focus on

post-degree supervision in denying "professional degree" status to certain degrees, including PA degrees, is arbitrary, as it does not reflect the criteria in the statutory definition, or the definition adopted via rulemaking.

#### 3. The free-from-supervision requirement is not the product of reasoned decision making.

Freeing itself from the scope and constraints of the governing statute and its own regulatory text, the Department used its analysis of perceived supervision requirements associated with PA practice as the basis for the exclusion of PA programs from the "professional degree" definition. *See* Final Rule, 91 Fed. Reg. at 23800. This analysis is not the product of reasoned decision making.

The subject of students' post-degree supervision was never presented during the negotiated rulemaking sessions or included in the language that achieved consensus, and the Department does not identify any vagueness or ambiguity that requires this analysis to provide clarity. *See generally id.* Supervision or collaboration requirements, involved in practice, are characteristics of the profession, not the degree. This extra-regulatory requirement is also not necessary to interpret or discern the clear criteria given in the statutory definition or the Department's regulatory definition. Further, the Department mischaracterizes how this unnecessary analysis applies to the PA profession.

Plaintiffs explained during rulemaking that scope-of-practice variation is a feature of state professional regulation across healthcare fields, not a basis for denying professional degree status. *See* Comment of the PA Education Association, RISE_AR_0013323-35, Ex. 1; Comment of the American Academy of Physician Associates, RISE_AR_0013076-90, Ex. 12. Plaintiffs' comments explained that PA licensure is individual and state-based; PAs are licensed directly by state boards, and practice laws regulate settings and responsibilities. *Id.* They also explained that

modern healthcare is team-based, that many states use collaboration terminology rather than supervision, and that remaining supervision requirements often require physician availability rather than on-site direction of care. *Id.*

Many health professions operate through similar collaborative, supervised, or team-based models without forfeiting professional status. For example, some states recognize special classifications that allow graduates with a M.D. degree who have not matched with a residency to practice under supervision. *See* Comment of the American Academy of Physician Associates, RISE_AR_0013092. Ex. 12. In addition, pharmacists, who hold a Pharm.D. degree, enter collaboration agreements with prescribers to expand their practice to include medication management.[9] Podiatry, pharmacy, psychology, dentistry, optometry, and other included professions all operate within state-law limits, collaborative arrangements, or supervision requirements in at least some settings. *See generally,* Comment of the PA Education Association, RISE_AR_0013323-35, Ex. 1; Comment of the American Academy of Physician Associates, RISE_AR_0013076-90, Ex. 12.

The Department never persuasively explained why similar regulatory constraints disqualify PAs but not the included professions, nor why a PA's state licensure, national certification, post-baccalaureate medical education, and legal authority to practice medicine become irrelevant once a state uses collaborative or supervisory terminology. That selective

[9] A "Collaborative Practice Agreement (CPA)" is "[a] formal agreement in which a licensed provider makes a diagnosis, supervises patient care, and refers patients to a pharmacist under a protocol that allows the pharmacist to perform specific patient care functions." Centers for Disease Control and Prevention, Collaborative Practice Agreements and Pharmacists' Patient Care Services: A Resource for Pharmacists (2013) at 1, https://www.cdc.gov/high-bloodpressure/media/pdfs/2024/04/Translational_Tools_Pharmacists.pdf. *See* Comment of the PA Education Association, RISE_AR_0013323-0013335; Comment of the American Academy of Physician Associates, RISE_AR_0013076-0013090.

treatment confirms that the agency relied on factors Congress did not authorize and failed to apply its chosen rationale consistently.

The Department's decision to exclude PA degrees from "professional degree" status, on the basis of work conditions shared by other professions, was arbitrary, not based on a rational decision, and conflicts with the regulatory language, all bases for holding that the Department's specific finding as to PA's is arbitrary and capricious in violation of the APA.

#### 4. The Final Rule's list of professional degrees conflicts with its doctoral requirement.

The Department underwent efforts at statutory interpretation to impose a doctoral-level requirement in its regulatory definition of "professional degree". In doing so, it relies on the degree examples listed in the definition of "professional degree" as a list with common attributes that can be extracted to form new criteria. And yet, not all degrees in that list are doctoral, meaning this requirement cannot reflect a common attribute of the listed degrees. One of the Law degrees listed (L.L.B.) is a baccalaureate degree and both Theology degrees listed (M.Div. and M.H.L.) are master's degrees. Thus three of the 16 degrees listed as professional in the Final Rule are below the doctoral level. The Department even acknowledged this inconsistency in the Final Rule's preamble. *See* Final Rule, 91 Fed. Reg. at 23796.

The regulatory definition's requirement that professional degrees "generally be at the doctoral level" also creates an ambiguity not contained in the statute by using the word "generally." *See* Final Rule, 91 Fed. Reg. at 23784. "Generally" suggests some professional degrees can be non-doctoral, but the Department provides no further guidance as to what types of degrees might otherwise qualify as exceptions to the rule. Instead, it seems intent on excluding all nondoctoral degrees and even some doctoral degrees not on its proscribed list of degrees without a discernable standard or definition.

