**THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF NURSE PRACTITIONERS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education, et al.*,<br><br>*Defendants*. | No. 1:26-cv-1780 (BAH) |
| PA EDUCATION ASSOCIATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>*Defendants*. | No. 1:26-cv-1941 (BAH) |

**DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 1

The Working Families Tax Cuts Act ..... 1

Reimagining and Improving Student Education ..... 2

This Litigation and Post-Issuance Developments ..... 7

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

I. Plaintiffs Lack Standing ..... 9

A. Plaintiffs Fail to Establish Organizational Standing. ..... 10

B. Plaintiffs Fail to Establish Associational Standing. ..... 15

II. The Rule's Definition of Professional Degree Does Not Violate the APA. ..... 20

A. The Rule's Definition Is Not Contrary to Law or Arbitrary and Capricious ..... 20

1. Contrary to Law ..... 20

2. Arbitrary and Capricious ..... 26

3. The Rule's Exclusion of the Relevant Degrees ..... 28

III. AANP Plaintiffs' Challenge to the Electronic Announcement Fails. ..... 35

IV. The Effective Dates of The Rule and Electronic Announcement Are Not Contrary to Law. ..... 37

A. The Rule is Not Contrary to the Master Calendar Provision. ..... 37

B. The Electronic Announcement Is Not Subject to the Master Calendar. ..... 40

V. Any Relief Should Be Appropriately Limited. ..... 41

A. Plaintiffs Are Not Entitled to a Permanent Injunction. ..... 41

B. The Court Should Not Issue Declaratory Relief. ..................................... 43

C. The Court Should Not Enjoin The Department From Enforcing the Statute. ........................................................................................ 43

D. Any Relief Should Be Limited to Plaintiffs with Standing. ..................... 45

CONCLUSION ........................................................................................................ 45

# TABLE OF AUTHORITIES

## CASES

*707 G St. Rest., LLC v. Jemal's Mickelson, LLC*,
No. CV 20-685 (RMM), 2023 WL 2571753 (D.D.C. Mar. 20, 2023) ..... 43

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ..... 42

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
719 F. Supp. 2d 26 (D.D.C. 2010) ..... 9

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ..... 10, 11, 14

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006) ..... 17

*Am. Libr. Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) ..... 10, 15

*Am. Nat'l Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011) ..... 8, 9

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ..... 36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 9

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ..... 44

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) ..... 39, 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 9

*Bennett v. Spear*,
520 U.S. 154 (1997) ..... 36

*Chamber of Com. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) ..... 17

*Chestnut Hill Benevolent Ass'n v. Burwell*,
142 F. Supp. 3d 91 (D.D.C. 2015) .......... 21

*Circuit City Stores v. Adams*,
532 U.S. 105 (2001) .......... 21

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 10, 11, 19

*Conservation Force, Inc. v. Jewell*,
733 F.3d 1200 (D.C. Cir. 2013) .......... 15

*Conservation L. Found. v. Pritzker*,
37 F. Supp. 3d 254 (D.D.C. 2014) .......... 43

*Cottage Health Sys. v. Sebelius*,
631 F. Supp. 2d 80 (D.D.C. 2009) .......... 9

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 13

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 11

*Dorsey v. United States*,
567 U.S. 260 (2012) .......... 38

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .......... 41

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) .......... 15, 20

*FBME Bank Ltd. v. Mnuchin*,
249 F. Supp. 3d 215 (D.D.C. 2017) .......... 27

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
45 F.4th 127 (D.C. Cir. 2022) .......... 18

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 21, 22, 25

*Fogg v. Ashcroft*,
254 F.3d 103 (D.C. Cir. 2001) .......... 43

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................... 10, 11, 13, 14

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015).................... 11, 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000) .................... 15

*Grunewald v. Jarvis*,
776 F.3d 893 (D.C. Cir. 2015).................... 33

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) .................... 20

*Harris Cnty. v. U.S. Env't Prot. Agency*,
– F. Supp. 3d –, 2026 WL 2837849 (D.D.C. Sep. 22, 2026) .................... 42

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .................... 12, 14

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .................... 44

*Hughey v. United States*,
495 U.S. 411 (1990) .................... 22

*Jifry v. Fed. Aviation Admin.*,
370 F.3d 1174 (D.C. Cir. 2004).................... 40

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................... 24, 26

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 10, 11, 18, 19

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012).................... 40

*Maniar v. Mayorkas*,
No. 19-cv-3826 (EGS), 2023 WL 2709040 (D.D.C. Mar. 30, 2023).................... 15, 16

*Methodist Hosp. of Sacramento v. Shalala*,
38 F.3d 1225 (D.C. Cir. 1994).................... 37

*Mobil Oil Exploration & Producing Se. Inc. v. United Distr. Cos.*,
498 U.S. 211 (1991) ..... 33

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ..... 42

*Moreno v. Spencer*,
310 F. Supp. 3d 83 (D.D.C. 2018) ..... 28

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ..... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..... 28

*Murthy v. Missouri*,
603 U.S. 43 (2024) ..... 10, 11, 15

*New Jersey Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ..... 42

*New Jersey Dep't of Env't Prot. v. EPA*,
626 F.2d 1038 (D.C. Cir. 1980) ..... 40

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. 2026) ..... 17

*Noble Energy, Inc. v. Salazar*,
671 F.3d 1241 (D.C. Cir. 2012) ..... 42, 43

*Ohio Forestry Ass'n, v. Sierra Club*,
523 U.S. 726 (1998) ..... 36

*Patton Boggs, LLP v. Chevron Corp.*,
791 F. Supp. 2d 13 (D.D.C. 2011), *aff'd*, 683 F.3d 397 (D.C. Cir. 2012) ..... 36

*Pub. Safety Spectrum All. v. FCC*,
184 F.4th 640 (D.C. Cir. 2026) ..... 14

*Rockwell International Corp. v. Untied States*,
549 U.S. 457 (2007) ..... 15

*Sekhar v. United States*,
570 U.S. 729 (2013) ..... 23

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) .......... 11

*Snapp v. Unlimited Concepts, Inc.*,
208 F.3d 928 (11th Cir. 2000) .......... 21

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 17

*Tincher, v. Mullin*,
No. 25-cv-4669 (KMM/DTS), 2026 WL 2797318 (D. Minn. Sept. 18, 2026) .......... 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 45

*Trinity Servs., Inc. v. Marshall*,
593 F.2d 1250 (D.C. Cir. 1978) .......... 20, 22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 45

*Turner Broad. Sys., Inc. v. FCC*,
507 U.S. 1301 (1993) .......... 44

*United States v. Philip Morris USA, Inc.*,
396 F.3d 1190 (D.C. Cir. 2005) .......... 21

*United States v. Texas*,
599 U.S. 670 (2023) .......... 18, 45

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022) .......... 15, 17

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 9

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .......... 24

*Yates v. United States*,
574 U.S. 528 (2015) .......... 22

**STATUTES**

5 U.S.C. § 553(b) .......... 37, 39

5 U.S.C. § 702(1) .......... 45

5 U.S.C. § 704 .......... 36

5 U.S.C. § 706(2)(A) .......... 9

20 U.S.C. § 1082 .......... 1, 26

20 U.S.C. § 1087e(a) .......... 2, 38

20 U.S.C. § 1089 .......... *passim*

20 U.S.C. § 1098a .......... 4, 38, 39

20 U.S.C. § 1221e-3 .......... 1, 24, 26

20 U.S.C. § 3441 .......... 1, 26

20 U.S.C. § 3471 .......... 1, 26

20 U.S.C. § 3474 .......... 1, 24, 26

Alaska Admin Code tit. 12 § 40.410(f) .......... 31

Cal. Bus. & Prof. Code § 3502(a)(1) (West) .......... 31

Ga. Code § 43-34-25(b) .......... 29

La. Rev. Stat. § 37:1310.11(F) .......... 32

Md. Code Regs. § 10.58.08.02B(16) .......... 34

Md. Code Regs. § 10.58.08.03A(2) .......... 34

Mo. Rev. Stat. § 334.036 .......... 32

N.C. Gen. Stat. Ann. § 90-270.47 .......... 34

N.C. Gen. Stat. Ann. § 90-270.54 .......... 34

N.Y. Educ. Law § 6542 .......... 31

One Big Beautiful Bill Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... 1, 2, 37, 44

Vt. Stat. Ann. Tit. 26 § 1735a .......... 31

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 119-106 .......... 27, 42

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

34 C.F.R. § 668.2 .......... *passim*

34 C.F.R. § 685.203(m)(2) .......... 19

*Federal Student Aid Programs*,
72 Fed. Reg. 44620 (Aug. 8, 2007) .......... 22

*Reimagining and Improving Student Education*,
91 Fed. Reg. 4254 (Jan. 30, 2026) .......... *passim*

*Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations*,
91 Fed. Reg. 23768 (May 1, 2026) .......... *passim*

**OTHER AUTHORITIES**

*About IPEDS*, NCES,
https://nces.ed.gov/ipeds/about-ipeds (last visited Nov. 12, 2026) .......... 23

American Association of Colleges of Nursing, *Accelerated Nursing Programs*,
https://perma.cc/KH9C-SA88 .......... 30

CDC, *Collaborative Practice Agreements and Pharmacists' Patient Care Services* (Oct. 2013),
https://perma.cc/L3NW-Q8NK .......... 29

Henry Byerley Thomson, *The Choice of a Profession, 1857,*
https://perma.cc/5S33-S65X .......... 29

*IPEDS 2025-26 Data Collection System*, NCES, U.S. Dep't of Educ.,
https://surveys.nces.ed.gov/ipeds/public/glossary (last visited Nov. 12, 2026) .......... 23

Laura G. Knapp, Janice E. Kelly-Reid & Scott A. Ginder, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007*, U.S. Dep't of Educ., NCES 2008-159 (Oct. 2008),
https://nces.ed.gov/pubs2008/2008159rev.pdf .......... 23

Nat'l Conf. of State Legislatures, *Physician Assistant Practice and Prescriptive Authority*,
https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-assistants/physician-assistant-practice-and-prescriptive-authority (last updated Oct. 2025) .......... 31

*One Big Beautiful Bill Act Updates*, Federal Student Aid, https://studentaid.gov/announcements-events/big-updates (last updated Oct. 30, 2026)............................................................................ 8

## INTRODUCTION

Concerned with the unsustainable strain on students, taxpayers, and the federal lending system, Congress enacted, and President Trump signed into law, the Working Families Tax Cuts Act ("WFTCA") to reform federal student lending and promote affordability in higher education. The WFTCA amended portions of the Higher Education Act ("HEA") of 1965 and made significant changes to the federal student aid framework, including by establishing new borrowing limits for graduate and professional students.

"When Congress passes legislation amending statutory provisions regarding programs administered by an agency, that agency is tasked with implementing those changes in its regulations." Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4256 (Jan. 30, 2026) ("NPRM"). Federal student loan programs are administered by the U.S. Department of Education ("Department"), who has received broad authority from Congress to implement those programs. *See* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3474, 3471. The Secretary exercised this authority by promulgating a Rule to implement WFTCA's statutory reforms. *See* Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations, 91 Fed. Reg. 23768 (May 1, 2026) ("Rule").

Both sets of Plaintiffs in this consolidated case lack standing to challenge the Rule's definition of "professional degree," and the Court should dismiss this case in its entirety. In the alternative, Defendants are entitled to summary judgment because the Rule is consistent with law and is not arbitrary and capricious. If the Court disagrees, Plaintiffs should not receive their requested declaratory or injunctive relief, and any remedy should be limited to the Plaintiffs who have demonstrated standing.

## BACKGROUND

### The Working Families Tax Cuts Act

Congress enacted on July 4, 2025, and President Trump signed into law, the WFTCA. *See* Pub. L. No. 119-21, 139 Stat. 72 (2025). As relevant here, the WFTCA amended the Department's Direct Loan program to establish loan caps for graduate and professional students and to terminate

graduate and professional federal Direct PLUS loans altogether. The WFTCA added multiple subparagraphs to the Higher Education Act, codifying caps on student loans at 20 U.S.C. § 1087e(a)(4). *See* Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35. Specifically, Congress capped borrowing by "a graduate student, who is not a professional student" to $20,500 for "any academic year or its equivalent." 20 U.S.C. § 1087e(a)(4)(A)(i). By contrast, the maximum annual amount that "a professional student may borrow" is $50,000. *Id.* § 1087e(a)(4)(A)(ii). Congress also established new aggregate limits—$100,000 for a graduate student "who is not (and has not been) a professional student" and $200,000 for a professional student "who is not (and has not been) a graduate student." *Id.* § 1087e(a)(4)(B)(i)–(ii). All loan limits "begin[] on July 1, 2026," *id.* § 1087e(a)(4)(A), (B), unless an exception applies, *see id.* § 1087e(a)(8)(A).