The Department's arbitrariness was not reserved for its decision on PA degrees but can be found throughout the rulemaking. By way of example, the Department refused to include the Doctor of Physical Therapy ("DPT") degree in its list of professional degrees, even though commenters explained that DPT is now the current entry-to-practice credential for physical therapists nationwide. *See* Final Rule, 91 Fed. Reg. at 23793. The Department explained that it would not include the DPT degree even though it met all requirements including the "generally doctoral" requirement, noting, "The fact that the PT profession has evolved to a doctoral entry model establishes that the profession's educational requirements have changed over time; it does not establish that PT must therefore be treated as falling within the incorporated professional-degree framework." *See* Final Rule, 91 Fed. Reg. at 23793. Yet, the Department contradicts itself elsewhere in the Final Rule noting, "The statute is not fixed in the sense that new degree programs could, at some point in the future, be professional degrees even if the program-type was not in existence when Congress passed the Act. As the economy evolves and new degrees and careers are created, it is possible that those degree pathways could meet the definition of professional student." *See* Final Rule, 91 Fed. Reg. at 23783.

Defendants have no plausible explanation why the presence of doctoral and non-doctoral degrees on the list does not simply support the plain reading of the statutory requirement that the qualifying degrees simply be "at a level of professional skill beyond that normally required for a bachelor's degree." 34 C.F.R. § 668.2(b) (2025). Nor can the Defendants cogently explain away the non-doctoral degrees on the list and continue to justify the doctoral level requirement when a number of master's degrees meet the statutory criterion of the three-part test. *Id.*; 20 U.S.C. § 1087e(a)(4)(C)(ii).

With no reasonable analysis supporting the free-from-supervision requirement, the arbitrary disqualification of PA degrees from the definition of professional degree, and the internal conflicts within the rulemaking, the Final Rule is arbitrary and capricious in violation of the APA.

**C. The appropriate remedy is vacatur and remand.**

The APA directs reviewing courts to "hold unlawful and set aside" agency action that is contrary to law or exceeds statutory authority. Vacatur is the ordinary remedy when an agency rule is unlawful. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Here, the unlawful portions of the Final Rule are the regulatory definition of "professional degree" that adds the doctoral-level, six-year, CIP-code, bounded-list, and free-from-supervision limitations. Those provisions should be set aside or vacated and the matter should be remanded to the Department to apply the definition Congress codified.

Plaintiffs do not ask this Court to rewrite the statute or reinstate the Grad PLUS program that Congress eliminated. Nor must the Court decide in the first instance every application of the statutory definition to every degree program. The appropriate course is to set aside the unlawful rule and remand for the agency to apply the correct legal standard: defining a "professional degree" as meeting the three-part test: (1) completion of academic requirements for beginning practice, (2) professional skill beyond the bachelor's level, and (3) licensure generally required. Following this remand, PA students should be considered "professional students", as they are under the Department's current interim guidance.

That remedy also responds to the record before the agency, which showed that PA programs satisfy those criteria and that the Department's contrary limitations rested on criteria Congress did not adopt. *See Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001); *Noble Energy,*

*Inc. v. Salazar*, 671 F.3d 1241, 1246 (D.C. Cir. 2012). Where an agency has misapplied the law, the ordinary remedy is remand for a new agency determination under the proper standard. *See United States. v. Schwarzbaum*, 24 F.4th 1355, 1367 (11th Cir. 2022); *Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010). That remedy respects both congressional authority and the agency's proper role on remand.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment under Federal Rule of Civil Procedure 56, hold unlawful and set aside the Final Rule's regulatory definition of "professional degree" and its separate free-from-supervision requirement under 5 U.S.C. § 706(2)(A) and (C), and remand the matter to the Department for further proceedings consistent with the Higher Education Act, 20 U.S.C. § 1087e(a)(4)(C)(ii), the APA, 5 U.S.C. §§ 701-706, and this Court's opinion.

Respectfully submitted,

Date: October 1, 2026

/s/Paul D. Cullen, Jr.
Paul D. Cullen, Jr. / Bar No. 463759
Kathleen Balthrop Havener / Bar No. 432638
The Cullen Law Firm, PLLC
1101 30th Street, Suite 500
Washington, DC 20007
202-298-4774
paul@cullenlaw.com
202-298-4775
kathleen@cullenlaw.com

Attorneys for Plaintiffs
PA Education Association and American
Academy of Physician Associates

**INDEX OF EXHIBITS**

1. Declaration of Sara Fletcher in Support of Plaintiffs' Motion for Summary Judgment
2. Declaration of Reamer Bushardt in Support of Plaintiffs' Motion for Summary Judgment
3. Declaration of Kyla Vaughan in Support of Plaintiffs' Motion for Summary Judgment
4. Declaration of Brian O'Neal in Support of Plaintiffs' Motion for Summary Judgment
5. Declaration of Olivia Trull in Support of Plaintiffs' Motion for Summary Judgment
6. Declaration of Tricia Serio Submitted in *State of Maryland, et al. v. U.S. Dep't of Education, et al.* (D. MD. Case No. 1:26-cv-01957-ABA)
7. Declaration of Hannah Hollis in Support of Plaintiffs' Motion for Summary Judgment
8. Comment Letter of Baylor University submitted to the Department of Education's Rulemaking
9. Comment Letter of Lake Erie College submitted to the Department of Education's Rulemaking
10. Comment Letter of Lincoln Memorial University submitted to the Department of Education's Rulemaking
11. Comment Letter of South University submitted to the Department of Education's Rulemaking
12. Declaration of Hannah Hollis in Support of Plaintiffs' Motion for Summary Judgment