The WFTCA defines the students eligible for each cap. As relevant here, a "professional student" "means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on [the date of enactment of this paragraph]), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii). In short, Congress's definition of professional student depends on the degree the student is seeking. And for the requisite degrees, Congress relied on a term defined at 34 C.F.R. § 668.2, which defines a professional degree as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

**Reimagining and Improving Student Education**

To implement the WFTCA's changes, the Department published a Notice of Proposed Rulemaking titled Reimagining and Improving Student Education explaining that a negotiated rulemaking committee had "reached consensus" on proposed new regulatory text. NPRM at 4256.

The Department noted in the NPRM that the WFTCA had "incorporated a variety of words and phrases that may, without context, appear ambiguous or vague on their face or as applied to specific degree programs." *Id.* at 4262. The Department therefore proposed a definition of professional degree constituting "the best reading . . . using the tools of statutory construction." *Id.*

The Department acknowledged that the WFTCA "establishes a three-part test" for a professional degree. *Id.* Those three requirements were included in the new proposed regulation as separate criteria. *See id.* at 4332. As for the specific degrees enumerated in § 668.2, the Department needed no "additional interpretive work" to know that they are professional degrees and listed them as fields where "[a] professional degree may be awarded," *id.* at 4262, 4332, though the Department proposed adding the Doctorate of Clinical Psychology to that list. *See id.* at 4263.

The rest of the Department's proposed criteria stemmed from § 668.2's illustrative list of degrees and the "additional contextual clues" provided by that list. *Id.* at 4262. Specifically, the Department explained that the illustrative list "suggests that" a degree "must *generally* be at the doctoral-level," since the list contains only three non-doctoral degrees. *Id.* (emphasis added). The Department further explained that § 668.2's definition was based on a previous definition of "first-professional degree" in a glossary of terms that the Department published to schools. *Id.* That old glossary required a first professional degree to include "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *Id.* And this glossary listed as first professional degrees the same ten degrees enumerated in § 668.2. Accordingly, the Department proposed that a professional degree must require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4332.

Lastly, the Department proposed to include degrees with "a four-digit program CIP code . . . in the same intermediate group as" the § 668.2 degrees and clinical psychology as professional degrees. *Id.* CIP refers to the Classification of Instructional Programs ("CIP"); the Department's system "for tracking and reporting fields of study and program completion activity" for every student who takes out student aid. *Id.* at 4264. For the Department, requiring four-digit

codes would encompass any degrees "closely related" to the ones enumerated in the new regulation and would "ha[ve] administrative benefits for the Department and institutions given [their] wide use." *Id.* In addition to these formal proposed criteria, the Department noted its hesitance, based on "the characteristics of [the] programs in" § 668.2, "to classify degrees that lead to employment that must be supervised by a licensed professional, and cannot be performed independently, as professional degrees." *Id.* at 4265. The NPRM also discussed specific degrees and the Department's conclusion that they did not "meet the professional degree definition." *Id.* at 4265–67. For example, the Department explained that a Masters in Public Health ("MPH") would not satisfy the definition because "it is not required for entrance into a specific profession and does not lead to licensure." *Id.* at 4266. Similarly, the Department explained why the Master of Science in Nursing ("MSN") and Doctor of Nursing Practice ("DNP") are not professional degrees, *see id.* at 4265–66, as well as degrees for physician assistants, *see id.* at 4266.

Separate from its proposed definition and criteria for a professional degree, the Department determined that the Master Calendar provision in 20 U.S.C. § 1089 was irreconcilable with Congress's effective date of the WFTCA. *See* NPRM at 4257. The Master Calendar provision sets timing requirements for certain HEA rules and renders ineffective any regulatory change to higher education programs not published in final form by November 1 "prior to the start of the award year" until "the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). That posed a conundrum for this Rule. The Department must follow a negotiated rulemaking process for any HEA rules, requiring the Secretary to obtain advice and recommendations from interested parties, provide a forum for their discussion, write proposed regulatory text, and submit that text to a negotiated rulemaking committee. *See id.* § 1098a(a)–(b).

As the Department explained, it was impossible to "undertake every step of the negotiated rulemaking process by November 1, 2025"—the date under the Master Calendar by which all higher-education changes must be finalized—given the WFTCA's July 1 effective date. Rule at 23770. Negotiated rulemaking could have occurred within "149 days" at the earliest, but there

were only 120 days between November 1, 2025, (the date required by the Master Calendar provision) to July 4, 2025, (the date of enactment). *Id.* Because "Congress was aware of this temporal impossibility" and yet decided that the caps on student loans "would still go into effect on July 1, 2026," the Department concluded that the WFTCA was irreconcilable with the Master Calendar provision. *Id.*

The Department requested comments by March 2, 2026, *see* NPRM at 4254, and published a final rule on May 1, 2026, *see* Rule. In the preamble to the Rule, the Department again stated that the list of degrees in § 668.2 "provides context and limiting principles" about whether other degrees qualify as professional degrees. *Id.* at 23783. The Department relied on that list "to identify common characteristics of those degrees" and included those common characteristics as criteria in the Rule. *Id.* at 23785. Namely, the Rule defines a professional degree as a degree that (1) signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree; (2) is generally at the doctoral level and requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework; (3) generally requires professional licensure to begin practice; and (4) includes a four-digit program CIP code in the same intermediate group as the fields listed in § 668.2, plus doctorates in Clinical Psychology, which the Department determined is a professional degree. *See id.* at 23782, 23882.

The Department also discussed supervision as another common characteristic based on "the contextual significance of the illustrative list" in § 668.2. *Id.* at 23787. "[P]eople who practice [the § 668.2 professions] may obtain a license and practice without supervision of another licensed professional, and, to the extent they are supervised at the beginning of their careers, it is by someone who holds the same degree and practices the same profession." *Id.* The Department acknowledged that certain § 668.2 degrees often involve some "supervised practice," but that period is "temporary" and, once complete, "is no longer required." *Id.* The Department further concluded that degrees leading to employment ordinarily supervised "by a licensed professional

in a different occupation" are not substantially similar to the degrees listed in § 668.2. *Id.*

In over five pages of text, the Department explained why the MSN, DNP, and Doctor of Nursing Anesthesia Practice ("DNAP") do not meet the Rule's definition of professional degree, even if they "appear to satisfy the three parts of the operative test" in § 668.2. *Id.* at 23795, 23797, 23798. For the MSN, it is "at the master's-level," *id.* at 23795, "can be obtained with as little as three years of total postsecondary study," and leads to professions required by many States to be supervised "by persons in a different profession"—namely, physicians. *Id.* at 23795–96. The DNP was excluded because it leads to the same professions as the MSN, which are subject to the same supervision. *See id.* at 23797–98. Also, for professions other than nurse anesthetists, the DNP exceeds the minimum required credential, which is the MSN. *See id.* at 23798. The Department also pointed out that, because the § 668.2 professions that list multiple degrees include degrees "at the same credential level," it would be "illogical" to treat a DNP as a professional degree when an MSN is not. *Id.* As for the DNAP and DNP programs in nurse anesthesia, the Department explained that the profession resulting from those degrees is "subject to career-long supervision or otherwise may be required to practice under the supervision of (or in collaboration with) physicians for a period of time." *Id.* Because no State imposes comparable requirements on the professions listed in § 668.2, the DNAP and DNP in nurse anesthesia are not professional degrees. *See id.* at 23798–99. While the Department did not separately discuss nursing Ph.D. degrees in the same manner, it responded to comments suggesting inclusion of that degree. The Department reiterated that it excluded "degrees that lead to employment that must be supervised by a licensed professional in another profession," like the nursing Ph.D. *Id.* at 23799.

As to the other degrees at issue in this lawsuit, the Department declined to include physician assistant ("PA") programs because post-licensure, a PA "must generally be supervised by medical doctors," except in "a few" States. *Id.* at 23800. The Department further excluded the MPH and Doctorate in Public Health ("DPH") because "licensure is not required for . . . public health positions," thus failing to meet the third part of the statutory definition. *Id.* at 23801. Lastly, the Department explained that a Marriage and Family Therapy ("MFT") degree is not professional

because "some States allow [holders of] degrees in related counseling fields" to obtain licensure as a marriage and family therapist. *Id.* at 23804.

The Department also noted in the preamble that all portions of the Rule are severable and established the Department's "inten[t] that [the portion of the Rule regarding classification of degrees as professional degrees] is entirely severable" from the rest of the Rule. *Id.* at 23771. The Rule became effective on July 1, 2026. *See id.* at 23768.

**This Litigation and Post-Issuance Developments**

Plaintiffs in case number 26-cv-1780 are professional groups representing nurses, nursing schools, public health schools, educators, marriage and family therapists, and prospective and actual students of these professions. *See* Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 58-1 ("AANP MSJ"). They challenged the Rule on May 21, 2026, as violating the Administrative Procedure Act ("APA"), and moved for preliminary relief on the same day. *See* ECF Nos. 1, 4. Plaintiffs in case number 26-cv-1941 are organizations representing practicing physician assistants, students in physician-assistant degree programs, and physician-assistant educators. *See generally* Mem. in Supp. of Mot. for Summ. J. by Pls.' PA Educ. Ass'n & Am. Acad. of Physician Assocs. at 16, 19, ECF No. 57-1 ("PA MSJ"). They likewise challenged the Rule as violating the APA and moved for preliminary relief on June 4, 2026. *See* ECF Nos. 1 & 7, No. 26-cv-1941-BAH. The Court consolidated the two cases during briefing on the motions for preliminary relief. *See* Minute Order, Jun. 5, 2026.

Shortly before July 1, this Court stayed under section 705 of the APA part (i) of the Rule's definition of professional degree (the part promulgating the contextual factors as a matter of regulatory text) and the "free-from-supervision requirement in the preamble to the Rule." *See* Order, ECF No. 45; Mem. Op., ECF No. 46.[1] But the Court refused to direct the Department to

[1] In addition to these consolidated cases, four other challenges to the Rule remain pending. *See Am. Nurses Ass'n v. U.S. Dep't of Educ., et al.*, No. 1:26-cv-12443 (D. Mass. May 29, 2026); *Maryland, et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-1957 (D. Md. May 19, 2026); *Ass'n of Accredited Naturopathic Med. Col. et al. v. McMahon, et al.*, No. 3:26-cv-1599 (D. Or. Jul. 31, 2026); *Am. Fed'n of Lab. & Cong. of Indus. Orgs., et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-

treat specific degrees as professional given the continuing "validity or force of the statutory definition." Mem. Op. at 47.[2] Five days later, the Department released an Electronic Announcement ("EA"), noting the Department's confidence in the lawfulness of the Rule. *See* ECF No. 47-1. "[T]o facilitate implementation of the Court's order," however, the EA listed programs that the Department would treat "as awarding professional degrees" for the duration of this Court's stay, *id.* at 1, and programs the Department would not treat as awarding professional degrees for the same duration, *see id.* at 2–3. The Department released an updated EA on July 10.[3] *See* ECF No. 50-1.

Following the Court's order, the parties proposed a joint schedule to include filing of an amended complaint, production of an administrative record, and motions for summary judgment. *See* Joint Status Report, ECF No. 51. Pursuant to that schedule, AANP Plaintiffs filed an Amended and Supplemental Complaint which added claims asserting that the EA also violates the APA. *See* Am. & Suppl. Compl., ECF No. 53 ("Am. Compl."). The Department produced the administrative record for the Rule and the EA on September 4, expressly noting that production of those materials did not "concede" that the EA is judicially reviewable under the APA. *See* Notice of Admin. R., ECF No. 56. All Plaintiffs filed their motions for summary judgment by October 2, 2026. *See* AANP MSJ; PA MSJ.

## LEGAL STANDARD

To resolve a motion to dismiss under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*,

---

2833 (D.D.C. Aug. 11, 2026). Plaintiffs in these cases variously challenge the Rule's classification of post-baccalaureate degrees in nursing, athletic training, anesthesiologist assistance, speech-language pathology, naturopathy, audiology, physician assistance, physical therapy, occupational therapy, social work, public health, marriage and family therapy, library science, and education.

[2] All pincites to filings in this case are to the ECF pagination.

[3] The Department has updated the EA to reflect a ruling from the District of Oregon in another challenge to the Rule. *See One Big Beautiful Bill Act Updates*, Federal Student Aid, https://studentaid.gov/announcements-events/big-updates (last updated Oct. 30, 2026).

642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In a case brought under the APA, summary judgment serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009). The Court must determine whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he Court's role is limited to reviewing the administrative record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (citation omitted).

## ARGUMENT

Plaintiffs' claims fail. As an initial matter, all Plaintiffs lack Article III standing. Even if they had standing, the Rule's definition of professional degree is consistent with Congress's decision in the WFTCA to incorporate the definition in 34 C.F.R. § 668.2. The Rule is thus not contrary to law or arbitrary and capricious. The Rule is also not contrary to the Master Calendar provision because Congress' directive to the Department to implement the WFTCA's new loan limits beginning July 1, 2026, is irreconcilable with the requirements of the Master Calendar provision. As for the EA, AANP Plaintiffs' claims challenging its determination of professional degrees only while this Corut's interim stay is in effect are not prudentially ripe. And the EA is not independently subject to the Master Calendar provision because it is neither a "regulatory change[]" nor was it "initiated by the Secretary." 20 U.S.C. § 1089(c)(1).

### I. Plaintiffs Lack Standing.

Standing is an essential aspect of the Article III case-or-controversy requirement that requires a plaintiff to have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). A "plaintiff 'bears the burden of establishing standing as of the time [it] brought the

lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified). "At the pleading stage, general factual allegations of injury" may suffice; "[i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

For an organization to assert standing on its own behalf (organizational standing), it "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024); *see also Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). When an organization sues on behalf of its members under a theory of associational or representational standing, a plaintiff must establish that at least one of its members would have "standing to sue in her or his own right." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). To do so, a plaintiff must establish injury-in-fact as to the member, which requires "that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. The injury must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

**A. Plaintiffs Fail to Establish Organizational Standing.**

Plaintiffs' alleged organizational injuries generally fall into three categories: (1) economic injury through anticipated losses of membership and membership-related revenues; (2) alleged interference with their organizational activities and services; and (3) diversion of organizational resources. *See generally* AANP MSJ at 26–27; PA MSJ at 22–23. None establishes a concrete injury required for Article III standing.

An organization cannot establish standing merely because a government policy conflicts with its mission, makes its advocacy more difficult, or causes it to devote resources to opposing that policy. *See All. for Hippocratic Med.*, 602 U.S. at 394–96. The D.C. Circuit accordingly requires an organization to identify a "concrete and demonstratable injury to [its] activities" that is "more than simply a setback to the organization's abstract social interests." *Am. Anti-Vivisection*

*Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citation omitted). "An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). "[A]n organization does not suffer an injury in fact where it expends resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." *Id.* at 920 (citation modified).

Plaintiffs have not established a direct economic injury that satisfies Article III. An organization may establish an Article III injury through direct economic loss, *see Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025), but the organization must still demonstrate that the asserted injury is concrete, fairly traceable, and redressable, *see Lujan*, 504 U.S. at 560–61. Plaintiffs have not made that showing. They contend that the Rule will reduce enrollment, which in turn will reduce organizational membership, dues, revenue, participation in continuing education and conferences, and other sources of organizational revenue. *See* AANP MSJ at 27; *see also* PA MSJ at 22–23. But these assertions depend on a chain of speculative contingencies—that students will delay or abandon their education, causing fewer students to enter the relevant professions, and a resulting decline in the professional pipeline that will reduce membership revenue.

Plaintiffs' claimed economic injuries depend on the conduct of third parties not before the court, which is not sufficiently predictable to establish standing. *See Lujan*, 504 U.S. at 560; *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976); *Murthy*, 603 U.S. at 57. Whether any student chooses not to enroll in a particular education program depends on a host of speculative contingencies that cannot establish the kind of "certainly impending" injury necessary to confer standing. *Clapper*, 568 U.S. at 414; *see also All. for Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."). Plaintiffs' theory also assumes that students will not have access to alternative sources of funding. But the Rule notes that "borrowers may have access to different funding

options, that may include institutional loans, scholarships, non-Federal funding sources, or additional institutional aid drawn down from endowments." Rule at 23817. Indeed, institutions are already lowering tuition and offering additional student aid, *see id.* at 23849 n.47 (citing examples), and Plaintiffs cannot assume that such effects will not happen in the future. Plaintiffs also generally allege that the Rule harms the professions they represent by potentially reducing the number of future practitioners in their given professions and injuring the profession's reputation. *See, e.g.*, Decl. of Jon Fanning ¶¶ 30, 33, ECF No. 58-3; Decl. of Lisa Gables in Supp. of Pls.' Mot. for Summ. J. ¶¶ 25–26, ECF No. 57-13. But an asserted reduction in the size of a profession, or damage to its reputation, is not itself a particularized injury, and an organization cannot establish standing merely by identifying harm to the interests in a profession they seek to advance. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

Plaintiffs' theory also fails the traceability and redressability requirements for standing. Even if the Court were to vacate the definition of professional degree, prospective students would still face the WFTCA's loan limits and Congress' elimination of Grad PLUS loans. In other words, prospective students may still need to obtain private loans and may still be deterred from pursuing higher education, not because of the Rule, but because Congress enacted new loan limits in the WFTCA and eliminated uncapped borrowing. *See, e.g.*, Decl. of Eileen K. Fry Bowers ¶ 19, ECF No. 58-7 (discussing potential students concerned about "the new student loan caps" rather than the Rule). Based on Plaintiffs' theory, all their injuries would still follow: lower enrollment due to lower loan limits, fewer students pursuing degrees, fewer students entering their relative professions, and fewer professionals to pay membership dues and attend organizational programing. This theory also fails to account for Plaintiffs' reported existing declines in enrollment. *See, e.g.*, Decl. of Deborah Trautman ¶ 23, ECF No. 58-6 (noting how, notwithstanding the Rule, "enrollment in PhD nursing programs declined for the 11th consecutive year"). In short, Plaintiffs' theory suggests that their injuries will occur even if this Court vacates portions of the Rule or directs the Department to treat certain programs as professional. Plaintiffs ultimately fail to show any concrete losses in enrollment that are attributed to the Rule rather than

the new loan caps or enrollment trends, and their requested remedy does not redress their asserted injuries.[4]

Plaintiffs have also not established that the Rule will impair their existing organizational activities. They contend that the Rule will impair their organizational missions and their ability to serve members, promote their professions, and support their workforces. *See, e.g.*, AANP MSJ at 27. But Plaintiffs do not identify any existing organizational activity that the Rule will prevent them from performing, any membership benefit that they will have to withdraw, or any program that they will have to suspend. Instead, the activities Plaintiffs characterize are the same activities they identify as ordinary membership benefits. For example, Plaintiffs variously describe their existing organizational services as providing "policy guidance," "advocacy and legislative representation," "career support," and educational services to members. *See, e.g.*, ECF No. 58-3 ¶¶ 4–5; Decl. of Linda Young ¶ 4, ECF No. 58-10; Decl. of Reamer Bushardt ¶ 7, ECF No. 57-2; ECF No. 57-13 ¶ 5. Plaintiffs' anticipated efforts to educate members, provide professional resources, and advocate on issues affecting their professions are ultimately not activities that will be newly undertaken in response to the Rule. And Plaintiffs cannot establish organizational injury merely because they will use their ordinary services to address an issue affecting their members. *See All. for Hippocratic Med.*, 602 U.S. at 394–96. Plaintiffs fail to show how these asserted

[4] Respectfully, the Court's preliminary injunction Opinion conflated the Department's anticipated effects of the WFTCA with those of the Rule. *See* Mem. Op. at 27–28. The Department's estimates of reduced student-loan disbursements and its prediction that some "students may need to 'reconsider [or reduce] their enrollment,'" Mem. Op. at 28 (quoting Rule at 23856), concern the effects of the new statutory loan limits enacted by the WFTCA, not the incremental effect of the Rule or its professional-degree definition. Indeed, the Department expressly identified "the policy changes enacted by the [WFTCA]," including the new borrowing limits and elimination of Grad PLUS loans as the source. Rule at 23855 (attributing $171 billion to the projected "reduction in loan disbursements in Graduate Stafford and Graduate PLUS Loans" and another $49 billion to "Parent PLUS Loans"). "[S]tudents' decisions not to enroll in degree programs due to reduced access to federal loans," Mem. Op. at 27, are therefore not a "predictable effect of Government action on the decisions of third parties," that stem from the Rule, *Dep't of Commerce v. New York*, 588 U.S. 752, 768–70 (2019). The Department's estimates cannot establish that the Rule will cause Plaintiffs' asserted membership, enrollment, or revenue losses, nor can they establish that Plaintiffs' alleges injuries are fairly traceable to the Rule or redressable by this Court.

expected impairments are "operational costs beyond those normally expended" to provide services to their members, *Vilsack*, 808 F.3d at 920, or "more than simply a setback to the organization's abstract social interests," *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618 (citation omitted).

For largely the same reasons, Plaintiffs have not established a concrete organizational injury through diversion of resources. Plaintiffs contend that if the Rule goes into effect, they will be required to divert organizational resources to educate members. *See* AANP MSJ at 27; PA MSJ at 22–25. But an organization cannot establish standing merely by identifying resources it chose to expend in opposition to government action. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 394 (emphasizing that an organization "cannot spend its way into standing"). Rather, the challenged action must directly interfere with the organization's existing activities in a manner that causes a cognizable injury. *See id.* For example, *Havens* involved a materially different circumstance in which the challenged conduct "directly affected and interfered with" the organization's core counseling activities, thereby "perceptibly impair[ing]" its ability to provide those services. *Id.* at 395 (citation omitted); *Havens*, 455 U.S. at 379. As discussed, Plaintiffs do not establish such impairment here because they do not identify a preexisting organizational service that the Rule has directly disrupted. Nor do they identify a new service that the Rule has forced them to provide in lieu of their ordinary activities. *See, e.g.*, ECF No. 57-13 ¶ 16 (describing ordinary organizational educational services to members expended in response to the Rule and EA). Instead, they identify anticipated advocacy, education, and member communications concerning a policy on which they were already engaged in advocacy before the Rule was finalized. *See, e.g.*, ECF Nos. 57-9–57-12 (comment letters).

Plaintiffs' conclusory assertions of resource diversion do not counsel otherwise. *See, e.g.*, ECF No. 58-3 ¶ 28. At summary judgment, a plaintiff must "point to evidence—not allegations—proving the elements of standing." *Pub. Safety Spectrum All. v. FCC*, 184 F.4th 640, 648 (D.C. Cir. 2026). AANP predicts that it "will be forced to devote substantial organizational resources, staff time, advocacy efforts, member support services, and educational programming to addressing the harms caused by the Rule." ECF No. 58-3 ¶ 28. It speculates that this will "include[e]

responding to member concerns, educating prospective and current NP students regarding the Rule's impact, engaging in advocacy and public education efforts, and attempting to mitigate anticipated workforce shortages." *Id.* But such "'barebones' statements do not suffice" to establish an Article III injury at summary judgment. *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (citation omitted). In *Viasat*, for example, the D.C. Circuit held that an affidavit with only "unadorned assertions" of diversion of resources was "too conclusory to establish organizational standing." *Id.*; *see also Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013) ("We do not insist on record evidence and affidavits to establish standing because we are misguided nitpickers, but rather because we must respect the limits of our jurisdiction."). The same is true here. Although AANP says that the anticipated diversion will impair AANP's ability to fund "initiatives, such as continuing education" programs, ECF No. 58-3 ¶ 28, AANP identifies no particular continuing-education program that will be curtailed. Nor do Plaintiffs establish the extent of any alleged impairment. Plaintiffs do not quantify the staff time or resources that they will allegedly divert, identify a particular program that was or will be curtailed or postponed, or identify an organizational function that they will be unable to perform as a result. Plaintiffs have ultimately not shown how their programs have or will be "perceptibly impaired." *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994). They fail to establish organizational standing.

**B. Plaintiffs Fail to Establish Associational Standing.**

To establish associational standing, an organization must demonstrate that at least one of its members would have "standing to sue in her or his own right." *Am. Library Ass'n*, 401 F.3d at 492. The Supreme Court has made clear that Article III standing must exist at the commencement of litigation and continue throughout its existence. *See Murthy*, 603 U.S. 43, 58 (2024); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000). It has also noted that where a plaintiff amends its complaint, the amended complaint becomes the operative pleading for purposes of determining jurisdiction. *Rockwell International Corp. v. Untied States*, 549 U.S. 457, 473–74 (2007); *Maniar v. Mayorkas*, No. 19-cv-3826 (EGS), 2023 WL 2709040, at

*13 (D.D.C. Mar. 30, 2023) ("While standing is generally determined at the time the suit is initiated, when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." (citation modified)); *Tincher, v. Mullin*, No. 25-cv-4669 (KMM/DTS), 2026 WL 2797318, at *4 (D. Minn. Sept. 18, 2026) (concluding "standing for all Plaintiffs should be assessed from the time of the Amended Complaint's filing"). AANP Plaintiffs must accordingly demonstrate that each association had standing at the time it filed the operative amended complaint on July 30, 2026, *see* Am. & Suppl. Compl., ECF No. 52-1, and PA Plaintiffs must establish that each association had standing on June 3, 2026, *see* No. 26-cv-1941, ECF No. 1. Both sets of Plaintiffs fail to make this showing through their individual members to support associational standing.

AANP Plaintiffs cannot rely on several of their declarations to support standing because those declarants were not members of the Plaintiff associations on July 30, 2026. For example, Ms. Amador and Mr. Carroll did not become members of the American Association for Marriage and Family Therapy ("AAMFT") until August 2026, Decl. of Rebecca Amador ¶ 2, ECF No. 58-15 ¶ ("Amador Decl."); Decl. of Jacob Carroll ¶ 2, ECF No. 58-16, while Ms. Eadon did not become a member until September 4, 2026, Decl. of Clarissa L. Eadon ¶ 2, ECF No. 58-17, and Ms. Panzo did not become a member of AANP or the National Association of Pediatric Nurse Practitioners ("NAPNAP") until after beginning her program, Decl. of Jennifer Panzo ¶ 2, ECF No. 58-5, on September 8, 2026, *id.* ¶ 10. Plaintiffs' other declarations similarly fail to establish the required membership at the time of the operative complaints. *See* ECF Nos. 58-7, 58-8, 57-2, 57-3, 57-4, 57-5, 57-8, 57-6; *see also* Suppl. Decl. of Lisa M. Gables ¶ 4, ECF No. 40 (stating that Ms. Olivia Trill was not a member of the American Academy of Physician Associates ("AAPA") on June 23, 2026). Although these declarants assert that they are members of the various Plaintiff organizations, they establish, at most, present membership; they do not establish that the declarants belonged to the organization when Plaintiffs filed the operative complaints. And two of Plaintiffs' institutional declarations fail to allege membership at all. *See* ECF Nos. 58-9, 57-7. As the D.C. Circuit has explained, where an organization fails to provide sufficient evidence concerning its

purported members, a court is left without a basis to determine that a plaintiff has satisfied the requirements of standing. *Viasat*, 47 F.4th at 782. Because Plaintiffs' declarations provide no evidence establishing this material temporal requirement, Plaintiffs cannot rely on these "members" to establish associational standing. Plaintiffs NAPNAP, AAMFT, American Association of Critical-Care Nurses ("AACN"), and AAPA identify no other individual members and thus cannot establish associational standing. *Chamber of Com. of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) (requiring a petitioner to "specifically identify members who have suffered the requisite harm" to establish associational standing); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) (requiring "the identity of the party suffering an injury in fact . . . be firmly established"). Plaintiffs do not allege that the National Education Association ("NEA") has standing.[5] *See* AANP MSJ at 23 n.3.

Plaintiffs Association of Schools and Programs of Public Health ("ASPPH") and AANP also fail to establish associational standing. In support of its associational standing, ASPPH relies on one declaration from an unidentified intuitional member. Decl. of John Doe, ECF No. 58-12. But to allege associational standing, it "is not enough to aver that unidentified members have been injured." *U.S. Chamber of Com.*, 642 F.3d at 199. Rather, the plaintiff "must specifically identify members who have suffered the requisite harm." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009)); *see also New Mexico v. Musk*, 824 F. Supp. 3d 80, 96 (D.D.C. 2026) ("Defendants' 'argument that the persons allegedly injured must be identified by name might have some validity if this litigation were at the summary judgment stage.'" (citation omitted)). Thus, where ASPPH has not identified any member due to the use of a pseudonym, ECF No. 58-12, it cannot establish associational standing.

AANP's identified member, Ms. Greenwalt, likewise does not establish associational standing because her asserted injuries are too speculative. Ms. Greenwalt is currently

[5] At the preliminary-injunction stage, the Court found that PA Plaintiffs were "likely to have [associational] standing" based on a declaration from Mr. Benjamin Pinckney, Mem. Op. at 24, but PA Plaintiffs no longer rely on his standing here.

grandfathered into the prior borrowing regime for her MSN degree, which she expects to complete in August 2027. Decl. of Rebecca Greenawalt ¶ 5, ECF No. 58-4. She has not yet enrolled in a program that would be subject to the WFTCA's new caps, and she does not establish when she plans to enroll. *Id.* Rather, she simply says that she "intend[s] to attend" a DNP program and that she has two years after completion of her MSN to enroll in a DNP program at Quinnipiac University without losing any academic credits. *Id.* ¶ 21; *see also* Decl. of Hannah Hollis ¶ 8, ECF No. 57-8 (discussing "intent"). But "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of [] 'actual or imminent' injury." *Lujan*, 504 U.S. at 564; *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 137 (D.C. Cir. 2022) ("[G]eneral averments, conclusory allegations, and speculative some day intentions are inadequate to demonstrate injury in fact." (citation omitted)). Plaintiffs thus cannot establish that the Rule has prevented their "individual student members from pursuing their chosen professions." AANP MSJ at 23.

Even if Plaintiffs had identified an individual member subject to the Rule, their asserted economic injuries are unsupported by the record. At the summary-judgment stage, a plaintiff may no longer rest on mere allegations but must "set forth" by affidavit or other evidence "specific facts" establishing standing, *Lujan*, 504 U.S. at 561 (citation omitted), and "the alleged injury must be legally and judicially cognizable," *United States v. Texas*, 599 U.S. 670, 676 (2023) (citation omitted). Plaintiffs' declarations do not satisfy these requirements with respect to Plaintiffs' theory of financial harm from private borrowing. For example, Ms. Greenwalt's declaration states that she may be required to take out private loans, which "may carry higher or variable interest rates." ECF No. 58-4 ¶ 15. But she identifies neither the interest rates, fees, repayment terms, nor other material terms of the private financing she may be subject to nor the terms of federal loans against which she purports to compare it. *See id.* The same deficiency is true for Plaintiffs' other individual declarants who allege such economic harm. *See, e.g.*, ECF No. 58-5 ¶ 29; Amador Decl. ¶ 15; ECF No. 58-16 ¶ 15. These Plaintiffs therefore provide no specific facts from which the Court could determine that the private financing available would truly be less favorable than

available federal financing under the changes in the WFTCA, much less that it would impose a concrete financial burden. And AAMFT member, Ms. Rebecca Amador, who took out $36,000 in private loans for her MFT degree, Amador Decl. ¶ 14, would have had to take out private loans even under the higher loan limits. Therefore, the mere fact that she incurred private debt does not establish an injury caused by the challenged portions of the Rule. On this record, Plaintiffs fail to establish specific facts necessary at summary judgment to show a concrete economic injury for Article III standing. *See Lujan*, 504 U.S. at 561.

Plaintiffs' institutional members likewise fail to establish Plaintiffs' associational standing based on reduced enrollment and tuition revenue. *See* AANP MSJ at 24–26; PA MSJ at 20–21. Plaintiffs allege that "[e]nrollment has already begun to decrease as a result of the Rule" AANP MSJ at 25, but the President of the American Association of Colleges of Nursing reports that "enrollment in PhD nursing programs declined for the 11th consecutive year." ECF No. 58-6 ¶ 23. Plaintiffs fail to sufficiently show any concrete losses in enrollment that are attributable to the Rule rather than normal enrollment trends or the availability of federal loans under the new WFTCA. *See, e.g.*, ECF No. 58-7 ¶ 19 (discussing conversations with potential students concerned about "the new student loan caps" rather than the Rule). Nor do they specifically quantify any institutional resources allegedly diverted, identify a particular education program that was curtailed or postponed, or identify an institutional function that they were unable to perform as a result of the Rule. *See, e.g.*, Decl. of Thomas A. Laveist ¶ 42, ECF No. 58-13 (speculating what their response to declining revenue "would likely include" "leaving faculty and staff vacancies unfilled, deferring hiring and planned investments, and reducing discretionary expenditures"). And an institution's decision to limit student borrowing based on its interpretation of the EA or its concern about the durability of preliminary relief, *see, e.g.*, Decl. of Kyla Vaughan ¶ 18, ECF No. 57-4, is not an Article III injury either. *Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves . . . ."); *see also* 34 C.F.R. § 685.203(m)(2) (departmental regulation independently permitting institutions to establish lower loan limits). Plaintiffs have not shown how any institutional programs have been "perceptibly

impaired." *Fair Emp. Council of Greater Washington, Inc.*, 28 F.3d at 1277. They fail to establish associational standing.

Because Plaintiffs lack standing, the Court should dismiss Plaintiffs' complaints for lack of jurisdiction. If the Court disagrees, Defendants are entitled to summary judgment for the reasons articulated below.

## II. The Rule's Definition of Professional Degree Does Not Violate the APA.

Plaintiffs' challenges to the Rule are split between general challenges to the Rule's definition and challenges that are specific to the degrees that Plaintiffs say should be included. The Department first explains why Plaintiffs' arguments about the definition as a whole are infirm and then explains why the Department correctly excluded particular degrees.

### A. The Rule's Definition Is Not Contrary to Law or Arbitrary and Capricious

#### 1. Contrary to Law

Plaintiffs argue that the Rule "grafts onto Congress's three-part test additional requirements found nowhere in the statutory definition." AANP MSJ at 29. But it is Plaintiffs, not the Department, who disregard the statutory definition, which incorporated all of 34 C.F.R. § 668.2, including its illustrative list of degrees.

The Department must execute the wishes of Congress as expressed in the text of the WFTCA. The canon of *noscitur a sociis*—"a word is known by the company it keeps," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995)—requires the Department to interpret "professional degree" based on the words surrounding it, including that illustrative list. Those degrees provide context for the type of degrees that Congress wanted to designate as professional because the illustrative list contains specific enumerations of the general term "professional degree." *See* NPRM at 4263. The related canon of *ejusdem generis* teaches that "where specific words precede or follow general words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978). As applied here, the general term "professional

degree" should be interpreted by reference to common attributes shared by the specific degrees listed in § 668.2. Otherwise, "the statute's enumeration of . . . specific categories" would be entirely superfluous. *Circuit City Stores v. Adams*, 532 U.S. 105, 114 (2001).

True enough, the illustrative list just provides "examples," AANP MSJ at 29, which "include but are not limited to" the enumerated degrees, 34 C.F.R. § 668.2. The word "includes" is "usually a term of enlargement," PA MSJ at 30 (citation omitted), but not one of *infinite* enlargement. The illustrative list still has meaning for what is a professional degree. "The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle." *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005). A proper interpretive method requires the Department to "expand on the [degrees] explicitly included in [§ 668.2] only with [degrees] similar in nature to those enumerated." *Id.*; *see also Chestnut Hill Benevolent Ass'n v. Burwell*, 142 F. Supp. 3d 91, 103 (D.D.C. 2015) (adopting same interpretive method for "including but not limited to" preceding a specific list of included items); *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir. 2000) (interpreting "legal relief" based on specific forms of relief "include[ed] without limitation" in the statutory text). Any other approach does not account for Congress's choice to incorporate the entire list of degrees in § 668.2. "Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it," so the Department must rely on the § 668.2 list to interpret "professional degree." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

This Court held in its previous decision that the statutory definition of professional degree is unambiguous and thus canons of statutory construction are unnecessary. *See* Mem. Op. at 34–35; *see also* AANP MSJ at 30 (making same argument). Defendants respectfully disagree because § 668.2 is far from unambiguous. For example, it defines a professional degree as signifying completion of requirements to begin practice "in a given profession," 34 C.F.R. § 668.2, without defining "profession" or indicating (absent the illustrative list) what qualifies as a "profession." The regulation also does not say whether a degree that "signifies [] completion of the academic requirements for beginning practice in a given profession," *id.*, includes only the entry-level degree

or any degree that can be used to gain entry into a "profession." The regulation further says that "[p]rofessional licensure is also *generally* required," without explaining what level of generality is needed. *Id.* (emphasis added). In other words, the language in § 668.2 is not straightforward and is ambiguous as to the universe of degrees that should be defined as "professional."

The Court's previous critique of the Department's use of the canons is also, respectfully, incorrect. *See* Mem. Op. at 36–37. The Court concluded that because "there is no 'one word'" requiring interpretation, *noscitur a sociis* does not apply. *Id.* at 37. But the canon's underlying logic is that "a *general phrase* can be given a more focused meaning by the terms linked to it." *Fischer*, 603 U.S. at 488 (emphasis added). The term being interpreted thus need not be one word. *See id.* at 486–91 (relying on *noscitur a sociis* to determine the reach of an "otherwise clause" in a statute); *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (relying on *nosictur a sociis* to "cabin the contextual meaning" of the two-word term "tangible object"). As for *ejusdem generis*, the Court said it did not apply because § 668.2 does not follow a general-then-specific pattern. Mem. Op. at 37. The logic underlying the canon, however, applies regardless of the order of the terms. *See Hughey v. United States*, 495 U.S. 411, 419 (1990) (defining "the principle of *ejusdem generis*" as "a general statutory term should be understood in light of the specific terms that surround it"). The D.C. Circuit has described the canon as applying "where specific words *precede* or follow general words." *Trinity Servs.*, 593 F.2d at 1258 (emphasis added). The Department's criteria for a professional degree correctly flow from that list and the proper use of these canons.

***Length-of-Coursework Criterion.*** Take first the requirement that a professional degree "requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." Rule at 23882. That requirement is a characteristic common to all the degrees listed in § 668.2 and comes from § 668.2's history. As the Department explained when it proposed § 668.2 in 2007, the term "professional degree" is "based on the definition [then] used by the National Center for Educational Statistics (NCES)," which defined the term first-professional degree. Federal Student Aid Programs, 72 Fed. Reg. 44620, 44621 (Aug. 8, 2007); *see also* NPRM at 4262–63 (discussing

this history). NCES defined that term for purposes of the Integrated Postsecondary Education Data System ("IPEDS"), "a system of interrelated surveys" that "gathers information from every college, university, and technical and vocational institution that participates in the federal student financial aid programs." *About IPEDS*, NCES, https://nces.ed.gov/ipeds/about-ipeds (last visited Nov. 12, 2026). IPEDS has always provided a glossary of terms,[6] and in 2007, two of the glossary's criteria for "first-professional degree" were that the degree reflects "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." Laura G. Knapp, Janice E. Kelly-Reid & Scott A. Ginder, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007*, U.S. Dep't of Educ., NCES 2008-159 at B-2 (Oct. 2008).[7] The glossary listed as first-professional degrees the same degrees as in § 668.2. *See id.* Thus, when the Department promulgated § 668.2 with the same list of degrees and professions, § 668.2 "br[ought] the old soil" with it, including the length-of-coursework requirement. *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted). To the extent a degree can be achieved in fewer years through an "accelerated program," it is not professional.[8] PA MSJ at 29.

***Doctoral-Level Criterion.*** The requirement in subsection (1)(B) that a professional degree be "generally at the doctoral level" likewise flows from § 668.2. Rule at 23882. "[O]nly one" grouping of those degrees—the one for Theology—includes only degrees "not at the doctoral level." *Id.* at 23784. That is a major clue for the meaning of "professional degree"; if 90% of the degrees are at the doctoral level, "professional degree" encompasses degrees that are "*generally* at the doctoral level." *Id.* at 23882 (emphasis added). Although § 668.2 does not "require a doctoral-

---

[6] To access the current glossary, *see IPEDS 2025-26 Data Collection System*, NCES, U.S. Dep't of Educ., https://surveys.nces.ed.gov/ipeds/public/glossary (last visited Nov. 12, 2026).

[7] This report is available at https://nces.ed.gov/pubs2008/2008159rev.pdf. And although the report postdates the Department's promulgation of § 668.2, the data collection occurred in "fall 2007." *Id.* at iii.

[8] The Department is aware of accelerated M. Div. programs at certain universities, but those programs simply reiterate the one-off nature of theology degrees and their unique history as a recognized profession. *See infra* at 29.

only rule"—hence the inclusion of the term "generally" in the regulatory text, *id.* at 23784—the identification of almost entirely doctoral degrees indicates that Congress incorporated a definition of "professional degree" that generally includes degrees at the doctoral level.

Plaintiffs point out, again as the Court did, that "Congress's own enumerated examples" refute the Rule's criterion about doctoral degrees. AANP MSJ at 30; *see also* Mem. Op. at 38; PA MSJ at 28. That isn't true—if Plaintiffs are right, then the list of professional degrees would be defined by a characteristic present in only 10% of that list, which makes little sense. It is more accurate to say, as the Department has, that a professional degree must be "generally at the doctoral level," which reflects a characteristic shared by 90% of the listed degrees. Rule at 23882.

***Four-Digit CIP Code Criterion.*** Consistent with its general approach, the Department's use of four-digit CIP codes ensures that professional degrees remain similar to the degrees listed in the definition Congress incorporated. Four-digit CIP codes group programs by "comparable content and objectives," so any program that falls into the same four-digit code as a recognized professional degree is a professional degree, assuming it meets all other requirements. NPRM at 4264. In contrast, using the two-digit codes would encompass programs with only a minimal relationship to the degrees that Congress incorporated through the WFTCA. *Id.* (discussing example of Veterinary Medicine); *see also* Rule at 23786. AANP Plaintiffs deride this requirement as based on "unjustified assertions" that CIP codes "avert 'confusion,'" AANP MSJ at 34, but the CIP-code criterion ensures that degrees dissimilar from the ones designated by the Department are excluded. The Department can "fill up the details" in this way to effectuate the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)); *see also* 20 U.S.C. §§ 1221e-3, 3474 (authorizing Secretary to prescribe general rules and regulations). And CIP codes *do* avoid "confusion among institutions or even [within] the Department regarding what specific programs are eligible for . . . higher loan limits" given that institutions are already familiar with them. Rule at 23784; *contra* AANP MSJ at 34.[9]

[9] The CIP-code requirement also does not "convert[] the statute's non-exhaustive list of professional degree examples of [*sic.*] into an exclusive list." PA MSJ at 29 (citation omitted).

***Supervision "Requirement."*** Relying on considerations surrounding supervision to identify a professional degree is consistent with Congress's incorporation of § 668.2. Professionals with the degrees listed in § 668.2 (and clinical psychology) "may obtain a license and practice without supervision of another licensed professional." *Id.* at 23787. The Department accordingly has not adopted a "free-from-supervision" requirement, AANP MSJ at 30; PA MSJ at 31, but that a degree holder will not be supervised by someone in a different profession. That characteristic is part of the definition of "professional degree" based on the "common sense" canons of *noscitur a sociis* and *ejusdem generis*. *Fischer*, 603 U.S. at 487. Some of the degrees in § 668.2 do involve supervision, but that supervision is "temporary" and "by someone who holds the same degree and practices the same profession." Rule at 23787.

Plaintiffs challenge the discussion of supervision as improper given that the regulatory definition proposed by the Department does not mention supervision as a freestanding criterion. *See* PA MSJ at 32; AANP MSJ at 35. Plaintiffs are correct that the Department did not adopt anything related to supervision in the new regulatory text—and the Department admitted as much in the Rule. *See* Rule at 23787. But as discussed, relying on laws surrounding supervision to identify professional degrees is consistent with Congress's incorporation of § 668.2's illustrative list, which lists no degrees that lead to a profession where the degree holder is supervised by a professional from a different profession. *See id.* PA Plaintiffs say that the Department should not consider "post-degree activity" in determining which degrees are professional, PA MSJ at 35, but yet again they ignore that the illustrative list is part of the statute. To the extent the fields and degrees listed there have similarities, whether it be in the course of getting a degree or afterwards,

---

The CIP-code requirement applies to programs with the same CIP code as those "listed in paragraph (ii)(A)." Rule at 23882. That list includes the doctorate in Clinical Psychology, which is not part of the statute's list. Nor has the Department created a "now-exclusive list." PA MSJ at 29. It made clear in the preamble that "[t]he statute is not fixed" because "new degree programs could, at some point in the future, be professional degrees." Rule at 23783. The Department thus allows that other degrees could be added in the future "[a]s the economy evolves and new degrees and careers are created." *Id.* But those degrees would still need to meet the definition of professional degree in the WFTCA.

the Department must consider those similarities and exclude degrees that do not share them.

In sum, the Rule's criteria flow from the statutory text and are correct as a matter of plain language. But even if the Court disagrees, the undefined and broad terms "profession" and "generally" in § 668.2 are "term[s] or phrase[s] that leave[] agencies with flexibility" in how to regulate the WFTCA's student loan caps. *Loper Bright*, 603 U.S. at 395 (citation omitted); *accord Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025) (when statute did not define phrase "predominant user," agency had reasonable flexibility to assess who is a "predominant user"). When the best reading of a statute is that it delegates "discretionary authority to an agency," a court must ensure that "the agency has engaged in reasoned decisionmaking within" the boundaries of that delegation. *Loper Bright*, 603 U.S. at 395 (citation modified); *see also* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3471, 3474 (delegating authority to Secretary to issue regulations). For all the reasons above, the criteria in the Rule are a reasonable use of the authority delegated to the Department by Congress. And the Department possesses expertise over the details of various postbaccalaureate degrees to which the Court can and should, consistent with the APA, "properly resort for guidance." *Loper Bright*, 603 U.S. at 394 (citation omitted).

**2. Arbitrary and Capricious**

Plaintiffs also claim that the definition of professional degree is arbitrary and capricious as a general matter. *See* AANP MSJ at 33–35. They assert first that the Department relied on factors Congress "has not intended it to consider," including "doctoral status, course length, CIP code, and supervision requirements." *Id.* at 34 (citation omitted). This point largely rehashes Plaintiffs' contrary- to-law arguments. The Department's response stands—by incorporating a definition that includes an illustrative list of degrees, Congress necessarily directed the Department to consider similarities between those degrees for the purpose of identifying the universe of professional degrees. Those similarities are reflected in the Rule's criteria. *See supra* § II.A.1.

AANP Plaintiffs take specific aim at the CIP-code criterion as "unreasoned." AANP MSJ at 34. Again, the CIP-code criterion "make[s] explicit was is already implicitly a common element" among the WFTCA's degree. NPRM at 4264; *see supra* at 24. AANP Plaintiffs also

say the Department has not explained incorporating "a reporting taxonomy tool" into a loan eligibility framework. AANP MSJ at 34. To the contrary, the Department explained how "over 4,000 institutions and tens of thousands of programs" could be confused "regarding what specific programs are eligible for the higher loan limits." Rule at 23784. This is hardly an objectionable statement—an institution might offer a degree that otherwise meets the Rule's criteria but is not the exact same credential as on the illustrative list. To give concrete guidance, the Department incorporated a taxonomy used by every "postsecondary school that receives Federal student aid funds" as well as by other entities connected to higher education. NPRM at 4264. Given the "wide use" of those codes, they are a "practically convenient" way to include programs that otherwise meet the Rule's criteria but might offer a different credential. *Id.*

AANP Plaintiffs also suggest that the Department failed to respond to comments that excluding certain degrees would "worsen already-devastating shortages" in certain professions. AANP MSJ at 39. The Department was required to "address significant comments in a reasoned manner." *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) (citations omitted). Far from "wav[ing] these concerns away," AANP MSJ at 40, the Department said on multiple occasions that it understood them, *see* Rule at 23790, 23806, but that the WFTCA does not permit consideration of workforce shortages when determining what degrees are professional, *see id.* at 23790, 23800, 23811. That is indisputably true. Congress did not define professional degree with any reference to labor shortages or even asserted need for certain professionals. In contrast, the supposedly "added [contextual] requirements" in the Rule stem from the language that Congress adopted, including the illustrative list. AANP MSJ at 40; *see supra* § II.A.1.

The Department also explained that the loan caps "could provide an incentive" to institutions to lower tuition given the correlation between "higher net prices" of graduate education and "higher student borrowing." Rule at 23857–58. AANP Plaintiffs dispute this, asserting that it relies on "unproven speculation." AANP MSJ at 40. This objection is not for the Department but for Congress, which determined that loan caps might have a beneficial effect on tuition prices and enacted the WFTCA in pursuit of that goal. *See* H.R. Rep. No. 119-106, at 203–207

(describing purpose of loan caps as lowering tuition costs). In that sense, the Department's explanation is neither here nor there. Even if it were relevant, the Department need only articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). The only question is "whether there is such relevant evidence as a reasonable mind might accept as adequate to support the agency's finding." *Moreno v. Spencer*, 310 F. Supp. 3d 83, 87 (D.D.C. 2018) (citations omitted). The Department presented enough evidence, citing a working paper from a Federal Reserve Bank noting a "particularly evident" correlation between tuition prices and graduate borrowing, "where annual borrowing limits generally do not bind." Rule at 23858. The Department further explained possible "bidirectional dynamics" in which "expanded capacity for student borrowing" contributes to a rise in tuition. *Id.* Plaintiffs reach a different conclusion, but they cannot seriously dismiss the Department's conclusion is unreasonable given this evidence.

### 3. The Rule's Exclusion of the Relevant Degrees

Plaintiffs also argue that excluding specific degrees[10] is contrary to law and arbitrary and capricious. *See* AANP MSJ at 30–33, 35–39; PA MSJ at 28–29, 36–40. Many of these degree-specific arguments overlap, so the Department responds below by degree.

***Nursing Degrees (MSN, DNP, DNAP, Ph.D.).*** The Department properly excluded these nursing degrees because, unlike any of the degrees listed in § 668.2, holders of these degrees are subject to supervision by a professional in another profession. *See* Rule at 23797 (MSN and DNP except for nurse anesthetists), *id.* at 23798–99 (DNP for nurse anesthetists and DNAP), *id.* at 23799 (nursing Ph.D.). AANP Plaintiffs respond that these and similar restrictions are "obsolete and unnecessary," AANP MSJ at 35, but even true, their existence remains a key distinction between advanced nurses and the degrees listed in § 668.2.

---

[10] Plaintiff National Education Association (NEA) has "withdraw[n] any request for relief specific to education degrees," AANP MSJ at 23 n.3, conceding that those degrees are not professional degrees.

AANP Plaintiffs also say that some of the "professions that are expressly included in the definition" are supervised in the way that advanced nurses are, *id.* at 36, but their arguments do not move the needle. Optometrists might not be able to perform certain procedures, but that does not mean they are supervised by a professional who is licensed in another profession. Indeed, requiring "collaboration" with an ophthalmologist for specific procedures, RISE_AR_0011199, is materially different from laws that grant an advanced nurse certain authority only by the leave of a physician, *see, e.g.*, Ga. Code § 43-34-25(b) (advanced nurse may prescribe medicine only as delegated by a physician). And pharmacists "*can* work with other health care providers" through collaborative agreements, but they are not required to do so. CDC, *Collaborative Practice Agreements and Pharmacists' Patient Care Services* at 1 (Oct. 2013), https://perma.cc/L3NW-Q8NK (emphasis added) (cited at AANP MSJ at 36).

The Department also properly excluded the MSN and DNP degrees. *Contra* AANP MSJ at 36–37. For the MSN, all the healthcare-related degrees in § 668.2 are at the doctoral level. "[T]he MSN is a master's-level degree." Rule at 23796. Had Congress wished to incorporate healthcare degrees at the master's level, it could have done so. And there is a rational explanation for excluding the MSN despite the presence of three master's degrees on the illustrative list. *Contra* AANP MSJ at 34. "The L.L.B. degree is no longer conferred by American institutions of higher education" and thus has no bearing on what degrees should be considered professional today. Rule at 2379. As for the Master of Divinity (M. Div.) and a Master of Hebrew Learning (M.H.L.), their inclusion reflects a centuries-long recognition of theology as one of the traditional "learned professions" along with law and medicine. Henry Byerley Thomson, *The Choice of a Profession, 1857,* https://perma.cc/5S33-S65X; *see also* RISE_AR_0004518–19 (detailing the rise of "Law, Divinity, and Medicine" as the learned professions). The Department must account for that history, not shared by advanced nurses.[11] As for the length of MSN programs, AANP Plaintiffs do not contest that it is possible to obtain an MSN "in 18 months." Rule at 23796.

[11] The First Amendment also requires different treatment of theology degrees. *See* Rule at 23791.

Indeed, one Plaintiff acknowledges on its website that MSN programs can take as little as 15 months, *i.e.* less than required by the Rule's length-of-coursework criterion. *See* American Association of Colleges of Nursing, *Accelerated Nursing Programs*, https://perma.cc/KH9C-SA88.

The Department also correctly excluded the DNP. *Contra* AANP MSJ at 37. Plaintiffs do not dispute that the DNP "leads to employment in [the] same professions" as an MSN. Rule at 23798. Nor do Plaintiffs dispute that the MSN is the "minimum degree" required for licensure in advanced nursing. *Id.* Their disagreement is based on § 668.2's inclusion of the L.L.B and J.D. *See* AANP MSJ at 37. But as the Department explained, "the L.L.B. is no longer conferred by American institutions," which means that, "practically," there is only one degree that leads to the legal profession, and that degree is at the doctoral level. Rule at 23798. And no other profession that has multiple degrees listed in § 668.2 includes degrees at different levels. *See id.* Thus, once the Department accounted for the practical realities of the L.L.B. degree, it reasonably excluded the DNP because it leads to the same professions as the MSN. Both degrees cannot signify "completion of the academic requirements for *beginning* practice in a given profession," as contemplated by the WFTCA. 34 C.F.R. § 668.2(b) (emphasis added).

The final advanced nursing degree is the Ph.D., and Plaintiffs say its exclusion was contrary to law.[12] *See* AANP MSJ at 31. But nursing Ph.D. degrees are not professional because they do not "generally" lead to professional licensure. 34 C.F.R. § 668.2. As Plaintiffs' own declaration admits, a nurse with a Ph.D. must maintain "the applicable advanced-practice license, certification, registration, or other authorization to practice," Decl. of Jon Fanning ¶ 33, ECF No. 58-3, meaning they are already licensed based on other degrees obtained, *see id.* ("Ph.D.-prepared nurses must be graduate-prepared nurses"). Plaintiffs respond that States "typically" require nursing faculty to have active licenses, AANP MSJ at 31, but Plaintiffs provide no evidence that a nursing faculty

[12] Contrary to Plaintiffs' aside, the Department did "discuss" the Ph.D. in the Rule. AANP MSJ at 31. The Department responded to comments asking for inclusion of programs in a certain four-digit CIP code covering "Nursing (MSN, DNP, *Ph.D.*)." Rule at 23799 (emphasis added).

member must have a Ph.D. And even if there was such evidence, the profession of nursing faculty is still as an advanced nurse practitioner, and a Ph.D. is not the degree that signifies completion of academic requirements for "beginning practice" in that profession. 34 C.F.R. § 668.2.

***Physician Assistant Degrees.*** PA Plaintiffs do not identify the exact degrees that qualify as "PA degrees." PA MSJ at 1. They should have; the WFCTA directs higher loan caps for specific degrees, not any degree related to a field, and PA Plaintiffs should have identified the relevant degrees that they want included. Regardless, the Department's decision to exclude PA degrees was lawful because PA degrees lead to supervision by a physician. Twenty-five States require physician supervision to permit a PA to practice and have prescriptive authority. *See* Nat'l Conf. of State Legislatures, *Physician Assistant Practice and Prescriptive Authority*, https://www.ncsl.org/scope-of-practice-policy/practitioners/physician-assistants/physician-assistant-practice-and-prescriptive-authority (last updated Oct. 2025). And twenty-one States (plus the District of Columbia) require a PA to "collaborat[e]" with a physician for practicing and prescribing authority. *See id.* PA Plaintiffs downplay this state of affairs by suggesting that "many states use collaboration terminology rather than supervision." PA MSJ at 37. But many States do not. *See, e.g.*, Cal. Bus. & Prof. Code § 3502(a)(1) (West) (allowing a PA to perform medical services so long as he "renders the services under the *supervision* of a licensed physician and surgeon (emphasis added)); N.Y. Educ. Law § 6542 (same for New York). And even in States that discuss "collaboration," they impose a barrier similar to supervision. *See* Alaska Admin Code tit. 12 § 40.410(f) (requiring a "collaborative plan," almost all changes to which will "automatically suspend[]" the PA's authority to practice under that plan); Vt. Stat. Ann. Tit. 26 § 1735a (requiring a PA to practice only under a "written practice agreement" with a physician). There are no similar requirements for any profession resulting from a degree listed in § 668.2.

Similar to AANP Plaintiffs, the PA Plaintiffs say otherwise, pointing out that "[m]any health professions operate through similar collaborative, supervised, or team-based models." PA MSJ at 37. Their examples do not prove their point, however. They cite the same publication as AANP Plaintiffs about collaboration agreements for pharmacists without addressing that the

publication never says such agreements are required. *See supra* at 29. PA Plaintiffs also cite evidence that psychologists "must practice under supervision for extended postdoctoral periods," RISE _AR_0013331, but they miss that such supervision is not under "another professional in a different profession," a point the Department made in the Rule when discussing psychologists, Rule at 23782. PA Plaintiffs also point to scope-of-practice restrictions on podiatrists regarding "how high on a patient's leg a podiatrist can treat." RISE_AR_0013081. This is a red herring; the Department has never suggested that professions resulting from § 668.2's degrees are not subject to scope-of-practice restrictions, such as the amount of leg a podiatrist can treat or—as also raised by PA Plaintiffs, *see id.*—the medication that a psychologist can prescribe. The key inquiry instead is whether those degrees result in professions that are supervised by a professional from another profession. PAs are so supervised in some States, unlike the professions listed in § 668.2.

PA Plaintiffs also highlight special classifications recognized in some States "that allow graduates with a M.D. degree who have not matched with a residency to practice under supervision." PA MSJ at 31. Yet again, the distinguishing characteristic is supervision by a professional in a different profession. In States that permit these graduates to practice, they must be supervised by a licensed physician, *i.e.*, a professional within their own profession. *See, e.g.*, Mo. Rev. Stat. § 334.036(1), (2); La. Rev. Stat. § 37:1310.11(F). PAs are different in that they are supervised by a professional in an entirely different field in at least some States.

PA Plaintiffs also challenge the doctoral-degree criterion as unreasoned. *See* PA MSJ at 38–40. They rely on the presence of non-doctoral degrees in the illustrative list, *see id.* at 38, but the Department has already explained why those degrees do not undermine the criterion, *see supra* at 29. Further, PA Plaintiffs assert that this criterion "creates an ambiguity not contained in the statute." PA MSJ at 38. "[B]y using the word 'generally,'" PA Plaintiffs say, the Department has suggested some non-doctoral degrees can be professional without providing "further guidance as to what types of degrees might otherwise qualify." *See id.* Not exactly. The Department made clear that § 668.2's illustrative list "shows that the incorporated framework is not categorically limited to doctoral degrees, but it also shows that the category is narrow and specific rather than

open-ended." Rule at 23784. PA Plaintiffs apparently want more explanation, but the Department is not required to explain where every "advanced non-doctoral program[]" in American higher education falls in the framework. *Id.*; *see* PA MSJ at 39. The Department responded to specific degrees raised by commenters to the Rule and that is all the APA requires. *See Grunewald v. Jarvis*, 776 F.3d 893, 906 (D.C. Cir. 2015) ("An agency need not solve every problem before it in the same proceeding." (quoting *Mobil Oil Exploration & Producing Se. Inc. v. United Distr. Cos.*, 498 U.S. 211, 231 (1991)).

***Public Health Degrees (MPH, DrPH).*** The Department lawfully excluded these public-health degrees because they do not meet the statutory test. *Contra* AANP MSJ at 32. Plaintiffs do not dispute that a person can enter the public-health field without obtaining an MPH or DrPH and, for that reason, those degrees are "not required for entrance into" that field. Rule at 23800. Thus, those degrees do not signify "completion of the academic requirements *for beginning practice*" in public health. 34 C.F.R. § 668.2 (emphasis added). The Department is not requiring that degrees "correspond to one narrowly defined job title." AANP MSJ at 32, 38. Rather, it is acknowledging the breadth of the public-health field and the simple fact that an MPH or DrPH is not required for entry. These degrees also fail the licensure requirement in § 668.2. As the Department has explained, "licensure is not required for epidemiology or other public health positions." Rule at 23801. Indeed, Plaintiffs *admit* that "publichealth practitioners are not licensed." AANP MSJ at 32. That certain positions are "associated with" things like accreditation and credentialing does not mean those positions generally require licensure, as the statute says. AANP MSJ at 32; *see also* Decl. of Laura Magaña Decl. ¶ 14.b, ECF No. 58-11 (describing what public health graduates "commonly pursue" without saying they are required to do so). Plaintiffs respond that the statute "does not require that a degree program lead directly to licensure," but they miss the point. AANP MSJ at 32. The field itself generally must have a professional licensure requirement for practice; otherwise there would be little way to distinguish between graduate and professional degrees. Public health does not have such a requirement.

Plaintiffs respond that the lack of licensure for public-health practitioners does not matter because § 668.2 includes two degrees in theology "that do not require licensure at all." *Id.* As the Department has explained, however, generally requiring licensure accounts for the First Amendment, which "would not permit a State or the Federal government to require professional clergy to be licensed to act as religious leaders." Rule at 23791. Indeed, professional clergy have "long been considered an exception to the rule that licensure is part of what defines a profession." *Id.* at 23791 & n.10. By "generally" requiring licensure while also including theology degrees, § 668.2 accounts for the unique nature and history of theological careers. Public health can lay claim to no similar uniqueness or history.

***MFT Degrees (M.A., M.S., Ph.D., D.M.F.T.).*** These degrees are properly excluded because they do not meet the statutory test. Plaintiffs do not contest that "some States allow degrees in related counseling fields" before applying for an MFT license. Rule at 23804. For example, North Carolina permits licensure based on completion of an MFT degree or a "related degree," N.C. Gen. Stat. Ann. § 90-270.54, including a master's in clinical social work or counseling, *see id.* § 90-270.47(6)(a), (c). Maryland likewise allows MFT licenses to those who complete a degree in a "related field," Md. Code Regs. § 10.58.08.03A(2), which includes any field "using counseling" with requirements in areas "such as expressive therapy, gerontology, human services, [etc.]," *id.* § 10.58.08.02B(16). The four MFT degrees listed by Plaintiffs thus are indisputably not required to enter the profession.

Plaintiffs respond that the statute does not "ask[] whether a degree is the *only* possible path to a profession," AANP MSJ at 33, but the statute does require that a degree signify "completion of the academic requirements for beginning practice," 34 C.F.R. § 668.2. Degrees that train students for more than "beginning practice" in a given profession are not specific to practice in that profession, and therefore do not meet the statutory definition. *See* Rule at 23786 ("[P]rograms that lead to degrees that are not necessary for entrance into a profession cannot be considered professional degrees under the definition in § 668.2."); *see also id.* at 23786 & n.7 ("[A]ll of the programs on the enumerated list have generally one pathway toward licensure."). Because a

degree in marriage and family therapy is not required to enter that profession, it does not meet the first statutory requirement.

Indeed, if Plaintiffs are right that degrees specifically in marriage and family therapy "signify completion of academic requirements to begin practice," AANP MSJ at 38, that would be true of any degree in "related counseling fields" that could lead to MFT licensure, Rule at 23804. That would be an absurd result. A student pursuing a master's in social work, for example, could obtain the higher loan limits for an MFT degree simply by telling the institution that he plans to use the degree to seek MFT licensure later, even if he ultimately does not do so. In other words, that student could circumvent the professional loan limits by seeking a degree that is not a professional degree. *See id.* at 23801–02 (excluding master's in social work). Plaintiffs' interpretation also would decide a professional degree based on what a student does with their degree, even though the statute does not require a degree holder to get licensed to obtain the higher caps. Moreover, Plaintiffs' interpretation would make the professional-degree framework even more dependent on each State's requirements for licensure in various professions. As the Department has said, a "dynamic classification keyed to a certain numerical cou[n]t of State laws" would "undermine clarity, predictability, and nationally uniform administration." *Id.* at 23787.

### III. AANP Plaintiffs' Challenge to the Electronic Announcement Fails.

AANP Plaintiffs' challenge to the EA in Counts IV and VI of their Amended Complaint is bizarre and entirely flawed. *See* Am. Compl. ¶¶ 90–93; 97–99. The Department issued the EA to comply with this Court's stay order, *i.e.* "solely to facilitate implementation of the Court's order." ECF No. 50-1 at 1. Plaintiffs now say that the Department's explanation was not "reasoned." AANP MSJ at 41. The proper avenue to make that argument would have been to seek clarification of this Court's stay order (which the EA implements) or further preliminary relief from this Court. Plaintiffs could have argued, for example, that the Department's "understanding of the Court's ruling" was incorrect, ECF No. 50-1 at 1, or that the Department needed to "explain its application of the correct statutory definition" after this Court's order, AANP MSJ at 41. AANP Plaintiffs

never sought that relief or explanation,[13] presumably choosing to wait until they could brief and argue the merits of the original Rule. And once the Court resolves this case on the merits, the Court will enter a final judgment that will, by the EA's terms, necessarily vitiate the EA, which is time bound to "the duration of th[is] Court's preliminary stay."[14] ECF No. 50-1 at 1; *see also id.* at 2 ("During the period of the Court's stay . . ."). Indeed, the Department's arguments for why the Rule definition is correct will not change regardless of the Court's decision on the EA.

AANP Counts IV and VI thus fall perfectly into the doctrine of prudential ripeness, which "ensures that Article III courts make decisions only when they have to." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). The doctrine "turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding resolution." *Patton Boggs, LLP v. Chevron Corp.*, 791 F. Supp. 2d 13, 23 (D.D.C. 2011), *aff'd*, 683 F.3d 397 (D.C. Cir. 2012). Here, the details of the EA are not fit for judicial resolution because the EA will go away once the Court at final judgment determines whether the Rule is lawful. Whether the EA is legal or not is therefore a question that not only "*may* prove . . . unnecessary," but will prove unnecessary, such that the Court should not resolve it now. *Ohio Forestry Ass'n, v. Sierra Club*, 523 U.S. 726, 735 (1998) (emphasis added). And there will be no hardship from withholding a decision on the EA since the Court will resolve the challenge to the Rule's definition in its decision on the other claims. Even if there could somehow be hardship, AANP Plaintiffs' failure to raise any issues with the EA in the almost four months since its issuance undermines any claim of hardship.

To the extent the Court disagrees and wishes to reach the merits of those claims, the EA is not a "final agency action" reviewable under the APA. 5 U.S.C. § 704. An action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The Department made clear that

[13] To be clear, the Department would have defended its EA had AANP Plaintiffs sought clarification or further preliminary relief.

[14] Put another way, the EA will be moot once the Court decides at final judgment whether the Rule's definition is lawful.

the EA represented "interim administrative designations" that "may change as litigation in the case proceeds." ECF No. 50-1 at 1. In other words, the EA is not the end of the agency's decisionmaking. And the Announcement's purpose was "solely to facilitate implementation of the Court's order," not to decide legal rights and obligations for all time for all persons holding a degree listed in the Announcement. *Id.*

## IV. The Effective Dates of The Rule and Electronic Announcement Are Not Contrary to Law.

### A. The Rule is Not Contrary to the Master Calendar Provision.

Congress' clear directive to the Department to implement the WFTCA's new loan limits beginning July 1, 2026, is irreconcilable with the requirements of the Master Calendar provision. That provision states that "any regulatory changes initiated by the Secretary affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). But when Congress has given an agency statutory direction that is irreconcilable with procedural requirements, the procedural requirements "need not be followed." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994) (finding "good cause" to bypass notice-and comment procedures under 5 U.S.C. § 553(b) when Congress's direction was irreconcilable with those procedural requirements). Indeed, "deviation from [procedural] requirements has been permitted where congressional deadlines are very tight and where the statute is particularly complicated." *Id.* at 1236.

The WFTCA is a "particularly complicated" statute, and the Department's deadline for implementing the changes was "very tight." *Id.* Congress enacted the WFTCA on July 4, 2025, and it set new statutory caps on student loans beginning July 1, 2026. *See, e.g.*, Pub. L. No. 119-21, § 81001, 139 Stat. at 334 (noting "annual limits beginning July 1, 2026"). The WFTCA required the Department to apply a regulatory definition that it had never used in this way before to implement the new borrowing limits. The Department thus promulgated the Rule to provide

guidance and support to borrowers and institutions to facilitate implementation of the WFTCA's statutory changes.

The HEA requires the Department to undergo negotiated rulemaking, which takes significant time. *See* 20 U.S.C. § 1098a. But Congress left the Department with only 120 days between the WFTCA's enactment on July 4, 2025, and the Master Calendar's final-rule deadline of November 1, 2025. Undergoing the entire negotiated rulemaking process—which covered the entire the Rule, not just the provisions at issue here—within those 120 days would have been impossible. Rule at 23770 (noting the fastest possible timeframe the negotiated rulemaking process could have occurred was 149 days). Congress nevertheless selected July 1, 2026, as the operative date.

The WFTCA implicitly displaces the Master Calendar provision to the extent necessary to implement its July 1, 2026, deadline. The WFTCA required implementation of certain amendments to the HEA by July 1, 2026, but given the time required to complete the negotiated rulemaking process, the Master Calendar provision would have prevented the Department from implementing those provisions until July 1, 2027. The WFTCA, a later-enacted statute containing specific effective dates, must control. *Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("[The earlier statute] cannot justify a disregard of the will of Congress as manifested either expressly or by *necessary implication* in a subsequent enactment." (citation omitted)); Rule at 23770.

The WFTCA's interim exception further demonstrates that Congress understood and expressly accounted for the transitional consequences of implementing the new loan regime by July 1, 2026. To reduce any surprise to students currently enrolled under the old borrowing limits, Congress enacted an interim exception. *See* 20 U.S.C. § 1087e(a)(8). Under the interim exception, qualifying borrowers can continue borrowing under the prior loan limits during the expected time to complete their program. *Id.* The WFTCA's interim exception shows that Congress anticipated a transition period and deliberately structured the legislation to accommodate implementation beginning July 1, 2026. Reading the Master Calendar provision to preclude the administrative

action necessary to implement the WFTCA's July 1, 2026, provisions would frustrate the transition Congress expressly prescribed.

Plaintiffs point to two "lawful paths" the Department could have traveled to comply with the Master Calendar requirement. AANP MSJ at 43–45. But Plaintiffs' proposed alternatives do not resolve the conflict between the Master Calendar provision and WFTCA's implementation dates.

First, Plaintiffs' reliance on the late-publication exception in 20 U.S.C. § 1089(c)(2) overlooks the distinction between permitting institutions to implement regulations early and ensuring that the statutory changes Congress enacted could be implemented on the dates Congress prescribed. Section 1089(c)(2) permits the Secretary to allow institutions to implement late-published regulations early, but it does not require institutions to do so. Thus, even if the Department had designated the Rule for early implementation, institutions could have elected not to implement them beginning July 1, 2026. This would have left institutions without a uniform regulatory framework for administering the new statutory requirements even though Congress had made those requirements effective July 1, 2026, and eliminated the prior statutory framework. The late-publication exception was accordingly not an adequate alternative to give effect to WFTCA's statutory effective dates.

Nor does Plaintiffs' suggestion that the Department could have issued an interim final rule establish that the Department could have complied with both the Master Calendar requirement and the WFTCA's implementation deadlines. Plaintiffs' argument assumes that the Department could have bypassed the APA's notice and comment requirements and the HEA's negotiated-rulemaking requirements to promulgate a final rule by November 1, 2025. Plaintiffs posit that the Department could have invoked the good-cause exception, but they do not concede that these circumstances warrant invocation of the exception. The good cause exceptions under both the HEA and the APA require the Secretary to determine that negotiated rulemaking would be "impracticable, unnecessary, or contrary to the public interest." 20 U.S.C. § 1098a(b)(2); 5 U.S.C. § 553(b)(4)(B); *see also Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018) (finding the good cause exception

of the HEA mirrors and "expressly incorporates the APA standard"). Plaintiffs cannot establish the availability of this alternative simply by pointing out that it exists. Rather, they must explain why the statutory standards could have been satisfied here. Plaintiffs have not done so.

Plaintiffs also have not established (or conceded) that the Department could successfully invoke good cause to waive negotiated rulemaking. As the D.C. Circuit has said, the good cause exception is "meticulous and demanding." *New Jersey Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). It "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citation omitted). "The exception excuses notice and comment in emergency situations, or where delay could result in serious harm." *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). As the Department explained, negotiated rulemaking was not "impracticable" here. Although the Master Calendar's November 1 deadline could not be reconciled with the WFTCA, it was still "possible to undergo negotiated rulemaking and publish a final rule at least 30 days prior to the effective date of the[] [WFTCA] provisions [that go into effect] on July 1, 2026." Rule at 23770. Plaintiffs' proposed alternative would effectively require the Department to invoke an exception to negotiated rulemaking not because the rulemaking process was impracticable, but simply to accommodate the Master Calendar's November 1 deadline. Judge Moss has held that the requirements of the Master Calendar provision, standing alone, are not sufficient good cause to waive negotiated rulemaking. *See Bauer*, 325 F. Supp. 3d at 85, 88–89, 96 (holding that the Department "improperly invoked the good cause exception" for an IFR based on the Master Calendar provision). Plaintiffs' suggestions fail to identify a lawful alternative that would have permitted the Department to meet the November 1 Master Calendar deadline, while also satisfying the independent negotiated rulemaking requirements and implementing the changes of the WFTCA by July 1, 2026.

**B. The Electronic Announcement Is Not Subject to the Master Calendar.**

As this Court recognized, "[t]he Master Calendar requirement applies only to 'regulatory *changes*' affecting student financial assistance that are '*initiated* by the Secretary.'" Mem. Op. at 46 n.10 (quoting 20 U.S.C. § 1089(c)(1)). The EA is neither, assuming it is reviewable at all.

The EA is not a "regulatory change" because, as discussed *supra*, it does not establish or change requirements governing Title IV eligibility. Rather, it applies the preexisting three-part definition in 34 C.F.R. § 668.2 instead of the portions of the Rule the Court stayed. Nor was the EA "initiated by the Secretary." The Department did not independently initiate a new regulatory policy in the ordinary course. It instead responded to a judicial order staying specified provisions of an existing regulation by applying the existing statutory framework. *See* ECF No. 47-1 at 1 ("These interim administrative designations are provided solely to facilitate implementation of the Court's order and may change as litigation in the case proceeds."). The Court's stay contemplated as much when it left the application of the statutory three-part test for the Department "to consider in the first instance." Mem. Op. at 48. And Congress could not have intended the Master Calendar provision to independently prohibit the Department's response to that instruction. Plaintiffs' theory would constructively prohibit the Department from complying with a court order.

In short, "since the new challenged definition is stayed, what remains is the *statutory* definition, which is neither a regulatory 'change' nor one 'initiated by the Secretary' subject to the Master Calendar requirements." *See id.* at 46 n.10 (citation modified). The effective date of the EA is not contrary to the Master Calendar provision.

## V. Any Relief Should Be Appropriately Limited.

### A. Plaintiffs Are Not Entitled to a Permanent Injunction.

No relief is warranted here for all the reasons above. But if the Court disagrees, it should not enter AANP Plaintiffs' requested injunction, which would "require[] the Department to treat the degrees that Plaintiffs' members offer and pursue as professional degrees." AANP MSJ at 47.

Plaintiffs have not met the factors for permanent injunctive relief. They must show actual success on the merits and then must show (1) irreparable injury; (2) that legal (as opposed to equitable) remedies are inadequate to compensate that injury; (3) that the balance of hardships between the parties warrants a permanent injunction; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs have not shown success on the merits for the reasons above. They also have not shown

irreparable harm. All Plaintiffs' asserted injuries are entirely speculative because they depend on the actions of third parties. *See surpa* § I. The final two factors also do not favor an injunction. The Rule is consistent with the motivation behind the relevant sections of WFTCA, which is "to lower the cost of post-secondary education for taxpayers, students, and families," costs that rose by "164 percent, nearly three times faster than the rate of inflation," in the two decades before 2020. H.R. Rep. No. 119-106, at 203, 207 (Book 1). Easing this burden on families and students is in the public interest, and setting loan limits is one step to reduce borrowers' overall expenditures and "provide an incentive to institutions to limit tuition increases." NPRM at 4299. On that point, Plaintiffs' proposed injunction would force the Department to make higher payments for degrees that have not yet been conclusively determined to meet the statutory definition of professional degree. That injunction would infringe on Congress's "broad discretion" to determine how and under what conditions federal taxpayer dollars are spent. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such an intrusion into the workings of a coordinate branch of the Government inflicts irreparable harm on the Government.

Even if Plaintiffs could meet the required showing for permanent injunctive relief, the requested injunction is improper in this case. The D.C. Circuit has recognized vacatur as an appropriate final remedy in APA cases. *See, e.g.*, *New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024). But "[t]he Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have a meaningful practical effect independent of its vacatur.'" *Harris Cnty. v. U.S. Env't Prot. Agency*, – F. Supp. 3d –, 2026 WL 2837849, at *9 (D.D.C. Sep. 22, 2026) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)) (citation modified). "Vacatur deprives the [challenged action] of legal effect," at least as to Plaintiffs. *Id.* Assuming vacatur is an available remedy under the APA, vacatur forecloses any need for an injunction in this case, particularly since any vacatur of the professional degree provisions of the Rule "does not change the validity or force of the statutory definition" enacted by Congress. Mem. Op. at 47. Agencies are "entitled to construe [their] own regulations in the first instance," *Noble Energy, Inc. v. Salazar*, 671 F.3d

1241, 1246 (D.C. Cir. 2012) (citation omitted), and the Court cannot "assume the mantle of the regulatory agency" to determine that degrees are professional under the statutory definition. Mem. Op. at 48; *see also Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 272 (D.D.C. 2014) ("When an agency commits a legal error, a court 'normally remand[s] . . . to the agency.'" (quoting *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001))). Whether a degree meets that definition is a question "best reserved for the agency to consider in the first instance." Mem. Op. at 48. The Department "has expert knowledge about the many graduate degree programs" and "institutional knowledge about the meaning and application of" § 668.2 that it should be permitted to apply, with guidance from this Court's decision. *Id.* Issuing the requested injunction would improperly short-circuit that process.

**B. The Court Should Not Issue Declaratory Relief.**

For many of the same reasons, AANP Plaintiffs should not receive the declaratory relief requested. *See* AANP MSJ at 51; Proposed Order Granting Pls.' Mot. for Summ. J. at 1–2, ECF No. 58-18 ("Proposed Order"). Plaintiffs seek declarations that the Rule's definition of "professional degree" and the "free-from-supervision" requirement are unlawful, and that the EA is unlawful to the extent it excludes certain degrees. *E.g.*, Proposed Order at 1. Such requests are duplicative of the vacatur sought and can be dismissed on that basis alone. *See 707 G St. Rest., LLC v. Jemal's Mickelson, LLC*, No. CV 20-685 (RMM), 2023 WL 2571753, at *7 (D.D.C. Mar. 20, 2023) ("Courts routinely deny requests for declaratory relief when such relief would be duplicative of other claims in the litigation or would otherwise not effectuate the purpose of the Declaratory Judgment Act."). AANP Plaintiffs' other requested declaratory judgment that certain degree programs are professional under 34 C.F.R. § 668.2, Proposed Order at 2, is also unwarranted because the Department must be permitted to review those degrees afresh based on this Court's decision on remand. *See supra* § V.A.

**C. The Court Should Not Enjoin The Department From Enforcing the Statute.**

As a form of alternative relief, AANP Plaintiffs ask the Court to enjoin the Department from applying the new statutory caps for graduate and professional degrees and instead to require

the Department to treat (seemingly all) "post-baccalaureate graduate degree programs as 'professional degrees' and apply the higher loan limits" until further "agency action implementing the distinction between graduate and professional degree programs takes effect." Proposed Order at 2. Such relief contradicts the statute's two-tier structure.

Plaintiffs have not challenged the validity of the WFTCA as a whole, which Congress required the Department to implement "beginning July 1, 2026." Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35. Nor is there any basis for the Court to find the statute unlawful or enjoin the Department from enforcing the two-tiered statutory caps. *See Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (noting the traditional presumption that "all Acts of Congress . . . 'should remain in effect pending a final decision on the merits by [the Supreme] Court'") (Rehnquist, C.J., in chambers) (citation omitted); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("[A] court cannot 'use its remedial powers to circumvent the intent of the legislature.'" (citation omitted)). Even assuming the Master Calendar provision applied here, a procedural violation is not, by itself, authority to erase the statutory distinction between graduate and professional degrees or to extend higher loan limits to a category Congress explicitly placed under a lower limit. As this Court recognized at the preliminary injunction stage, "such an order from the Court would impermissibly supersede the statutory text and require defendants to act contrary to congressional mandate to implement a two-tiered loan cap." Mem. Op. at 47–48 n.12.

If the Court does require the Department to treat all post-baccalaureate graduate degree programs as professional degrees until a new rule becomes effective, the Court should issue a stay pending appeal. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). For the reasons explained above, Plaintiffs are not likely to succeed on the merits and Defendants will be irreparably injured absent a stay. *See id.* The public interest strongly favors giving full effect to a provision enacted by the American people's democratically elected representatives, particularly here where Plaintiffs do not challenge the validity of the statute. *See id.* Those factors outweigh any injury Plaintiffs might suffer.

### D. Any Relief Should Be Limited to Plaintiffs with Standing.

Separately, any relief should be limited to the Plaintiffs and their members who have demonstrated standing. In *Trump v. CASA, Inc.*, the Supreme Court reaffirmed the longstanding principle that federal courts may award "complete relief to the plaintiffs before the court," but may not extend relief to nonparties merely because they may also be affected by the challenged action. 606 U.S. 831, 852–53 (2025). That principle reflects the traditional limits on judicial power to resolve disputes before the court rather than determine the rights of nonparties. *See id.* at 859, 861. This same principle limits the relief available under the APA, which does not independently authorize relief for nonparties not before the court. *See, e.g.*, *Texas*, 599 U.S. at 693–703 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross," and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (citation omitted)). Although *CASA* expressly reserved whether the APA authorizes universal vacatur, 606 U.S. at 847 n.10, its rejection of universal relief as a default remedy reinforces the need to assess the scope of each remedy by reference to the injuries of the parties before the Court, *see* 5 U.S.C. § 702(1) ("Nothing" in the APA "affects . . . the power or duty of the court to . . . deny relief on any . . . equitable ground."). Even though the D.C. Circuit recognizes vacatur as an appropriate remedy, at a minimum, any relief should be limited to Plaintiffs and their members with standing and the Court should tailor any relief to what is necessary to redress Plaintiffs' injuries. At the very least, Plaintiff NEA should receive no relief because there is no evidence of its standing—indeed, it disclaims seeking any relief at all. *See* AANP MSJ at 23 n.3.

## CONCLUSION

For the forgoing reasons, the Court should grant Defendants' motion to dismiss and dismiss this consolidated case in its entirety for lack of subject matter jurisdiction. In the alternative, the Court should enter summary judgment in favor of Defendants.

Dated: November 12, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Christian Dibblee*
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
KATHRYN L. ALKIRE (FL Bar No. 1050146)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*